UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

DIEGO N., address omitted per LCvR 5.1,

RENESME R., address omitted per LCvR 5.1,

MARIO C., address omitted per LCvR 5.1, and

BENITO S., address omitted per LCvR 5.1,

           Plaintiff(s)

v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
200 Independence Avenue, S.W.
Washington, DC 20201;

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services,
200 Independence Avenue, S.W.
Washington, DC 20201

OFFICE OF REFUGEE RESETTLEMENT,
330 C Street, S.W., Room 5123
Washington, DC 20201; and

ANGIE SALAZAR, in her official capacity as
Acting Director of the Office of Refugee
Resettlement,
330 C Street, S.W., Room 5123
Washington, DC 20201,

           Defendant(s)

Case No. 26-cv-577

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.     Across the United States a quieter, new form of family separation has taken hold. Children who were released from the custody of the Office of Refugee Resettlement ("ORR") to vetted and approved sponsors, often parents or close family members, are being re-detained and held for prolonged periods in federal immigration custody despite having loving family members available and eager to continue caring for them. These children were re-arrested by the Department of Homeland Security ("DHS") and re-referred to ORR within the Department of Health and Human Services ("HHS") after having lived with their families in the United States for months and sometimes years. Once they are re-referred to ORR custody, these children often languish for months. Despite the lack of any due process or evidence their sponsors can no longer care for the children, ORR requires all previously approved sponsors to begin the sponsor application process anew without any individualized justification.

2.     The Plaintiffs and the putative class they represent were living with their families in the United States when they were suddenly uprooted from their communities and put back into ORR custody. They were attending public school, playing sports, participating in Junior ROTC, and growing up with loved ones, but are now detained in institutional congregate care settings with significant restrictions on their personal liberty and little to no opportunity to advance their education. These children miss home, long for their mothers' cooking or a hug from their father, and seek nothing more than the opportunity to continue to grow up in their communities with the support and care of their already approved sponsors.

3.     More than twenty years ago, Congress acted decisively to protect the interests of children who enter the United States without a parent or legal guardian in the Homeland Security Act ("HSA"). 6 U.S.C. § 279(b)(1)(B). That statute, in relevant part, moved the care of

unaccompanied children away from an immigration enforcement agency to an agency charged with protecting the interests of children. *Id*. Since then, Congress has entrusted ORR with the placement, care, custody, and release of these vulnerable children. 6 U.S.C. § 279; 8 U.S.C. § 1232.

4.     Under the Trafficking Victims Protection Reauthorization Act ("TVPRA") of 2008, Congress further required ORR to promptly place unaccompanied children "in the least restrictive setting that is in the best interest of the child," usually with a "suitable family member." 8 U.S.C. § 1232(c)(2)(A).

5.     In 2024, ORR promulgated regulations "to codify policies, standards, and protections for the [Unaccompanied Children] Program, consistent with the HSA and TVPRA, and to implement the substantive requirements of the [*Flores* Settlement Agreement, which is described in greater detail below] as they pertain to ORR" in what is known as the Foundational Rule. Unaccompanied Children Foundational Rule, 89 Fed. Reg. 34384, 34385 (Apr. 30, 2024) (to be codified at 45 C.F.R. pt. 410) (the "Foundational Rule").

6.     With respect to the release of unaccompanied children to their sponsors, the agency sought to "reflect[] its strong belief that, generally, placement with a vetted and approved family member or other vetted and approved sponsor, as opposed to placement in an ORR care provider facility … is in the best interests of unaccompanied children." *Id.* at 34439. To effectuate its purpose, ORR created policies and procedures "regarding release, without unnecessary delay, of an unaccompanied child from ORR custody to a vetted and approved sponsor." *Id.* at 34439.

7.     Consistent with its prior practice and statutory obligations, the Foundational Rule mandates that "[s]ubject to an assessment of sponsor suitability, when ORR determines that the detention of the unaccompanied child is not required either to secure the child's timely appearance before DHS or the immigration court, to ensure the child's safety or that of others, ORR shall

release the child from its custody without unnecessary delay," with preference to a parent or legal guardian and then to an adult relative. 45 C.F.R. § 410.1201(a).

8.    Plaintiffs are children who were previously in ORR custody, determined to be eligible for release, and released to a suitable sponsor who was vetted and approved by ORR pursuant to the TVPRA. These children were later detained by DHS and re-referred to ORR. Despite having sponsors ORR has already approved, ORR has required these children and their previously approved sponsors to recommence the sponsorship application process as if there was no prior sponsor approval decision. There is no process through which these children or their sponsors can challenge ORR's blanket policy of requiring all previously approved sponsors to reapply for sponsorship.

9.    Plaintiffs bring this action on behalf of Diego N., Renesme R., Mario C., Benito S., and a class consisting of all noncitizen minors who are or will be in the custody of HHS and (1) who were previously in ORR custody, (2) who were approved for release by ORR to a sponsor, (3) who have been or will be re-detained by DHS and re-referred to ORR, and (4) whom ORR has not released to their previously approved sponsor pursuant to ORR's policy requiring the previously approved sponsor to submit a new sponsor application and obtain a new approval for release. Plaintiffs seek declaratory and injunctive relief to prevent Defendants from continuing to carry out an unlawful policy to keep children in prolonged ORR detention, separated from their families, without any individualized determination that the circumstances of the child's re-referral to ORR indicate the sponsor is no longer capable of providing for the child's physical and mental well-being such that the prior sponsor application approval decision must be reconsidered.

## PARTIES

10.    Plaintiff Diego N. is currently detained by ORR at a shelter in Texas. He was born in 2011 and is 14 years old. Diego is, and at all relevant times was, classified as an unaccompanied

3

child within the meaning of 6 U.S.C. § 279(g)(2). Pursuant to Federal Rule of Civil Procedure 17(c)(2), Diego appears through his Next Friend and father Alexis N., a resident of Texas. Alexis was previously approved by ORR as Diego's sponsor. ORR refuses to release Diego to his Next Friend and father on the grounds that Alexis has not completed a new sponsor application and has not received a new sponsor approval decision.

