# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

DIEGO N. *et al.*,                          )
                                            )
                    Plaintiffs,             )
                                            )
v.                                          )
                                            )   No. 1:26-cv-577
U.S. DEPARTMENT OF HEALTH AND               )
HUMAN SERVICES, *et al.*,                   )
                                            )
                    Defendants.             )

**DECLARATION OF MARION DONOVAN-KALOUST**

**DECLARATION OF MARION DONOVAN-KALOUST**

I, Marion Donovan-Kaloust, do hereby declare as follows:

1. I am at least 18 years of age. I make this declaration based on personal knowledge and on a review of records related to my position as Director of Legal Services at Immigrant Defenders Law Center ("ImmDef"), and, if called to testify, I could and would testify competently to the facts stated herein.

2. I am an attorney licensed to practice law in California, and I am the Director of Legal Services of the Children's Representation Project ("CRP") at ImmDef, where I have been employed for over ten years.

3. ImmDef is a non-profit organization headquartered in Los Angeles, California, with additional offices in Santa Ana, Riverside, and San Diego. ImmDef believes in providing universal representation so that no immigrant is forced to face removal proceedings without an attorney or accredited representative at their side. ImmDef is the largest provider of legal services to unaccompanied children in California and currently provides legal services to children housed in twenty-one Office of Refugee Resettlement ("ORR") facilities throughout Southern California. ImmDef also represents thousands of unaccompanied children who have been released from ORR and are residing with sponsors in the Greater Los Angeles Area.

4. In the over ten years I have worked at ImmDef, it has been my experience that it is extremely rare to see children re-referred to ORR from within the United States after release to a vetted sponsor. In my career, prior to 2025, I am only aware of a handful of children being re-referred to ORR following either a juvenile arrest of the child, or a trafficking investigation that led to the child being placed back in ORR custody. Since March 2025, I am personally aware of children who were re-referred to ORR for other reasons or no reason at all, such as being picked

up in a raid or following a routine traffic stop. It is my understanding that ORR applies the same sponsorship application requirements to all new and re-referred cases.

5.  Beginning in 2025, ORR began changing its sponsorship application requirements in ways that have made the sponsorship process extremely burdensome, chaotic and complex. It has become very difficult for sponsors who are not U.S. citizens or who do not have lawful immigration status to successfully sponsor a child from ORR custody. As a result of the changes to ORR's sponsor application requirements, many children are spending far longer in ORR custody than is typical. For example, we have seen many children with lengths of stay over 200 days, including tender-aged children and children seeking to reunify with their own parents. While ORR's sponsor vetting process always took some time to verify sponsor identity, relationship, and safety, ORR has begun to layer on more and more new sponsorship requirements that result in children languishing in custody far longer than before.  For example, ORR recently required all sponsors and household members to produce social security numbers or ITINs.  If the sponsor or household member does not have one, they have to show satisfactory efforts to obtain one.  This can cause long delays in itself, but has also caused other problems because in order to obtain an ITIN, a person may have to submit their original identity document to the U.S. government.  In one recent case, a tender-aged child's mother was approved for sponsorship, only to have the approval rescinded because ORR learned that the mother would not be able to produce her original passport at the time she collected her child, *because she had sent it away to obtain an ITIN in response to ORR's own request.*  This child has been in government custody for over 200 days and it is not clear when he will be finally released to his loving mother.  In other instances, certain application requirements, such as background checks and proof of address and income, expire after a certain amount of time.  Because ORR is

currently taking so long to process sponsor applications, these items repeatedly expire, requiring the sponsor to redo them, further delaying the process in a vicious cycle.  All the while, the child remains detained and separated from their family.  These kinds of delays that cause more delays have become the norm rather than the exception.

6.   In addition to changes to the sponsorship application process, I believe that the increased length of detention for children in ORR custody is also caused because by very reasonable fear among potential sponsors of being detained during the sponsorship application process. I am personally aware of at least eight sponsors who have been detained by DHS while participating in the ORR sponsorship process. I am aware of many other sponsors—in the dozens-- who have withdrawn as sponsors because the fear of immigration enforcement was too high, for example because ORR asked them to show their identification in person at ICE offices or be subjected to invasive "interviews" by DHS personnel.  Many of the children whose sponsors withdraw end up in long-term federal foster care despite having an available, loving family member to care for them, or decide to accept repatriation rather than growing up in government custody.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 20th day of February, 2026, in Riverside, California.



Marion Donovan-Kaloust