# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DIEGO N., *et al.*,  )  | |
| )  | |
| Plaintiffs,  )  | |
| v.  )  | |
| )  | No. 1:26-cv-577 |
| U.S. DEPARTMENT OF HEALTH AND  )  | |
| HUMAN SERVICES, *et al.*,  )  | |
| )  | |
| Defendants.  )  | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## THEIR MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Table of Authorities .............................................................................................................. 2

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 4

    I.   ORR's Statutory Mandate and Regulations ............................................................ 4

    II.  Return of Children to ORR Custody ....................................................................... 5

    III. Sponsorship Application Process and New Requirements ..................................... 9

    IV. Prolonged Detention ............................................................................................. 12

    V.  ORR Administrative Hearings .............................................................................. 18

ARGUMENT ..................................................................................................................... 19

    I.   Plaintiffs Are Likely to Succeed on the Merits of Their Due Process and APA Claims .. 20

        A.   Defendants' Policy Violates Procedural Due Process .................................. 20

            1.   Children Have Protected Liberty and Family Integrity Interests ............................. 22

            2.   ORR's Lack of Process Risks Erroneous Deprivations of Constitutional Rights ..... 27

            3.   Absent Material Changed Circumstances, the Government Has No Legitimate Interest in Separating Children from Previously Approved Sponsors ...................... 31

        B.   Defendants' Reapplication Policy Violates the Administrative Procedure Act .......... 33

            1.   The Reapplication Policy Is Contrary to Law ....................................... 33

            2.   Defendants' Policy is Arbitrary and Capricious. ................................... 35

    II.  Plaintiffs are Suffering Irreparable Injury ........................................................... 39

    III. The Balance of Harms and the Public Interest Favor Plaintiffs ........................... 41

CONCLUSION .................................................................................................................. 42

## TABLE OF AUTHORITIES

**Cases**                **Page(s)**

*\*A.A.R.P. v. Trump*, 605 U.S. 91, 98 (2025)..................................................... 20

*\*A.N.P.S. v. Salazar*, No. 25-cv-14778, 2025 WL 3707333 (N.D. Ill. Dec. 22, 2025) ..................................................................................................... passim

*Addington v. Texas*, 441 U.S. 418 (1979) .......................................................... 30

*AFL-CIO v. Fed. Lab. Rels. Auth.*, 25 F.4th 1 (D.C. Cir. 2022)............................ 35, 37

*Am. Bar Ass'n v. Dep't of Educ.*, 370 F. Supp. 3d 1 (D.D.C. 2019)....................... 36

*Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227 (D.C. Cir. 2008)................... 39

*Angelica S. v. HHS*, 786 F. Supp. 3d 158 (D.D.C. 2025) ................................. passim

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ......................................................... 29

*Blackman v. D.C.*, 277 F. Supp. 2d 71 (D.D.C. 2003)......................................... 40

*Coal. for Humane Immigrant Rights*, 805 F. Supp. 3d 48 (D.D.C 2025)................... 36

*Damus v. Nielsen*, 313 F.Supp.3d 317 (D.D.C. 2018) ......................................... 20

*Davis v. District of Columbia,* 158 F.3d 1342 (D.C. Cir. 1998)............................ 40

*\*DHS v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020)....................................... 38, 39

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ................................. 35, 36

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) ..................................... 35

*\*FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542 (2025)........................... 35, 36

*Fla. Inst. of Tech. v. FCC*, 952 F.2d 549, 553 (D.C. Cir. 1992) ............................ 34

*Flores v. Barr*, No. 85-cv04544, 2020 WL 5491445 (C.D. Cal. Sep. 4, 2020)............ 13

*Flores v. Garland*, No. 85-cv-4544, 2024 WL 3467715 (C.D. Cal. June 28, 2024) ..................... 5

*Flores v. Rosen*, 984 F.3d 720 (9th Cir. 2020) .................................................. 19

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).............................. 35, 36

*\*Franz v. United States*, 707 F.2d 582, 599 (D.C. Cir. 1983) ............................ 23, 24

*Garcia Ramirez v. ICE*, No. 18-508, 2025 WL 3563183 (D.D.C. Dec. 12, 2025) ................ 26, 34

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ...................................................... 21

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ....................................... 40

*Goss v. Lopez*, 419 U.S. 565 (1975) ........................................................... 25

*J.E.C.M. v. Lloyd*, 352 F. Supp. 3d 559 (E.D. Va. 2018) ............................. 23

*\*Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d
491 (D.D.C. 2018) ............................................................................. 24, 30, 40

*Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020) ........................................ 19

*League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ........... 41

*L.V.M. v. Lloyd*, 318 F. Supp. 3d 601 (S.D.N.Y. 2018) .......................... 26, 37, 40

*Lucas R. v. Becerra*, Case No. 18-5741, 2022 WL 2177454 (C.D. Cal. March 11,
2022) ............................................................................................. 31

*M.G.U. v. Nielsen*, 325 F. Supp. 3d 111 (D.D.C. 2018) ............................. 41

*\*Mathews v. Eldridge*, 424 U.S. 319 (1976) ............................... 21, 27, 29, 30

*Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1 (9th Cir. 2025) ............... 37

*\*Moore v. City of E. Cleveland*, 431 U.S. 494 (1977) ........................... 23, 41

*\*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............ 35, 39

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ............ 29

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) .................. 35

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................... 19, 35, 41

*Ohio v. EPA*, 603 U.S. 279 (2024) ........................................................ 35

*Olmstead v. L.C.*, 527 U.S. 581 (1999) ................................................. 25

*Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1990) ................... 36

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925) ................................. 24

*Prince v. Massachusetts*, 321 U.S. 158 (1944) .................................. 22, 23

*Propert v. District of Columbia*, 948 F.2d 1327 (D.C. Cir. 1991) ................................ 29

*Quilloin v. Walcott*, 434 U.S. 246 (1978) ................................................................. 24

*R.I.L.-R. v Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ............................................. 41

*Santos v. Smith*, 260 F. Supp. 3d 598 (W.D. Va. 2017) .............................................. 30

*\*Santosky v. Kramer*, 455 U.S. 745, 758 (1982) ................................................. passim

*\*Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017) ............................... passim

*\*Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) ............................... passim

*Saravia v. Garland*, Settlement Agreement and Release, No. 3:17-cv-03615, ECF 237-1 (N.D. Cal. Sep. 17, 2020) ................................................................................ 8

*Solondz v. FAA*, 141 F.4th 268 (D.C. Cir. 2025) ....................................................... 37

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247 (D.C. Cir. 2021) ............ 39

*\*Stanley v. Illinois*, 405 U.S. 645 (1972) ............................................................. passim

*Troxel v. Granville*, 530 U.S. 57 (2000) ......................................................... 22, 24, 41

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ............................ 34

*United States v. Nixon*, 418 U.S. 683 (1974) ............................................................ 34

*Vitarelli v. Seaton*, 359 U.S. 535 (1959) ................................................................. 34

*Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994) ............................................ 41

*Way of Life Television Network, Inc. v. FCC*, 593 F.2d 1356 (D.C. Cir. 1979) .............. 34

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .......................................... 19

**Statutes**

5 U.S.C. § 706 ............................................................................................. 3, 33, 35

6 U.S.C. § 279 .................................................................................................. 4

8 U.S.C. § 1232(b)(3) ........................................................................................ 1, 4

\*8 U.S.C. § 1232(c)(2) .................................................................................. passim

8 U.S.C. § 1232(c)(3) ................................................................................... 4, 5, 33

**Regulations**

*45 C.F.R. § 410.1201 ............................................................................... passim

45 C.F.R. § 410.1205 ............................................................................ 5, 19, 34

45 C.F.R. § 410.1206 ................................................................................. 19, 30

45 C.F.R. § 410.1210 ......................................................................................... 5

45 C.F.R. § 410.1901 ...................................................................................... 30

45 C.F.R. § 410.1902 ...................................................................................... 19

45 C.F.R. § 410.1903 ................................................................................. 18, 30

Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384 (Apr. 30, 2024) ....................................................................................... passim

Unaccompanied Program Foundational Rule; Update to Accord with Statutory Requirements, 90 Fed. Reg. 13554 (Mar. 25, 2025) ............................. 10

**Treatises**

2 W. Rubenstein, Newberg & Rubenstein on Class Actions § 4:30 (6th ed. 2022 and Supp. 2024) ........................................................................... 20

**Other Authorities**

Melissa Adamson, Mishan Wroe, Neha Desai, *Educational Advocacy for Unaccompanied Immigrant Youth in California* (May 2024), https://youthlaw.org/wp-content/uploads/toolkit-educational-advocacy-for-unaccompanied-immigrant-youth-in-california.pdf ................................. 16

Priscilla Alvarez and Adam Cancryn, CNN, *Exclusive*: *Thousands of parents, guardians of migrant kids arrested in Trump administration crackdown* (Nov. 14, 2025), https://www.cnn.com/2025/11/14/politics/parents-arrested-migrant-children-ice.......................................................................................................12

John Burnett, NPR, *Several Thousand Migrant Children In U.S. Custody Could Be Released Before Christmas*, (Dec. 18, 2018), *archived at* https://perma.cc/SHR7-CECM ................10

Dep't of Health & Hum. Servs., Office of the Inspector Gen., Report No. OEI-09-18-00431, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* (Sep. 2019), *archived at* https://perma.cc/98JU-49HK ........................................................... 10, 13

Office of Refugee Resettlement, Data: Average Length of Care (last updated Feb. 9, 2026), *archived at* https://perma.cc/JNK2-KBTY ................................. 13

5

Office of Refugee Resettlement, Data: Average Monthly Data (last updated Feb. 9, 2026), *archived at* https://perma.cc/JNK2-KBTY ........................................................ 8, 13

Office of Refugee Resettlement, Field Guidance # 24 – ORR Division of Sponsor Administration Role Guidance (revised 1/26/2026), *archived at* https://perma.cc/BTT2-N43M ................................................................................... 12

Office of Refugee Resettlement, Field Guidance # 26 ("FG-26"): Fingerprint Background Checks and Acceptable Supporting Documentation for a Family Reunification Application (Feb. 14, 2025), *archived at* https://perma.cc/3R26-GK9Y ............................................................................................................ 10

Office of Refugee Resettlement, Field Guidance # 27 ("FG-27"): DNA Testing Expansion (Mar. 14, 2025), *archived at* https://perma.cc/67MF-ELB8 .................................. 11

Office of Refugee Resettlement, Unaccompanied Alien Children Bureau Policy Guide Section 1, *archived at* https://perma.cc/FRE5-5YAZ .................................... 15

Office of Refugee Resettlement, Unaccompanied Alien Children Bureau Policy Guide Section 2, *archived at* https://perma.cc/8EJU-YH9D .......................................... 9, 11, 26

