Department of Health and Human Services
# Office of Inspector General



# Gaps in Sponsor Screening and Followup Raise Safety Concerns for Unaccompanied Children

**Christi A. Grimm**
Inspector General
February 2024, OEI-07-21-00250



# REPORT HIGHLIGHTS

February 2024 | OEI-07-21-00250

# Gaps in Sponsor Screening and Followup Raise Safety Concerns for Unaccompanied Children

## Why OIG Did This Study

The Office of Refugee Resettlement (ORR), a program office of the HHS's Administration for Children and Families (ACF), is tasked with evaluating the suitability of sponsors who apply to care for children who arrive in the United States unaccompanied by a parent or legal guardian. Thorough and efficient vetting of sponsors is essential to help protect the safety and well-being of unaccompanied children. To provide information on two important aspects of ensuring safe placements for children, we reviewed ORR's implementation of sponsor screening and post-release followup calls for children in our sample from early 2021, a time when ORR received a surge in referrals of unaccompanied children.

## What OIG Found

 In 16 percent of children's case files, one or more required sponsor safety checks lacked any documentation indicating that the checks were conducted.

 For 19 percent of children who were released to sponsors with pending FBI fingerprint or State child abuse and neglect registry checks, children's case files were never updated with the results.

 In 35 percent of children's case files, sponsor-submitted IDs contained legibility concerns.

 ORR failed to conduct mandatory home studies in two cases and four other cases raise concerns about whether ORR guidance on discretionary home studies should offer more specificity.

 In 5 percent of cases, sponsor records within ORR's case management system were not updated with child welfare outcomes or sponsorship history.

 In 22 percent of cases, ORR did not conduct timely Safety and Well-Being Follow Up Calls, and in 18 percent of cases, the followup calls were not documented in children's case files.

## What OIG Recommends

To continue to improve its process intended to safely release children to sponsors, we recommend that ACF: (1) implement additional safeguards to ensure that all safety checks are conducted and documented, as required, prior to approving the release of a child to their sponsor; (2) develop a reference guide to help case managers better evaluate sponsors' identity; (3) take additional steps to ensure that mandatory home studies are conducted when required; (4) provide additional guidance for case managers on when to consider recommending discretionary home studies; (5) ensure that sponsors' records in the UC Portal accurately capture sponsorship history and information obtained after children's release regarding sponsors' suitability; and (6) develop an effective monitoring mechanism to identify children who do not receive timely followup calls after their release to sponsors. ACF concurred with all of our recommendations.

# TABLE OF CONTENTS

BACKGROUND ......................................................................................................................................... 1

FINDINGS .............................................................................................................................................. 12

    In 16 percent of children's case files, one or more required sponsor safety checks lacked any documentation indicating that the checks were conducted ................................................................ 12

    For 19 percent of children who were released to sponsors with pending FBI fingerprint or State child abuse and neglect registry checks, children's case files were never updated with the results ................ 13

    In 35 percent of children's case files, sponsor-submitted IDs contained legibility concerns ................... 14

    ORR failed to conduct mandatory home studies in two cases and four other cases raise concerns about whether ORR guidance on discretionary home studies should offer more specificity ................... 15

    In 5 percent of cases, sponsor records within ORR's case management system were not updated with child welfare outcomes or sponsorship history ....................................................................................... 16

    In 22 percent of cases, ORR did not conduct timely Safety and Well-Being Follow Up Calls, and in 18 percent of cases, the followup calls were not documented in children's case files ................................ 18

CONCLUSION AND RECOMMENDATIONS ........................................................................................ 21

    Implement additional safeguards to ensure that all safety checks are conducted and documented, as required, prior to approving the release of a child to their sponsor .................................................... 22

    Develop a reference guide to help case managers better evaluate sponsors' identity ............................ 22

    Take additional steps to ensure that mandatory home studies are conducted when required ............... 22

    Provide additional guidance for case managers on when to consider recommending discretionary home studies ............................................................................................................................................ 23

    Ensure that sponsors' records in the UC Portal accurately capture sponsorship history and information obtained after children's release regarding sponsors' suitability ............................................................ 23

    Develop an effective monitoring mechanism to identify children who do not receive timely followup calls after their release to sponsors ........................................................................................................ 23

AGENCY COMMENTS AND RESPONSE ............................................................................................. 24

DETAILED METHODOLOGY ................................................................................................................ 26

APPENDICES ......................................................................................................................................... 29

    Appendix A: Background Checks for Sponsor Categories .................................................................. 29

    Appendix B: Release of a Child With Pending Results for an FBI Fingerprint or Child Abuse and Neglect Check .................................................................................................................................... 30

    Appendix C: Related OIG Work ......................................................................................................... 31

Appendix D: Children's Case Files Lacking Any Documentation Indicating That Sponsor Safety Checks Were Conducted ...................................................................................................................................34

Appendix E: Children's Case Files Lacking ORR-Required Documentation Verifying That the Sponsor Safety Checks Were Completed ...................................................................................................................35

Appendix F: Children's Case Files That Were Not Updated With the Results of FBI Fingerprint or Child Abuse and Neglect Checks After Their Release ..................................................................................36

Appendix G: Children's Case Files With Sponsor Identity Documents That Have Legibility Concerns..37

Appendix H: Sponsor Records in ORR's Case Management System That Were Not Updated With Child Welfare Outcomes or Sponsorship History..................................................................................................38

Appendix I: Safety and Well-Being Follow Up Calls That Occurred Later Than 37 Days...........................39

Appendix J: Safety and Well-Being Follow Up Calls, by ORR Facility Type.................................................40

Appendix K: Agency Comments......................................................................................................................41

ACKNOWLEDGMENTS AND CONTACT ........................................................................................................51

Acknowledgments...........................................................................................................................................51

Contact..............................................................................................................................................................51

ABOUT THE OFFICE OF INSPECTOR GENERAL.........................................................................................52

ENDNOTES .......................................................................................................................................................53

# BACKGROUND

### OBJECTIVES

1. To assess the extent to which Office of Refugee Resettlement (ORR)-funded facilities took required steps to help ensure the safe release of unaccompanied children through sponsor screening and followup calls.
2. To identify ways in which ORR could better ensure the safe release of unaccompanied children to sponsors.

ORR, a program office of the Administration for Children and Families (ACF) within the Department of Health and Human Services (HHS), manages the Unaccompanied Children (UC) Program.  Children who arrive in the United States unaccompanied are in ORR's care and custody until they can be released to sponsors—the majority of whom are parents or other relatives—who assume care of them.[1, 2]

ORR is responsible for identifying and evaluating potential sponsors in the United States to release children from care in a safe and timely manner.[3]  It is important for ORR to protect children from unsafe placements by taking appropriate steps to screen sponsors while also releasing children from care in a timely manner and without unnecessary delay.  The age of these children, their separation from family, and the dangerous journey to the United States make these children especially vulnerable to exploitation.[4]  Thorough vetting of sponsors is essential to help identify potential safety concerns before children are released to sponsors.

## Unaccompanied Children Program

Unaccompanied children are minors who have no lawful immigration status in the United States, are less than 18 years of age, and do not have a parent or legal guardian available in the United States to provide care and physical custody.[5]  The majority of unaccompanied children in ORR custody have been apprehended by immigration authorities while trying to enter the United States.  Children in custody of any Federal department or agency, including the Department of Homeland Security, must be transferred to ORR within 72 hours from the time that the child is determined to be unaccompanied, unless there are exceptional circumstances.[6]  Federal law requires ORR to make safe and timely placements for children in the least restrictive setting that is in each child's best interest.[7]  To that end, ORR funds a network of facilities that furnish temporary care for children until they are released to a sponsor or otherwise leave ORR custody.[8]  A child remains in ORR custody until an appropriate sponsor in the United States who can assume custody is identified, the child turns 18

years old and ages out of the UC Program, or the child's immigration status is resolved.[9]

## Office of Refugee Resettlement care provider network

ORR enters into grants, cooperative agreements, and contracts with several types of facilities, in a variety of settings, to form a care provider network that provides placements for the children in its care.[10]  These facilities must provide services for children, including housing, food, medical care, mental health services, educational services, case management, and recreational activities.[11]  Most facilities are licensed or accredited under the laws of their respective States, and they must meet ORR requirements.[12]  During our review in fiscal year (FY) 2021, ORR provided funding to approximately 200 facilities and programs in 22 States.

Standard network facilities, which are licensed residential care provider facilities in which all programmatic components are administered onsite, represent the least restrictive setting for children.[13, 14]  When ORR standard network facilities reach capacity during an influx or emergency, ORR may place children in influx care facilities (ICFs) or emergency intake sites (EISs).[15, 16, 17]  ICFs provide temporary shelter and services to children and may be exempt from State or local licensing standards.[18]

Although the number of unaccompanied children referred to ORR care varies from season to season and year to year, in FY 2021 ORR received a surge in referrals of unaccompanied children from the previous year.  The number of children in ORR care increased from 1,929 children in October 2020 to 20,339 children in April 2021.  At the same time, ORR's capacity to care for these children was diminished due to COVID-19-related staffing shortages and the loss of bed space due to recommended public health mitigation strategies.  (See Exhibit 1 for information on the number of referrals ORR has received since 2014.)

In response to the surge in referrals, ORR established EISs—unlicensed facilities meant to move children out of Department of Homeland Security border facilities.[19]  While in operation from March 2021 to June 2022, EISs were designed to provide limited services to children on a short-term basis before they were transferred to a standard network facility or released to sponsors.  EISs met basic standards of care for children in emergency response settings and, by April 30, 2021, were required to, as soon as possible and to the extent practicable, provide case management services for the safe and timely release of children to sponsors.[20]

**Exhibit 1: Annual referrals of unaccompanied children to ORR increased in FY 2021 and remained high in FY 2022 and 2023.[1]**



Source: ORR data on annual referrals of unaccompanied children from Department of Homeland Security, 2024.
[1] In FY 2020, the number of referrals of unaccompanied children decreased to 15,381 because of a U.S. public health order responding to the COVID-19 pandemic that was implemented in March 2020. The order suspended entry of certain noncitizens at or near the U.S. borders, resulting in the expulsion of most unaccompanied children upon attempting to enter the United States. Following a court injunction and a February 2021 policy change, referrals of unaccompanied children from the Department of Homeland Security to ORR began to increase.

## Sponsor screening for safe and timely release of children

ORR must release unaccompanied children from Federal custody to sponsors in the United States in a safe and timely manner.[21] Before releasing children to sponsors, ORR must establish the safety and suitability of potential sponsors.[22, 23] Children are released to sponsors in the following categories of preference: Category 1 (parent or legal guardian), Category 2A (an immediate relative such as a brother or grandparent, or a close relative such as an aunt or a first cousin who previously served as the unaccompanied child's primary caregiver), Category 2B (an immediate relative such as an aunt or a first cousin who was not previously the unaccompanied child's primary caregiver), and Category 3 (distant relatives and unrelated adults).[24] (See Exhibit 2 for the list of Sponsor Categories.)

**Exhibit 2: ORR Sponsor Categories for release of unaccompanied children[1]**



Source: OIG review of ORR UC Program Policy Guide, section 2.2.1, June 2019.
[1] Category 4 placements occur when no sponsor is identified.  We excluded Category 4 placements from our review.

## ORR and facility staff roles related to sponsor screening for safe and timely release of children from care

The steps for screening sponsors and releasing children from care are carried out by a variety of staff at all types of ORR facilities.[25]  Key staff include:

*Case managers.*  Case managers are facility staff who are responsible for assessing children and their potential sponsors, providing regular case updates to children, making transfer and release recommendations based on collected information, and coordinating the release of children.[26]

*Case coordinators.*  Case coordinators review all assessment information for unaccompanied children and children's sponsors to make a recommendation for release at ORR facilities.  During our review period (March–April 2021), case coordinators were not required staff at EIS facilities and were not required to review cases in which a child was eligible for expedited release.[27, 28]

*Federal field specialists.*  Federal field specialists are ORR employees who serve as official ORR representatives in the field tasked with oversight of children's cases. Federal field specialists are responsible for approving or denying children's release to sponsors.

*Other key staff.*  Other staff who are involved in the process of releasing children to sponsors include post-release service providers who connect children and their sponsors with resources within their local community, and other ORR and facility staff who conduct followup calls with children and their sponsors.

## Key steps in the sponsor screening process

ORR sets the following timelines for completing the screening process for potential sponsors in each sponsor category: Categories 1 and 2A (10 calendar days), Category 2B (14 calendar days), and Category 3 (21 calendar days).  ORR's process for screening a sponsor includes:[29]

*Identifying and contacting a sponsor.*  The case manager interviews the child, parents, legal guardians, or other family members (including those in their home country) to identify potential sponsors in the United States.  Once a sponsor is identified, the case manager contacts the potential sponsor.[30, 31]

*Sponsor submission of an application for release.*  The potential sponsor must complete and submit the Family Reunification Application.[32]  The potential sponsor must also provide documentation (i.e., original versions or legible copies) needed to verify the sponsor's identity, address, and relationship to the child, and, when applicable, any household member's identity.[33]  The case manager must ensure that copies of sponsor submitted identity documents (IDs) are readable, including a legible photo and information.[34]
The case manager is required to upload these documents to the child's case file in ORR's case management system, the UC Portal.[35]

**Exhibit 3: Key steps in the sponsor screening process**



Source: OIG review of ORR UC Program Policy Guide, section 2, June 2019.