11.     Plaintiff Renesme R. is currently detained by ORR at a shelter in Texas. She was born in 2009 and is 16 years old. Renesme is, and at all relevant times was, classified as an unaccompanied child within the meaning of 6 U.S.C. § 279(g)(2). Pursuant to Federal Rule of Civil Procedure 17(c)(2), Renesme appears through her Next Friend and father Michael R., a resident of Tennessee. Michael was previously approved by ORR as Renesme's sponsor. ORR refuses to release Renesme to her Next Friend and father on the ground that Michael has not completed a new sponsor application and has not received a new sponsor approval decision.

12.     Plaintiff Mario C. is currently detained by ORR at a shelter in New York. He was born in 2008 and is 17 years old. Mario is, and at all relevant times was, classified as an unaccompanied child within the meaning of 6 U.S.C. § 279(g)(2). Pursuant to Federal Rule of Civil Procedure 17(c)(2), Mario appears through his Next Friend and mother Marisol C., a resident of Texas. Marisol was previously approved by ORR as Mario's sponsor. ORR refuses to release Mario to his Next Friend and mother on the ground that Marisol has not completed a new sponsor application and has not received a new sponsor approval decision.

13.     Plaintiff Benito S. is currently detained by ORR at a shelter in Texas. He was born in 2008 and is 17 years old. Benito is, and at all relevant times was, classified as an unaccompanied child within the meaning of 6 U.S.C. § 279(g)(2). Pursuant to Federal Rule of Civil Procedure 17(c)(2), Benito appears through his Next Friend and immigration case worker Belinda T., a resident of Texas. Benito's aunt was previously approved by ORR as Benito's sponsor. ORR

refuses to release Benito to his aunt on the ground that she has not completed a new sponsor application and has not received a new sponsor approval decision.

14.    Defendant HHS is a federal agency headquartered in Washington, D.C. and responsible for the care, custody, and prompt reunification of unaccompanied immigrant children with suitable sponsors.

15.    Defendant Robert F. Kennedy, Jr., is the Secretary of HHS, the department of which ORR is a part. Mr. Kennedy is sued in his official capacity.

16.    Defendant ORR is the component of HHS that is charged with primary responsibility for carrying out that agency's responsibilities for the care, custody and prompt reunification of unaccompanied immigrant children with suitable sponsors.

17.    Defendant Angie Salazar is the Acting Director of ORR. Ms. Salazar is sued in her official capacity.

## JURISDICTION

18.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1346, because this action arises under federal law and is against the United States. Defendants have waived sovereign immunity for purposes of this suit. 5 U.S.C. § 702.

19.    The claims for declaratory and injunctive relief are authorized by 5 U.S.C. §§ 702-706, 28 U.S.C. §§ 1651, 2201, 2202, Federal Rules of Civil Procedure 57 and 65, and the inherent and equitable powers of this Court.

## VENUE

20.    Venue is proper in this district under 28 U.S.C. § 1391(e) because at least one of the Defendants is headquartered in Washington, D.C. and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here.

## BACKGROUND

## The Law Requires the Prompt Release of Unaccompanied Children

21.    Prior to 2002, the Office of Juvenile Affairs in the Immigration and Naturalization Service ("INS") was responsible for the custody of unaccompanied children in the United States. The *Flores* Settlement Agreement, originally signed by the INS in 1997, established national minimum standards for the treatment and placement of minors in immigration custody. Stipulated Settlement Agreement, *Flores v. Reno*, No. CV 85-4544-RJK(Px) (C.D. Cal. Jan. 17, 1997) ("*Flores* Settlement").[1] Paragraphs fourteen through sixteen of the *Flores* Settlement require that children be released from federal immigration custody without unnecessary delay. These provisions also place restrictions on their re-detention.

22.    In 2002, Congress passed the Homeland Security Act ("HSA"), transferring functions of the former INS to other government entities. Pub. L. No. 107-296, 116 Stat. 2153 (2002). Specifically, the HSA transferred authority over the care and custody of unaccompanied immigrant children from the INS to ORR, housed within HHS. 6 U.S.C. § 279.

23.    Congress' decision to transfer responsibility for the care and custody of unaccompanied children from the INS to ORR reflected Congress' determination that caring for children who arrive to the United States without their parent or legal guardian and immigration enforcement were incompatible roles for a single agency.[2] Within HHS, ORR is responsible for children's

---

[1] The *Flores* case remains under the supervision of U.S. District Judge Dolly M. Gee in the Central District of California. The Settlement was partially terminated as to children in HHS custody following the publication of implementing regulations, the Foundational Rule. *See Flores v. Garland*, No. CV 85-4544-DMG (AGRx), 2024 WL 3467715, *9 (C.D. Cal. June 28, 2024).

[2] *See, e.g.*, 148 Cong. Rec. S11295 (Nov. 18, 2002) (statement of Sen. Feinstein); 148 Cong. Rec. S8189 (Sep. 4, 2002) (reprinting letter from Sens. Kennedy and Brownback). *See also* 148 Cong. Rec. S9670 (Oct. 1, 2002) ("As we transfer and reshape the INS in this legislation, it is imperative to relieve the INS of its responsibility of the care and custody of unaccompanied children. Doing so would accomplish two ends: one, it would permit the INS to focus its energies, efforts, and attention on its core missions; and two, it would transfer the care and custody of these

safety and welfare and is explicitly not a law enforcement agency. *See* Foundational Rule, 89 Fed. Reg., at 34399, 34423 ("it is not a law enforcement agency, unlike the former INS …"), 34591.

24.    With strong bipartisan support, Congress then expanded protections for unaccompanied children in the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), reaffirming Congress' intent for government agencies to treat unaccompanied children differently than adults, both in detention and in immigration proceedings. 8 U.S.C. § 1232 *et seq*.