Office of Refugee Resettlement, Unaccompanied Alien Children Bureau Policy Guide: Record of Posting and Revision Dates (last updated Feb. 9, 2026), *archived at* https://perma.cc/53QZ-SU3C ................................................................. 9

Office of Refugee Resettlement, Unaccompanied Alien Children Bureau Policy Guide: Guide to Terms (last updated Aug. 8, 2025), *archived at* https://perma.cc/MRB2-HZ8S ........................................................................ 15, 16

Mica Rosenberg et al., ProPublica, *ICE Sent 600 Immigrant Kids to Detention in Federal Shelters This Year. It's a New Record*, *archived at* https://perma.cc/S7E7-UB53. ..................................................................................... 7

Testimony of Jonathan Hayes before the Subcommittee on Labor, Health and Human Services, Education, and Related Agencies, U.S. House Committee on Appropriations, Sep. 18, 2019, https://www.c-span.org/video/?464368-1/administration-officials-testify-migrant-children-mental-health.................................................................................................................10

## INTRODUCTION

Over the past year, a hidden new form of family separation has been taking place across the United States. Immigrant children are being taken from loving families, separated from their parents, siblings, close family, and friends, and sent to federal immigration custody for months on end. Many of these children were previously in the custody of the Office of Refugee Resettlement ("ORR") and were released to live with vetted and approved sponsors in the community, usually parents or other close family members. As a result of increased indiscriminate interior immigration enforcement, hundreds of previously released children are being plucked from their communities by the Department of Homeland Security ("DHS") and transferred back to ORR custody, often without any justification or explanation at all.

Statutory protections require that children in the custody of ORR, an agency within the Department of Health and Human Services ("HHS"), "be promptly placed in the least restrictive setting that is in the best interest of the child," usually with "a suitable family member." 8 U.S.C. §§ 1232(b)(3), (c)(2)(A). ORR's regulations additionally require that children generally be "released without unnecessary delay" to a vetted sponsor, with preference for close family members. 45 C.F.R. § 410.1201(a). Despite these legal requirements, ORR has inexplicably applied a blanket policy of disregarding its prior sponsorship approval decisions and requiring that every previously approved sponsor restart the application process every time a child re-enters ORR custody, regardless of the reasons for the child's re-referral. Children who could safely return to their families are thus unnecessarily detained for months while their previously approved parents and other relatives attempt to navigate an increasingly lengthy and complex application process to get their children back.

Fourteen-year-old Diego N. for example, lived with his father, stepmother, and siblings in Texas before he was re-detained last November when Border Patrol stopped his friend's car.

1

Declaration of Diego N. ¶ 5, ECF 4-4 ("Diego N. Decl."). Although ORR previously approved his father as a sponsor, it now refuses to let Diego go home until his father attends DNA testing and identification verification appointments—appointments ORR has yet to schedule. Diego N. Decl. ¶ 10. In the meantime, Diego remains detained in a congregate care shelter, separated from his family and unable to attend public school or earn high school credit. *Id.* ¶¶ 13-16. Before she was re-detained without explanation in November 2025, sixteen-year-old Renesme R. had been living with her father in the United States for two years. Declaration of Renesme R. ¶ 4, ECF 4-5 ("Renesme R. Decl."). She was a junior in high school participating in J.R.O.T.C. and hoping to one day enlist in the U.S. military. *Id.* ¶¶ 5, 8, 14. She feels "imprisoned and very closed in" at her ORR shelter, worries about her lost progress in school, and misses her father and the rest of her family, whom she hasn't seen in months because she was placed in a shelter out-of-state. *Id.* ¶¶ 14-15.

Mario C. and Benito S. each re-entered ORR custody after an arrest by local police and are considering long-term foster care placement because ORR refuses to release them back to their mother and aunt, respectively. Declaration of Mario C. ¶¶ 13-15, ECF 4-6 ("Mario C. Decl."); Declaration of Benito S. ¶¶ 7, 10-11, ECF 4-7 ("Benito S. Decl."). ORR has not raised specific concerns about their previously approved sponsors' fitness or ability to care for them. Instead, ORR refuses to process their mother's and aunt's applications because they lack a newly required U.S.-issued form of identification. Mario C. Decl. ¶¶ 13-14, 21-22; Benito S. Decl. ¶ 10. After living with his mom for two years, Mario feels uncomfortable in his ORR shelter, where "all our choices are made for us" and kids are "always watched." Mario C. Decl. ¶¶ 6, 16-17. He longs to taste his mom's food again and see his baby brother grow up. *Id.* ¶¶ 6, 21. Benito, who lived with his aunt in the United States for over two years prior to his re-detention, is struggling with the

2

monotonous routine of living in a congregate care facility, noting that "[i]t gets really boring, and then it is really hard to keep my mind off of my worries and thinking about my family." Benito S. Decl. ¶ 11-12. He has a congenital heart condition and has experienced increased symptoms since re-entering ORR custody; his cardiologist told him his condition is exacerbated by stress. *Id.* ¶ 9.

These children are suffering while their parents and other family members wait anxiously, ready and willing to care for them but unable to secure their release. ORR's policy of requiring *all* previously approved sponsors to repeat the entire sponsorship application process, without any individualized reasoning or showing of sponsor unfitness, deprives children of their rights to liberty and family integrity without procedural due process. This unreasoned reapplication policy additionally violates the Administrative Procedure Act because it is contrary to ORR's statutory and regulatory obligations and is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

Plaintiffs thus seek a preliminary injunction on behalf of Plaintiffs and a putative class of all noncitizen minors who are or will be in the custody of HHS and (1) were previously in ORR custody, (2) were approved for release by ORR to a sponsor, (3) have been or will be re-detained by DHS and re-referred to ORR, and (4) whom ORR has not released to their previously approved sponsors pursuant to ORR's policy requiring the previously approved sponsor to submit a new sponsor application with ORR and obtain a new approval for release from ORR ("Proposed Class"). Plaintiffs filed a motion for class certification on February 23, 2026. *See* ECF 4. Plaintiffs request that the Court provisionally certify the Proposed Class and preliminarily enjoin Defendants from enforcing their blanket reapplication policy and denying children due process during the pendency of this litigation.

# BACKGROUND

## I. ORR's Statutory Mandate and Regulations

In the Homeland Security Act ("HSA") of 2002, Congress transferred responsibility for the placement, care, custody, and release of unaccompanied children who arrive in the United States without a parent or legal guardian from the former Immigration and Nationality Service ("INS") to ORR. 6 U.S.C. § 279. In 2008, Congress passed the Trafficking Victims Protection Reauthorization Act ("TVPRA") to codify additional protections for this especially vulnerable population. Except in "exceptional circumstances," the TVPRA requires all other federal agencies to transfer detained unaccompanied children to HHS custody within 72 hours. 8 U.S.C. § 1232(b)(3).

The TVPRA mandates that children in ORR custody "shall be promptly placed in the least restrictive setting that is in the best interest of the child." 8 U.S.C. §§ 1232(b)(3), (c)(2)(A). This is usually with "a suitable family member." 8 U.S.C. § 1232(c)(2)(A). Prior to placing a child with a proposed sponsor, HHS must "make[] a determination that the proposed custodian is capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A). This "determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id.* In certain cases, the TVPRA further requires that ORR conduct a home study prior to release and provide follow-up services to the child after release. 8 U.S.C. § 1232(c)(3)(B).

In 2024, ORR codified its policies related to the custody and release of unaccompanied children in its Foundational Rule. Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384 (Apr. 30, 2024) (to be codified at 45 C.F.R. pt. 410) ("Foundational Rule"). The Rule implements many provisions of the longstanding 1997 *Flores* Settlement Agreement. Except in

4

rare cases where ORR determines detention is required to ensure the child's safety or that of others or ensure their attendance at immigration proceedings, ORR is required to "release a child from its custody without unnecessary delay" to a suitable sponsor, with preference to a parent, legal guardian, or adult relative. 45 C.F.R. § 410.1201; Preamble to ORR Foundational Rule, 89 Fed. Reg. at 34384-86; *see also Flores v. Garland*, No. 85-cv-4544-DMG (AGRx), 2024 WL 3467715, at *9 (C.D. Cal. June 28, 2024) (terminating the *Flores* Settlement in part as to HHS based on the Foundational Rule). The Foundational Rule's Preamble repeatedly emphasizes that ORR is a child welfare agency, not an immigration enforcement agency. 89 Fed. Reg. at 34399, 34402-03, 34442-43, 34452, 34568. ORR also "reiterates its strong belief . . . that placement with a vetted and approved family member or other vetted and approved sponsor, as opposed to continued placement in an ORR care provider facility, is generally in the best interests of unaccompanied children whenever feasible." *Id.* at 34440. Recognizing children's strong interest in prompt release, ORR's regulations further require the agency to "adjudicate the completed sponsor application of a parent or legal guardian" or other close relative within 10 or 14 days, depending on the closeness of the relationship, absent an unexpected delay. 45 C.F.R § 410.1205(b).

## II. Return of Children to ORR Custody

After ORR approves a sponsorship application and releases a child pursuant to the TVPRA, the child is free to live in the community while they await completion of their immigration proceedings. ORR may provide the child with post-release services and is required to provide such services to certain categories of children under the TVPRA. 8 U.S.C. § 1232(c)(3)(B); 45 C.F.R. § 410.1210.

ORR has, however, disclaimed continuing custodial authority over children after they are released. *See, e.g.,* Preamble to ORR Foundational Rule, 89 Fed. Reg. at 34452 ("ORR acknowledges that it cannot require sponsors to seek permission to transfer custody of a child from

the sponsor to someone else because ORR no longer has custody over children after they are discharged from its care. However, ORR needs to maintain and update records of the child's location in order to be able to provide [post-release services] on a mandatory or discretionary basis"). In the preamble to its Foundational Rule, ORR clarified "that it is not an immigration enforcement authority and would not go out into the community to take custody of any child. Rather, unaccompanied children enter ORR custody upon transfer of custody from another Federal department or agency." 89 Fed. Reg. at 34399. When ORR has concerns regarding the suitability of a sponsor post-release, it has in the past "coordinat[ed] with state welfare agencies" rather than reassuming custody. *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1198 n.15 (N.D. Cal. 2017), *aff'd*, 905 F.3d 1137 (9th Cir. 2018). In the past, children rarely re-entered ORR custody following a prior approved release and ORR's procedures are therefore not designed for this group of children. *See* Declaration of Alexa L. Sendukas ¶ 5, ECF 4-8 ("Sendukas Decl."); Declaration of Marion Donovan-Kaloust ¶ 4, ECF 4-9 ("Donovan-Kaloust Decl.").