*Sponsor Assessment.*  The case manager completes the Sponsor Assessment in which each sponsor's strengths, resources, risk factors, and special concerns are reviewed.  Case managers consider factors such as the sponsor's relationship with the child, the sponsor's motivation for wanting to sponsor the child, and the child's views on a release to the potential sponsor.[36]  The case manager is required to upload the Sponsor Assessment to the child's case file in the UC Portal.[37]

*Safety checks for all sponsors.*  ORR requires potential sponsors—and when applicable, sponsors' household members—to undergo address and background checks (together referred to as "safety checks") prior to a child's release.[38, 39, 40] The case manager is required to verify each sponsor's address in several systems, including SmartyStreets[41] and Google Earth/Google Maps.  The case manager is also required to search the sponsor's address in the UC Portal to determine whether the address has been used in a previous sponsorship case.  The case manager must document in the child's case file that each address check has been completed (e.g., save screenshots showing the results of the address searches) and upload the supporting documentation to the UC Portal.[42, 43]

The case manager is required to conduct  internet criminal public records checks and sex offender registry name and address checks for all potential sponsors. The case manager must upload documentation of the results of these public background checks (i.e., internet criminal public records checks and sex offender registry name and address checks) to the UC Portal.[44]

*Safety checks for some sponsors.*  A sponsor may be required to receive a Federal Bureau of Investigation (FBI) criminal history check (fingerprint check) and/or a State child abuse and neglect registry check as part of their safety checks depending on the sponsor's relationship to the child and other factors.[45]  These checks are conducted and uploaded to the UC Portal by HHS.[46, 47]  The case manager is notified of the results of these checks by email.[48]  (See Appendix A for a detailed description of when each type of background check is required.)  In some circumstances, a child may be released to a sponsor before ORR receives the results of a required FBI fingerprint or child abuse and neglect check (see Appendix B).

*Home study.*  The case manager consults with a case coordinator to determine whether to recommend that a home study be conducted.[49]  An ORR Federal field specialist makes the final decision as to whether a home study should be conducted.  If a case is approved for a home study, the case manager makes a referral to a home study provider to conduct the home study.[50]

A home study consists of interviews, a home visit, and a written report containing a home study case worker's findings.  A home study case worker assesses the potential sponsor's ability to meet the child's needs, educates and prepares the sponsor for the child's release, and builds on the Sponsor Assessment to verify or corroborate information gathered during that process.[51, 52]

**Exhibit 4: Staff determine whether to recommend a home study.**



Source: OIG review of ORR UC Program Policy Guide, section 2.4.2, January 2017.

*Mandatory home study.* A mandatory home study is required by the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) or by ORR policy for children who meet certain criteria. A TVPRA-mandated home study is required under the following circumstances: (1) a child is a victim of a severe form of trafficking in persons; (2) a child is a special needs child with a disability as defined by section 3 of the Americans with Disabilities Act of 1990; (3) a child has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened;[53] or (4) a child's sponsor clearly presents a risk of abuse, maltreatment, exploitation, or trafficking to the child based on all available objective evidence.[54]

ORR requires a mandatory home study under several circumstances. ORR's UC Program Policy Guide states that a home study is required for a nonrelative sponsor who seeks to sponsor multiple children, or who has previously sponsored or sought to sponsor a child and seeks to sponsor additional children.[55] In response to OIG's inquiry into this policy, ORR further clarified that an unrelated sponsor who had previously sponsored a related child is not required to undergo a home study when sponsoring an unrelated child. Separately, The UAC Manual of Procedures (version 5.0; internal guidance for ORR staff, contractors, and grantees) states that a home study is required for sponsors who are applying to sponsor a child who is not their own (e.g., niece or first cousin) and who have previously sponsored an unrelated child.[56] Additionally, ORR requires a mandatory home study for a child who is 12 years of age or younger before releasing them to a nonrelative sponsor.[57]

*Discretionary home study.* In cases in which a mandatory home study is not required, ORR's UC Program Policy Guide states that case managers and case coordinators may recommend a discretionary home study if they believe that it is likely to provide additional information to determine that

the sponsor is able to care for the child.[58,59]  ORR provides minimal guidance on when a discretionary home study should be conducted.[60]

*Release decision.*  The case manager reviews all collected information and makes a recommendation to the case coordinator regarding a child's release to a sponsor.  The case coordinator is responsible for integrating all areas of assessment and providing their own assessment of potential sponsors.  The case coordinator makes a recommendation for release to the ORR Federal field specialist.[61]  The ORR Federal field specialist then makes one of the following determinations: (1) approves the release, (2) approves the release with post-release services, (3) requires a home study before making a decision, (4) denies the release, or (5) sends the case back for further review.[62]  To make a decision to approve a release, the ORR Federal field specialist must determine that the sponsor can care for the well-being of the child.

## Safety and Well-Being Follow Up Calls

After the release of an unaccompanied child to a sponsor, ORR and facility staff conduct a Safety and Well-Being Follow Up Call (followup call) with both the sponsor and the child to help ensure the continued safety of the child.[63, 64]  Staff are instructed to conduct these followup calls between 30 and 37 days after a child's release from care and note the outcome of the call in the child's case file.[65]  The purpose of the followup call is to determine whether the child still resides with the sponsor, is enrolled in or attending school, and is safe, and to connect the child and their sponsor with any additional resources.[66]  Additional resources can include legal services, educational support, medical care, and safety plans for children or sponsors at risk of experiencing violence or trafficking.

## ORR's online case management system

The UC Portal is ORR's online case management system and is used throughout the sponsor screening process.  Case managers use the UC Portal to manage all activities related to a child's sponsorship case.  The UC Portal contains documentation used to verify a sponsor's identity, address(es), and relationship with a child, as well as other documents related to a child's case.

Every child who enters ORR care and every potential sponsor is logged in the UC Portal.[67]  Each child has an individual case file within the UC Portal that contains information from when the child enters ORR care to when the child is released, as well as followup that may occur.  Similarly, each sponsor has a unique record that is connected to each child's case file by the case manager during the sponsor screening process.  The sponsor's record contains links to the case files of each of the children associated with past sponsorships as well as flags for issues of concern.

Since April 2021, ORR has been making incremental improvements to the UC Portal.  According to ORR, these improvements prioritize child safety, efficiency of the case management process, the overall user experience, and system security and stability.

## Related work

OIG has issued many reports related to the well-being of unaccompanied children. This report follows a companion report, *Operational Challenges Within ORR and the ORR Emergency Intake Site at Fort Bliss Hindered Case Management for Children*, issued in September 2022.[68]  The report found that operational challenges, including a rushed opening and rapid onboarding of inexperienced case managers, along with case management challenges, may have adversely affected the safety and well-being of unaccompanied children at the ORR EIS at Fort Bliss.  In a 2017 report, OIG noted that ORR was able to contact 89 percent of sponsors and 84 percent of children 30 to 37 days after release from ORR custody.[69]  For previous OIG reports related to unaccompanied children, please see Appendix C.

## Methodology

### Scope

To provide information on two important aspects of ensuring safe placements for children, we reviewed ORR's implementation of sponsor screening and followup calls for children released to sponsors in March and April 2021.

### Sample Selection

We identified a population of 16,790 children in ORR care who were released to sponsors in March and April 2021.  We selected a random sample of 343 children stratified by facility type (i.e., (1) a standard network facility/foster care, or (2) ICF/EIS facility) and by sponsor category (i.e., (1) Category 1–2A/B, or (2) Category 3 sponsors) based on the population size of children within each stratum.  One child was ineligible for our review, leaving a final sample size of 342 children.  This sample design ensured that the sample included all sponsor categories and facility types.

**Exhibit 5: Stratified sample of 342 children released to sponsors in March and April 2021**



**Stratum 1: 100 children**

Sponsor Category 1–2A/B

Standard Network Facility or Foster Care

**Stratum 2: 100 children**

Sponsor Category 1–2A/B

ICF or EIS

Sample Selection Strata

Sponsor Category 3

Standard Network Facility or Foster Care

Sponsor Category 3

ICF or EIS

**Stratum 3: 99 children[1]**

**Stratum 4: 43 children**

Source: OIG sample selection of unaccompanied children, 2022.
[1] One child was ineligible for review in this stratum, for a final stratum size of 99 children.

**Data Collection**

To examine sponsor screening and followup calls for children selected for this review, we requested all policies and guidance from ORR related to these processes that were in effect in March and April 2021. For children in our sample, we also requested all case file documentation from ORR related to these processes and timelines.

To better understand sponsor screening and followup calls, we conducted a pre-inspection site visit to the ORR EIS at Fort Bliss in June 2021. While onsite, we interviewed more than 30 ORR and facility staff for this review.[70] We also participated in an orientation to the UC Portal.

**Data Analysis**

To determine whether sponsors were screened and followup calls were conducted according to ORR policy, we examined ORR's policies and guidance, and reviewed case file documentation and supplemental data (e.g., additional followup data not contained in children's case files) for the sampled children. We reviewed ORR's policies and guidance applicable to sponsor screening and followup calls and confirmed with ORR any questions regarding these policies.

We reviewed case file documentation obtained from ORR (i.e., documentation from the UC Portal and, when provided, scanned copies of the child's physical case file) for our sample of children to determine whether all sponsors were screened according to ORR policy and applicable field guidance. We determined whether all required sponsor documents and, as applicable, household member documents (e.g., proof of identity, proof of relationship, Family Reunification Packet) were contained in each child's case file. We reviewed the legibility of IDs submitted by sponsors.

We determined whether children's case files contained any documentation that indicated required safety checks were conducted (e.g., case notes or other references to a check). In addition, we determined whether children's case files contained ORR-required documentation verifying that each public background and address check was completed (e.g., a PDF or screenshot containing the results of a check). For additional details on the safety checks that we reviewed, please see the Detailed Methodology.

We also assessed whether children's case files contained any documentation that indicated a followup call was conducted for all sponsors and unaccompanied children. Then we reviewed the notes describing the outcome of each call.

For children who did not have documentation in their case file of a required step for the sponsor screening process or followup call, we reviewed supplemental data and documentation when provided by ORR. We attempted to analyze the timeliness of the sponsor screening process and identify any delays that may have occurred; however, the documentation we reviewed in the children's case files regarding this was not complete.

## Limitations

We reviewed all documentation contained within each child's case file to determine whether required steps for sponsor screening and followup calls were conducted; however, it is possible that actions were taken for sponsor screening and followup calls although no documentation of those actions appears in the case files.

## Standards

We conducted this study in accordance with the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.

# FINDINGS

## In 16 percent of children's case files, one or more required sponsor safety checks lacked any documentation that the checks were conducted

Case files for 16 percent of unaccompanied children who were released to sponsors in March and April 2021 did not contain any documentation that indicated one or more required safety checks for sponsors were conducted.  For all sponsors, required public background checks include internet criminal public records checks and sex offender registry name and address checks; required address checks include UC Portal address checks, SmartyStreets checks, and Google address checks.  For some sponsors, FBI fingerprint and State child abuse and neglect registry checks are also required (see Appendix A).[71]  In the children's case files that lacked any documentation of a check, we were unable to find any notes or other references in the case file that indicated the check was conducted.  Specifically, 11 percent of children's case files were missing any documentation that indicated one or more required address checks were conducted and 5 percent of case files were missing any documentation that indicated one of the required background checks were conducted.[72]

**16%** of children's case files **lacked any documentation** indicating that one or more required safety checks were conducted

When case files do not contain any documentation indicating that required address checks were conducted, case managers may miss information that could reveal unsafe placements.  For example, an address check may show that a residence is vacant or that the same residence was used by a sponsor for multiple prior sponsorships.  Similarly, for the children whose case files lacked documentation indicating that required background checks were conducted, case managers could miss disqualifying information such as prior felony convictions or pending criminal charges.  This evaluation, however, did not examine whether case managers addressed this missing information or how it may have impacted release decisions.  For a detailed breakout of our review of these safety checks, see Appendix D.

In some case files that contained references to completed public background checks (i.e., sex offender registry name and address checks and internet criminal public records checks) or address checks, we were unable to identify ORR-required documentation verifying that the checks were completed.[73]  During the period of our review, case managers were required to upload documentation verifying that they completed these public background checks and address checks to the UC Portal.

These case files did not contain the ORR-required documentation such as screenshots or PDFs with the outcome of the checks in the children's case files. (For a detailed breakout of checks that lacked the ORR-required documentation, see Appendix E.)

### Other sponsor documents were missing or incomplete in several children's case files

Our review also identified several children who were released to sponsors and who had missing or incomplete documents in their case file related to the sponsor screening process. Case managers collect and prepare many documents from each potential sponsor and manually upload each document to children's case files in the UC Portal. The incomplete and missing documents from the case files of children in our review included incomplete sponsor identity documentation, a missing household member identity document, missing Family Reunification Applications, and missing Sponsor Assessments. Although the impact of these missing documents was not evaluated in this review, documents that were incomplete or not uploaded to the UC Portal at the time of children's release could have limited the ability of staff who review and approve children's case files from fully assessing the safety of sponsors.

## For 19 percent of children who were released to sponsors with pending FBI fingerprint or State child abuse and neglect registry checks, children's case files were never updated with the results

For 19 percent of children whose sponsors required an FBI fingerprint check or a child abuse and neglect registry check, we found documentation in children's case files indicating that a check was initiated, but the results were pending at the time of the children's release.[74] ORR policy allows for children to be released to sponsors when the results of these checks are pending, under certain conditions (see Appendix B).[75] This practice can reduce children's length of stay in care because these checks can take weeks or more to be processed. However, this policy may also limit case managers' ability to address concerns regarding sponsor suitability before children are released to sponsors.

Further, children's case files were not updated to include the results of these checks after the children's release (see Appendix F). ORR was able to provide us with supplemental data regarding results from checks that were pending at the time of release and completed thereafter. However, this supplemental data did not demonstrate that children's case files had been updated with the results of these checks. Although ORR's policy does not require children's case files to be updated with the results of checks after the children have been released, a child's case file in the UC Portal is ORR's primary means of monitoring children and ensuring that each of the sponsor screening steps have been completed for their safety.

In cases in which ORR has released a child to a sponsor and later obtains concerning results from a safety check or information that would have led to a denial of

sponsorship, ORR policy directs staff to contact State Child Protective Services and/or local law enforcement as necessary and provide them with ORR's findings.[76]  Without the results of the background checks, it is not possible for OIG to determine whether ORR needed to contact State Child Protective Services and local law enforcement for these children.

After ORR provided supplemental data on the 26 pending checks, five cases raised concern; the rest raised no concerns.  There were three children for whom ORR could provide no evidence that the sponsor's results were ever received.  ORR records also indicated that the sponsor results for two children included some derogatory information, but those results were not retrieved by nor sent to the children's care provider facility.  Without knowing the nature of the derogatory information—which could be, but is not necessarily, information that would disqualify the sponsor—we cannot determine whether ORR should have taken any followup actions in these cases.  For both of these children, ORR records indicated that followup calls successfully contacted the child and sponsor.