25.    When an unaccompanied child is detained by federal immigration authorities, the TVPRA requires the child be transferred to the custody of HHS within 72 hours. *Id*. § 1232(b)(3). The TVPRA also tasks ORR with ensuring that unaccompanied children are "promptly placed in the least restrictive setting that is in the best interest of the child." *Id*. § 1232(c)(2)(A). This is usually with a sponsor. *See, e.g., Saravia v. Sessions*, 905 F.3d 1137, 1142–43 (9th Cir. 2018). Congress enacted the TVPRA specifically to facilitate the safe, speedy release and minimally restrictive placement of unaccompanied children. *See, e.g.*, 154 Cong. Rec. S10886 (Dec. 10, 2008) (statement of Sen. Leahy, sponsoring senator).

26.    In 2024, ORR promulgated regulations (the "Foundational Rule") codifying the "policies, standards, and protections for [unaccompanied children], consistent with the HSA and TVPRA, and to implement the substantive requirements of the [*Flores* Settlement Agreement] as they pertain to ORR." 89 Fed. Reg., at 34385 (promulgating 45 C.F.R. §§ 410.1000 et seq.).

27.    As required by the TVPRA and the Foundational Rule, children in ORR custody are entitled to release without unnecessary delay, subject to an assessment of their proposed sponsor's suitability. 45 C.F.R. § 410.1201(a). Sponsors are suitable if they can provide for the child's physical and mental well-being. 45 C.F.R. § 410.1205(a).

---

children to the Office of Refugee Resettlement, ORR, an office that is better suited and much more experienced in handling the complexities of the children's situations.")

28.    The Foundational Rule includes "policies and procedures regarding release, without unnecessary delay, of an unaccompanied child from ORR custody to a vetted and approved sponsor." 89 Fed. Reg., at 34439. The Foundational Rule is consistent with the agency's "strong belief that, generally, placement with a vetted and approved family member or other vetted and approved sponsor, as opposed to placement in an ORR care provider facility … is in the best interests of unaccompanied children." *Id.*

29.    ORR releases children to sponsors in the following order of preference:

a. Category 1 (CAT 1): Parent or legal guardian, including qualifying step-parents with legal or joint custody.
b. Category 2 (CAT 2): Close relative, defined as "a brother, sister, grandparent, aunt, uncle, first cousin, or other immediate biological relative, or immediate relative through legal marriage or adoption, and half-sibling." 45 C.F.R. § 410.1001. CAT 2A sponsors are close relatives who were previously the child's primary caregiver, and CAT 2B sponsors are close relatives who were not previously the child's primary caregiver.
c. Category 3 (CAT 3): Other sponsor, such as distant relatives and unrelated adult individuals.

ORR Unaccompanied Alien Children Bureau Policy Guide § 2.2.1 ("ORR Policy Guide").

30.    The process of releasing a child to a sponsor involves a comprehensive evaluation by ORR of both the child and the sponsor. It includes investigations and background checks and, by regulation, may include fingerprinting of some potential sponsors and adult residents in some sponsors' households. 45 C.F.R. § 410.1205(c).[3] The sponsor application process also includes an assessment of the child's needs, strengths, risk factors, and relationship to the sponsor. ORR may conduct a home study, as required by law or as necessary to ensure the welfare of the child. 8 U.S.C. § 1232(c)(3)(B); ORR Policy Guide § 2.4.

---

[3] Beginning in February 2025, ORR changed the application requirements for sponsorship. ORR's new proof of identification and proof of income requirements are subject to a separate, and ongoing, legal challenge. *See Angelica S. v. HHS*, No. 1:25-cv-01405-UNA (D.D.C.).

31.    All potential sponsors are also required to develop a sponsor care plan, which "identifies an adult caregiver who will assume care of an unaccompanied alien child if the sponsor becomes unable to care for the child." ORR Policy Guide § 2.7.6.4. This alternate caregiver must also provide ORR with their identifying information and their relationship with the child and undergo background checks. *Id.*; *see also* ORR Policy Guide § 2.2.4 (Required Documents).

32.    "[O]nce an unaccompanied child is released by ORR to a sponsor, that unaccompanied child is no longer in ORR's custody." Unaccompanied Children Program Foundational Rule, 88 Fed. Reg. 68902, 68927 (Oct. 4, 2023) (to be codified at 45 C.F.R. pt. 410); 89 Fed. Reg. at 34439. The child is then free to live in their local community, attending school, church, participating in extra-curricular activities, making friends, and enjoying time with their family and friends.

**Re-arrest and Prolonged Detention of Children Without Due Process**

33.    Upon information and belief, prior to 2025, it was uncommon for a child to re-enter ORR custody after being released to a vetted and approved sponsor. However, with the increase in internal apprehensions of noncitizens in the United States, upon information and belief, hundreds of children have been re-arrested by DHS and re-referred to ORR custody.[5] These re-arrests occur under a variety of circumstances including traffic stops, Immigration and Customs Enforcement ("ICE") raids, arrests by local law enforcement, and at immigration courts.[6]

---

[4] Prior to January 2023, the sponsor care plan was required for sponsors who were not U.S. citizens or lawful permanent residents. Since January 2023, the sponsor care plan has been required for all sponsors.

[5] Rosenberg, Mica et al., *ICE Sent 600 Immigrant Kids to Detention in Federal Shelters this Year. It's a New Record.* ProPublica (Nov. 24, 2025) https://perma.cc/S7E7-UB53 (Since the beginning of 2025, "some 600 immigrant children have been placed in government shelters by ICE. … [I]n a majority of the cases we examined, kids ended up in shelters in ways government officials say they never would have in the past: after routine immigration court hearings or appointments, or because they were at a home or a business when immigration authorities showed up to arrest someone else.").

[6] *Id.*

34.    Upon information and belief, when these children arrive in ORR custody, ORR's policy in such cases is to ignore its prior decision approving these children's sponsors and to require these children's sponsors to reapply for sponsorship as if there had been no previous sponsorship application, even though the agency has already previously vetted and approved the sponsor.

35.    Upon information and belief, ORR applies this blanket policy to all children and does not make any individualized determination that the child was re-referred to ORR because of any concern related to the child's safety or wellbeing. ORR provides no explanation or justification for why its prior decisions approving these children's sponsors are no longer valid or respected.