In the spring of 2017, as part of an ICE operation called "Operation Matador," numerous children previously released from ORR custody were rearrested by ICE in New York on allegations of gang affiliation, re-referred to ORR custody, and detained in facilities across the country, including in California. *See Saravia*, 280 F. Supp. 3d at 1178-79. Several children sued on behalf of a putative class of unaccompanied children rearrested on gang allegations, alleging procedural due process and other legal violations. As the district court observed, these "were not your typical unaccompanied minors" because they "had come across the border previously—often years before—as unaccompanied minors, and had already once been placed into the custody of ORR" before being released to an approved sponsor. *Id.* at 1179. When they were re-detained, they

were "taken away from their families, their schools, and their communities, often to be shipped across the country to a high-security institution and held for an indefinite period." *Id.* at 1196.

ORR insisted on treating these re-referred minors in the same way as all other unaccompanied children in their custody and required that they remain in custody while their sponsors repeated the application process. *Id.* at 1198. After finding the government likely violated children's due process rights, the district court issued a preliminary injunction requiring the government to provide hearings within seven days of rearrest to determine whether the child was a danger to the community and, if not, to release the child into the custody of the previously approved sponsor. *Id.* at 1205-06. The court rejected the government's argument that the TVPRA requires a reassessment of a previously approved sponsor every time a child re-enters ORR custody. *Id.* at 1198. The Ninth Circuit affirmed. *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018); *see also id.* at 1143 ("Nothing in the TVPRA requires the government to conduct this [sponsor suitability] review a second time.").

In 2025, in connection with increased indiscriminate interior immigration enforcement, DHS again began referring significant numbers of previously released children back to ORR.[1] This time though, children are largely not re-entering custody because of alleged gang affiliation. Rather, *any* interaction with DHS can lead to a re-referral to ORR, including traffic stops, compliance with immigration appointments, or even chance encounters. *See* Diego N. Decl. ¶ 5.; Renesme R. Decl. ¶ 8; *see also* Sendukas Decl. ¶ 5 (describing reasons for re-referrals, including traffic stops, ICE raids, routine immigration appointments, local law enforcement arrests, and "reasons we do not fully understand"); *A.N.P.S. v. Salazar*, No. 25-cv-14778, 2025 WL 3707333,

---

[1] *See* Mica Rosenberg et al., ProPublica, *ICE Sent 600 Immigrant Kids to Detention in Federal Shelters This Year. It's a New Record*, *archived at* https://perma.cc/S7E7-UB53.

at *5 (N.D. Ill. Dec. 22, 2025) (noting previously released child was rearrested and re-detained "with no justification (or even explanation)" before being sent back to ORR custody).

Children who have spent years living with their parents or other sponsors and who have begun rebuilding their lives in the United States have suddenly found themselves back in ORR custody. *See* Renesme R. Decl. ¶¶ 2-3; Benito S. Decl. ¶¶ 2-3; Sendukas Decl. ¶ 8; *see also* Declaration of J.M.P.V. ¶ 2, ECF 4-11 ("J.M.P.V. Decl.") (sixteen-year-old boy living with dad in Texas for past five years); Declaration of C.A.C.C. ¶¶ 2, 7, 11, ECF 4-10 ("C.A.C.C. Decl.") (eight-year old boy re-detained after being released to mom two years ago; "I was crying a lot in the beginning because I missed my mom so much. . . . there were other kids who were crying like me, and saying they wanted to be with their moms and dads.").

Despite these prior decisions, ORR is again requiring that all previously approved sponsors restart the application process, regardless of the circumstances of the child's return to ORR custody. *See* Sendukas Decl. ¶ 5; Donovan-Kaloust Decl. ¶ 4. As detailed in the following section, ORR's recent policy changes have made the sponsorship application process significantly more difficult and lengthier than in years past. Children now spend an average of six months in ORR custody awaiting release. *See* Data, Office of Refugee Resettlement, Average Monthly Data, *archived at* https://perma.cc/JNK2-KBTY (as of January 2026, average length of custody for children discharged from ORR custody was 180 days) (last updated Feb. 9, 2026). Had these children been accused of gang affiliation, they would, until recently, have had the right under the *Saravia* settlement to a prompt hearing to determine whether they could immediately return to their previously approved sponsor.[2] But children re-referred to ORR for any other reason—

---

[2] In 2020, the parties in *Saravia* reached a settlement that outlined procedures for hearings for *Saravia* class members rearrested based on alleged gang affiliation. *See* Settlement Agreement and Release, *Saravia v. Garland*, No. 3:17-cv-03615, ECF 237-1 (N.D. Cal. Sep. 17, 2020);

including no clear reason at all—have no similar mechanism to challenge ORR's decision to require their sponsors to repeat the application process.

### III. Sponsorship Application Process and New Requirements

When a child enters ORR custody, ORR interviews the child and close family members to identify potential sponsors. *See* Office of Refugee Resettlement, Unaccompanied Alien Children Bureau Policy Guide ("Policy Guide") § 2.2.1, *archived at* https://perma.cc/8EJU-YH9D. ORR then sends the child's potential sponsor a sponsor application packet. *Id.* § 2.2.3. Sponsors must provide proof of their identity and relationship with the child and undergo background checks. *Id.* § 2.2.4. Sponsorship applications must also include a "sponsor care plan" identifying an alternate "adult caregiver who will assume care of an unaccompanied alien child if the sponsor becomes unable to care for the child." *Id.* § 2.7.6.[3] The sponsor care plan identifies the alternate caregiver, including their identifying documentation, relationship with the child, and background check results, discusses the alternate caregiver's responsibilities, and includes details confirming that the adult caregiver has discussed the plan with the child's case manager. *Id.* The purpose of this plan "is to ensure an unaccompanied alien child has a caregiver, despite any complications that may arise after release to their sponsor." *Id.*

Beginning in 2025, ORR has significantly increased the amount and sensitivity of information it requires from potential sponsors, their household members, and alternate caregivers. The agency has simultaneously narrowed the types of documentation it will accept from sponsors

---

Order Certifying the Settlement Class and Granting Final Approval of Class Action Settlement, *Saravia* v. *Barr,* No. 3:17-cv-03615, ECF 249 (N.D. Cal. Jan. 19, 2021). The settlement was in effect until January 2026. *See Saravia v. Garland,* No. 3:17-cv-03615, ECF 269 (N.D. Cal. June 3, 2024).

[3] Prior to 2023, the sponsor care plan was not required for sponsors who were legal permanent residents or U.S. citizens. After January 2023, ORR began requiring this for all sponsors. *See* ORR Unaccompanied Alien Children Bureau Policy Guide: Record of Posting and Revision Dates (last updated Feb. 9, 2026), *archived at* https://perma.cc/53QZ-SU3C.

and removed safeguards against the use of sponsor immigration status information for immigration enforcement purposes. As a result, some previously approved sponsors are no longer able to meet ORR's sponsor application requirements and even willing and able sponsors experience prolonged delays in application approval.

In February 2025, ORR expanded its fingerprinting requirements to mandate that all sponsors, adult household members, and alternate caregivers submit to fingerprint-based background checks prior to release. *See* Office of Refugee Resettlement, Field Guidance #26 ("FG-26"): Fingerprint Background Checks and Acceptable Supporting Documentation for a Family Reunification Application (Feb. 14, 2025), *archived at* https://perma.cc/3R26-GK9Y.[4] The following month, HHS issued an "Interim Final Rule" rescinding prior regulatory prohibitions on (1) denying sponsors based solely on immigration status; (2) collecting sponsor immigration status information for enforcement purposes; and (3) sharing sponsor immigration status with law enforcement and immigration enforcement agencies. *See* Unaccompanied Program Foundational Rule; Update to Accord with Statutory Requirements, 90 Fed. Reg. 13554 (Mar. 25, 2025) (to be codified at 45 C.F.R. pt. 410).

---

[4] ORR imposed similar blanket fingerprinting requirements in 2018, leading to a rapid increase in children's length of stay. Dep't of Health & Hum. Servs., Office of the Inspector Gen., Report No. OEI-09-18-00431, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* 4-5, 12-13 (Sep. 2019), *archived at* https://perma.cc/YLT7-R3HP. Recognizing that children's release was being unnecessarily delayed, in late 2018 and early 2019 ORR ended blanket fingerprinting requirements for adult household members and for parents or legal guardian sponsors (except in cases with special concerns) and stopped sharing certain information with ICE. *See* John Burnett, *Several Thousand Migrant Children In U.S. Custody Could Be Released Before Christmas*, NPR (Dec. 18, 2018), *archived at* https://perma.cc/SHR7-CECM; Testimony of Jonathan Hayes before the Subcommittee on Labor, Health and Human Services, Education, and Related Agencies, U.S. House Committee on Appropriations, Sep. 18, 2019 at 1:29:00-1:31:00, https://www.c-span.org/video/?464368-1/administration-officials-testify-migrant-children-mental-health (ORR suspended reconciliation of background checks with ICE in 2019 to facilitate release).

ORR concurrently imposed more restrictive documentation requirements that effectively disqualify many sponsors if they, any of their household members, or their alternate caregiver lack stable lawful immigration status. In March 2025, ORR amended its proof of identification requirements to align with United States Citizenship and Immigration Services ("USCIS") I-9 form documentation requirements, which are used by USCIS to prove work authorization. *See Angelica S. v. HHS*, 786 F. Supp. 3d 158, 174 (D.D.C. 2025). For example, foreign passports are no longer acceptable unless accompanied by proof of work authorization. *Id.* at 173-74; Policy Guide § 2.2.4. All sponsors, adult household members, and alternate caregivers must present one of the newly required forms of identification, with limited case-by-case exceptions for parents and legal guardians. Policy Guide § 2.2.4. In April 2025, ORR again amended Policy Guide § 2.2.4 to require that all sponsors provide either their previous year's tax return, 60 days of continuous paystubs, or a letter from their employer on company letterhead verifying their employment and salary information. Policy Guide § 2.2.4; *Angelica S.*, 786 F. Supp. 3d at 168.[5]

Since March 2025, ORR also now requires DNA testing of the child and sponsor in every case where a sponsor claims a biological relationship with the child. *See* Office of Refugee Resettlement, Field Guidance #27 ("FG-27"): DNA Testing Expansion (Mar. 14, 2025), *archived at* https://perma.cc/67MF-ELB8. Sponsors have waited months for a DNA testing appointment.