When children's case files are not updated with the results of these checks after children are released, it also has the potential to impede thorough screenings for sponsors during future sponsorship attempts.  This is because ORR requires case managers to review the results of past background checks for potential sponsors who previously sponsored children.[77]  If these results are not contained in children's case files, potential safety concerns could be missed during future sponsorship reviews.

## In 35 percent of children's case files, sponsor-submitted IDs contained legibility concerns

Our review of children's case files identified legibility concerns with sponsor-submitted IDs (e.g., images or scans of photo IDs, birth certificates, or legal documents) in 35 percent of children's case files.  Facility staff are required to ensure that copies of sponsor-submitted IDs include a legible photo and information.  However, we identified legibility issues in the scanned images of sponsor IDs including images that were overly dark, light, blurry, or grainy.  (See Exhibit 6 for examples of sponsor IDs with legibility concerns on the next page.)

These issues could limit a case manager's ability to fully evaluate the photo or read the text on a sponsor's ID.  ORR does require sponsors to present the same ID for review against the image of the ID submitted during the screening process when physical custody of the children is transferred to sponsors.[78]  However, this review could be difficult in cases where the images of the IDs contain legibility issues.

In addition to sponsor IDs with legibility concerns, we identified images of IDs that were incomplete (e.g., missing the back or second page of the ID) and in which ID details (e.g., holograms or watermarks) were not visible in black and white images.  Although ORR's policy during the review period did not provide additional guidance for case managers on images of sponsor-submitted IDs, ORR later provided a training

to its staff on safe releases.[79]  In this training, ORR directed case managers to look for indicators that sponsor-submitted documents had been altered.  For example, ORR listed missing holograms, misspelled words, and blurry pictures as common concerns that may prompt case managers to conduct additional verification of a sponsor-submitted document.

**Exhibit 6: Examples of sponsor identity documents with legibility concerns**



Source: OIG review of case files, 2022.

## ORR failed to conduct mandatory home studies in two cases and four other cases raise concerns about whether ORR guidance on discretionary home studies should offer more specificity

Our review of children's case files identified two cases in which ORR failed to conduct mandatory home studies.  Home studies, which include in-person or virtual home visits and interviews with a potential sponsor and household members, represent an important opportunity to address safety issues and concerns before a child is released from care.  Home studies also prompt FBI fingerprint and child abuse and neglect checks for sponsors who would not otherwise receive them, which may provide further information on the sponsors and other adult household members (see Appendix A).  ORR is required to conduct mandatory home studies when a child or sponsor meets specific criteria. (For a description of our home study review process, please see the Detailed Methodology.)

In two cases, children who met ORR's criteria for a mandatory home study were released without receiving one.  In one case, a child was released to a distant relative sponsor who previously sponsored an unrelated child, which necessitates a mandatory home study under ORR policy.[80]  In another case, a child went through an expedited release process to a parent, although the child had reported escaping their physically and verbally abusive caregiver in their home country.[81]  The TVPRA requires a mandatory home study for an alleged victim of physical abuse by a caregiver.  In these cases, a home study would have helped case managers and Federal field

specialists to fully evaluate safety concerns and ensure that sponsors had sufficient supports and resources to meet the needs of these children.

If a case does not meet ORR criteria for a mandatory home study, facility staff may request, and ORR may approve, a discretionary home study if staff believe that it is likely to provide additional information regarding the suitability of a sponsor. However, ORR provides minimal guidance to case managers on recommending when a discretionary home study should be conducted.[82]

With limited guidance from ORR on the types of concerns that should prompt a case manager to consider whether a discretionary home study is warranted, opportunities to address safety issues could be missed.[83]  In four cases for which a mandatory home study was not required and a discretionary home study was not performed, we found concerning information documented in children's case files regarding sponsors' living arrangements.  In three of these cases, address checks conducted by case managers yielded results such as vacant houses or nonresidential addresses, but no home studies were conducted before children were released to these sponsors. Discretionary home studies could have enabled case managers to assess the safety of the home environments to ensure that they were valid places of residence before the children were released.  In a separate case, information in the child's case file indicated that a sponsor's household member had been previously denied sponsorship for unsafe living conditions at a former address where three children had run away.  A discretionary home study for this case could have included an interview with the household member in question and verified the safety of the residence.  In these four cases, discretionary home studies could have provided additional information to help ORR assess the safety of the home environment.

## In 5 percent of cases, sponsor records within ORR's case management system were not updated with child welfare outcomes or sponsorship history

Information regarding child welfare outcomes or sponsorship history was inaccurate or missing from sponsor records within ORR's case management system, the UC Portal, for 5 percent of sponsors (see Appendix H).  As a component of the sponsor screening process, case managers maintain information about potential and actual sponsors in their respective records within the UC Portal.  These sponsor records are connected to children's case files by the case manager during the sponsor screening process.  Within these sponsor records, case managers are required to use "flag" buttons to prominently display any issues that call into question the sponsor's ability to care for a child.  For example, case managers should flag a case when a child who is still a minor no longer resides with the sponsor who accepted the responsibility to care for the child.[84]  (See Exhibit 7 for an example of a sponsor flag.)  In addition, the sponsor records contain a table that tracks how many children sponsors have previously sponsored or attempted to sponsor.

**Exhibit 7: Example of the Sponsor Flag button within a sponsor record**

Sponsor Flag: ☑

Flag Note:

The sponsor was flagged because the child ran away from home. The sponsor reported that the child went to work in Florida to pay off a debt. The sponsor filed a police report and CPS was alerted.

Source: OIG review of case files and ORR policy, 2022.

If child welfare outcomes or sponsorship history are not updated in the sponsor records, they may not be flagged or reviewed, as appropriate.  This can impact the safety of other children that the sponsor may attempt to sponsor in the future.  For example, if a sponsor's record does not capture child welfare concerns that occurred after a child is released, this information may not be flagged for review during future sponsorships.  Another issue is the accuracy of data regarding how many children a sponsor has previously sponsored or attempted to sponsor.  This process can reveal, for example, a history of sponsoring multiple unrelated children, which would raise concerns and prompt a mandatory home study.  Because historical information about sponsors can help inform staff's decisions to approve or deny future applications for sponsorship, this missing information can hinder staff's ability to fully screen sponsors.

## In several cases, sponsors' records were not updated and flagged after staff identified concerns following children's release to sponsors

Although staff conducting followup calls and post-release services sometimes identified serious concerns about children's safety and well-being following their release from ORR care, these concerns were not always updated in sponsors' records. For example, one sponsor reported to a post-release services provider that the 15-year-old child released to the sponsor's care went missing in the middle of the night without any belongings or known contacts in the United States.  The sponsor reported the case to the police department and the post-release service provider reported the child as missing to the National Center for Missing and Exploited Children.  However, no notes or flags about this outcome were added to this sponsor's record, and he went on to sponsor two additional children following the incident.  During the followup call for another case, a staff member discovered that the whereabouts of a 3-year-old child who had been released to an unrelated sponsor were unknown.  Although the case was reported to Child Protective Services, no notes or flags were added to the sponsor's record in the UC Portal, meaning that a case

manager screening this sponsor for a future sponsorship may not learn of this concerning outcome.

Overall, staff identified more than 10 children who were no longer residing with their sponsors shortly after children were released from ORR care. Only five of these children's sponsor records noted this concerning outcome and contained related flags indicating concern about the suitability of the sponsor. It is possible that the remaining five children had legitimate reasons for no longer residing with the sponsor; however, information about the reasons for a change in the children's living situation was not always noted in the children's case files. Although we did not assess the impact of this missing information on any future placements with these sponsors, it is important that adverse outcomes be prominently noted in sponsor records. This is because case managers tasked with reviewing future sponsorship applications use this information in making placement decisions with a particular sponsor.

### In several children's case files, sponsor records did not accurately reflect sponsorship history, which may have impeded case managers' ability to adequately screen sponsors

Our review of children's case files identified 20 sponsor records in the UC Portal that did not reflect the number of children a sponsor had previously sponsored or attempted to sponsor. In these cases, we found references to previously sponsored children throughout the children's case files but did not see these sponsorships accounted for in sponsors' records. The process of confirming a sponsor's history of attempted and actual sponsorship is a crucial and required step to help alert case managers to a sponsor's past activities and identify potential safety concerns from previous screenings or sponsorships. This step introduces safeguards to mitigate risks of children falling victim to exploitation, which is a heightened concern when one adult attempts to sponsor several unrelated children.

## In 22 percent of cases, ORR did not conduct timely Safety and Well-Being Follow Up Calls, and in 18 percent of cases, the followup calls were not documented in children's case files

ORR made Safety and Well-Being Follow Up Calls to all children and their sponsors; however, our review of children's case files identified cases in which followup calls were not conducted timely or documented in children's case files. After children are released to sponsors, followup calls are an important opportunity for ORR to determine whether children are safe and whether children and their sponsors need additional support.

ORR guidance instructs staff to conduct followup calls within 30 to 37 days following a child's release.[85] When followup calls are not completed within 37 days, staff may face delays in connecting children and sponsors with additional resources, if needed,

or determining whether a child is still residing with their sponsor, is enrolled in school, is aware of upcoming court dates, and is safe. ORR also requires staff to document these calls, including the call outcome (e.g., if the child was safe or still residing with the sponsor), in children's case files. Noting the result of the call in the child's case file is important because case managers should consider this information (e.g., concerns identified if a child is no longer residing with the sponsor) when assessing future sponsorship attempts.[86]

## Followup calls were not conducted timely for 22 percent of children

Twenty two percent of followup calls were conducted 38 days or more after children's release, which may have caused delays in connecting children and sponsors to needed services (see Exhibit 8). Although ORR provided a list of dates showing that followup calls were made to all children in our sample at some point, many followup calls took place months after children left ORR care. For calls that occurred late, the median length of time before a call was placed was 122 days. The latest call that occurred for a child in our sample took place 324 days after this child was released.

The percentage of followup calls that were made 38 days or more after children's release varied by the facility type from which the children were released. Calls occurred late for 80 percent of children released from EISs, compared to 9 percent of children released from standard network facilities.[87] ORR attributed delays to the volume of children requiring followup calls in FY 2021 and the number of case managers or other staff available to make such calls. (See Appendix J for a detailed breakout of followup calls by facility type.)

**Exhibit 8: For one in five children, ORR did not conduct timely Safety and Well-Being Follow Up Calls.**



Source: OIG review of ORR case files, 2022.

## The case files of 18 percent of children did not contain documentation of the followup calls

Although ORR ultimately provided OIG information indicating that followup calls were made to all children and their sponsors, the case files for 18 percent of children lacked documentation indicating that the followup calls occurred, including the outcomes of the call. For children whose case files lacked documentation, ORR provided a

separate data file including dates on which the followup calls occurred and limited details on the outcomes of the calls.

The percentage of children's case files that did not contain documentation of the followup calls varied by the facility type from which the children were released.  Case files for 47 percent of children released from EISs were missing documentation of followup calls, compared to case files for 13 percent of children released from standard network facilities (see Exhibit 9).   See Appendix J for a detailed breakout of the followup calls lacking documentation by facility type.

**Exhibit 9: For children released from emergency intake sites (EISs), followup calls were more often late and not documented in case files as compared to followup calls made to children released from standard network facilities.**



Source: OIG review of ORR case files, 2022.

Our sample included 169 children released from standard network facilities and 76 children released from EISs.

* The difference in these proportions was statistically significant ($p$ <0.001).

# CONCLUSION AND RECOMMENDATIONS

ORR conducts sponsor screening and followup calls to help ensure children's safety following their release to sponsors.  Children who arrive in the United States unaccompanied are especially vulnerable to exploitation due to their age, separation from family, and hazardous journey to the United States.  We acknowledge that ORR received a surge in referrals of unaccompanied children during our review period in 2021, that created operational constraints and hindered its ability to fulfill its mission.  However, the number of unaccompanied children in ORR care has fluctuated widely over time, and ACF needs to be prepared to safely place children with sponsors in the event of future influxes. In fact, in 2022, referrals of unaccompanied children grew even higher, up to 128,904, compared to 122,731 the prior year.

Reducing the risk of harm to children following their release to sponsors requires a coordinated approach before and after children are released.  To provide information on two important aspects of ensuring safe placements for children, we reviewed ORR's implementation of sponsor screening and post-release followup calls for children.  We found that ORR generally conducted all steps for sponsor screening for most children in our sample; however, 16 percent of children's case files lacked any documentation that one or more required safety checks were conducted.  We also identified other documentation deficiencies in the case files of children released from ORR's care in March–April 2021 that may have introduced vulnerabilities into the sponsor screening process.  In addition, post-release followup calls that were conducted later than 37 days may have caused delays in connecting children and sponsors with needed services.

Addressing the vulnerabilities identified during our review will contribute to ORR's ongoing efforts to screen prospective sponsors more comprehensively and to better protect these children.  Other actions including post-release services for all children and coordinated efforts with other child welfare agencies could further help to ensure children's safety.

Following our review period and in response to our companion report,[88] ORR reported taking several actions to improve the sponsor screening process.  These actions include developing a training curriculum for case managers to help ensure effective case processing and sponsor screening and replacing all followup calls with post-release services by the end of FY 2024.  The post-release services will include virtual or in-person visits with all children and their sponsors.  Additionally, in June 2023, ORR published a sponsor screening audit, which outlined planned actions to improve the UC Program, including establishing a new Program Accountability team that will be responsible for assessing and addressing potential child exploitation risks.[89]

ORR also reported that it made multiple improvements to the UC Portal, including standardizing sponsor address data and adding additional data points to sponsor profiles.  In addition, ORR has incorporated a case management dashboard to better track case manager interactions and delays in the sponsor screening process.  Through this system, ORR is able to track which cases are delayed and why by reviewing case manager notes in tandem.

To continue to improve its process intended to safely release children to sponsors, ACF will need to take additional steps.  We recommend that ACF:

## Implement additional safeguards to ensure that all safety checks are conducted and documented, as required, prior to approving the release of a child to their sponsor

ACF should implement additional safeguards to ensure that all safety checks are conducted and documented within each child's case file, as required, prior to children's release.  To accomplish this, ACF could enable ORR's case management system, the UC Portal, to identify when a child's file is missing a required safety check, and prevent those children from being approved for release.  Exceptions could be made in situations in which ORR policy does not require specific checks to be completed prior to a child's release (i.e., when a child is released with the result of an FBI fingerprint or child abuse and neglect check pending).