36.    ORR's blanket reapplication policy unnecessarily prolongs children's detention and separation from their families. Changes that ORR made to its sponsor application process beginning in February 2025 have placed a heightened burden on all sponsors, leading to much longer lengths of custody for most children.

37.    Since ORR implemented new sponsorship application requirements, described below, and instituted its reapplication policy, the average length of custody for children has increased to well beyond 100 days. The average length of care for children discharged from ORR custody has climbed precipitously from 37 days in January 2025 to 180 days in January 2026. *Compare* Fact Sheets and Data, Office of Refugee Resettlement, *Average Monthly Data* (current as of Apr. 7, 2025), https://perma.cc/SPV6-3KBD *with* Fact Sheets and Data, Office of Refugee Resettlement, *Average Monthly Data* (current as of Feb. 9, 2026), https://perma.cc/JNK2-KBTY.

38.    In February 2025, ORR began increasing the application requirements for sponsorship, leading to dramatically longer average lengths of custody. A non-exhaustive list includes: (1) expanded fingerprinting requirements; (2) refusal to accept previously acceptable forms of sponsor identification such as foreign passports; (3) changes to which documents are required to prove a sponsor's financial stability and address; (4) expanded DNA testing requirements (5) expanded

home study requirements; and (6) in-person appointments to verify identification, often with ICE present.[7] In an Interim Final Rule published on March 25, 2025, ORR also eliminated protections against sharing sponsor immigration status information with DHS. *See* Unaccompanied Program Foundational Rule; Update to Accord with Statutory Requirements, 90 Fed. Reg. 13554 (Mar. 25, 2025) (to be codified at 45 C.F.R. pt. 410) ("Interim Final Rule").

39.    The majority of unaccompanied children's potential sponsors lack the requisite immigration status necessary to meet many of ORR's new requirements,[8] dramatically decreasing children's options for release from custody and indefinitely extending their time in detention.

40.    In February 2025, ORR began requiring all potential sponsors, their adult household members, and the child's alternate caregiver to submit to fingerprint-based background checks.

41.    Then, on March 7, 2025, ORR revised section 2.2.4 of the Policy Guide to change the list of acceptable documents to prove sponsor identity. The revised Policy Guide requires that all sponsors, adult household members, and adult caregivers identified in a sponsor care plan provide specific forms of identification generally available only to people with legal status in the United States. *See* ORR Policy Guide § 2.2.4.

42.    The only document on the current list of acceptable forms of identification that appears open to some people without legal status is a driver's license or photo ID card issued by a U.S. state or local government. *Id*. Obtaining a state or local ID is only an option in a minority of states[9]

---

[7] *See* ORR Field Guidance # 24 – ORR Division of Sponsor Administration Role Guidance at 16-19 (revised Jan. 26, 2026), https://perma.cc/BTT2-N43M; ORR Policy Guide § 2.4.2; *see also* Valerie Gonzalez, *ICE is Showing Up to Interview Parents Hoping to Reunite with Their Children Who Entered U.S. Alone*, Associated Press (Sep. 2, 2025), https://apnews.com/article/immigration-children-parents-reunification-trump-81b20a1e3651337cec14b508f59cc52f.

[8] *See* William A. Kandel, Cong. Rsch. Serv., R43599, *Unaccompanied Alien Children: An Overview* 24 (2024), https://perma.cc/DRE3-M7TH (in 2018, ICE "estimated that 80% of active UAC sponsors and accompanying family members were residing in the country illegally").

[9] As of March 2023, the National Conference of State Legislatures identified 19 states and the District of Columbia with state legislation allowing individuals to get State drivers' licenses (not

and usually requires the sponsor to be able to pass a driver's test. For potential sponsors in states where driver's licenses are not available without proof of legal status, potential sponsors who are unable to drive, or potential sponsors whose adult household members cannot meet these requirements, the identification requirements make it impossible for them to complete sponsor applications.

43.    The revised ORR Policy Guide Section 2.2.4 also requires "original, unexpired" identification documents, where the previous policy allowed expired versions. Some adults required to provide identification for family reunification applications do not have access to their original documents because those original documents are held by ICE and returned only at ICE's discretion.[10] Others may be unable to get new unexpired government-issued IDs from their countries of origin because they are fleeing persecution from the governments that would provide them. Even when adults are able to apply for or renew government-issued photo IDs, that process can take weeks or months, significantly prolonging children's time in custody.

44.    Then on March 17, 2025, ORR began requiring DNA testing of all children and potential sponsors who claim to be biologically related to the child they are applying to sponsor.

---

Real ID compliant) without proof of lawful presence. Br., Nat'l Conf. of State. Legislatures, *States Offering Driver's Licenses to Immigrants* (updated Mar. 13, 2023), https://perma.cc/6TZU-JP7U. United We Dream states that 16 states and the District of Columbia allow undocumented people to obtain driver's licenses. United We Dream, *Can I Get A Driver's License If I Am Undocumented?*, https://perma.cc/G7VX-4GFP.

[10] *See* U.S. Immigr. & Customs Enf't, Enf't & Removal Ops., *Confiscation and Return of Original Documents, Policy No. 11311* (Jan. 13, 2023), https://perma.cc/V4AB-R6HN ("ERO Officers will generally confiscate any foreign and domestic government-issued documents either in the noncitizen's possession or submitted to ERO by the noncitizen. ERO will generally retain all confiscated documents of noncitizens . . .."). *See also* Conor Wight, CNY Central, *Syracuse immigration lawyer says ICE has taken clients' passports under President Trump*, CNY Central (Jan. 24, 2025), https://perma.cc/RS8J-UQGV.

45.    That change was quickly followed by ORR's decision to eliminate information privacy protections for undocumented sponsors in its March 2025 Interim Final Rule, permitting ORR to share immigration status information and collaborate with immigration enforcement agencies for enforcement against sponsors.

46.    In July 2025, ORR began requiring potential sponsors to attend in-person appointments with ORR personnel to verify identification documents. These appointments can take place at ICE offices, and some sponsors have been detained by immigration enforcement at these appointments.