---

[5] A federal district court issued a preliminary injunction prohibiting ORR from applying these new documentation requirements to a provisionally certified class of children who entered ORR custody on or before April 22, 2025. *Angelica S.*, 786 F. Supp. 3d at 168, 176, 179. ORR continues to apply these requirements to children who entered ORR custody after April 22, 2025, including those entering ORR custody for the second time. Mario C. Decl. ¶¶ 13-14; Benito S. Decl. ¶ 10. The National Center for Youth Law and Democracy Forward Foundation serve as class counsel in *Angelica S.* The legality of the proof of identification and proof of income requirements are not at issue in this case.

*See* Diego N. Decl. ¶¶ 5, 10 (detained since November 2025, no DNA appointment); J.M.P.V. Decl. ¶¶ 4, 7 (entered ORR custody in September 2025, father still waiting on DNA appointment).

In addition, sponsors must now attend an in-person sponsor vetting appointment to present their identification and other documentation to an ORR official in person, often at a DHS-Homeland Security Investigations ("HSI") field office. *See* ORR Field Guidance # 24 – ORR Division of Sponsor Administration Role Guidance at 16-19 (revised 1/26/2026), *archived at* https://perma.cc/BTT2-N43M. This appointment is scheduled only after the sponsor has completed all other requirements, including a background check and home study if one is requested. *Id.* at 13, 15. After the in-person sponsor vetting appointment, ORR has 30 days to issue a Vetting Results Report before the sponsor is approved. *Id.* at 20. Numerous sponsors have been detained by immigration enforcement at these in-person identification verification appointments. Sendukas Decl. ¶ 7; Donovan-Kaloust Decl. ¶ 6.[6] If a sponsor is detained during the application process, the child must restart the entire process with a new sponsor, leading to prolonged detention as well as severe emotional distress. *See* Sendukas Decl. ¶ 7 (children were "devastated to learn of their [sponsor's] detention" after months awaiting reunification and their release process is "now either significantly delayed, or altogether halted").

### IV. Prolonged Detention

As a result of ORR's new sponsorship requirements and widespread increased fear of immigration enforcement during the sponsorship process, children's average time in custody has increased dramatically. Sendukas Decl. ¶¶ 6-7; Donovan-Kaloust Decl. ¶¶ 5-6. Between fiscal year 2015 and fiscal year 2024, ORR's average length of custody varied between 27 days and 69

---

[6] *See, e.g.,* Priscilla Alvarez and Adam Cancryn, CNN, *Exclusive*: *Thousands of parents, guardians of migrant kids arrested in Trump administration crackdown* (Nov. 14, 2025), https://www.cnn.com/2025/11/14/politics/parents-arrested-migrant-children-ice.

days. *See* Data, Office of Refugee Resettlement, *Average Length of Care*, *archived at* https://perma.cc/JNK2-KBTY. As of January 2026, by contrast, children spent an average of 180 days in custody prior to discharge; those not yet discharged were in custody an average of 185 days. *See* Data, Office of Refugee Resettlement, *Average Monthly Data*, *archived* https://perma.cc/JNK2-KBTY.

When lengths of custody last peaked in 2018 and 2019 due to expanded fingerprinting requirements and sharing of fingerprint results with ICE, the HHS Office of Inspector General reported concerns from ORR facilities that "longer stays resulted in higher levels of defiance, hopelessness, and frustration among children, along with more instances of self-harm and suicidal ideation." Dep't of Health & Hum. Servs., Office of the Inspector Gen., Report No. OEI-09-18-00431, *Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody* 4-5, 12-13 (Sep. 2019), *archived at* https://perma.cc/98JU-49HK; *see also id.* at 12 ("even children who were outgoing and personable started getting more frustrated and concerned about their cases around the 70th day in care"). At that time, the highest monthly length of custody was 93 days in November 2018. *Id.* at 13.[7] As the average length of custody has now reached almost double that previous high, children are predictably experiencing significant mental health concerns and emotional distress. *See, e.g.,* Sendukas Decl. ¶ 6 (prolonged detention "has caused increased instances of detention fatigue, mental health crises, and hospitalizations of the children in the facilities we [regularly] serve" and facility staff "have also expressed concern").

---

[7] The highest yearly average length of custody prior to fiscal year 2025 was 69 days in fiscal year 2020. The data for 2020 is an outlier, however, because very few children were in ORR custody due to the effects of the Covid-19 pandemic and the Title 42 expulsion policy. *See, e.g., Flores v. Barr*, No. 85-cv04544, 2020 WL 5491445, at *8 (C.D. Cal. Sep. 4, 2020) ("ORR shelters were 97% vacant as of August 22, 2020").

Despite already having vetted sponsors, children who are returned to ORR custody are experiencing the same months-long delays and prolonged detention as newly arrived children. *See, e.g.,* C.A.C.C. Decl. ¶¶ 6, 10 (8-year-old boy detained for six months while mother repeated application process).[8] In some cases, children's sponsorship processes have stalled completely because their previously approved and vetted sponsor cannot meet ORR's new documentation requirements. *See, e.g.,* Mario C. Decl. ¶¶ 11, 14 ("When I first arrived, I thought it would just be a few weeks or a month until I could go home to my mom, and I thought I could handle that . . . But they won't even move forward with her application if she doesn't have the ID they want."); Benito S. Decl. ¶¶ 3, 9-10 (released to aunt in 2023 but now seeking foster care placement because his aunt and all potential alternative sponsors lack newly required documentation); *see also Angelica S.*, 786 F. Supp. 3d at 174 (noting that plaintiff Leo B. "was released to his sister under the earlier documentation requirements" but "is now stuck in ORR custody without any potential sponsor because of the retroactive document changes").

Other children have made the difficult decision to seek release to a different sponsor because they fear their original sponsor will be targeted for immigration enforcement through their participation in the sponsorship process. Renesme R. Decl. ¶¶ 11-12 (seeking release to aunt instead of father because aunt can provide all the documents ORR requires and "we've heard that there have been many cases where sponsors are arrested when they show up to appointments that are part of the sponsor application process. There is so much fear right now."); *see also* Donovan-Kaloust Decl. ¶ 5 (aware of dozens of sponsors who have withdrawn due to fear of immigration enforcement).

---

[8] C.A.C.C. was finally released to his mother in February 2026, after he filed a petition for a writ of habeas corpus. *See C.A.C.C. v. Kennedy*, Case No. 26-cv-368 (E.D. Va. Feb. 6, 2026).

Even when a child's previously approved sponsor is willing and able to repeat the application process, the process has dragged on for many months as the sponsor attempts to meet all of ORR's new requirements. Fourteen-year-old Diego, for example, has been in custody since November 2025 as his father repeats the application process. Diego N. Decl. ¶¶ 5, 8-11. Despite complying with all ORR's documentation requirements, providing fingerprints, and completing a positive home study, Diego's father is still waiting for ORR to provide appointments for a DNA test and in-person identification verification. Diego N. Decl. ¶¶ 8-11; *see also* J.M.P.V. Decl. ¶¶ 4, 7 (five months in ORR custody; previously approved father still awaiting appointments despite positive home study); Sendukas Decl. ¶ 8 (children pursuing release to their previously approved sponsor are "experiencing severe stress and frustration as the process drafts on for months without a clear end in sight").

Although children are now detained for much longer periods of time, most ORR programs remain designed for short-term stays.[9] For instance, children in ORR custody generally do not attend public school and instead attend classes within their ORR program.[10] Classes in ORR facilities are intended for recently arrived children who are expected to attend for only a few weeks. The material is basic and generally does not result in academic credit.[11] *See* Diego N. Decl. ¶ 13

---

[9] The only ORR program designed for longer-term custody is Long-Term Foster Care, where children are placed in foster placements in the community and attend public school. *See* ORR Unaccompanied Alien Children Bureau Policy Guide: Guide to Terms, *Long Term Foster Care* (last updated Aug. 8, 2025), *archived at* https://perma.cc/MRB2-HZ8S. Placement in this program is generally available only to children who lack a viable sponsor. *See* Policy Guide § 1.2.6, *archived at* https://perma.cc/FRE5-5YAZ.

[10] *See* Unaccompanied Alien Children Bureau Policy Guide: Guide to Terms, *Shelter*, *Transitional Foster Care* (last updated Aug. 8, 2025), *archived at* https://perma.cc/MRB2-HZ8S (explaining that children in shelter and transitional foster care placements typically receive services on-site).

[11] *See, e.g.,* Foundational Rule, 89 Fed. Reg. at 34490-91 (commenters suggested that ORR provide ability to earn transferable academic credits); Melissa Adamson, Mishan Wroe, Neha Desai, *Educational Advocacy for Unaccompanied Immigrant Youth in California*, 61 (May

("We have school here but I am not learning anything . . . they teach us how to read a clock and the names of fruits in English."); *see also* Mario C. Decl. ¶ 15 (not getting school credit); J.M.P.V. Decl. ¶ 11 ("I am trying to learn what I can here, but the classes are very different from those in my high school. In my previous school they taught things much more deeply.").

Children who were previously attending public school have thus seen their educations abruptly interrupted. After three months in ORR custody following an unexplained detention by DHS, Renesme fears she will have to repeat her junior year and will not be able to complete her three-year J.R.O.T.C. certificate. Renesme R. Decl. ¶ 14. Diego is missing out on his freshman year of high school and is making no academic progress despite his father's best efforts to find a way for his son to continue earning academic credit while detained. Diego N. Decl. ¶ 14 (unable to attend virtual classes or leave the shelter to attend school despite requests from father).

Life in ORR's congregate care programs is also highly regulated, with a set schedule and extremely limited opportunities to leave the facility, pursue extracurricular interests, or interact with the broader community. *See* Renesme R. Decl. ¶ 14 (everyone follows the same routine and "I feel imprisoned and very closed in here. We almost never get to leave the shelter."); Benito S. Decl. ¶¶ 12-14 ("I don't like how everything here just repeats every day . . . I really miss listening to my music. Mostly I think about how much I miss my family, and how much I want to leave."). Even in shelter placements, officially ORR's least restrictive congregate care placement, children's movements are restricted and they are subject to constant staff supervision. Mario C. Decl. ¶ 17 ("I am always watched. It makes me feel uncomfortable and I don't like it."); *see also id.* ¶ 15 ("If

---

2024), https://youthlaw.org/wp-content/uploads/toolkit-educational-advocacy-for-unaccompanied-immigrant-youth-in-california.pdf (uncommon for school districts to accept ORR credit); *see also* Unaccompanied Alien Children Bureau Policy Guide: Guide to Terms, *Shelter* (last updated Aug. 8, 2025), *archived at* https://perma.cc/MRB2-HZ8S.

they tell my mom she can't sponsor me, I think I will ask to go to foster care. In foster care I would be able to go outside when I want, and go to public school instead of the school they have here in the shelter."); Diego N. Decl. ¶ 12 ("There are a lot of rules and the shelter staff accompany us everywhere, even when we want to go to the bathroom. I cannot go outside for some fresh air when I want to.").