## Develop a reference guide to help case managers better evaluate sponsors' identity

In addition to steps ACF has taken to train case managers, ACF should develop a reference guide for all case managers to fully evaluate sponsor IDs.  This guide should include the steps a case manager should take when reviewing a sponsor ID, such as standards for legibility and photo clarity; examples of acceptable submissions; potential indicators of fraud; and steps to take when case managers are unable to verify a sponsor ID.  This guide could include a checklist for case managers to track their efforts when evaluating a sponsor ID and actions to take in response to any concerns that may be identified.  ACF should provide this resource to all case managers during its training curriculum for the sponsor screening process.

## Take additional steps to ensure that mandatory home studies are conducted when required

ACF should implement additional oversight mechanisms to ensure that mandatory home studies are conducted to thoroughly vet sponsors, when required.  These mechanisms could complement existing review protocols for reviewing children's case files.

## Provide additional guidance for case managers on when to consider recommending discretionary home studies

ACF should provide more robust guidance on when case managers should consider recommending discretionary home studies.  To do this, ACF should issue guidance to assist staff reviewing children's cases by providing examples of circumstances in which a discretionary home study is advisable to determine whether sponsors are able to care for the children before releasing the children into sponsors' care.

## Ensure that sponsors' records in the UC Portal accurately capture sponsorship history and information obtained after children's release regarding sponsors' suitability

In addition to the steps that have already been initiated to improve ORR's case management system, ACF should ensure that sponsor records in the UC Portal accurately capture sponsorship history and contain complete information on the suitability of sponsors.  This should include information obtained after children's release such as the results from pending background checks, or concerns identified during the Safety and Well-Being Follow Up Call or during the provision of post-release services.

## Develop an effective monitoring mechanism to identify children who do not receive timely followup calls after their release to sponsors

To complement its expansion of post-release services, ACF should develop and implement an effective monitoring mechanism to identify children who do not receive timely followup calls (to be replaced with "virtual check-ins") after their release to sponsors.  This mechanism should identify children who have not been contacted within the required time frame following their release and alert staff that the contact has not yet been completed.  ACF should also ensure that the outcome of the call or check-in (i.e., discussions with the child and sponsor and any necessary actions taken in response) is documented in each child's case file.  This would enable any concerns that were identified during the call to be linked to the child's case file and the sponsor's record for consideration during future sponsor screenings.

# AGENCY COMMENTS AND RESPONSE

ACF concurred with all six of our recommendations.  ACF provided additional context regarding the historic challenges that ORR faced during the period of review, and detailed steps that it has since taken to enhance services for unaccompanied children.

In response to our first recommendation—for ACF to implement additional safeguards to ensure that all safety checks are conducted and documented within each child's case file, as required, prior to children's release to sponsors—ACF stated that it had taken steps to implement additional safeguards in the sponsor screening and documentation process.  These steps included digitizing sponsor assessment forms and enabling case managers to upload and track documents in the UC Portal.  ACF stated that it is in the process of making improvements to an electronic release request form to confirm required documentation and document evidence for release decisions.  We appreciate ACF's continued efforts to improve the sponsor screening and documentation process.  When ACF operationalizes the proposed improvements to its electronic release request, we will review documentation of these changes in its final management decision, or annual status updates, to determine whether they fulfill the first recommendation.

In response to our second recommendation—for ACF to develop a reference guide for case managers to better evaluate sponsors' identity—ACF described actions it had taken to implement a new training curriculum for case managers on sponsor identity verification.  ACF stated that the training material is continuously available as a resource guide via an online learning portal.  ACF also described that it has conducted trainings with HHS OIG to ensure ORR staff, grant recipients, and contractors are equipped to apply best practices in the identification of ID fraud.  We appreciate ACF's actions regarding sponsor identity verification and believe that these actions fulfill this recommendation.

In response to our third recommendation—for ACF to take steps to ensure that mandatory home studies are conducted when required—ACF noted that it has updated policies, procedures, guidance, and training.  These updates include policies to ensure timely home study referrals and clarify requirements for mandatory home studies.  ACF also added requirements to review previous sponsor or address flags and document how they were addressed.  ACF also stated that it developed and delivered trainings to case managers, grant recipients, and post-release services providers on home study requirements, recommendations, referrals, and procedures.  We appreciate ACF taking these actions to ensure mandatory home studies are conducted when required and believe that these actions fulfill this recommendation.

In response to our fourth recommendation—for ACF to provide more robust guidance on when case managers should consider recommending discretionary home studies—ACF shared actions it had taken to update procedures and trainings.  ACF

stated that it had clarified requirements for home studies and offered instances in which a case may be elevated or in which a discretionary home study may be appropriate. We appreciate ACF's efforts to update guidance related to discretionary home studies and believe that its actions fulfill this recommendation.

In response to our fifth recommendation—for ACF to ensure that sponsor records in the UC Portal accurately capture sponsorship history and information obtained after children's release—ACF stated that it had implemented updates to the UC Portal, sponsor vetting processes, and training modules. ACF described efforts to ensure accurate sponsor records that can be cross-referenced; a requirement for case managers to conduct searches for existing records before adding a new sponsor to the system; a standardization project to deduplicate records; and updated sponsor flagging capabilities. ACF stated that post-release services documents are now uploaded to UC Portal case files to capture information obtained after children's release from care and to allow tracking, flagging, and reporting of safety concerns. ACF also noted that updated training modules cover requirements for sponsor records to include sponsorship history and information obtained after children's release from care. We ask that ACF provide documentation supporting the updates it made to the UC Portal in its final management decision.

In response to our sixth recommendation—for ACF to develop and implement an effective monitoring mechanism to identify children who do not receive timely followup calls after their release to sponsors—ACF described actions it has taken and plans to take to improve the UC Portal in ways that make it easier to upload, access, and track information about followup calls. We appreciate these improvements to the Portal, which could support ACF in monitoring and ensuring that these calls occur timely. We ask that ACF provide more information in its final management decision about how it will leverage these Portal improvements to monitor and ensure that calls occur timely.

For the full text of ACF's comments, see Appendix K.

# DETAILED METHODOLOGY

## Sample selection

We obtained a list of all children released from ORR care to sponsors between March 1, 2021, and April 30, 2021.  To ensure that the sample included all sponsor categories and facility types, we stratified our sample selection by facility type (i.e., (1) a standard network facility/foster care, or (2) EIS/ICF facility) and sponsor category (i.e., (1) Category 1–2A/B, or (2) Category 3 sponsors).  We randomly selected a total of 343 children, distributed across each stratum.  The percentages included in this report are weighted to reflect the population from which the strata were selected. One child was ineligible for our review, which left a final sample size of 342 children. See Exhibit 10 for a detailed breakdown of the sample selection.

**Exhibit 10:  Population and final sample size of children in each stratum.**

| No. of Children in Each Stratum | Standard Network Facility or Foster Care | Emergency Intake Facility or Influx Care Facility |
|---|---|---|
| **Sponsor Category 1–2A/B** | 12,020 (n=100) | 3,507 (n=100) |
| **Sponsor Category 3** | 1,188 (n=99)[1] | 75 (n=43) |

[1] One child was ineligible for review in this stratum, for a final stratum size of 99 children.

## Data sources

We obtained from ORR policies and guidance on sponsor screening and followup calls, case file documentation, and supplemental data.  Specifically, we obtained all policies and guidance from ORR related to sponsor screening and followup calls that were in effect in March and April 2021.  This included the ORR UC Program Policy Guide, The UAC Manual of Procedures, field guidance, the UC Portal User Manual, and other sources.  For children in our sample, we requested all case file documentation from ORR related to these processes.  This included documentation for sponsors, and when applicable, household members, for proof of identity, proof of relationship, the Family Reunification Application, the Sponsor Assessment, address checks, background checks, home studies, followup calls, case management notes, and, when available, closure reports from post-release services.  We also requested supplemental documentation of dates of care for children and followup calls when they were not otherwise available in case file documentation.

We conducted a pre-inspection site visit to the ORR EIS at Fort Bliss, which included interviews with more than 30 ORR and facility staff involved with the case

management process.  During the site visit, we participated in an orientation to the UC Portal.

## Data analysis

**ORR Policies.**  We reviewed all the policies and guidance applicable to sponsor screening and followup calls in effect during our period of review.  We followed up with ORR to confirm our understanding of the policies and guidance to obtain answers to any additional questions we had.

**Case File Review.**  We reviewed each child's case file documentation (i.e., documentation from the UC Portal and, when provided, scanned copies of the child's physical case file) to determine whether all steps of the sponsor screening process were completed according to ORR policy and applicable field guidance.

*Sponsor Application*.  We determined whether each case file contained the required documents for each sponsor, and, as applicable, household member (i.e., a Family Reunification Application, proof of identity, proof of relationship, and a Sponsor Assessment).

*Sponsor IDs*.  We reviewed the images of IDs submitted by the sponsor to determine whether they contained a legible photo and information.

*Safety Checks*.  For required sponsor safety checks (i.e., address and background checks), we determined whether children's case files contained: (1) any documentation that indicated required safety checks were conducted (e.g., case notes or other references to a check) and, when applicable, (2) ORR-required documentation verifying that each check was completed (e.g., a PDF or screenshot containing the results of a check).  We determined which background checks were required for each sponsor on the basis of the sponsor category and any special circumstances indicated in the case file, such as a home study referral. We did not determine whether all safety checks were completed for a sponsor's adult household members.

Specifically, for required sponsor address checks, we looked for any documentation in the child's case file that indicated the address checks were conducted.  We also determined whether the case files contained ORR-required documentation verifying that each check was completed.

For required sponsor public background checks (i.e., internet criminal public records checks and sex offender registry name and address checks), we looked for any documentation in the child's case file that indicated the checks were conducted.  We also determined whether the case files contained ORR-required documentation verifying that each check was completed.

For required sponsor FBI fingerprint and State child abuse and neglect registry checks, we looked for any documentation in the child's case file that indicated

that the checks were conducted.  We also looked for the results of these checks, when available.

We shared with ORR a list of safety checks that were missing documentation.  For some cases, ORR provided supplemental data and documentation for these missing checks.  We reviewed these data and documentation and updated our data on a case-by-case basis.

*Safety and Well-Being Follow Up Call.*  We assessed whether a followup call was conducted for all sponsors and children.  We reviewed each child's case file for any documentation indicating that the call occurred.  If a call occurred, we reviewed the outcome of the call.  For the children without documentation of a followup call in their case file, we used supplemental data ORR provided with dates and additional details regarding the call.

*Other Safety Concerns.*  We reviewed children's case files for other safety concerns.  This included reviewing available information contained in case notes, home study documentation, and reports from post-release service providers.  We did not analyze the number of children who received mandatory and discretionary home studies.

*Screening Timeline.*  We attempted to analyze the timeliness of the sponsor screening process and any delays that may have occurred.  We identified dates regarding each child's length of stay in care and, when available, dates when specific steps in the sponsor screening process occurred (e.g., receipt of sponsor documentation or completion of a safety check).  The dates obtained from case file documentation were incomplete and did not allow us to obtain a complete picture of the sponsor screening timeline or delays that may have occurred.

# APPENDICES

## Appendix A: Background Checks for Sponsor Categories

The table below reports the background checks that ORR policy requires for each sponsor category.

| Check | Criteria for Check |
|---|---|
| Internet Criminal Public Records Check | Always required for all sponsors. |
| Sex Offender Name and Address Registry Check | Always required for all sponsors. |
| FBI National Criminal History (Fingerprint) Check | **Category 1 and 2A Sponsors:**<br>Required only if:<br><ul><li>a public records check reveals possible disqualifying factors,</li><li>there is a documented risk to the safety of the child,</li><li>the child is especially vulnerable, and</li><li>the case is being referred for a home study.</li></ul>**Category 2B and 3 Sponsors:**<br>Always required. |
| State Child Abuse and Neglect Registry Check | For all sponsors, required only if:<br><ul><li>the case requires a home study and</li><li>a special concern is identified.</li></ul> |
| State Criminal History Repository Check and/or Local Police Check | For all sponsors, required on a case-by-case basis only when there is an unresolved criminal arrest or issue that is still in process. |

Source: **The UAC Manual of Procedures (version 5.0), section 2.5.1**, February 2021; **ORR UC Program Policy Guide, section 2.5.1**, June 18, 2019.

# Appendix B: Release of a Child With Pending Results for an FBI Fingerprint or Child Abuse and Neglect Check

ORR may release a child to a sponsor before receiving the results of an FBI fingerprint or child abuse and neglect check in the following circumstances:

### Release pending results of FBI fingerprint check

1. The sponsor is Category 2B, which ORR defines as an immediate relative such as an aunt or a first cousin who was not previously the unaccompanied child's primary caregiver.

2. A public records check did not reveal possible disqualifying factors.

3. There is no documented risk to the safety of child and the child is not considered especially vulnerable.

4. The case is not being referred for a home study.

5. All applications, assessments, documents, and other required background check results needed to approve a safe release have been received and reviewed by the case manager.

6. The FBI fingerprint check was requested following ORR procedures.

7. Receipt of the FBI fingerprint check results is the only step preventing a release recommendation.

### Release pending results of State child abuse and neglect registry check[1]

1. All applications, assessments, documents, and other required background check results needed to approve a safe release have been received and reviewed by the case manager.

2. Receipt of the child abuse and neglect check results is the only item delaying release.

3. The child abuse and neglect check was not requested because a special concern was identified.

Source: **The UAC Manual of Procedures (version 5.0), section 2.5.1**, February 2021.

[1] ORR policy notes that ORR may choose to release a child when results of a child abuse and neglect registry check are pending if there are no significant child welfare concerns associated with the sponsor, an adult in the sponsor's home, or with the child or other children; the policy does not explicitly define significant child welfare concerns. **ORR UC Program Policy Guide, section 2.5.2**, June 18, 2019.