47.    These changes, in combination with the fact that previously approved sponsors must reapply, has led to ORR preferencing more distant relatives or unrelated sponsors who can meet the new requirements over previously approved parents, guardians, and other close relative sponsors who lack such documentation, in violation of 45 C.F.R. § 410.1201(a).

### ORR's Reapplication Policy

48.    Plaintiffs and the putative class are children who were released by ORR to the custody of their vetted and approved sponsors pursuant to the requirements of the TVPRA, the Foundational Rule, and ORR's own internal policies.

49.    As required by the TVPRA, ORR has already concluded that Plaintiffs' sponsors are capable of providing for Plaintiffs' physical and mental wellbeing and ORR has previously verified their sponsors' identities, relationship to Plaintiffs, and that the sponsors could safely care for Plaintiffs. *See* 8 U.S.C. § 1232(c)(3)(A). ORR has further concluded pursuant to the TVPRA that placement with these sponsors was the least restrictive setting in Plaintiffs' best interests. 8 U.S.C. § 1232(c)(2)(A).

50.    Plaintiffs and putative class members have re-entered ORR custody for many different reasons that do not necessarily implicate sponsor suitability, including children who were merely

13

passengers in a car stopped by immigration officials and children stopped based on alleged conduct that, even if proven, would not call into question their custodian's fitness.

51.     Regardless of the circumstances of a child's re-referral to ORR, the agency has a blanket policy to disregard its prior sponsor approval decision and require children's sponsors to begin the sponsor application process anew as if there were no prior sponsor approval ("reapplication policy"). ORR's reapplication policy disregards–without explanation–its prior conclusion that placing Plaintiffs into their sponsors' custody was in the best interests of Plaintiffs. Upon information and belief, ORR's policy would apply even if a child were re-referred to ORR custody for a third time after two prior sponsorship approvals.

52.     Noncitizen children have long been recognized as "persons" guaranteed due process by the Fifth and Fourteenth Amendments to the U.S. Constitution. Plaintiffs and putative class members have strong private interests in continuing to live freely in the community with their parents or other relatives, rather than being held in prolonged detention. ORR custody involves significantly more restrictions on personal liberty than placement in the community. Most children are placed in congregate care facilities designed for short-term stays, with limited to no interaction with the broader community. Children are generally required to follow the same schedule every day, cannot participate in outside extracurricular activities, and cannot leave the facility except for occasional outings accompanied by staff. With the exception of children placed in long-term foster care, children in ORR custody do not attend public school and instead attend class within the facility. These education programs are designed for short-term stays and generally do not provide academic credit.

53.     Children also have a family integrity "right to protection from interference in the relationship [that] derives from the psychic importance of being raised by a loving, responsive, reliable adult." *Franz v. United States*, 707 F.2d 582, 599 (D.C. Cir. 1983); *see also Santosky v.*

*Kramer*, 455 U.S. 745, 760 (1982) ("[U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship."); *Stanley v. Illinois*, 405 U.S. 645, 657-58 (1972) (removing children from father without hearing "needlessly risks running roughshod over the important interests of both parent and child"); *Moore v. City of E. Cleveland*, 431 U.S. 494, 504-06 (1977) ("The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition" and "the choice of relatives in this degree of kinship to live together may not lightly be denied by the State").

54.    Despite the significant interests at stake, ORR currently has no procedures in place to determine whether a child's re-detention is necessary and instead places the burden on the sponsor and child to try and convince ORR to approve release. Although ORR places this heavy burden on the child and sponsor, ORR does not provide children or their previously approved sponsors any notice of the reasons the sponsor is required to reapply or any process to challenge that determination. The only option to secure a child's release back into the custody of their previously approved sponsor is to repeat a lengthy application process while the child remains detained.

55.    In addition to violating children's due process rights, ORR's reapplication policy is contrary to children's legal rights as codified in the TVPRA and the Foundational Rule. ORR previously determined that each Plaintiff should be released to his or her sponsor to fulfill the agency's duty to place the child in the least restrictive setting that is in the child's best interests. It cannot arbitrarily disregard that determination. If ORR can ignore its prior decisions to reunify children with their sponsors and children can be serially re-detained solely based on the fact that they do not have lawful status in the United States, the protections afforded unaccompanied children under the TVPRA would be rendered meaningless. *See Saravia*, 905 F.3d at 1143.

Refusing to release a child to a previously approved sponsor without reason also constitutes unnecessary delay in release in violation of the Foundational Rule, 45 C.F.R. § 410.1201(a).

56.    The reapplication policy is plainly arbitrary and capricious because ORR has already determined that the sponsors are suitable and did so pursuant to the requirements of the TVPRA. Defendants provide no justification for their sudden change in position on sponsor approval, nor do they make an individualized determination of each sponsor's continued suitability. Neither does ORR provide any process to challenge ORR's decision to require the sponsor to begin the process anew.

**Plaintiffs Are Harmed by ORR's Unlawful Policy**

57.    The reapplication policy has already caused profound harm to children in ORR custody by prolonging their detention, denying them placement in the least restrictive setting, and impairing their ability to pursue their education and live with their family. These children have been forced to spend extremely long periods of time away from their family, friends, school and community without justification. Importantly, ORR's education programs generally do not provide transferable academic credit and children's progress in school has therefore been severely interrupted.

58.    While lengthy detention is harmful for all children, it is particularly difficult for children who have been living in the community for long periods of time. Sudden and unexpected inability to attend school, see their friends, and regularly see and speak to their family compounds the trauma of detention.

59.    HHS is well aware that extended lengths of stay in ORR custody harm children's mental health and well-being. *See, e.g.*, Dep't of Health and Hum. Servs., Off. of the Inspector Gen., *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody*, 13 (Sep. 2019), https://perma.cc/YLT7-R3HP (following expanded fingerprinting and

information sharing with immigration enforcement, "[f]acilities reported that it became more difficult to identify sponsors willing to accept children after the new fingerprinting requirements were implemented, which delayed placing children with sponsors, adding further stress and uncertainty."); *see also id*. at 12 ("According to facility staff, longer stays resulted in higher levels of defiance, hopelessness, and frustration among children, along with more instances of self-harm and suicidal ideation.").