Children have been removed from the care of their families and are now being raised in institutional care far from loved ones. *See* Mario C. Decl. ¶¶ 11, 21 ("I think about being with my family all the time and it's difficult to focus on anything else" . . . [my mom] is better at taking care of me. She can make me the food I like, and I can have fun and be a kid."); Diego N. Decl. ¶¶ 3, 15 ("I really miss being at home and having a normal life and eating my stepmother's good food."); Benito S. Decl. ¶ 8 ("My aunt tells me that I seem so sad when she talks to me. It's true. I am sad."). They have missed celebrating Christmas, New Year's, birthdays, and other important milestones and everyday moments with their families. *See, e.g.,* J.M.P.V. Decl. ¶ 12. Mario wishes he could "be with my family, and see my baby brother and help take care of him." Mario C. Decl. ¶¶ 6, 21. Renesme misses playing with her baby cousins. Renesme R. Decl. ¶ 4.

Children are also deprived of the in-person expressions of love and care that come with living with family and being with friends. Although children make friends in their ORR programs, their interactions are regulated. Hugging or even touching other children, for example, is often prohibited. Renesme R. Decl. ¶ 14 ("I have friends here, but it is difficult to have a normal relationship. We cannot touch each other, we cannot hug, we cannot share food."); *see also* C.A.C.C. Decl. ¶ 8 ("It makes me feel really bad to be here without my mom. I don't have love, and I don't get hugs."); J.M.P.V. Decl. ¶ 10 ("I have friends here, but we cannot play or joke around like I would with my friends from school. We cannot even touch each other. The staff is

always watching."). In-person visitation with family is limited and in many cases infeasible because children are placed far from home, often in a different state. Renesme R. Decl. ¶ 15 ("I have phone calls with my dad, but he can't visit me because he's so far away, and there aren't shelters in Tennessee. It's so hard not to be able to see him in person."); Mario C. Decl. ¶ 9 (flown from Texas to ORR placement in New York); Benito S. Decl. ¶¶ 5, 7 (living in Louisiana but placed in Texas); J.M.P.V. Decl. ¶ 12 ("I have phone calls with my dad, but they are not private, and I cannot see him in person because I am too far away."); *see also* Diego N. Decl. ¶ 16 ("My dad comes to visit me once or twice a week . . . but I cannot see my stepsister and my little brother in person. I miss them a lot."); C.A.C.C. Decl. ¶ 10 ("I like when [my mom] can visit me, but then I feel so sad when she leaves again.").

### V.  ORR Administrative Hearings

ORR's regulations provide for three types of administrative hearings: (1) a risk determination hearing (formerly a *Flores* bond hearing), (2) a placement review panel to determine whether a child is appropriately placed in a restrictive setting, and (3) a sponsor appeal process if a sponsorship application is denied. None of these procedures, however, provide a mechanism for a re-referred child to challenge the requirement that their sponsor repeat the application process.

ORR's Foundational Rule provides for a risk determination hearing to determine whether a "child would present a risk of danger to self or to the community if released[.]" 45 C.F.R. § 410.1903(a). But even if a child prevails in this hearing, they cannot be released until a sponsor application is approved. 45 C.F.R. § 410.1903(j). For this reason, ORR has taken the position that risk determination hearings are generally unnecessary for children placed in shelter or foster care programs because ORR has already determined that they are not a danger to themselves or others. *See* 89 Fed. Reg. at 34569 ("ORR notes that for the great majority of unaccompanied children in ORR custody, it has determined they are not a danger and therefore has placed them in non-

restrictive placements such as shelters and group homes. These unaccompanied children remain in ORR care only because a suitable sponsor has not yet been found and approved."); *see also Flores v. Rosen*, 984 F.3d 720, 735 (9th Cir. 2020) (permitting opt-out rather than opt-in bond hearing for children in non-restrictive placements for this reason).

Similarly, ORR's regulations provide for a Placement Review Panel to permit a child to challenge their placement in a restrictive placement. 45 C.F.R. § 410.1902. These hearings consider only placement within the ORR system, not release. *Id.*

Finally, ORR provides a procedure for a parent, legal guardian, or close relative sponsor to appeal ORR's denial of their sponsorship application. 45 C.F.R. § 410.1206. This process is triggered by receipt of a Notification of Denial letter after "ORR determines that the potential sponsor is not capable of providing for the physical and mental well-being of the unaccompanied child or that the placement would result in danger to the unaccompanied child or the community." 45 C.F.R. §§ 410.1205(a), (c). Denied sponsors who receive such a letter may seek an appeal of the denial decision. 45 C.F.R. § 410.1206(a). Previously approved sponsors do not have access to this process, however, because their applications have never been denied.

## ARGUMENT

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The balance-of-equities and public-interest factors merge where, as here, the government is the opposing party." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The same standard applies to a request for preliminary relief under the Administrative Procedure Act, 5 U.S.C. § 705. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 168 (D.D.C. 2020).

Plaintiffs are entitled to an order enjoining ORR from enforcing its blanket policy of disregarding ORR's prior sponsorship application approval decision—thereby requiring all previously approved sponsors to complete the sponsor application process anew regardless of the circumstances of the child's re-referral ("reapplication policy"). Plaintiffs are likely to succeed on the merits of their claims that the reapplication policy violates children's rights to procedural due process and the Administrative Procedure Act ("APA"). They are currently suffering irreparable harm from prolonged detention and family separation, and the balance of the equities and the public interest favor a preliminary injunction.

For the reasons set forth in Plaintiffs' Motion for Class Certification, ECF 4, Plaintiffs are also entitled to provisional class certification. *See A.A.R.P. v. Trump*, 605 U.S. 91, 98 (2025) ("because courts may issue temporary relief to a putative class, we need not decide whether a class should be certified in order to temporarily enjoin the Government") (citing 2 W. Rubenstein, Newberg & Rubenstein on Class Actions § 4:30 (6th ed. 2022 and Supp. 2024)); *see also Angelica S.*, 786 F. Supp. 3d at 176; *Damus v. Nielsen*, 313 F. Supp. 3d 317, 328 (D.D.C. 2018).

## I. Plaintiffs Are Likely to Succeed on the Merits of Their Due Process and APA Claims

Plaintiffs are likely to succeed on the merits of their claims for multiple independent reasons. Defendants' reapplication policy deprives Plaintiffs and putative class members of liberty without procedural due process in violation of the Fifth Amendment to the U.S. Constitution. The policy further violates the APA because it is contrary to ORR's legal obligations under the TVPRA and the Foundational Rule and is arbitrary and capricious.

### A. Defendants' Policy Violates Procedural Due Process

ORR's policy of disregarding its own prior sponsor application approval decisions when a child re-enters ORR custody violates the Due Process Clause. *See Mathews v. Eldridge*, 424 U.S.

319, 334-35 (1976). To determine what due process requires, courts consider: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335. "The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be condemned to suffer grievous loss." *Santosky v. Kramer*, 455 U.S. 745, 758 (1982) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 262-263 (1970)).

All three factors weigh heavily in favor of the need for robust procedural protections here. Children have a strong private interest in continuing to live freely in the community with their parents or other family members rather than being held in prolonged detention. Plaintiffs and putative class members face an unacceptably high risk of erroneous deprivation because ORR currently has *no* procedures in place to determine whether a child's re-detention is necessary; it instead requires *all* sponsors to begin the sponsorship process anew regardless of the child's individual circumstances. Nor would the additional procedures requested here burden the government. To the contrary, a prompt determination of whether a child's re-detention is justified is likely to spare ORR resources it would otherwise expend in paying for the child's detention and repeating the sponsor vetting process with the same individual who was previously approved to care for the child.

Two federal courts addressing similar factual circumstances have already held that ORR's blanket reapplication policy violates procedural due process. *See Saravia*, 905 F.3d at 1142-45 (affirming preliminary injunction requiring a hearing within seven days for children previously approved for release to a sponsor and re-referred to ORR custody based on alleged gang

affiliation); *A.N.P.S.*, 2025 WL 3707333, at *4-7 (holding that government violated due process when child was re-detained "with no justification (or even explanation)" and ORR required the sponsor to re-apply). Despite these court rulings, ORR has not adjusted its reapplication policy or afforded Plaintiffs any procedural protections to avoid the prolonged custody associated with reapplication.

### 1. Children Have Protected Liberty and Family Integrity Interests

There can be no dispute that ripping children away from their families, schools, and communities and detaining them in government institutions for weeks, months, or potentially indefinitely is a "grievous loss" that implicates significant liberty interests. *Santosky*, 455 U.S. at 758. These interests are grounded in constitutional protections for family integrity and physical liberty as well as statutory requirements mandating that children be placed in the least restrictive setting.

The right of children and their families to live together free from unnecessary state interference is deeply rooted in our constitutional order and "is an interest far more precious than any property right." *Santosky*, 455 U.S. at 758-59; *see also, e.g., Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court.") (plurality opinion); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.") (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)).

Just as parents have a right to the care and custody of their children, a child has a "corresponding right to protection from interference in the relationship [that] derives from the

psychic importance to him of being raised by a loving, responsive, reliable adult." *Franz v. United States*, 707 F.2d 582, 599 (D.C. Cir. 1983); *see also Santosky*, 455 U.S. at 760 ("[U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship."); *Stanley*, 405 U.S. at 657-58 (removing children from father without a hearing to show father is unfit "needlessly risks running roughshod over the important interests of both parent and child").

A child's private interest in family integrity is not limited to living with their parents; it includes living with their extended families as well. "The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition." *Moore v. City of E. Cleveland*, 431 U.S. 494, 504-06 (1977). Like many children in ORR custody who are released to relatives because their parents are unable to care for them, *Moore* involved a child who moved in with his grandmother, cousin, and uncle, after his mother's death. *Id.* at 497. As the Supreme Court explained, "[w]hether or not such a household is established because of personal tragedy, the choice of relatives in this degree of kinship to live together may not lightly be denied by the State." *Id.* at 505-06; *see also Prince v. Massachusetts*, 321 U.S. 158, 159, 166 (1944) (analyzing rights of child's "aunt and custodian" as if they were parental rights); *J.E.C.M. v. Lloyd*, 352 F. Supp. 3d 559, 585 (E.D. Va. 2018) (holding that relationships between children in ORR custody and potential sponsor "siblings, aunts or uncles, grandparents, or first cousins . . . are thus constitutionally significant").

Absent evidence that a child's custodian is unfit, the Due Process Clause plainly forbids government officials from seizing children from their families, detaining them in government custody, and forcing the children's parents or other custodians to undergo lengthy vetting to get

their children back. *See Troxel*, 530 U.S. at 68-69 ("[S]o long as a parent adequately cares for his or her children (*i.e.,* is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.") (plurality opinion); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have little doubt that the Due Process Clause would be offended if a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.") (citation modified). As the Supreme Court emphasized over a hundred years ago, "[t]he child is not the mere creature of the state[.]" *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925).