## Appendix C: Related OIG Work

Information on OIG's work on this topic can be found on our Unaccompanied Children webpage.  Below is a list of OIG reports on unaccompanied children.

| Title | Report No. | Date Issued |
|---|---|---|
| The Office of Refugee Resettlement Needs To Improve Its Oversight Related to the Placement and Transfer of Unaccompanied Children | A-06-20-07002 | May 2023 |
| The Office of Refugee Resettlement Needs To Improve Its Practices for Background Checks During Influxes | A-06-21-07003 | May 2023 |
| Operational Challenges Within ORR and the ORR Emergency Intake Site at Fort Bliss Hindered Case Management for Children | OEI-07-21-00251 | September 2022 |
| Office of Refugee Resettlement's Influx Care Facility and Emergency Intake Sites Did Not Adequately Safeguard Unaccompanied Children From COVID-19 | A-06-21-07002 | June 2022 |
| HHS Should Improve Internal Coordination Regarding Unaccompanied Children | OEI-BL-20-00670 | May 2022 |
| Office of Refugee Resettlement Generally Ensured That Selected Care Provider Facilities for Its Unaccompanied Children Program Complied With Federal Emergency Preparedness Requirements | A-04-20-02025 | February 2022 |
| Characteristics of Separated Children in ORR's Care: June 27, 2018–November 15, 2020 | OEI-BL-20-00680 | November 2021 |
| OIG Toolkit: Insights from OIG's Work on the Office of Refugee Resettlement's Efforts To Care for Unaccompanied Children | OEI-09-21-00220 | May 2021 |
| The Office of Refugee Resettlement Did Not Award and Manage the Homestead Influx Care Facility Contracts in Accordance With Federal Requirements | A-12-20-20001 | December 2020 |
| Office of Refugee Resettlement Ensured That Selected Care Providers Were Prepared To Respond to the COVID-19 Pandemic | A-04-20-02031 | November 2020 |
| Youth For Tomorrow—New Life Center, Inc., an Administration for Children and Families Grantee, Did Not Comply With All Applicable Federal Policies and Requirements | A-03-16-00250 | September 2020 |

| Title | ID | Date |
|---|---|---|
| Southwest Key Programs Failed To Protect Federal Funds Intended for the Care and Placement of Unaccompanied Alien Children | A-06-17-07004 | September 2020 |
| Unaccompanied Alien Children Program Care Provider Facilities Do Not Include All Required Security Measures in Their Checklists | OEI-05-19-00210 | June 2020 |
| The Office of Refugee Resettlement's Incident Reporting System Is Not Effectively Capturing Data To Assist Its Efforts To Ensure the Safety of Minors in HHS Custody | OEI-09-18-00430 | June 2020 |
| Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy | OEI-BL-18-00510 | March 2020 |
| Care Provider Facilities Described Challenges Addressing Mental Health Needs of Children in HHS Custody | OEI-09-18-00431 | September 2019 |
| Unaccompanied Alien Children Care Provider Facilities Generally Conducted Required Background Checks but Faced Challenges in Hiring, Screening, and Retaining Employees | A-12-19-20001 | September 2019 |
| Southwest Key Did Not Have Adequate Controls in Place To Secure Personally Identifiable Information Under the Unaccompanied Alien Children Program | A-18-18-06001 | August 2019 |
| Southwest Key Programs Did Not Always Comply With Health and Safety Requirements for The Unaccompanied Alien Children Program | A-06-17-07005 | August 2019 |
| The Children's Village Inc., an Administration for Children and Families Grantee, Did Not Always Comply With Applicable Federal and State Policies and Requirements | A-02-16-02013 | April 2019 |
| Lincoln Hall Boys' Haven, an Administration for Children and Families Grantee, Did Not Always Comply With Applicable Federal and State Policies and Requirements | A-02-16-02007 | February 2019 |
| Separated Children Placed in Office of Refugee Resettlement Care | OEI-BL-18-00511 | January 2019 |
| BCFS Health and Human Services Did Not Always Comply With Federal and State Requirements Related to the Health and Safety of Unaccompanied Alien Children | A-06-17-07007 | December 2018 |
| The Tornillo Influx Care Facility: Concerns About Staff Background Checks and Number of Clinicians on Staff | A-12-19-20000 | November 2018 |

| | | |
|---|---|---|
| Florence Crittenton Services of Orange County, Inc., Did Not Always Claim Expenditures in Accordance With Federal Requirements | A-09-17-01002 | October 2018 |
| Heartland Human Care Services, Inc. Generally Met Safety Standards, but Claimed Unallowable Rental Costs | A-05-16-00038 | September 2018 |
| Florence Crittenton Services of Orange County, Inc. Did Not Always Meet Applicable Safety Standards Related to Unaccompanied Alien Children | A-09-16-01005 | June 2018 |
| BCFS Health and Human Services Did Not Always Comply With Federal Requirements Related to Less-Than-Arm's-Length Leases | A-06-16-07007 | February 2018 |
| Office of Refugee Resettlement Unaccompanied Alien Children Grantee Review—His House | A-04-16-03566 | December 2017 |
| HHS's Office of Refugee Resettlement Improved Coordination and Outreach To Promote the Safety and Well-Being of Unaccompanied Alien Children | OEI-09-16-00260 | July 2017 |
| Division of Unaccompanied Children's Services: Efforts To Serve Children | OEI-07-06-00290 | March 2008 |

# Appendix D: Children's Case Files Lacking Any Documentation Indicating That Sponsor Safety Checks Were Conducted

The table below reports the number of children's case files that did not contain any documentation that indicated one or more required sponsor address or background checks were conducted.  These case files did not contain any notes or other references in the case file that indicated the check was conducted.

| Safety Check | No. of Case Files | Point Estimate | 95% Confidence Interval |
|---|---|---|---|
| UC Portal Address Check | 40 of 342 | 10.5% | 7.4%–14.7% |
| SmartyStreets | 5 of 342 | 1.0% | 0.4%–2.4% |
| Google Earth/Google Maps[1] | 4 of 342 | 0.6% | 0.2%–1.9% |
| **Missing Address Check Total[2]** | 43 of 342 | 10.9% | 7.8%–15.1% |
| Internet Criminal Public Records Check | 1 of 342 | 0.2% | 0.03%–1.4% |
| Sex Offender Name Check | 1 of 342 | 0.7% | 0.1%–4.9% |
| Sex Offender Address Check | 13 of 342 | 4.2% | 2.0%–8.7% |
| FBI Fingerprint Check | 0 of 189[3] | 0% | 0.0%–13.9% |
| Child Abuse and Neglect Registry Check[4] | 0 of 23[3] | N/A | N/A |
| **Missing Background Check Total[5]** | 15 of 342 | 5.1% | 2.6%–9.8% |
| **Missing Address and Background Checks Rollup[6]** | 55 of 342 | 15.6% | 11.3%  21.0% |

Source: OIG review of ORR case files, 2022.  N/A = Not applicable.

[1] Our analysis counted any documentation that indicated either a Google Earth or Google Maps check was conducted as complete documentation.  Numbers reported are of individuals missing any documentation of both checks.

[2] Missing address check totals include the number of sponsors missing one or more address check.

[3] FBI fingerprint checks and child abuse and neglect registry checks are not required for all children's sponsors.

[4] We are unable to reliably project the proportion of children's cases lacking child abuse and neglect registry checks due to the small sample size.

[5] Missing background check totals include the number of sponsors missing one background check.

[6] Missing address and background checks rollup includes the number of sponsors missing one or more address and/or background checks.

# Appendix E: Children's Case Files Lacking ORR-Required Documentation Verifying That the Sponsor Safety Checks Were Completed

The table below reports the number of children's case files missing ORR-required documentation verifying the sponsor safety checks. These checks were noted in the children's case files but did not include the required documentation verifying that these checks were completed (e.g., screenshots or PDFs with the results or outcomes of the checks). At the time of this review, ORR policy required case managers to upload documentation to ORR's case management system, the UC Portal, verifying the results of address checks (i.e., UC Portal Address Check, SmartyStreets, and Google address check) and public background checks (i.e., Internet Criminal Public Records Check, Sex Offender Name Check, Sex Offender Address Check).[1, 2, 3]

| Safety Check | No. of Case Files | Point Estimate | 95% Confidence Interval |
|---|---|---|---|
| UC Portal Address Check[2] | 187 of 342 | 61.6% | 54.6%–68.1% |
| SmartyStreets | 2 of 342 | 0.8% | 0.1%–4.6% |
| Google Earth/Google Maps[4] | 2 of 342 | 0.9% | 0.2%–4.4% |
| Internet Criminal Public Records Check | 1 of 342 | 0.2% | 0.03%–1.4% |
| Sex Offender Name Check | 4 of 342 | 0.4% | 0.1%–1.2% |
| Sex Offender Address Check | 5 of 342 | 0.5% | 0.2%–1.3% |

Source: OIG review of ORR case files, 2022.  N/A = Not applicable.

[1] **ORR, The UAC Manual of Procedures (version 5.0), section 2.2.4 and 2.5.1**, February 2021.

[2] ORR shared that only some facilities take a screenshot of the results of the check of the UC Portal address search and upload the results to the child's case file in the UC Portal.  As of March 2023, ORR does not require case managers to upload documentation of the UC Portal address check to the UC Portal.  **ORR, The UAC Manual of Procedures (version 8.1), section 2.2.4**, March 2023.

[3] ORR policy does not require case managers to upload the results of FBI fingerprint or State child abuse and neglect checks to the UC Portal.  **ORR, The UAC Manual of Procedures (version 5.0), section 2.5.1 and appendix 2.14**, February 2021.

[4] Our analysis counted documentation verifying either a Google Earth or Google Maps check as complete documentation. Numbers reported are of case files missing documentation verifying both Google checks.

# Appendix F: Children's Case Files That Were Not Updated With the Results of FBI Fingerprint or Child Abuse and Neglect Checks After Their Release

The table below reports the number of children whose sponsor required an FBI fingerprint or child abuse and neglect registry check and whose case files did not contain the results of these checks after the child's release. ORR policy allows for children to be released to sponsors without the results of an FBI fingerprint or child abuse and neglect registry check under certain conditions[1]; however, the results were never updated in children's case files after their release. Although ORR policy does not require that these results be added to case files, these results then may not be available for consideration by facility staff during future sponsorships. OIG followed up with ORR regarding the status of these pending checks and, as of January 2024, ORR reported that the checks were completed for 23 of the 26 children whose cases we had flagged. However, ORR did not provide documentation indicating that these children's case files were updated with the results.

| Metric | No. of Case Files | Point Estimate | 95% Confidence Interval |
|---|---|---|---|
| Case files that were not updated with the results of FBI fingerprint or child abuse and neglect registry checks after children's release | 26 of 189 | 19.0% | 11.1%–30.7%[2] |

Source: OIG review of ORR case files, 2022.

[1] **The UAC Manual of Procedures (version 5.0), section 2.5.1**, February 2021.

[2] The 95-percent confidence intervals for projected proportions exceed our standard of 10-percent absolute precision.

## Appendix G: Children's Case Files With Sponsor Identity Documents That Have Legibility Concerns

The table below reports the number of children's case files with scanned images of sponsor identity documents (IDs, e.g., photo IDs, birth certificates, and legal documents) that had legibility issues including images that were overly dark, light, blurry, or grainy.  Facility staff are required to ensure that copies of sponsor-submitted IDs are readable, including a legible photo and information.[1]

| Metric | No. of Case Files | Point Estimate | 95% Confidence Interval |
|---|---|---|---|
| Children's case files with sponsor IDs that contained legibility concerns | 124 of 342 | 35.1% | 28.4%–42.4% |

Source: OIG review of ORR case files, 2022.

[1] **ORR, The UAC Manual of Procedures (version 5.0), section 2.2.4**, February 2021.

## Appendix H: Sponsor Records in ORR's Case Management System That Were Not Updated With Child Welfare Outcomes or Sponsorship History

The table below reports the total number of children's case files in which sponsor records within ORR's case management system, the UC Portal, were not updated with child welfare outcomes identified after children's release or sponsors' history of sponsorship.

| Metric | No. of Case Files | Point Estimate | 95% Confidence Interval |
|---|---|---|---|
| Sponsor records within ORR's case management system not updated with sponsorship history or outcomes | 26 of 342 | 4.8% | 2.6%–8.8% |

Source: OIG review of ORR case files, 2022.

## Appendix I: Safety and Well-Being Follow Up Calls That Occurred Later Than 37 Days

For Safety and Well-Being Follow Up Calls that were conducted later than 37 days after children's release, the table below reports the median number of days the call took place after children's release.  ORR policy instructs staff to conduct a followup call with a child and their sponsor 30 to 37 days after a child's release.[1]

| No. of Followup Calls Conducted Later Than 37 Days After Children's Release | Point Estimate of Median (Days) | 95% Confidence Interval of Median (Days) |
|---|---|---|
| 93 of 342 | 121.6 | 72.8–170.4[2] |

Source: OIG review of ORR case files, 2022.
[1] **ORR, The UAC Manual of Procedures (version 5.0), section 2.8.4**, February 2021.
[2] The 95-percent confidence intervals for projected proportions exceed our standard of 30-percent relative precision.

## Appendix J: Safety and Well-Being Follow Up Calls, by ORR Facility Type

The table below reports the number of followup calls that occurred later than 37 days after children's release and the number of case files that lacked documentation of the followup calls, by ORR facility type.  For case files which did not contain documentation of a call, ORR shared a data file that contained dates on which the followup calls occurred and limited details on the outcomes of the calls.

| Facility Type | No. of Followup Calls | Point Estimate | 95% Confidence Interval |
|---|---|---|---|
| **No. of Late Followup Calls** | | | |
| Standard Network Facility | 18 of 169 | 8.5% | 4.5%–15.5% |
| Foster Care[1] | 14 of 31 | N/A | N/A |
| Influx Care Facility | 1 of 66 | 0.2% | 0.04%–0.6% |
| Emergency Intake Site | 60 of 76 | 80.5% | 69.8%–88.0%[2] |
| **Late Followup Calls Total** | 93 of 342 | 21.5% | 17.0%–26.8% |
| **No. of Case Files Lacking Documentation of a Followup Call** | | | |
| Standard Network Facility | 21 of 169 | 12.6% | 7.4%–20.6% |
| Foster Care[1] | 9 of 31 | N/A | N/A |
| Influx Care Facility | 5 of 66 | 7.2% | 2.0%–22.7%[2] |
| Emergency Intake Site | 35 of 76 | 47.2% | 36.1%–58.5%[2] |
| **Missing Documentation Total** | 70 of 342 | 18.1% | 13.5%–23.8% |

Source: OIG review of ORR case files, 2022.  N/A = Not Applicable.
[1] We are unable to reliably project rates for children released from foster care due to the low sample size.
[2] The 95-percent confidence intervals for projected proportions exceed our standard of 10-percent absolute precision.