### *Diego N.*

60.    Diego N. is a 14-year-old boy who first arrived in the United States in 2024. He was referred to ORR custody and his father, Alexis, immediately applied to be his sponsor. After ORR vetted and approved Alexis, Diego was released to live with him. Until his reapprehension, Diego was happily living with his father, stepmother, stepbrother and little brother, in Texas. He loves being a big brother and has a good relationship with his parents and his siblings.

61.    Diego and his family live in Texas near the U.S.-Mexico border and in November 2025, he was a passenger in a car that was pulled over by Border Patrol. Diego was asked for his identification, but as a 14-year-old boy he could not provide any. He explained that he had already been in immigration custody and released to his dad, but Border Patrol detained him anyway.

62.    Diego spent approximately one day in Border Patrol custody before being permitted to call his father. He was then re-referred to ORR. His father was worried about him and immediately sought to have him released back into his care. ORR provided no explanation as to why Diego's father had to reapply to be his sponsor.

63.    The reapplication process has been much more difficult than the original sponsor application process. Alexis submitted his work permit, his license, his Social Security number, and information about his work and his income. Both Alexis and Diego's stepmother submitted to fingerprint-based background checks. ORR also did a home study to evaluate where Diego was

living and the results were positive. In January 2026, Diego's case manager told him the application was ready to be approved. Diego and his family were very happy.

64.    Unfortunately, after the application was submitted to ORR for approval it was inexplicably returned, and Alexis was told his application was still not complete. ORR asked that he submit to DNA testing and attend an in-person appointment to present the documents he has already submitted to ORR. Despite Alexis asking for appointments to complete these new requirements, there has been no progress on Diego's release.

65.    Diego is desperate to return to his life with his family. It has been difficult for him to adjust to life in custody where he has little privacy and staff accompany him everywhere, even when he needs to go to the bathroom. He misses being able to go outside for fresh air when he wants to and being able to talk to his friends. Diego also does not feel that he is learning anything while he is in ORR custody because the lessons are too easy and basic. He is being taught how to name fruits in English when he should be a freshman at his public high school.

66.    Diego misses being at home and having a normal life where he can enjoy his stepmother's cooking, talk to his siblings, and play soccer with his friends after school.

**_Renesme R._**

67.    Renesme R. is a 16-year-old girl who first arrived in the United States in 2023. She was promptly released to her father after he was vetted and approved by ORR. She loved living with her dad, aunt, and cousins in Tennessee and now misses them dearly.

68.    In November 2025, she was again detained by immigration authorities while a friend drove her home from a laundromat. Renesme and her friend were followed home by what she believes was a police car, but she does not know why. She was arrested by immigration authorities and her hands and legs were restrained. The entire experience was terrifying, and she was crying as they put her in a car and took her into custody. She was never told why she was detained.

69.    Renesme feels imprisoned at the shelter where she's been held for three months in Texas, far from her home in Tennessee. The monotony of her life at the shelter, where she does the same thing every day, is so different from the freedom she had as a teenager who went to school, spent time with friends, and could leave her house and live a normal life. She is particularly concerned that she's not receiving academic credit for school and that she will need to repeat 11th grade and will not be able to finish her three-year Junior ROTC certificate, which she has been working toward in the hopes of serving in the U.S. military.

70.    Her dad was hoping to sponsor her again but, because Renesme knows that other sponsors of children in ORR custody have been detained by immigration authorities when they attend appointments that are part of the ORR sponsorship process, she is too scared to ask her dad to reapply. Her aunt is applying to sponsor her instead and has all the documents ORR requires, but the process is still taking months. Renesme is not able to see her dad because he is so far away from the shelter, so she can only have phone calls with him. She misses him and wants to be at home with him and her family.

*Mario C.*

71.    Mario C. is a 17-year-old boy who first arrived in the United States in 2023. After ORR vetted and approved his mother, Marisol, he was sent to live with her, and he was so happy to be released to her. He had a good life living with his mother and her partner. Mario enjoyed going to the park and the beach on the weekends. He liked school and playing video games with his friends from his neighborhood. He loves his baby brother and misses him very much.

72.    In November 2025, Mario was pulled over by police while he was a passenger in a car his friends were driving. He spent three nights in the local jail until his mother was able to pay his bond, but ICE arrived and detained him before he could be released to her. When ICE detained him, he was terrified and crying and feared that he was being deported. Instead of releasing him to

the care of his mother, ICE detained him for two days and then sent him to an ORR heightened supervision facility in New York. Mario was transferred to a less restrictive shelter after approximately a month, but he remains stuck in ORR custody.

73.    Mario knows that his mom wants to take him home, but her reapplication process has stalled because she is unable to obtain a U.S.-issued form of identification newly required by ORR. Mario is also worried about having his mother reapply for sponsorship because he knows other kids whose parents were arrested during the sponsorship process. Mario is considering going to foster care instead of being released back into the custody of his own mother who loves him and wants to continue to care for him.

74.    Mario is struggling in ORR custody where he feels he is always under surveillance. He misses having his own phone so that he can call his mom any time he wants. He misses the freedom to choose what he does during his free time, and he is worried about not getting any credit for his schooling.

### *Benito S.*

75.    Benito S. is a 17-year-old boy who first arrived in the United States in 2023. The first time he was in ORR custody he asked to be released to his aunt. His aunt applied to be his sponsor and was vetted and approved by ORR. He has been living with her and his cousins in Louisiana since that time. He felt comfortable at home and describes his cousins as like brothers to him. He misses cooking with his family and playing video games and basketball with his cousins.

76.    In December 2025, a few weeks before Christmas, Benito was arrested in Louisiana after he got into a small car accident. He was detained by the local police and sent to ICE before he was re-referred to an ORR shelter in Texas. He was never told why he was taken into custody or why he was sent to a shelter far from his family instead of being sent home to his aunt.

20

77.    Benito's aunt wants him to come home but is unable to obtain a U.S. issued identification newly required by ORR. Now, instead of going home to his loving family, he is pursuing foster care placement in the hopes of at least being able to leave ORR congregate care.