Not only have Plaintiffs been removed from their families without any showing of unfitness but any contact with their families is controlled by ORR and in-person visitation is often impossible because children are placed in shelters far from home. Mario C. Decl. ¶ 9; Renesme R. Decl. ¶ 15; Benito S. Decl. ¶¶ 5, 7, 14; J.M.P.V. ¶¶ 5, 12; *see also Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 501 (D.D.C. 2018) (finding "no question that defendants have directly and substantially burdened plaintiffs' right to family integrity" where boys in ORR custody had "only periodic phone calls" with their mother "[a]nd the forced separation prevents her from expressing love for, and comfort to, her sons – comfort that they surely need as they endure the bewildering experience of detention.").

In addition to being deprived of "the psychic importance [] of being raised by a loving, responsive, reliable adult," *Franz*, 707 F.2d at 599, Plaintiffs experienced a significant loss of personal liberty when they were returned to ORR custody. "Although the law that recognizes minors, unlike adults, 'are always in some form of custody,' minors nonetheless 'retain a strong

24

interest in being free from unnecessary government interference with their liberty.'" *A.N.P.S.*, 2025 WL 3707333, at *4 (quoting *Saravia*, 280 F.Supp.3d at 1195); *see also Goss v. Lopez*, 419 U.S. 565, 574-75 (1975) ("The Due Process Clause also forbids arbitrary deprivations of liberty," which includes temporarily suspending a child from school based on allegations of misconduct "unilaterally and without process [to determine] whether that misconduct has occurred").

Plaintiff children were living freely in their communities prior to their re-detention and their continued detention in ORR custody indisputably infringes on their liberty. Mario C. Decl. ¶¶ 4-5, 15-17; Benito S. Decl. ¶¶ 4-6, 11-14; Diego N. Decl. ¶¶ 12-16; Renesme R. Decl. ¶¶ 4-5, 9, 14. As discussed above, when children are in ORR custody, their movements and associations are strictly limited, they cannot participate in extracurricular activities they once enjoyed, and their educational progress is significantly interrupted. *See* Background Sec. IV, *supra*; Mario C. Decl. ¶¶ 15-17; Benito S. Decl. ¶¶ 11-13; Diego N. Decl. ¶¶ 12-15; Renesme R. Decl. ¶ 14; *see also Goss*, 419 U.S. at 576 ("[T]he total exclusion from the educational process for more than a trivial period, and certainly if the suspension is for 10 days, is a serious event in the life of the suspended child."); *Olmstead v. L.C.,* 527 U.S. 581, 601 (1999) ("[C]onfinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.").

Children previously released to a sponsor from ORR custody pursuant to the TVPRA also have a right to due process based on their "legitimate claim of entitlement" to continuing placement with that sponsor or alternate caregiver in the community. *Goss*, 419 U.S. at 573. The TVPRA provides that "an unaccompanied alien child in the custody of the Secretary of Health and Human Services *shall* be promptly placed in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A) (emphasis added). Here, "[f]or each member of the plaintiff class,

25

ORR has already determined that the 'least restrictive setting that is in the best interest of the child' is placement with a sponsor." *Saravia*, 905 F.3d at 1143; *see also A.N.P.S.*, 2025 WL 3707333, at *6 ("Respondents *already identified* [Petitioner's sponsor] as a suitable sponsor" and ORR released child "pursuant to the requirements of the HSA and TVPRA."). ORR also vetted and approved an alternate caregiver to ensure that the "child has a caregiver, despite any complications that may arise after release to their sponsor," ORR Policy Guide § 2.7.6, and can continue to live in the least restrictive setting in the community.

"[I]f DHS could, the day after a minor was released to a parent or other sponsor, arrest the minor . . . and restart the process, the TVPRA's instruction to place the minor in the least restrictive appropriate setting would mean little." *Saravia*, 905 F.3d at 1143 (quoting *Saravia*, 280 F. Supp. 3d at 1196); *see also Garcia Ramirez v. ICE*, No. 18-508 (RC), 2025 WL 3563183, at *15-16 (D.D.C. Dec. 12, 2025) (holding that similarly worded TVPRA provision requiring ICE to consider the least restrictive setting for unaccompanied children who turn 18 in ORR custody "serves to place the age-out in a suitable setting pending the outcome of their immigration proceedings" and does not permit arbitrary rearrest); *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 613 (S.D.N.Y. 2018) ("[T]he TVPRA does not authorize ORR to place [unaccompanied children] whenever ORR gets around to it or whenever ORR wants to do so[.]").[12]

Courts considering the re-detention of children previously released from ORR custody have held that these constitutional and statutory interests are significant. *See A.N.P.S.*, 2025 WL 3707333, at *4 ("[T]he Court finds that Petitioner [unaccompanied child] has a liberty interest in

---

[12] As noted above, ORR has expressly disclaimed authority to revisit its release decisions or to change a child's placement post-release. *See* Preamble to ORR Foundational Rule, 89 Fed. Reg. at 34399, 34452. When ORR has concerns regarding the suitability of a sponsor post-release, "ORR typically refers such cases to Child Protective Services." *Saravia*, 905 F.3d at 1143 n.9.

freedom from detention, and that the government violated that interest when it re-detained Petitioner without a change in circumstances."); *Saravia*, 280 F. Supp. 3d at 1195-96 (finding heightened liberty interest because minors were previously released by ORR to family members pursuant to the TVPRA and "have been taken away from their families, their schools, and their communities, often to be shipped across the country to a high-security institution and held for an indefinite period.").

### 2. ORR's Lack of Process Risks Erroneous Deprivations of Constitutional Rights

Because ORR provides no process at all to determine whether changed circumstances justify a child's re-detention before requiring the sponsor to re-apply, the risk of erroneous deprivation is exceedingly high. *Mathews*, 424 U.S. at 335.

Children have re-entered ORR custody for many different reasons that do not indicate the sponsor is unable to care for the child, including children who were re-detained by DHS seemingly based only on the child's immigration status and children re-detained based on the child's own alleged behavior rather than accusations that the sponsor was unfit. Diego N. Decl. ¶¶ 5-6; Renesme R. Decl. ¶ 8; Benito S. Decl. ¶ 7; Mario C. Decl. ¶ 7; Sendukas Decl. ¶ 5; Donovon-Kaloust Decl. ¶ 4. Yet ORR appears to assume that the mere fact of re-referral renders the prior sponsor approval void and reassessment necessary. Nor is ORR's reassessment focused on any specific concerns raised by the re-referral. Previously approved sponsors have instead been disqualified or delayed because ORR requires them to re-establish previously verified facts such as their identity and relationship with the child. *See, e.g.,* Mario C. Decl. ¶¶ 13-14 (mom lacks newly required form of identification); Diego N. Decl. ¶¶ 8-10 (positive home study but waiting on DNA test and in-person ID verification); J.M.P.V. Decl. ¶ 7 (same).

This treatment of unaccompanied children is inconsistent with basic principles of due process and with the treatment afforded other noncitizens subject to rearrest, including children apprehended with their parents. *See A.N.P.S.*, 2025 WL 3707333, at *5 ("[T]here is clearly a severe risk of erroneous deprivation here: Respondents previously determined that it was appropriate to release Petitioner to N.C.S.E., and with no justification (or even explanation) they subsequently rearrested and re-detained Petitioner."); *id.* at *4 (discussing rights of adult non-citizens and accompanied minors released and subsequently rearrested); *Saravia*, 280 F. Supp. 3d at 1199 ("In the absence of a prompt adversarial hearing of the type other rearrested noncitizens receive, there is a serious risk that minors who were appropriately placed with sponsors, in accordance with the TVPRA and the *Flores* settlement agreement, will—after rearrest on the basis of insufficiently substantial allegations of gang affiliation—erroneously be placed into ORR custody, and without an opportunity [to] obtain prompt relief.").

Nor are there any apparent limits to ORR's reapplication policy. The government appears to assert the authority to "arrest, detain, and transfer to ORR any [unaccompanied child] in the nation today who has previously been released to an approved sponsor," require their sponsor to repeat the sponsor application process, "[a]nd once that process is completed, there is nothing to stop [the government] from arresting the [child] *again* and starting the process over." *A.N.P.S.*, 2025 WL 3707333, at *6; *see also Saravia*, 905 F.3d at 1143. "The Due Process Clause does not permit the government to subject persons in the United States to this kind of procedural house of mirrors, where one can only secure illusory freedom from custody, and any freedom is constantly subject to the impermanent whims of the government." *A.N.P.S.*, 2025 WL 3707333, at *6

The risk of erroneous deprivation is compounded by ORR's increasingly lengthy and onerous sponsorship application process, which may disqualify previously approved sponsors

based on factors outside their control and for reasons unrelated to their fitness. *See* Background Secs. III-IV, *supra*. Even a short-term re-detention and separation from family without any due process poses an unacceptably high risk of erroneous deprivation. Where Plaintiffs and putative class members are facing prolonged—and potentially indefinite—detention and family separation, even more robust procedural safeguards are required.

In many cases, an initial inquiry into the circumstances of a child's re-referral may lead ORR to determine that the previous sponsor application approval decision must be respected because the circumstances of the child's re-referral do not demonstrate that the sponsor is unfit. *See, e.g., A.N.P.S.*, 2025 WL 3707333, at *6-7 (ordering immediate release because ORR had provided no explanation or justification for the child's re-detention).

In cases where ORR believes material changed circumstances justify requiring the previously approved sponsor to repeat application requirements, due process requires, at a minimum, "notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950); *see also Stanley*, 405 U.S. at 658 (hearing constitutionally required before children removed from custody of unwed father). "The constitutional requirement of some kind of hearing means, at a minimum, that the affected individual must have a meaningful opportunity to present his case before a neutral decisionmaker." *Propert v. District of Columbia*, 948 F.2d 1327, 1333 (D.C. Cir. 1991). The "opportunity to be heard" must occur "'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). ORR must thus provide children and their previously approved sponsors timely notice of ORR's reasons for denying custody to the previously approved sponsor, including the evidence supporting this determination, and a prompt hearing before a neutral and detached decision-maker.