# Appendix K: Agency Comments

Following this page are the official comments from ACF.



**Office of the Assistant Secretary** | 330 C Street, S.W., Suite 4034
Washington, D.C. 20201 | www.acf.hhs.gov

December 29, 2023

Ms. Juliet T. Hodgkins
Principal Deputy Inspector General
U.S. Department of Health and Human Services
330 Independence Avenue, SW
Washington, D.C. 20201

Dear Ms. Hodgkins:

I am writing to provide the Administration for Children and Families' (ACF) response to the Office of Inspector General's (OIG) draft report, *Gaps in Implementation of Sponsor Screening and Follow-up Calls Raise Concerns About the Safety of Unaccompanied Children*, (OEI-07-21-00250), which contains recommendations for the Office of Refugee Resettlement (ORR). Your report reviews March through April 2021, during one of the most challenging periods in ORR's history amid a historic number of unaccompanied children placed in ORR care, the largest and fastest expansion of emergency capacity, and at the height of the COVID-19 pandemic. As ORR worked quickly to respond to this unprecedented emergency, and with limited resources, it prioritized the safety and well-being of children at every step. We appreciate the opportunity to review and comment on the report. Below please find our comments on the report findings and our specific response to each recommendation.

## ACF Response to Recommendations

**Recommendation 1:** ACF implement additional safeguards to ensure that all safety checks are conducted and documented, as required, prior to approving the release of a child to their sponsor.

**ACF Response:** ACF concurs with this recommendation and has already taken action to address this recommendation. ORR continually reviews its processes and procedures and makes additions and enhancements as needed based on these reviews to strengthen the Unaccompanied Children (UC) Program. Since the time period of OIG's review, March through April 2021, ORR has taken several actions to implement additional safeguards in the sponsor screening and documentation process to ensure that all safety checks are conducted and documented. ORR has implemented UC Portal updates and developed additional trainings and resources to assist ORR field staff—who bear the responsibilities to ensure all sponsor vetting documentation is uploaded to the UC Portal and all vetting processes are followed in accordance with ORR policies and procedures.

ORR has made several important improvements to the UC Portal in an effort to better document sponsor vetting and prevent identify fraud. Since OIG reviewed ORR's implementation of sponsor screening and follow-up calls for children released to sponsors in

March and April 2021, for example, and interviewed staff at the now demobilized ORR Emergency Intake Site at Fort Bliss in June 2021, ORR has implemented several updates to the UC Portal to ensure that sponsors' records are accurately and comprehensively obtained and accessible.  In December 2021, ORR added data points to the sponsor profile in the UC Portal so a case manager could see information such as previous addresses, other sponsors using that address, the number of sponsorships the sponsor has attempted as a "potential" sponsor, and the number of children who have been actually sponsored by this sponsor in a single place on the UC Portal. In February 2022, ORR created a feature in the UC Portal where a case manager vetting a sponsor who has previously sponsored another child can view the full case file of the previous child, regardless of the shelter at which the previous child was cared for. Before this new feature, ORR programs had to email a request to the other program, which then had to compile and email the files to the requesting program. This new feature in UC Portal resolved a time-intensive process, greatly expediting field staff's ability to view and evaluate necessary case information. As a function of this new feature, case managers and other users are not able to add a "new sponsor" without first using the UC Portal search functions to determine if the sponsor is already in the system.

Additionally, in May 2022, ORR digitized the sponsor assessment, which was previously only available in paper form to be uploaded as a new document in the UC Portal, making it easier for field staff to complete after speaking directly to sponsors and for case managers to review. In September 2022, ORR's Technology team introduced the concept of "UC document categories," which allows case managers to upload notes, reports, and notices. This makes it significantly easier for field staff to differentiate between documents, identify if any and what remaining documents are yet to be uploaded, and ensure a child's file includes all relevant documents. Further, in November 2022, ORR significantly enhanced how addresses are standardized when entered into the UC Portal by leveraging Smarty Streets, an address validation utility that refences United States Postal Service address data, to verify and standardize each address that is entered into the UC Portal. By March 2023, the ORR Data team had standardized over one million addresses in the UC Portal, replacing unstandardized addresses. The UC Portal team is continuing this address standardization project to identify and deduplicate existing sponsor records.

As part of its effort to provide additional staff training on sponsor vetting and identifying document fraud, ORR collaborated with OIG to conduct training sessions for ORR staff, grant recipients, and contractors. In June 2022, ORR's Special Projects team, composed of federal field specialists, began collaborating with OIG's Office of Investigations (OI) to develop and implement these trainings. In 2023, ORR hosted trainings in El Paso and Houston, Texas; Los Angeles and San Francisco, California; Miami and Tampa, Florida; Portland, Oregon; and Seattle, Washington. Approximately 1,900 ORR staff, grant recipients, and contractors attended these trainings. ORR and OIG will continue to collaborate to identify future opportunities to host these trainings and provide vetting tools case managers can use post-training in 2024. Beginning in February 2023, ORR's Training and Technical Assistance Center began rolling out newly developed case manager curriculum modules, to equip all case managers with the same foundation of knowledge and understanding of thorough sponsor screening and effective case management practices. Case managers receive this training in

their first year of employment, with the majority of the training completed within 30 days of the case manager's assignment. Curriculum modules that address sponsor vetting requirements include "Category 3 Sponsor Assessment," "UC Portal Sponsor Assessment," "Assessing and Preparing Sponsors for Home Study," and "Sponsor Fingerprinting: Service Providers and Procedures 1.0." Case managers are also required to receive additional periodic trainings when policy updates are made, and trainings can be accessed any time as refreshers, as needed, in an online learning center. "UC Safe Release" was the most recent training module refreshed in November 2023 to address policy updates to the UC Program Policy Guide Section 2 regarding safe and timely release of children from ORR care. In addition to the above trainings, ORR continues to require critical safeguards when vetting a sponsor. Every sponsor receives public records and sex offender background checks. ORR also conducts interviews with sponsors, sponsor assessments, and completed family reunification applications with supporting documents.

ORR is also in the process of developing further resources, including advancing improvements to the electronic Release Request form that would require case managers, case coordinators, and federal field specialists (FFS) to describe what evidence they relied on for their release decision-making. The new form is also anticipated to include check-boxes to quickly confirm that all materials are present for the case. On August 7, 2023, ORR published a Federal Register notice pursuant to the Paperwork Reduction Act requesting public comments on the new Release Request form.[1]

In December 2023, ORR began issuing several policy updates to further strengthen the sponsor assessment and identification verification process. In early 2024, ORR will require parents and legal guardian (Category 1 sponsors) to provide documentation to verify their addresses, aligning them with the existing requirement for all other sponsors. This change will help to ensure consistency in the vetting process across all categories of sponsors and seeks to both enhance the accuracy of sponsor information and reduce the risk of fraudulent activities.

**Recommendation 2:** ACF should develop a reference guide to help case managers better evaluate sponsors' identity.

**ACF Response:** ACF concurs with this recommendation and has already taken action to address this recommendation. As mentioned in the response to Recommendation 1, in February 2023, ORR implemented a new case manager training curriculum, which includes training on evaluating and confirming a sponsor's true identity and serves as a critical resource guide for case managers.

ORR is consistently engaging in efforts to ensure that all staff, including case managers, understand and can appropriately implement its policies and procedures regarding sponsor

---

[1] U.S. Department of Health and Human Services, Office of Refugee Resettlement, *Request for public comment*, 88 FR 52167 (Aug. 7, 2023) www.federalregister.gov/documents/2023/08/07/2023-16795/proposed-information-collection-activity-release-of-unaccompanied-children-from-office-of-refugee.

identity verification. The case manager training curriculum was disseminated by ORR's Training and Technical Assistance Center and serves as a critical resource guide for case managers. The curriculum includes training on evaluating and confirming a sponsor's true identity; steps case managers should take when reviewing sponsor identification; and guidance on how to determine if sponsor identification is authentic. The curriculum training is continuously available to case managers via an online learning portal. Case managers receive this training in their first year of employment, with the majority of the training completed within 30 days of the case manager's assignment.

Further complementing the case manager training curriculum as additional guidance, also mentioned in Recommendation 1, as began in June 2022, ORR's Special Projects team and OIG OI are continuing their collaboration to develop and implement additional trainings to ensure ORR staff, grant recipients, and contractors understand and can apply best practices and become better equipped to identify identification fraud.

The case manager training curriculum, which serves as a foundational reference guide both during trainings and is continuously accessible via the online learning portal, as well as ORR's as partnership with OIG to provide best practices training on sponsor identification provides the needed guidance to help case managers evaluate a sponsor's identity.

**Recommendation 3:** ACF take additional steps to ensure that mandatory home studies are conducted when required.

**ACF Response:** ACF concurs with this recommendation and has already taken action to address this recommendation. As part of ORR's efforts to ensure that mandatory home studies are conducted when required, ORR has published several updates to the UC Program Policy Guide and UC Manual of Procedures (MAP) Section 2 to clarify requirements for home studies, review of sponsors, and steps to address sponsor and address flags in the UC Portal.

On January 30, 2023, to help ensure more timely home study referrals, ORR added a new requirement in the UC Program Policy Guide (Section 2.4.2) that within three calendar days of the home study referral, the home study provider must accept the referral and staff the case with a case manager. Effective March 28, 2023, ORR also updated the UC Program Policy Guide in the same section to reformat the ORR mandatory home study policy requirements into bullet points for clarity and to state that final authority for approving discretionary home studies to ORR's FFS supervisors

Home study referrals are made by FFS and complex cases, such as cases with confirmed fraud, cases where the sponsor is the partner of the child, cases where the sponsor resides in a flagged area, and cases with concerns regarding multiple sponsorships by the same sponsor, are elevated to FFS supervisors. If a case includes criteria triggering a mandatory home study and does not already have a home study referral, the reviewing FFS and FFS supervisor, if necessary, ensure that the home study referral is made. After the home study, reports are shared with the FFS and the case manager through the UC Portal. Home study reports must be uploaded to close home

study referrals in the UC Portal. The Home Studies Post-Release Services Project Officer team monitors the closure of home study referrals utilizing Tableau and collaborates with the Child Services team to follow-up as necessary to ensure that home studies are completed.

ORR policy and procedures clarify that if an address has been flagged by ACF's Office of Trafficking in Persons (OTIP), a home study mandated by the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) is required. Under no circumstances should a sponsor identified by OTIP as having subjected a minor to trafficking be approved. Per ORR policy (UC Policy Guide Section 2.4.2), a sponsor is required to undergo a mandated home study if the child (1) meets mandatory TVPRA categories specified in UC Program Policy Guide Section 2.4.2 Home Study Requirement; (2) is 12 years of age or under and is being released to an unrelated sponsor; or (3) is being released to an unrelated sponsor who is seeking to sponsor multiple unrelated children or has previously sponsored or sought to sponsor additional unrelated children. In addition, the UC MAP Section 2 updated in January 2023, clarifies that a home study is required if an address has been flagged by OTIP, though under no circumstances should a sponsor identified by OTIP as having subjected a minor to trafficking be approved.

Beginning in January 2023, ORR made several updates to UC MAP Section 2: Safe & Timely Release from ORR Care, to clarify home study requirements for addresses used in numerous sponsorship applications if there is a safety concern. The UC MAP Section 2.2.2 updated in January 2023, now states that case managers must also cross-reference the address against a list of previous flags in the UC Portal to see if the sponsor or address has been flagged during a previous case. In the event that the sponsor or address has been previously flagged, the case manager must elevate all prior and current flags to the FFS by noting the concern(s) and how any previous flag(s) were addressed in the Release Request form.

In addition, ORR's Training and Technical Assistance Center developed a training for case managers and other grant recipients on both discretionary and mandatory home studies. The mandatory live training for case managers, leads, clinicians, program directors, and assistant directors was delivered live in April 2023 and a recorded version of the training was provided as a required training course for individuals who could not attend the live sessions. The training was focused on how to prepare sponsors for home studies. It covered TVPRA home study requirements and referrals as well as home study recommendation and referral requirements. Along with this training, the Project Officer team developed a script disseminated for residential care case managers to use when preparing sponsors for a home study. This document is accessible as a resource available to all case managers attached to the Assessing and Preparing Sponsors for Home Study training.[2]

---

[2] U.S. Department of Health and Human Services, Administration for Children and Families, Home Study Preparation Guide,
http://lsidcdev.com/ORR/ORR/QRGs/Assessing_and_Preparing_Sponsors_for_Home_Study_Preparation_Guide.pdf

On July 11, 2023, the UC Program Policy Unit developed and issued *Frequently Asked Questions (FAQ) #11: Assessing and Preparing Sponsors for Home Study*, to the Care Provider Network, which is also uploaded to the UC Portal for continued reference. The FAQ addresses questions from the April 2023 training including information on the following topics:

- Identifying potential sponsors
- TVPRA home study requirements and referrals to OTIP
- Home study recommendation and referral requirements
- Home study case acceptance
- Preparing a sponsor for home study
- Home study process
- After the home study, including the process to request a home study addendum and timing of release recommendation

Additionally, in October and November 2023, ORR's Training and Technical Assistance Center delivered mandatory live trainings on how to conduct home studies to home study and post-release services (PRS) providers regarding ORR standardized procedures for completing a home study. Further, in December 2023, the FFS Academy released Standard Operating Procedures (SOP)to FFS on home studies.[3] Aligned with ORR policy and procedures, the SOP provides step-by-step instructions to guide ORR field staff on when and how to perform home studies in a consistent manner.

Since OIG's March–April 2021 evaluation period, ORR has updated its policy and implemented robust guidance, procedures, and trainings provide more safeguards into the process for determining whether to conduct a home study. Collectively, these actions help ensure home studies are conducted when required and provide guidance for when home studies are mandatory or when a discretionary home study may be advised.