78.    Benito says that being in ORR custody again is awful. He is bored and it is difficult for him to focus on anything other than how much he misses his family. He is allowed to listen to some music, like country music, but he is not allowed to listen to the music he loves like Reggaeton. He is sad and lonely and wants to go home.

CLASS ACTION ALLEGATIONS

79.    Plaintiffs, as individuals and in their representative capacity, bring the claims set forth herein against Defendants pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2) to certify an injunctive relief class. A class action is proper because this action involves questions of law and fact common to the class, the class is so numerous that joinder of all members is impractical, Plaintiffs' claims are typical of the claims of the class, and Plaintiffs will fairly and adequately protect the interests of the class. Defendants have acted in ways that apply generally to the class by disregarding ORR's prior sponsor approval decisions and requiring children's previously approved sponsors to begin the sponsor application process anew regardless of the circumstances of the child's re-referral. Therefore, injunctive and declaratory relief are appropriate with respect to the class as a whole.

80.    Detained child Plaintiffs seek to represent the following class: all noncitizen minors who are or will be in the custody of HHS and who meet the following criteria: (1) were previously in ORR custody; (2) were approved for release by ORR to a sponsor; (3) who have been or will be re-detained by DHS and re-referred to ORR; and (4) whom ORR has not released to their previously approved sponsor pursuant to ORR's policy requiring the previously approved sponsor to submit a new sponsor application and obtain a new approval for release.

81.    The proposed class meets the numerosity requirements of Federal Rule of Civil Procedure 23(a)(1). The class is so numerous that joinder of all members is impracticable. The precise number of class members is unknown at this time, and grows by the day, but as of January 2026, upon information and belief, over 300 children have been separated from their sponsors and re-referred to ORR. Joinder is also impracticable because the proposed class consists of unaccompanied children held in ORR facilities across the country and new children are regularly re-referred to ORR custody.

82.    The proposed class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2) and shares common issues of fact and law. The members of the class are all children in the custody of Defendant ORR who have been subject to Defendants' reapplication policy. This uniform policy harms the children in ORR's custody and violates the agency's statutory obligations, the Due Process Clause of the U.S. Constitution, and the Administrative Procedure Act.

83.    The proposed class's claims meet the typicality requirements of Federal Rule of Civil Procedure 23(a)(3). The members of the class seek uniform injunctive and declaratory relief—namely an order that holds unlawful and sets aside Defendants' blanket reapplication policy, declares this policy unlawful, and requires ORR to provide class members and their previously approved sponsors procedural due process regarding the necessity of a new sponsor approval decision.

84.    The proposed class meets the adequacy requirements of the Federal Rule of Civil Procedure 23(a)(4). The representative Plaintiffs seek the same final relief as the other members of their class. Plaintiffs will fairly and adequately protect the interests of the proposed class members because they seek relief on behalf of the class as a whole and have no interest antagonistic to other class members.

85.    Plaintiffs are represented by competent counsel with extensive experience in complex class actions, children's and family's rights, and immigration law. In particular, the counsel from the National Center for Youth Law involved in this case have represented plaintiffs in several other class action lawsuits on behalf of detained immigrant youth including *Flores v. Bondi*, 2:85-cv-04544-DMG-AGR (C.D. Cal.); *Lucas R. v. Becerra*, 2:18-cv-05741-DMG-PLA (C.D. Cal.); *Duchitanga v. Lloyd*, 1:18-cv-10332-PAC-JW (S.D.N.Y.); *Angelica S. v. HHS*, 1:25-cv-01405 (D.D.C.); and *LGML v. Noem*, 1:25-cv-02942-TJK (D.D.C.). Counsel from Democracy Forward Foundation have been involved in many other class action lawsuits including *Angelica S. v. HHS*, 1:25-cv-01405 (D.D.C.), a class action on behalf of detained immigrant youth.

86.    The proposed class also satisfies Federal Rule of Civil Procedure 23(b)(2). Defendants have acted on grounds generally applicable to the proposed classes, thereby making final injunctive, declaratory, and APA relief appropriate.

### CLAIMS FOR RELIEF

### COUNT I
### Deprivation of Liberty without Procedural Due Process
### Fifth Amendment to the U.S. Constitution

87.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

88.    ORR's policy to detain unaccompanied children who have previously been released from their custody to a vetted and approved sponsor and require that sponsor to reapply for sponsorship without any evidence that the circumstances of the child's reapprehension render the sponsor unable to care for the child's physical and mental wellbeing, deprives the child of liberty without procedural due process.

89.    Children have significant private interests in family integrity and personal liberty as well as a statutory claim of entitlement to placement in the least restrictive setting with their previously approved sponsor. *See* 8 U.S.C. § 1232(c)(2)(A); *Santosky*, 455 U.S. at 758-59; *Moore*, 431 U.S.

at 504-06; *Stanley*, 405 U.S. at 657-58. The deprivation of these interests constitutes irreparable harm.

90.    ORR provides no timely, prompt, or meaningful notice or opportunity for the child or previously approved sponsor to be heard before a neutral arbiter regarding their sponsor's suitability before requiring the sponsor to restart the application process anew. Indeed, ORR provides no process at all. ORR improperly places the burden on the child and sponsor to prove suitability rather than ORR bearing the burden of showing why a sponsor is no longer suitable. Even if the previously approved sponsor is eventually able to re-prove their suitability, the delay in the re-approval causes children irreparable harm.

91.    This policy violates the Fifth Amendment to the U.S. Constitution, which protects all "persons" from deprivation of liberty without due process of law.

92.    Defendants' reapplication policy has already injured Plaintiffs and will continue to injure Plaintiffs until enjoined or vacated. Injunctive relief is necessary to prevent further harm and to mitigate the harm already caused by the reapplication policy.

### COUNT II
### Violation of the Administrative Procedure Act—5 U.S.C. §§ 706(2)(A), (C)
### *Contrary to Law and Beyond Statutory Authority*

93.    Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

94.    The APA requires a court to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §§ 706(2)(A), (C).

95.    The reapplication policy, and each application of that policy to each Plaintiff and putative class member to disregard their sponsor's approval, is a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights and obligations" and creates "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *see*

24

*also L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 612-13 (S.D.N.Y. 2018). Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); *id.* § 706(2)(D); *see also DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 17 (2020).