29

Given the weighty interests at stake and the high risk of erroneous deprivation, ORR must bear the burden to establish by clear and convincing evidence that the circumstances of the child's re-referral demonstrate that the previously approved sponsor is not capable of providing for the child's well-being such that additional application steps are required. *See Santosky*, 455 U.S. at 756 ("This Court has mandated an intermediate standard of proof—'clear and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.'") (internal citation omitted); *see also Addington v. Texas*, 441 U.S. 418, 433 (1979) (civil commitment requires at a minimum clear and convincing evidence); *Santos v. Smith*, 260 F. Supp. 3d 598, 613 (W.D. Va. 2017) (concluding, in case of a child in ORR custody seeking release to a parent, that relevant authorities "strongly suggest that both a restraint of liberty and a continued separation of a child from a parent require that the government bear the burden of proof."). Notably, clear and convincing evidence is the standard ORR already uses to review whether a child is appropriately placed in a restrictive setting and whether a child is a danger to the community. *See* 45 C.F.R. §§ 410.1901(a), 410.1903(c).[13]

Every day children spend detained in ORR custody separated from their families and communities compounds their injuries. *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 502. In this context, for a hearing to be "at a meaningful time" to protect children's rights, *Mathews*, 424 U.S. at 333, it must occur within days, not weeks or months. Faced with similar circumstances of children re-referred to ORR custody after living in the community, the district court in *Saravia* ordered hearings within seven days of a child's rearrest. *Saravia*, 905 F.3d at 1144-45 & n.10

---

[13] The relevant regulation is silent as to the standard of proof in an appeal of ORR's denial of release to a sponsor. 45 C.F.R. § 410.1206. But children and sponsors involved in an appeal of an initial denial are differently situated from Plaintiffs here, where ORR has previously determined the sponsor was fit and approved released to the sponsor. Under these circumstances, the burden must be on ORR to justify its changed position.

(affirming preliminary injunction and finding that the district court reasonably based its seven-day timetable on procedures applicable to adult noncitizens rearrested after a prior release on bond).

The same seven-day timeline is appropriate here, with the option for the class member to waive an immediate hearing if the class member does not wish to be released to their prior sponsor, needs more time to obtain counsel, or needs more time to prepare for the hearing. *See, e.g.,* Order Granting in Part Plaintiffs' Emergency Application for Relief, *Saravia v. Sessions*, No. 3:17-cv-03615, ECF 103 (N.D. Cal. Nov. 27, 2017). To ensure meaningful notice, ORR should be required to provide notice to the child's counsel or legal service provider as well as to "provide prompt notice to class counsel about where the class member is being held, the basis for the detention, and the details regarding the hearing the minor will receive." *Saravia*, 280 F. Supp. 3d at 1206; *see also Lucas R. v. Becerra*, Case No. 18-5741-DMG (PLAx), 2022 WL 2177454, at *21 (C.D. Cal. March 11, 2022) (requiring ORR to provide notice of placements to a child's legal counsel and parents because "[n]otice is not an effective safeguard of liberty interests if the child does not understand his or her right.").

### 3. Absent Material Changed Circumstances, the Government Has No Legitimate Interest in Separating Children from Previously Approved Sponsors

The government has no interest in detaining children it previously approved for release absent material changed circumstances. Continuing to detain a child who could be released to a fit and suitable sponsor undermines ORR's own legal mandate to protect children, place them in the least restrictive setting in their best interest, and release them without unnecessary delay. *See* 8 U.S.C. § 1232(c)(2)(A); 45 C.F.R. § 410.1201(a); *see also* Preamble to ORR Foundational Rule, 89 Fed. Reg. at 34440 (noting ORR's "strong belief . . . that placement with a vetted and approved family member or other vetted and approved sponsor" is generally in children's best interests).

ORR therefore "spites its own articulated goals when it needlessly separates [a child] from his family." *Stanley*, 405 U.S. at 652-53.

Nor would hearings pose an undue fiscal or administrative burden on ORR. Even if "it is more convenient to presume than to prove" that a child's re-referral to ORR custody renders a sponsor no longer fit, "that advantage is insufficient to justify refusing a [child] a hearing when the issue at stake is the dismemberment of his family." *Id.* at 656-658. This is especially true when increasing numbers of children are being re-referred to ORR custody because of mere chance encounters with DHS. Diego N. Decl. ¶ 5.; Renesme R. Decl. ¶ 8; Sendukas Decl. ¶ 5. Moreover, ORR already provides children and sponsors with adversarial administrative hearings on issues related to sponsorship and release. *See* 45 C.F.R. §§ 410.1206, 410.1903; *see also* Background Sec. V, *supra*. Those procedures are inadequate to protect the rights of Plaintiffs because they do not permit a child or previously approved sponsor to challenge ORR's requirement that the sponsor repeat the application process. Those procedures could nonetheless be adapted to satisfy due process requirements without undue burden.

Finally, ORR has expended significant resources to detain Plaintiffs, sometimes for multiple months, and to repeat the sponsor vetting process. A prompt procedure to adjudicate whether a child's re-detention is necessary would likely save the government resources. *See Saravia*, 280 F. Supp. 3d at 1200 ("[T]his safeguard will enhance, rather than hinder, the government's capacity to act in the child's best interest by ensuring that the child is placed in the least restrictive setting appropriate to his needs and the needs of the community" and "reduce the risk that a child is erroneously removed from a sponsor's custody and placed into a taxpayer-funded juvenile detention facility").

**B. Defendants' Reapplication Policy Violates the Administrative Procedure Act**

Plaintiffs are also likely to succeed on their claims that ORR's reapplication policy must be held "unlawful and set aside" under the Administrative Procedure Act because it is "not in accordance with law" and is arbitrary and capricious. 5 U.S.C. § 706(2).

**1. The Reapplication Policy Is Contrary to Law**

ORR's reapplication policy violates Defendants' legal obligations to place each unaccompanied child "in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A), and to "release a child from its custody without unnecessary delay" to a suitable sponsor, with a preference for close family members, 45 C.F.R. § 410.1201(a).

The TVPRA does not require ORR to repeat its sponsor application process a second time just because a child re-enters its custody. *Saravia*, 905 F.3d at 1143 ("[T]he government has already determined each of these sponsors is suitable. Nothing in the TVPRA requires the government to conduct this review a second time."); *A.N.P.S.*, 2025 WL 3707333, at *6 ("To the extent that Respondents believe that either [the HSA or the TVPRA] gives them the right (or indeed the obligation) to re-detain and hold indefinitely a previously-released [child] to a previously-approved sponsor without any change in circumstances, Respondents are wrong."). As required by the TVPRA, ORR has already verified "the custodian's identity and relationship to the child," conducted background checks, and determined that release is in the child's best interests. 8 U.S.C. §§ 1232(c)(2)(A), (3)(A).

Far from being required by law, the reapplication policy violates the TVPRA and the ORR Foundational Rule. Subjecting a child to endless re-detention and re-evaluation of their sponsors without a showing of material changed circumstances is fundamentally inconsistent with "the TVPRA's instruction to place the minor in the least restrictive appropriate setting." *Saravia*, 905 F.3d at 1143 (quoting *Saravia*, 280 F. Supp. 3d at 1196); *A.N.P.S.*, 2025 WL 3707333, at *6; *cf.*

*Garcia Ramirez*, 2025 WL 3563183, at *15-16 (permitting ICE to rearrest an individual a few days after releasing them pursuant to the TVPRA without a showing of material changed circumstances is "unsupported by the text" and would be an "absurd result"). And absent evidence of material changed circumstances that render the sponsor unfit, refusing to release a child to a previously vetted and approved sponsor or alternate caregiver plainly constitutes unnecessary delay. 45 C.F.R. § 410.1201(a).[14] "[I]t is a 'well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action.'" *Fla. Inst. of Tech. v. FCC*, 952 F.2d 549, 553 (D.C. Cir. 1992) (quoting *Way of Life Television Network, Inc. v. FCC*, 593 F.2d 1356, 1359 (D.C. Cir. 1979)); *see also United States v. Nixon*, 418 U.S. 683, 695 (1974); *Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

Even where material changed circumstances do exist, additional vetting must be tailored to those circumstances to avoid unnecessary delay. For example, an individual's identity and biological relationship with the child do not change over time. Where there is no reason to doubt the sponsor's previously verified identity and relationship to the child, it is wholly unnecessary to block release while requiring new proof of identification and DNA testing. Mario C. Decl. ¶ 14; Benito S. Decl. ¶ 10; Diego N. Decl. ¶ 10; J.M.P.V. Decl. ¶ 7.

---

[14] ORR's regulations require it to release children "without unnecessary delay" to sponsors "in the following order of preference, to: (1) A parent; (2) A legal guardian; (3) An adult relative," and then to other adults or entities seeking custody. 45 C.F.R. § 410.1201(a). A "completed sponsor application" from parents, legal guardians, or other close relatives must be adjudicated within 10 or 14 days, "absent an unexpected delay (such as a case that requires completion of a home study)." 45 C.F.R. § 410.1205(b). Plaintiffs' sponsors already submitted completed sponsorship applications and had those sponsorship applications approved. Yet ORR is not only requiring the sponsors to reapply, but it has imposed new requirements that have lengthened the release process far beyond these regulatory timelines and effectively preference more distant relatives over parents and legal guardians based solely on their immigration status. *See, e.g.,* Renesme R. Decl. ¶¶ 11-12 (seeking release to aunt instead of previously approved father because of concerns about immigration enforcement).

## 2. Defendants' Policy is Arbitrary and Capricious.

Plaintiffs are also likely to succeed on their claim that the reapplication policy is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A). This provision of the APA authorizes courts to set aside agency action that is "not reasonable" or "reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). An agency action is arbitrary and capricious when the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants may not rely "on factors which Congress has not intended it to consider, entirely fail to consider an important aspect of the problem, offer an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 43 (citation modified). An action is also arbitrary and capricious if it lacks a "factual basis." *AFL-CIO v. Fed. Lab. Rels. Auth.*, 25 F.4th 1, 10 (D.C. Cir. 2022). Accordingly, courts must ensure that an agency "has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained [its] decision." *Prometheus Radio Project*, 592 U.S. at 423. An "unexplained inconsistency" in agency policy renders that action arbitrary and capricious. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981-82 (2005)).

Additionally, when an agency *changes* its position, it must "provide a reasoned explanation for the change, display awareness that [it is] changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 568 (2025). "An agency may not . . . depart from a prior policy s*ub silentio*." *FCC v. Fox Television Stations, Inc.*, 556 U.S.

502, 515 (2009). "Once a change in agency position is identified" a court must ask whether the agency "display[ed] awareness that it is changing position" and "offer good reasons for the new policy." *Wages & White Lion Invs.*, 604 U.S. at 570. This often means that an agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate" when "its prior policy has engendered serious reliance interests that must be taken into account." *Fox Television Stations, Inc.*, 556 U.S. at 515; *see also Am. Bar Ass'n v. Dep't of Educ.*, 370 F. Supp. 3d 1, 33 (D.D.C. 2019).