**Recommendation 4:** ACF provide additional guidance for case managers on when to consider recommending discretionary home studies**.**

**ACF Response:** ACF concurs with this recommendation and has already taken action to address this recommendation. ORR has made several policy and guidance updates since OIG's evaluation period, particularly related to sponsor address flags and search protocols, notations, and standardization, as well as UC Portal improvements and trainings.

As referenced in Recommendation 3 above, beginning in January 2023, ORR made several updates to UC MAP Section 2: Safe & Timely Release from ORR Care, to clarify home study requirements for addresses used in numerous sponsorship applications if there is a safety concern. the UC MAP Section 2.2.2. states the process for case managers to cross-reference addresses against a list of previous flags in the UC Portal. These cases are elevated

---

[3] This is an ORR funded grant recipient (GDIT) that works with FFS to identify training needs and develop and deliver training in coordination with FFS and other ORR stakeholders. The FFS Academy provides FFSs with a collaborative learning experience to ensure unaccompanied children have the best opportunity for a safe and secure future.

and may receive discretionary home studies. In addition, the UC MAP Section 2.2.3 now states that a consultation with OTIP and a discretionary home study may be appropriate if there are concerns about a particular address. For instance, if an exact address has been used repeated times to sponsor or request to sponsor unrelated children, the case manager, case coordinator, and FFS may refer the case for a discretionary home study. Further, ORR refined UC MAP Section 2 guidance for identifying an address, checking for address flags, flagging concerns from trusted stakeholders, and determining when a home study is required or appropriate.

ORR has recently completed multiple initiatives to improve sponsor data integrity and search protocols, with additional initiatives planned in 2024. To assist on when to consider recommending discretionary home studies, FFS are required to elevate to their supervisors all cases that have issues that may trigger discretionary home studies. As mentioned in the response to Recommendation 3 above, ORR's Training and Technical Assistance Center developed a training for case managers and other grant recipients on both mandatory and discretionary home studies. This was followed by the UC Program Policy Unit's development and issuance of the *Frequently Asked Questions (FAQ) #11: Assessing and Preparing Sponsors for Home Study*, to the Care Provider Network. Also, as previously mentioned, in December 2023, the FFS Academy released Standards Operating Procedures to FFS on home studies. These initiatives ensure case mangers' ability to consider recommending discretionary home studies.

Further, ORR has implemented UC Portal improvements on sponsor flagging throughout fiscal years (FYs) 2022 and 2023, including improvements released on August 23, 2023, which enhance a user's ability to search for a sponsor in the UC Portal to increase the likelihood of finding a sponsor's record with limited information. As discussed in response to Recommendation 1 above, in November 2022, ORR also significantly enhanced how addresses are standardized when entered into the system by leveraging Smarty to verify and standardize each address that is entered into the UC Portal. By March 2023, the ORR Data team had standardized over one million addresses in the UC Portal, replacing unstandardized addresses. If a search in Smarty or the UC Portal raises a flag, depending on the totality of the conditions surrounding the case, the flag may lead to a discretionary home study. ORR's efforts to strengthen UC Portal sponsor flagging capabilities will continue throughout 2024.

**Recommendation 5:** ACF should ensure that sponsors' records in the UC Portal accurately capture sponsorship history and information obtained after children's release regarding sponsors' suitability.

**ACF Response:** ACF concurs with this recommendation and has already taken action to address this recommendation. As detailed in Recommendations 1 and 4 above, ORR has implemented multiple updates to the UC Portal and the sponsor vetting process to ensure that sponsors' records are accurately and comprehensively obtained and accessible to staff. ORR conducts monitoring to ensure that case files are updated appropriately with relevant records.

Additionally, the UC Safe Release 1.2 training module, published on November 8, 2023, covers ORR's policy requirement that sponsor records be added to the UC Portal to accurately capture sponsorship history and information obtained after children's release from ORR care. The Multi-Discipline Technical Assistance Team also delivers training and technical assistance to ORR care providers on the Safe and Timely Release process. This in-person technical assistance and training covers topics related to all documents and assessments required for the unification process, including sponsorship assessment background investigations and the safety and well-being process, as outlined in UC Program Policy Guide Section 2. As of December 2023, more than 100 ORR care providers have received this technical assistance and training.

To ensure that a child's records accurately capture information obtained after a child's release from ORR care and custody, beginning in September 2023, PRS documents, such as PRS reports and concerns identified during the provision of PRS have been added to the UC Portal case file. PRS providers are able to upload the home study report and the PRS closing report. In addition, in line with the UC Portal improvements, PRS providers are now able to upload all PRS event reports (based on each PRS visit) and Notice of Concern reports into the UC Portal when closing out the referral. The addition of these PRS-related materials will further enable a feedback loop of information allowing for potential issues or safety concerns to be flagged immediately and reported as applicable to the appropriate authorities. Sponsors, for instance, can be flagged post-release by the PRS providers in the UC Portal if sponsors do not fulfill their obligations. Notably, the UC Program Policy Guide Section 6.8.6 requires reporting issues to the appropriate authorities in certain circumstances such as suspected human trafficking, abuse, and disappearances.

To assist PRS providers, in June 2023, the ORR Technology team updated the UC Portal to allow PRS providers to better document and track their reports. Specifically, the available UC Documents categories were expanded to include "Case Management Notes," "PRS Report," and "Notification of Concern." Further, in September 2023, ORR contracted with a new partner to advance plans to implement new tools on what will eventually be a new state-of-the art platform which replaces the original UC Portal.

Finally, ORR's UC Monitoring team utilizes a standard checklist when reviewing case files during monitoring visits (i.e., monitors verify that there is documentation indicating that this call has been made and/or that attempts to contact the sponsor and/or child have been made). The ORR UC Monitoring team will continue to work with the Project Officer team to enhance monitoring tools to reflect new home study and PRS policies.

**Recommendation 6:** ACF develop an effective monitoring mechanism to identify children who do not receive timely follow-up calls after their release to sponsors.

**ACF Response:** ACF concurs with this recommendation and has already taken action to address this recommendation. From June to July 2022, ORR conducted a 30-day improvement sprint to identify barriers and improve outcomes in four key sponsor screening process and case manager interaction indictors across 50 focused care provider programs.

This effort focused on provider performance and staff supervision to ensure cases were processed appropriately. As mentioned in response to Recommendation 5 above, in June 2023, the ORR Technology team updated the UC Portal to allow PRS providers to better document and track their reports by expanding the available UC Documents categories to include "Case Management Notes," "PRS Report," and "Notification of Concern." Further, in September 2023, ORR issued a contract to advance plans to implement new tools on what will eventually be a new state-of-the art platform to replace the original UC Portal. ORR will continue to implement additional improvements that will assist in the effective and timely follow-up for unaccompanied children, within the bounds of ORR's authority, after their placement with a vetted sponsor as the new platform is operationalized and rolled out. The effort to continually identify and improve provider performance, staff supervision, and implement UC Portal advancements will further ensure effective monitoring mechanisms to timely support to children following their placement with sponsors.

Thank you for the opportunity to review and comment on this draft report. Please direct any follow-up inquiries to Amanda Barlow, Director of the Office of Legislative Affairs and Budget, at (202) 401-5009.

Sincerely,

Jeff Hild
Acting Assistant Secretary
    for Children and Families

# ACKNOWLEDGMENTS AND CONTACT

## Acknowledgments

Haley Lubeck and Dana Squires served as the team leaders for this study. Caroline Filbrun and Mollee Sultani served as research analysts for this study. Additional staff who contributed to this study include Joe Chiarenzelli, Christina Price, Sarah Smith, Andrea Hofstetter, and Jordan Swoyer. Office of Evaluation and Inspections headquarters staff who provided support include Althea Hosein, Jessica Swanstrom, and Sara Swisher.

This report was prepared under the direction of Brian Whitley, Regional Inspector General for Evaluation and Inspections in the Kansas City regional office, and Abbi Warmker, Deputy Regional Inspector General.

## Contact

To obtain additional information concerning this report, contact the Office of Public Affairs at Public.Affairs@oig.hhs.gov. OIG reports and other information can be found on the OIG website at oig.hhs.gov.

Office of Inspector General
Department of Health and Human Services
330 Independence Avenue, SW
Washington, DC 20201

# ABOUT THE OFFICE OF INSPECTOR GENERAL

**Office of Inspector General**
https://oig.hhs.gov

The mission of the Office of Inspector General (OIG) is to provide objective oversight to promote the economy, efficiency, effectiveness, and integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of the people they serve.  Established by Public Law No. 95-452, as amended, OIG carries out its mission through audits, investigations, and evaluations conducted by the following operating components:

## The Office of Audit Services.
OAS provides auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others.  The audits examine the performance of HHS programs, funding recipients, and contractors in carrying out their respective responsibilities and provide independent assessments of HHS programs and operations to reduce waste, abuse, and mismanagement.

## The Office of Evaluation and Inspections.
OEI's national evaluations provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues.  To promote impact, OEI reports also provide practical recommendations for improving program operations.

## The Office of Investigations.
OI's criminal, civil, and administrative investigations of fraud and misconduct related to HHS programs and operations often lead to criminal convictions, administrative sanctions, and civil monetary penalties.  OI's nationwide network of investigators collaborates with the Department of Justice and other Federal, State, and local law enforcement authorities.  OI works with public health entities to minimize adverse patient impacts following enforcement operations.  OI also provides security and protection for the Secretary and other senior HHS officials.

## The Office of Counsel to the Inspector General.
OCIG provides legal advice to OIG on HHS programs and OIG's internal operations.  The law office also imposes exclusions and civil monetary penalties, monitors Corporate Integrity Agreements, and represents HHS's interests in False Claims Act cases.  In addition, OCIG publishes advisory opinions, compliance program guidance documents, fraud alerts, and other resources regarding compliance considerations, the anti-kickback statute, and other OIG enforcement authorities.

# ENDNOTES

[1] ORR, UC Program Policy Guide (ORR Policy Guide): Introduction.  Available at https://acfmain-stage.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-introduction.  Accessed on Dec. 2, 2021.  During our review period, the (Policy Guide) was known as ORR Guide: Children Entering the United States Unaccompanied.

[2] ORR Policy Guide: Guide to Terms.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-guide-terms.  Accessed on Mar. 23, 2022.

[3] ORR Policy Guide, section 2.1, June 18, 2019.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2.  Accessed on Apr. 21, 2021.

[4] ACF, About the Program, Apr. 29, 2021.  Available at https://www.acf.hhs.gov/orr/programs/ucs/about.  Accessed on Feb. 22, 2022.

[5] 6 USC § 279(g)(2).

[6] 8 USC § 1232(b)(3).

[7] 8 USC § 1232(c)(2).

[8] ORR Policy Guide: Introduction.  Available at https://acfmain-stage.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-introduction.  Accessed on Dec. 2, 2021.

[9] ORR Policy Guide: Introduction.  Available at https://acfmain-stage.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-introduction.  Accessed on Dec. 2, 2021.

[10] Facility types in ORR's licensed care provider network include shelters; foster care or group homes; staff-secure or secure facilities; and residential treatment centers.  ORR Policy Guide, section 1.1, Jan. 27, 2015.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-1.  Accessed on Sept. 16, 2022.

[11] ORR Policy Guide: Introduction.  Available at https://acfmain-stage.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-introduction.  Accessed on Dec. 2, 2021.

[12] ACF, About the Program, Apr. 29, 2021.  Available at https://www.acf.hhs.gov/orr/programs/ucs/about.  Accessed on Feb. 22, 2022.

[13] ORR terminology previously referred to standard network facilities as shelter facilities.

[14] ORR Policy Guide: Guide to Terms.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-guide-terms.  Accessed on Mar. 23, 2022.

[15] ORR may activate and open an Influx Care Facility when ORR's net bed capacity at State-licensed shelters and transitional foster care programs is at or exceeds 85 percent for a period of 3 days.  ORR Policy Guide, section 7.2.2, Sept. 18, 2019.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-7.  Accessed on Apr. 21, 2021.

[16] As of May 2023, ORR does not operate any EISs.  ORR closed its last EIS in June 2022.

[17] As of January 2024, ORR plans to update the term "influx care facility or emergency intake site" with the term "emergency or influx facility."

[18] Influx Care Facilities generally provide the same services as ORR standard network facilities.  ORR details minimum required services for Influx Care Facilities in section 7.5.1 of the ORR Policy Guide, Sept. 18, 2019.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-7#7.5.1.  Accessed on Apr. 21, 2021.

[19] ORR field guidance, ORR Field Guidance #13, Emergency Intake Sites (EIS) Instructions and Standards, Apr. 30, 2021. Available at https://www.acf.hhs.gov/sites/default/files/documents/orr/FG-13%20EIS%20Instructions%20and%20Standards%202021%2004%2030.pdf. Accessed on June 16, 2021.

[20] ORR Field Guidance #13, issued April 30, 2021, required EISs to provide case management services, "as soon as possible and to the extent practicable," for the safe and timely release of children to sponsors. However, because EISs were established as temporary stopgap facilities, prior to the issuance of ORR Field Guidance #13, they were not initially intended to provide the full range of services offered at ORR's licensed facilities (e.g., case management for the safe and timely release of children). The rapid increase of unaccompanied children referred to ORR care from February through April 2021, combined with physical distancing protocols recommended to reduce the spread of COVID-19, caused a severe shortage of beds in ORR's licensed care provider network. This meant that many children could not be transferred from EISs to licensed ORR facilities and needed to be released directly from EISs to sponsors. As a result, ORR and its contractors had to establish services for the safe and timely release of children from EISs.

[21] Settlement Agreement, *Flores, et al. v. Reno*, Case No. CV 85-4544-RJK (C.D. CA, 1997), § 6, par. 14.

[22] ORR Policy Guide, section 2.1, June 18, 2019. Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2. Accessed on Apr. 21, 2021.

[23] 8 U.S.C. § 1232(c)(3).

[24] ORR Policy Guide, section 2.2.1, June 18, 2019. Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2. Accessed on Apr. 21, 2021.

[25] ORR Policy Guide, section 2.3, June 18, 2019. Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2. Accessed on Apr. 21, 2021.

[26] During our period of review (March and April 2021), EISs were staffed by Federal detailees and contracted case managers given the urgent need to increase ORR's network capacity.