96.    By unnecessarily denying and delaying release, ORR's reapplication policy violates the TVPRA's command to promptly place children "in the least restrictive setting that is in the best interest of the child," which is usually with a "suitable family member." 8 U.S.C. § 1232(c)(2)(A); *see also Saravia*, 905 F.3d at 1143, *L.V.M. v. Lloyd*, 318 F. Supp. 3d at 612.

97.    The Foundational Rule also requires release without unnecessary delay, sets an order of preference for sponsors depending on their relationship to the child, and sets defined timelines for the adjudication of completed sponsorship applications. 42 C.F.R. §§ 410.1200, 410.1201(a), 410.1205(b)–(c).

98.    Federal agencies and their officials are required to follow their own "existing valid regulations." *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). This Circuit recognizes that "*Accardi* has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others." *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005). When the agency fails to comply with binding regulations, such actions are "not in accordance with law." *See Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959) ("Because the proceedings attendant upon petitioner's dismissal from government service on grounds of national security fell substantially short of the requirements of the applicable departmental regulations, we hold that such dismissal was illegal and of no effect."); *Fla. Inst. of Tech. v. FCC*, 952 F.2d 549, 553 (D.C. Cir. 1992) ("[I]t is a 'well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action." (quoting *Way of Life Television Network, Inc. v. FCC*, 593 F.2d 1356, 1359 (D.C. Cir. 1979)).

99.   The reapplication policy results in unnecessary delays in release and in ORR preferencing more distant relatives or unrelated sponsors with United States documentation over parents, guardians, and other close relative sponsors who lack such documentation in violation of 45 C.F.R. § 410.1201(a).

100.   The decision to continue to detain children for whom ORR has already determined that placement with a sponsor is in the best interest of the child and without any reliable evidence of material changed circumstances is contrary to the TVPRA's mandate and exceeds ORR's statutory authority.

101.   The reapplication policy has already injured Plaintiffs and will continue to do so until enjoined or vacated. Injunctive relief is necessary to prevent further harm and to mitigate the harm already caused by the new sponsorship requirements.

**COUNT III**
**Violation of the Administrative Procedure Act—5 U.S.C. § 706(2)(A)**
***Arbitrary and Capricious***

102.   Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

103.   The APA, 5 U.S.C. § 551 *et seq*., authorizes suits by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant strategy." *Id*. § 702. Section 706 of the APA provides that courts "shall … hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)(A).

104.   The reapplication policy, and each application of that policy to each Plaintiff and putative class member to disregard their sponsor's approval, is a final agency action because it is "the consummation of the agency's decisionmaking process" and it determines "rights and obligations" and creates "legal consequences." *Bennett*, 520 U.S. at 177-78; *see also L.V.M.*, 318

F. Supp. 3d at 612-13. Final agency action is subject to judicial review. 5 U.S.C. §§ 551(4), (13); *id.* § 706(2)(D); s*ee also Regents of the Univ. of Cal.*, 591 U.S. at 17.

105.  ORR previously determined that Plaintiffs' sponsors were suitable. ORR has provided no explanation for its systematic disregard of its previous decisions that Plaintiffs' sponsors were suitable and that it was in the best interest of the children to be released to those sponsors.

106.  ORR's blanket reapplication policy, which disregards the fact that ORR has already determined that placement with a sponsor is in the best interest of the child and is applied without any reliable evidence of material changed circumstances, is arbitrary and capricious because it lacks a reasoned justification or a factual basis, is inconsistent with ORR's statutory and regulatory duties, relies on facts that Congress did not intend the agency to consider, disregards significant reliance interests, fails to consider available alternatives to minimize the harm to children, and fails to consider other important aspects of the problem, including but not limited to the impact on children's interests in family integrity, personal liberty, mental health, and educational progress.

107.  The reapplication policy has already injured Plaintiffs and will continue to do so until enjoined or vacated. Injunctive relief is necessary to prevent further harm and to mitigate the harm already caused by the policy.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

    a.  Assume jurisdiction over this matter;

    b.  Certify this action as a class action under Federal Rule of Civil Procedure 23 and appoint National Center for Youth Law and Democracy Forward Foundation as class counsel;

c.   Order Defendants to promptly identify all class members to class counsel and to notify all class members (and their attorneys of record, if any) of their status as class members in this action;

d.   Hold unlawful and set aside ORR's reapplication policy under 5 U.S.C. § 706(2).

e.   Declare, pursuant to 28 U.S.C. § 2201, that Defendants' actions as set forth above are unlawful;

f.   Enter preliminary and permanent injunctions enjoining ORR's blanket reapplication policy and requiring ORR to provide children and their previously approved sponsors procedural due process regarding the necessity of a new sponsor approval decision;

g.   Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements deemed appropriate; and

h.   Grant such other relief as the Court deems necessary, just, and proper.

February 23, 2026                                Respectfully submitted,

                                                 */s/  Rebecca Wolozin*_____
                                                 Rebecca Wolozin (D.C. Bar No. 144369)
                                                 National Center for Youth Law
                                                 818 Connecticut Avenue NW, Suite 425
                                                 Washington, DC 20006
                                                 (202) 868-4792
                                                 bwolozin@youthlaw.org

                                                 Mishan Wroe*
                                                 Diane de Gramont*
                                                 National Center for Youth Law
                                                 1212 Broadway, Suite 600
                                                 Oakland, California 94612
                                                 (510) 835-8098
                                                 mwroe@youthlaw.org
                                                 ddegramont@youthlaw.org

                                                 Anna Deffebach (D.C. Bar No. 241346)
                                                 Joel McElvain (D.C. Bar No. 448431)
                                                 Robin F. Thurston (D.C. Bar No. 1531399)
                                                 Democracy Forward Foundation

P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
adeffebach@democracyforward.org
jmcelvain@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*

\* Motion to appear *pro hac vice* forthcoming