ORR's policy of disregarding its prior sponsorship approval decisions and requiring sponsors to begin the sponsor application process anew represents nearly every hallmark of arbitrary and capricious agency decision making.

*First*, ORR has provided no reasoned justification for systematically disregarding its prior determinations that Plaintiffs' release to their previously vetted and approved sponsors was in each child's best interests. When ORR releases children to sponsors, ORR necessarily determines that the sponsors are suitable and it is appropriate to release each particular child to each particular sponsor consistent with the TVPRA. *Saravia*, 905 F.3d at 1142. ORR has not articulated any reason why those sponsors, once deemed satisfactory by ORR, must in every case be required to start the process anew. *See Coal. for Humane Immigrant Rights*, 805 F. Supp. 3d 48, 94 (D.D.C 2025) ("'[A]n agency must give adequate reasons for its decisions,' such that a reviewing court can 'evaluate the agency's rationale at the time of decision.'") (quoting *Encino Motorcars*, 579 U.S. at 22, and *Pension Ben. Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 654 (1990)). The agency has not even "display[ed] awareness that it is changing position" regarding its prior sponsor application approval decisions, much less "offer[ed] good reasons for" its new position regarding the sponsor. *Wages & White Lion Invs.,* 604 U.S. at 570.

36

Even if ORR had provided some justification for disregarding its prior sponsor approvals, the justification offered for a change in policy or agency action cannot be inconsistent with the purpose of the requirement being implemented. *Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1, 39 (9th Cir. 2025). The goal of the TVPRA is to place children in the least restrictive setting in the best interests of the child; in most cases, with a family member. Disregarding its previous approval of children's sponsors and making those sponsors begin the application process anew results in lengthier detention of children in *more* restrictive settings, away from their loved ones. Here, the agency's decision to require already-approved sponsors to begin the lengthy application process anew "is in direct tension with" the purpose of the TVPRA." *Montana Wildlife Fed'n*, 127 F.4th at 39 (holding that prioritizing administrative efficiency over public participation in its streamlining of oil and gas leasing decisions was contrary to the purposes of the National Environmental Policy Act).

*Second*, ORR's reapplication policy is also arbitrary and capricious because it lacks a "factual basis." *AFL-CIO*, 25 F.4th at 10; *see also L.V.M.*, 318 F. Supp. 3d at 613 (holding that policy requiring ORR Director approval for release was arbitrary and capricious because "[the ORR Director] had no factual or legal basis for adopting" this policy, "he made no analysis of the policy's impact; and he offered no justification for the policy"). ORR appears to have adopted its reapplication policy solely based on a misreading of the TVPRA's requirements as requiring reapplication in every case. *See, e.g., A.N.P.S.*, 2025 WL 3707333, at *6.

To the extent ORR's policy is based on general child welfare concerns, there is no rational justification for refusing to make individualized determinations regarding whether the particular circumstances of each child's re-referral demonstrate a need to reconsider the sponsor approval decision. *See Solondz v. FAA*, 141 F.4th 268, 279 (D.C. Cir. 2025) (holding that FAA decision to

37

categorically disqualify airmen taking a specific medication without case-by-case consideration was arbitrary and capricious because it lacked a reasoned rationale). In the case of the individual Plaintiffs, ORR has not provided them or their previously approved sponsors any evidence that Plaintiffs were not safe or well cared-for by their sponsors, much less that ORR has reason to doubt the sponsor's identity or relationship with the child so as to require new identity verification steps.

*Third*, ORR has not acknowledged serious reliance interests that children and their sponsors have on the initial sponsorship application approval decision. *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020) (holding it was arbitrary and capricious for DHS to fail to consider reliance interests of DACA recipients; "because DHS was 'not writing on a blank slate,' it *was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns.") (internal citations omitted). Plaintiffs have been living with their approved sponsors for years and have developed strong reliance interests in remaining rooted to their communities: continuing to attend school, participate in sports and other activities, and reside with their loved ones. *See, e.g.,* Benito S. Decl. ¶¶ 2-4; Renesme R. Decl. ¶ 4-6; Diego N. Decl. ¶¶ 3-4; Mario C. Decl. ¶¶ 5-6, 21; J.M.P.V. Decl. ¶¶ 3, 9-12; *see also Angelica S.*, 786 F. Supp. 3d at 174 (holding that ORR failed to adequately consider reliance interests before changing sponsor documentation requirements, including the "particularly stark" impact on a re-referred plaintiff whose previously approved sister was now unable to sponsor him). ORR appears to have given no weight to these strong reliance interests when it refused to release Plaintiffs unless and until their sponsors repeated the application process.

*Fourth*, despite its prior conclusion that Plaintiffs' sponsors were suitable and that release to these sponsors was in the best interests of the children, ORR does not appear to have considered whether the benefits of repeating the sponsor vetting process outweigh the well-established harm

to children's mental health, family integrity, personal liberty, educational progress, and disruption of their lives that prolonged detention will cause. *See* Background Sec. V, *supra*. ORR thus failed to "examine the relevant data" and "entirely failed to consider [these] important aspect[s] of the problem." *State Farm*, 463 U.S. at 43.

Nor does ORR appear to have considered potential alternatives to its reapplication policy to minimize harm and respect children's constitutional rights. "An agency is required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (quoting *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008)). "This principle goes to the heart of reasoned decisionmaking; it is not limited to rulemaking" *Id*. The need to consider alternatives is especially strong where, as here, the agency is changing its prior positions. *Regents*, 591 U.S. at 30. The Ninth Circuit made clear in 2018 that ORR is not required—or even authorized—to reconsider its prior sponsor suitability decisions simply because a child re-enters its custody. *Saravia*, 905 F.3d. at 1143. Yet ORR failed to consider alternatives to its blanket reapplication policy, such as requiring additional application steps only on a case-by-case basis based on clear evidence of sponsor unsuitability and providing children and previously approved sponsors an opportunity to be heard regarding ORR's concerns about the sponsor, if any.

The reapplication policy is arbitrary and capricious and must accordingly be enjoined.

## II. Plaintiffs are Suffering Irreparable Injury

Plaintiffs and putative class members are suffering and will continue to suffer irreparable and grave harm in the absence of an injunction. Plaintiffs are all desperate to be released from ORR congregate care and return home to their families. Sixteen-year-old Renesme and fourteen-year-old Diego have been detained for months waiting for ORR to complete its increasingly

lengthy sponsorship approval process. Renesme R. Decl. ¶¶ 9-13; Diego N. Decl. ¶¶ 5, 7-11. Children such as Mario and Benito who are unable to return to their previously approved sponsor because of ORR's new sponsorship requirements are contemplating foster care placement despite having loving families ready to receive them. Mario C. Decl. ¶ 15; Benito S. Decl. ¶ 10. Both are seventeen years old and face the additional risk that they could be transferred to an adult ICE detention facility if they remain in ORR custody when they turn eighteen.

The harm resulting from Plaintiffs' detention and denial of their constitutional rights to procedural due process multiply every day and cannot be remedied after trial. *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself.") (quoting *Davis v. District of Columbia,* 158 F.3d 1342, 1346 (D.C. Cir. 1998)); *Blackman v. D.C.*, 277 F. Supp. 2d 71, 79 (D.D.C. 2003) (finding irreparable injury from failure to schedule a timely due process hearing under the Individuals with Disabilities Education Act because "each day a child is denied a free appropriate education by such procedural dereliction of a school system he or she is harmed yet again.").

Courts have consistently held that unnecessarily prolonged detention in ORR custody creates irreparable harm. *See, e.g., Angelica S.*, 786 F. Supp. 3d at 175 (finding irreparable harm where "plaintiffs attest that they are suffering by remaining in the care of ORR and separated from their families"); *Lucas R.*, 2022 WL 2177454, at *27, 33 (noting "the well-documented deleterious effects of prolonged detention on minors" and finding children in ORR custody "are likely to suffer irreparable harm in the form of unnecessarily restrictive or prolonged detention" without additional due process protections); *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 503 (family "[s]eparation irreparably harms plaintiffs every minute it persists"); *L.V.M.*, 318 F. Supp. 3d at 618

(holding that delayed release from ORR custody "incidental to the challenged director review policy (more than 35 days) is clearly long enough to cause irreparable harm to Plaintiffs" and noting that "neither party questions that prolonged detention is deleterious to young children, and, obviously, the longer the detention, the greater the harm."); *Saravia*, 280 F. Supp. 3d at 1200 (finding irreparable harm and noting evidence that "the longer children remain in confinement, the more likely they are to experience lasting negative mental health repercussions.").

### III. The Balance of Harms and the Public Interest Favor Plaintiffs

The remaining preliminary injunction factors, "the harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the balance of equities and the public interest strongly favor Plaintiffs. "[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). "[T]he government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns.'" *Angelica S.*, 786 F. Supp. 3d at 175-76 (quoting *R.I.L.-R. v Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)). "And the public interest is served when the government follows the APA's procedural requirements by offering a reasoned explanation for its decisions." *Id.* at 176. Here, ORR's reapplication policy violates constitutional due process and the Administrative Procedure Act.

The public also has a strong interest in the well-being of children and protecting the constitutional right to family integrity. *See Troxel,* 530 U.S. at 64; *Moore*, 431 U.S. at 504-06; *see also M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 124 (D.D.C. 2018) ("[T]he public also has an interest in ensuring that its government respects the rights of immigrants to family integrity while their removal proceedings are pending."). Although the government has an interest in caring for

41

children, this interest "is de minimis" if their parent or other potential sponsor is in fact suitable. *Stanley*, 405 U.S. at 657-58. "[W]hile there is still reason to believe that positive, nurturing parent-child relationships exist, the [state's] *parens patriae* interest favors preservation, not severance, of natural familial bonds." *Santosky*, 455 U.S. at 765-66.

## CONCLUSION

For these reasons, the Court should provisionally certify the putative class and issue a preliminary injunction.

Date: February 24, 2026

Respectfully submitted,

*/s/ Rebecca Wolozin*
Rebecca Wolozin (D.C. Bar No. 144369)
National Center for Youth Law
818 Connecticut Avenue NW, Suite 425
Washington, DC 20006
(202) 868-4792
bwolozin@youthlaw.org

Mishan Wroe*
Diane de Gramont*
National Center for Youth Law
1212 Broadway, Suite 600
Oakland, California 94612
(510) 835-8098
mwroe@youthlaw.org
ddegramont@youthlaw.org

Anna Deffebach (D.C. Bar No. 241346)
Joel McElvain (D.C. Bar No. 448431)
Robin F. Thurston (D.C. Bar No. 1531399)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
adeffebach@democracyforward.org
jmcelvain@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*

\* Motion to appear *pro hac vice* pending