[27] ORR Field Guidance #13, Emergency Intake Sites (EIS) Instructions and Standards, Apr. 30, 2021. Available at https://www.acf.hhs.gov/sites/default/files/documents/orr/FG-13%20EIS%20Instructions%20and%20Standards%202021%2004%2030.pdf. Accessed on June 16, 2021.

[28] As of Mar. 22, 2021, children to be released to their parent or legal guardian sponsor were eligible for expedited release if they met criteria specified under ORR Field Guidance #10. A child is not eligible for expedited release if: (1) the child is determined to be especially vulnerable, (2) the child is subject to a mandatory TVPRA home study, or (3) there are red flags present in the child's case. This field guidance modified assessments and procedures of the sponsor screening process to accelerate the release of eligible children to their sponsors. ORR Field Guidance #10, Expedited Release for Eligible Category 1 Cases, Mar. 22, 2021. Available at https://www.acf.hhs.gov/sites/default/files/documents/orr/FG-10%20Expedited%20Release%20for%20Eligible%20Category%201%20Cases%202021%2003%2022.pdf. Accessed on June 8, 2021.

[29] The applicable policies and guidance related to the sponsor screening process in effect during our period of review (March and April 2021) included the ORR UC Program Policy Guide, section 2 (January 2015), The UAC Manual of Procedures (version 5.0), section 2 (February 2021), ORR Field Guidance #10 (March 2021), and ORR Field Guidance #11 (March 2021).

[30] ORR Policy Guide, section 2.2, June 18, 2019. Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2. Accessed on Apr. 21, 2021.

[31] ORR, The UAC Manual of Procedures (version 5.0), section 2.2.2, February 2021.

[32] Sponsors are required to complete the Family Reunification Application as one component of The Family Reunification Packet. The packet consists of documents a potential sponsor must complete before a release decision can be made, including an Authorization for Release of Information, a Family Reunification Application, and a Sponsor Care Agreement. Documents in the Family Reunification Packet were updated following our period of review. See https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program.

[33] ORR Policy Guide, section 2.2.4, July 3, 2019. Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2. Accessed on Apr. 21, 2021.

[34] ORR, The UAC Manual of Procedures (version 5.0), section 2.2.4, February 2021.

[35] ORR, The UAC Manual of Procedures (version 5.0), sections 2.2.3 and 2.2.4, February 2021.

[36] ORR Policy Guide, section 2.4, Mar. 15, 2016.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2.  Accessed on Apr. 21, 2021.

[37] ORR, The UAC Manual of Procedures (version 5.0), section 2.4.1, February 2021.

[38] ORR Policy Guide, section 2.5, June 18, 2019.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2.  Accessed on Apr. 21, 2021.

[39] ORR, The UAC Manual of Procedures (version 5.0), section 2.2.4, February 2021.

[40] On March 31, 2021, ORR Field Guidance #11 waived requirements for background checks of household members of Category 2 sponsors, unless: (1) the child is especially vulnerable, (2) the child is subject to a mandatory TVPRA home study, or (3) there are red flags present in the case.  This field guidance remains active as of April 2023.  ORR Field Guidance #11, Temporary Waivers of Background Check Requirements for Category 2 Adult Household Members and Adult Caregivers, March 31, 2021.  Available at https://www.acf.hhs.gov/sites/default/files/documents/orr/FG-11%20Temporary%20Waiver%20of%20Background%20Check%20Requirements%202021%2003%2031.pdf.  Accessed on June 16, 2021.

[41] SmartyStreets is an internet address verification platform.

[42] ORR, The UAC Manual of Procedures (version 5.0), section 2.2.4, February 2021.

[43] The UAC Manual of Procedures had been updated since the date of this review and, as of March 2023, ORR does not require case managers to upload documentation of the UC Portal address check to the UC Portal.  ORR, The UAC Manual of Procedures (version 8.1), section 2.2.4, March 2023.

[44] ORR, The UAC Manual of Procedures (version 5.0), section 2.5.1, February 2021.

[45] ORR Policy Guide, section 2.5, June 18, 2019.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2.  Accessed on Apr. 21, 2021.

[46] ORR, The UAC Manual of Procedures (version 5.0), section 2.5.1, February 2021.

[47] HHS Program Support Center, Division of Children's Services conduct all FBI fingerprint and State child abuse and neglect registry checks on behalf of ORR.  ORR, The UAC Manual of Procedures (version 5.0), section 2.5, February 2021.

[48] ORR, The UAC Manual of Procedures (version 5.0), section 2.5.1 and appendix 2.14, February 2021.

[49] If there is nonconcurrence between the case manager's recommendation and the case coordinator's recommendation on the performance of a home study, the case coordinator elevates the case to the Federal field specialist, who will make a determination on whether or not to conduct a home study.  ORR, The UAC Manual of Procedures (version 5.0), section 2.4.2, February 2021.

[50] ORR, The UAC Manual of Procedures (version 5.0), section 2.4.2, February 2021.

[51] ORR Policy Guide, section 2.4.2, Jan. 9, 2017.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2.  Accessed on Apr. 21, 2021.

[52] When a child is released to a sponsor who received a home study, that child is referred for post-release services.  ORR also refers for post-release services in cases in which a child is released to a non-relative sponsor, or the child and sponsor would benefit from ongoing assistance from a community-based service provider.  Post-release services are provided to promote the safety and well-being of children and to provide access to services that support the child and sponsor.  ORR Policy Guide, section 6.2, Sept. 11, 2017.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-6#6.2.  Accessed on May 28, 2021.

[53] For the purposes of a TVPRA-mandated home study, the physical or sexual abuse must be perpetrated by a parent, legal guardian, caregiver, or other adult with a special relationship to the child.

[54] ORR Policy Guide, section 2.4.2, Jan. 9, 2017.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2.  Accessed on Apr. 21, 2021.

[55] ORR Policy Guide, section 2.4.2, Jan. 9, 2017.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2.  Accessed on Apr. 21, 2021.

[56] ORR, The UAC Manual of Procedures (version 5.0), section 2.4.2, February 2021.

[57] ORR Policy Guide, section 2.4.2, Jan. 9, 2017.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2.  Accessed on Apr. 21, 2021.

[58] ORR, The UAC Manual of Procedures (version 5.0), section 2.4.2, February 2021.

[59] If a case manager recommends a discretionary home study, they are required to document in children's case files what additional information the home study will be able to provide, other than what has already been gathered via the sponsor assessment process.  If a case manager does not recommend a discretionary home study, ORR policy does not require case managers to document their decision process.  ORR, The UAC Manual of Procedures (version 5.0), section 2.4.2, February 2021.

[60] ORR's guide, The UAC Manual of Procedures, contains only the following specific example of when a discretionary home study should not be conducted: concerns related to moving violations and DUIs or DWIs (unless there are multiple charges in a relatively short period) unconnected to a well-founded child welfare concern are not to be used as the underlying basis for a discretionary home study.  ORR, The UAC Manual of Procedures (version 5.0), section 2.4.2, February 2021.

[61] The case manager and case coordinator must agree on a release recommendation to the ORR Federal field specialist.  If they cannot agree they may refer the case directly to an ORR Federal field specialist for guidance on how to proceed.  ORR, The UAC Manual of Procedures (version 5.0), section 2.7, February 2021.

[62] ORR Policy Guide, section 2.7, June 29, 2018.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2.  Accessed on Apr. 21, 2021.

[63] As of April 2023, ORR is transitioning away from Safety and Well-being Follow Up Calls to expand post-release services to all children released from care.  ORR reported that under this new framework, each child should receive, at a minimum, a virtual or in-person visit at 7, 14, and 30 days after release to confirm the child is residing with their sponsor; is enrolled in school; is aware of upcoming court dates; and is healthy and safe.

[64] Facility staff are required to conduct Safety and Well Being Follow Up Calls with children and their sponsors after children are released from care.  However, because of staffing challenges, ORR shared that staff at the ORR National Call Center also conducted followup calls for children in our sample and their sponsors.

[65] The care provider facility staff must make a minimum of three attempts to speak with both the sponsor and the child unless the telephone is disconnected.  The facility staff must make all call attempts within the 7 days following the 30-day mark of the child's release.  The facility staff must not begin making calls prior to that 30-day mark and must make the call even if the sponsor or the child has already reached out to them independently.  The results of the call are documented in the case management notes of the child's case file.  ORR, The UAC Manual of Procedures (version 5.0), section 2.8.4, February 2021.

[66] If the care provider believes that the child is unsafe, the care provider must comply with mandatory reporting laws, State licensing requirements, and Federal laws and regulations for reporting to local child protective agencies and/or law enforcement.  ORR Policy Guide, section 2.8.4, Mar. 14, 2016.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2.  Accessed on Apr. 21, 2021.

[67] ACF, UAC Portal User Manual (version 1.2), September 2017.

[68] OIG, *Operational Challenges Within ORR and the ORR Emergency Intake Site at Fort Bliss Hindered Case Management for Children*, OEI-07-21-00251, September 2022.

[69] OIG, *HHS's Office of Refugee Resettlement Improved Coordination and Outreach To Promote the Well-Being of Unaccompanied Alien Children*, OEI-09-16-00260, July 2017.

[70] As a result of our pre-inspection interviews and reports on case management and child safety at the ORR EIS at Fort Bliss, we initiated a second evaluation focused on operational challenges at the facility.  For that work, we conducted 66 interviews

with individuals who were directly or indirectly involved in case management at the ORR EIS at Fort Bliss.  For additional information, the final report can be accessed at https://oig.hhs.gov/oei/reports/OEI-07-21-00251.asp.

[71] Some sponsors may be required to receive an FBI fingerprint or State child abuse and neglect registry check depending on the sponsor's relationship to the child and other factors specified in ORR Policy.  ORR, UAC Manual of Procedures (version 5.0), sections 2.2.4 and 2.5.1, February 2021.

[72] Three case files were missing any documentation of both an address check and a background check.

[73] During our period of review, ORR policy required case managers to upload documentation of the results of each address check and public background check in the UC Portal.  However, ORR shared separately that only some facilities take a screenshot of the results of the UC Portal address search and upload the results to the child's case file in the UC Portal.  ORR, The UAC Manual of Procedures (version 5.0), section 2.2.4, February 2021.

[74] The denominator for this analysis changes because only 189 of the 342 children's sponsors were required to receive an FBI fingerprint check and/or a child abuse and neglect registry check.

[75] ORR policy does not explicitly define all conditions (e.g., cases in which a special concern is identified) that would disqualify a child from release to a sponsor when the results of a safety check are pending.  Therefore, our analysis did not determine whether children with pending FBI fingerprint or child abuse and neglect checks were released in accordance with ORR policy.

[76] ORR Policy Guide, section 2.5.2, June 18, 2019.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2.  Accessed on Apr. 21, 2021.

[77] ORR, The UAC Manual of Procedures (version 5.0), section 2.2.2, February 2021.

[78] ORR Policy Guide, section 2.8.2, June 18, 2019.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2.  Accessed on Apr. 21, 2021.

[79] ORR provided training to its staff on safe releases in February 2022.

[80] ORR's Manual of Procedures, section 2.4.2, states that if a sponsor has sponsored an unrelated child and later wishes to sponsor a related child who is not their own child (e.g., a niece or first cousin), then the sponsor is required to undergo a home study.  ORR, The UAC Manual of Procedures (version 5.0), section 2.4.2, February 2021.

[81] In ORR's Policy Guide, section 2.4.2, a TVPRA-mandated home study is required for a child who has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened.  For the purposes of a TVPRA-mandated home study, the abuse must come from a parent, legal guardian, caregiver, or other adult with a special relationship to the child.  ORR Policy Guide, section 2.4.2, Jan. 9, 2017.  Available at https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2.  Accessed on Apr. 21, 2021.

[82] If a case manager recommends a discretionary home study, they are required to document in children's case files what additional information the home study will be able to provide, other than what has already been gathered via the sponsor assessment process.  If a case manager does not recommend a discretionary home study, ORR policy does not require case managers to document their decision process.  ORR, The UAC Manual of Procedures (version 5.0), section 2.4.2, February 2021.

[83] ORR's UAC Manual of Procedures contains only the following specific example of when a discretionary home study should not be conducted: concerns related to moving violations and DUI/DWIs (unless there are multiple charges in a relatively short period) unconnected to a well-founded child welfare concern are not to be used as the underlying basis for a discretionary home study.  ORR, The UAC Manual of Procedures (version 5.0), section 2.4.2, February 2021.

[84] ORR, The UAC Manual of Procedures (version 5.0), section 2.2.3, February 2021.

[85] ORR shared with OIG that it considers its Policy Guide, section 2.8.4, which requires care providers to conduct a followup call with a child and their sponsor 30 days after the release, to be a best practice.  ORR also considers the timeline specified in The UAC Manual of Procedures (version 5.0), section 2.8.4, which requires care providers to make a minimum of three attempts to speak with both the sponsor and the child within 7 days following the 30-day mark of a child's release, to be a best practice.

[86] If a check for previous sponsorship indicates that a potential sponsor has previously sponsored or previously attempted to sponsor an unaccompanied child in ORR care, the case manager assesses the sponsor's compliance for successful sponsorships by obtaining the records from the care provider where the previously sponsored child was in care, including the Safety and Well-Being Follow Up Call notes.  The case manager reviews the information provided and compares the information to the current case noting any discrepancies or red flags and then documents the findings in the UC Case Review.  ORR, The UAC Manual of Procedures (version 5.0), section 2.2.2, February 2021.

[87] These percentages reflect adjusted rates based on the population and sample size of children released from each facility type.  Our sample included 169 children released from standard network facilities and 76 children released from EISs.  The difference in the proportion of calls that were late for children released from standard network facilities compared to those for children released from EISs was statistically significant ($p$ <0.001).

[88] OIG, *Operational Challenges Within ORR and the ORR Emergency Intake Site at Fort Bliss Hindered Case Management for Children*, (OEI-07-21-00251), September 2022.

[89] ORR, Update on Efforts to Mitigate Child Labor Exploitation and Internal Audit on Placement Process Used to Transfer Custody of Unaccompanied Children to Vetted Sponsors, June 2, 2023.  Available at https://www.acf.hhs.gov/sites/default/files/documents/orr/update-on-efforts-to-mitigate-child-labor-exploitation-internal-audit-placement-process.pdf.  Accessed on June 27, 2023.