

ADMINISTRATION FOR
CHILDREN & FAMILIES
Office of Refugee Resettlement | 330 C Street, S.W., Washington, DC 20201
www.acf.hhs.gov/programs/orr

February 4, 2025

To:    File
From: Office of the Director, Office of Refugee Resettlement
Re:    Recommendations to Combat Sponsor and UAC Fraud

## EXECUTIVE SUMMARY

Under the Biden Administration, the Office of Refugee Resettlement (ORR) became a conduit for child exploitation, sexual predators, and human trafficking. They failed to protect these vulnerable children by ignoring safety risks, prioritizing their quick release over their safety even when presented with facts from the HHS Office of the General Counsel (OGC). President Trump will no longer allow ORR to facilitate the exploitation of unaccompanied children. President Trump is committed to protecting children. ORR will now be combating pervasive fraud in the UAC Program which enabled child trafficking, abuse, and unsafe conditions for vulnerable children. Our goal is to protect these children from continued exploitation.

In June 2022, at the request of Florida Governor Ron DeSantis, the Supreme Court of Florida impaneled a statewide grand jury to investigate the impact of illegal immigration on Florida. One of its reports, published in March 2023, outlined over 100 allegations concerning deficiencies in ORR's administration of the Unaccompanied Children (UAC) Program. Allegations included sponsor vetting failures, identity verification lapses, instances of child trafficking, and fraud in the sponsorship process.

In response to these allegations, the OGC conducted an internal investigation, confirming significant issues in sponsor vetting and broader programmatic vulnerabilities. Findings included instances of sponsors submitting fraudulent documents, sponsors with multiple aliases and addresses, children being released into overcrowded or unsafe living conditions, and sponsors extorting or exploiting children. OGC also identified rising concerns about age fraud, where adults masqueraded as minors, leading to serious safety risks.

Following OGC's findings, ORR established an Integrity & Accountability (I&A) Team in mid-2023 to detect and prevent fraud. The I&A Team corroborated OGC's findings, identifying additional instances of fraudulent sponsorship applications, document falsifications, and patterns of human trafficking and exploitation. Despite mounting evidence, ORR's data revealed that less than 1% of sponsorship applications were denied over recent years, highlighting systemic gaps in oversight. OGC briefed Secretary Becerra's Chief of Staff and the Deputy Secretary about this matter and political leadership took no meaningful steps to address the issue. This was a heinous dereliction of duty by the Biden Administration and must be immediately rectified in order to protect vulnerable children."

OGC briefed Secretary Becerra's Chief of Staff and the Deputy Secretary about this matter and political leadership took no meaningful steps to address the issue. This was a heinous dereliction of duty by the Biden Administration and must be immediately rectified in order to protect vulnerable children.

To address these challenges, ORR proposes immediate changes to improve sponsor vetting, programmatic oversight, and interagency collaboration. Key recommendations include:

- **Strengthening Sponsor Vetting**: Implement fingerprinting, DNA testing, and stricter document verification requirements, including immigration status, for all sponsor categories.

- **Enhancing Oversight**: Expand ORR's I&A Team, increase background checks for care provider staff, and ensure compliance with internal audit policies.

- **Technology Upgrades**: Introduce facial recognition, fraud tracking tools, and a centralized case management database to improve the data collection, sponsor adjudication process, post-release sponsor monitoring and document security.

- **Interagency Coordination**: Work with federal partners, including DOJ, USCIS, and DHS, to improve information sharing and expedite legal proceedings for UAC cases.

- **Legislative Proposals**: Advocate for a stronger national child abuse database, biometric data collection for minors, and changes to appropriations language to allow better collaboration between ICE and ORR.

These actions aim to mitigate fraud, protect UAC from exploitation, and improve the integrity of the UAC Program. By addressing systemic vulnerabilities, ORR seeks to create a safer and more accountable framework for children that come through its custody and support administrative and criminal investigations to eliminate child trafficking.

**BACKGROUND**

In June 2022, the Supreme Court of Florida at the request of Governor Ron DeSantis opened a statewide grand jury investigation into the impact of illegal immigration on the State of Florida. See Order Directing Impanelment of a Statewide Grand Jury, Case No. SC22-796, available at: https://efactssc-public.flcourts.org/casedocuments/2022/796/2022-796_disposition_155909_d04i.pdf (last visited January 24, 2025). The Florida statewide grand jury issued several reports, including a report that was published on March 29, 2023 (hereinafter "March report").[1] The March report contained over 100 allegations related to the Office of Refugee Resettlement and how it administers the Unaccompanied Children (UAC) Program. The allegations covered a variety of issues including insufficient sponsor vetting, lax verification of sponsor and UAC identities, gang affiliation of UAC, care provider fraud, deficiencies in hiring and training care provider staff, and UAC safety concerns while in ORR's custody. About one-third of the allegations focused on deficiencies in the sponsorship vetting process. The March report alleged that the process of identifying UAC and their sponsors creates multiple perverse

---

[1] The statewide grand jury reports are available here: https://acis.flcourts.gov/portal/court/68f021c4-6a44-4735-9a76-5360b2e8af13/case/651d8f68-f322-4cd0-831f-74dc9b0d77a8 (last visited January 24, 2025).

incentives and tragic outcomes and cast ORR and other Federal agencies as "middlemen" in an ongoing child trafficking scheme.

In May 2023, the HHS Office of the General Counsel (OGC) conducted an internal investigation to identify "which allegations [in the March report related to sponsor vetting] can and cannot be substantiated, where policy was and wasn't complied with, and where additional safeguards should be considered to continue to strengthen and improve the [UAC] program for the children [ORR] serve[s]."

### A. Fraud Identified by OGC during Internal Investigation

As part of its investigation, OGC conducted about 20 hours of interviews with ORR staff and reviewed data, case files, videos, and other publicly available information. The investigation focused on whether allegations related to sponsor vetting in the grand jury's March report were accurate. By and large, OGC found that most of the allegations in the March report were accurate. For instance, the grand jury alleged that potential sponsors were submitting fraudulent documents and photographs to ORR to sponsor multiple children simultaneously. OGC's investigation uncovered multiple instances of sponsors submitting fraudulent photographs and documents.

For example, in 2022, a potential sponsor submitted to ORR Photograph 1 below to establish his relationship with the child's mother.

**Photograph 1**



Even though this photograph was photoshopped, ORR released the child to the sponsor. The post-release services provider assigned to follow-up with the child and sponsor was unable to contact the sponsor or child and the case was closed.

About two months later, that same sponsor attempted to sponsor *another* child. He submitted Photograph 2 below to ORR to establish his identity.

**Photograph 2**



As shown in Photograph 2, the sponsor holding the ID card in the photograph is not the same individual pictured in the Guatemalan identification card. ORR denied the sponsorship after an ORR Federal Field Specialist coincidentally remembered the sponsor from the first case.

Another allegation made by the Florida statewide grand jury was that 100 UAC were released to a "single family dwelling" in Texas. OGC was not able to find a single-family dwelling where 100 UAC were released but did find that between 2021 and 2023, about 240 UAC had been released to about 200 unique sponsors with addresses at four apartment complexes within a quarter mile of each other in Austin, Texas. To put this in perspective, these four addresses include about 565 total units (based on a Google search). During the two-and-a-half-year period reviewed, on average a UAC was released to nearly half of all units. While migrants from the same country often live near each other, there were several indications of suspicious activity at these addresses, including seven sponsors using the same apartment number. OGC also identified a sponsor who sponsored two UAC at two of these apartment buildings at nearly the exact same time.

Further, in April 2022, a sponsor attempted to sponsor a UAC at an address where nine people were already living. The apartment only had two bedrooms. The sponsor was already sponsoring another UAC living at that address. The UAC was sleeping in a small closet with no ventilation that was described as "very, very warm." Although the home study provider did not

recommend release, ORR released the UAC to the sponsor knowing that ten people would be living in a two-bedroom apartment. After the UAC was released, the post-release services provider was unable to contact the sponsor or child.

Despite not being an objective of OGC's work, through the course of its investigation, OGC learned of age fraud in the Program. ORR staff indicated that they believed age fraud was on the rise. Some UAC are pretending to be children when in fact they are adults. In one high-profile case, a UAC (hereinafter "the defendant") was released to a sponsor in Jacksonville, Florida. Several months later, the defendant murdered the sponsor. After a law enforcement investigation, it was revealed that the defendant was actually 23 years old at the time of the murder, making him 23 years old when he was in ORR custody. Photograph 3 below is a photograph of the defendant when he was in ORR custody.



Multiple ORR incident reports reveal that the defendant made lewd comments to children and staff while in custody. One report stated that the defendant asked a child, "Usted quiere tener sexo?" meaning "You want to have sex?" Another incident report indicated that the defendant told a shelter staff that he was in love with her. The prevalence of adults living among children raises serious concerns about child safety in ORR's facilities.

During the investigation, ORR staff nearly unanimously stated that both sponsor and age fraud had increased, and some said the increase was dramatic. OGC was not able to quantify the increase in fraud, however, because ORR does not systematically track identified instances of fraud. But these documented instances of fraud corroborate what ORR Field staff reported. Among various other recommendations, ORR Field staff unanimously recommended fingerprinting all sponsors, no matter the sponsor's alleged relationship with the UAC, and also recommended stricter document verification policies for all sponsors. Additionally, multiple staff mentioned the possibility of using DNA testing more frequently to establish sponsor relationship with the child.

**B. Fraud Identified by ORR's Integrity & Accountability Team**

Following OGC's findings, in June 2023, an Integrity and Accountability (I&A) Team was established within the Office of the ORR Director as an independent oversight body with defined responsibilities to detect, prevent, mitigate, and report fraud and exploitation perpetrated by stakeholders of the Unaccompanied Children Bureau, such as sponsors, parents, and UAC. Over the past 7 months, the I&A Team has conducted a review of suspected fraud incident reports and data analysis of fraud in the Program. In short, the I&A Team identified the same types of fraud that OGC found during its internal investigation.

For instance, the Team has identified instances of children and sponsors using altered birth certificates or unaltered birth certificates belonging to another person. The Team found that the fraud often involved collusion with other people, such as a family member in the Country of Origin (COO). For example, the I&A Team identified 10 UAC who were released to sponsors who committed intentional document fraud in October 2024. The Team believes, however, that this fraud is underreported. The volume of fraud is difficult to capture because the categories of sponsors require different levels of documentation and receive varying levels of scrutiny. For example, category 1 sponsors (parent or legal guardian) and category 2A (relative that has previously been a primary caretaker of the UAC) and 2B (relative that has not been a primary caretaker of the UAC) are less scrutinized than the category 3 sponsors (unrelated adult).

In one case, the I&A Team found a woman and her partner attempted to sponsor a total of 15 UAC by using multiple aliases over a five-year period. The woman used various aliases to attempt to sponsor eight UAC over five years, with four UAC having been released to her, and four unsuccessful attempts to sponsor other UAC. The aliases were only discovered when the sponsor was fingerprinted. Of the four successful sponsorships, three were Category 1 cases and one was a Category 2A case. ORR staff also determined that the woman's partner also sponsored multiple children at multiple addresses. ORR staff identified three attempted or successful sponsorships by the woman's partner. All three of these cases were associated with one of the addresses listed by the woman. The woman's partner successfully sponsored one child as a purported Category 1 sponsor. The other two attempted sponsorships by the woman's partner were unsuccessful. Still, the woman was listed as part of the care plan for one UAC at the address that the partner listed, and that was the same address listed in the several of the sponsor's cases. There were four sponsors who used one of the addresses used by the woman in an attempt to sponsor seven UAC. In all, 15 UAC were impacted by successful and potential sponsorships by these two individuals.

In another case that occurred in late February 2024, an individual sponsor using multiple identities and addresses to sponsor or attempt to sponsor multiple children in the Cleveland, Ohio area was discovered after an investigation of potential child abuse and trafficking. The individual successfully sponsored a 15-year-old female UAC whose allegations of sexual abuse and trafficking led to charges of rape against the sponsor. The sponsor successfully used multiple identifications as revealed by multiple images in the UC Portal holding different identification cards, posing as various relatives (mostly as a brother), resulting in numerous sponsor profiles. At least two different addresses were used by the same individual. In addition to the 15-year-old female UAC he also sponsored a 17-year-old male UAC and attempted to sponsor a second 16-

year-old female UAC, and a 15-year-old male UAC. The two attempts were unsuccessful due a UC Portal address flag.

After pulling all releases to sponsors in Cleveland, Ohio that occurred between July 1, 2023, through February 28, 2023, additional cases in the region were flagged with concerns. The cases uncovered another sponsor who was using different IDs, as well as different sponsor who lived with the first sponsor, and an overlap of addresses. This example and related cases indicate sponsors' use of multiple identities, and multiple sponsors using the same addresses to sponsor or attempt to sponsor multiple children, as well as the fluidity of sponsor movement from one address to another.

The I&A Team also identified several instances of attempted or successful extortion of sponsors and/or other individuals who were part of a UAC's case. In the cases reviewed over a 7-month period, an estimated $63,900 was extorted. In several cases, an individual demanded payment to sponsor the UAC. One scheme consisted of 17 reported instances of successful extortion over 4 months, totaling $27,694.

The I&A Team has developed many important recommendations for combatting fraud to prevent sex and labor trafficking, which are incorporated in the recommendations below.

### C.  ORR Sponsorship Denial Data

Review of ORR's sponsorship data shows that almost no sponsorships have resulted in a denial, despite the mounting evidence of significant fraud in the Program. In Fiscal Year 2021, 108,352 UAC were released to a sponsor. Of those, 107,856 were released to a sponsor without a sponsorship denial. Therefore, less than 1% of sponsorships were denied. This pattern of nearly nonexistent denials has continued over the last four years. In FY 2024, 99,421 UAC were released to a sponsor. Of those, 98,866 were released without a sponsorship denial, or less than 1%. The nearly nonexistent sponsorship denials are concerning given that ORR's Field staff has repeatedly warned of an increase in sponsorship fraud and the I&A Team's and OGC's findings that fraud occurs at an alarming rate in the Program.

### D.  Congressional and Other Warnings About Increased Fraud

The HHS Office of Inspector General released a report in February 2024 titled, "Gaps in Sponsor Screening and Follow Up Raise Safety Concerns for Unaccompanied Children."[2] The Report identified numerous deficiencies in ORR's screening process of potential sponsors. Notably, the OIG found that in 35% of children's case files, sponsor-submitted IDs contained legibility concerns.

Additionally, for years Congress has identified deficiencies in the sponsor vetting process. For instance, in January 2024, Senator Grassley wrote a letter to HHS identifying instances of sponsor fraud. See Letter from Sen. Grassley (dated January 23, 2024).[3] Senator

---

[2] The report is available here: https://oig.hhs.gov/reports/all/2024/gaps-in-sponsor-screening-and-followup-raise-safety-concerns-for-unaccompanied-children/

[3] The letter is available here: https://www.grassley.senate.gov/news/news-releases/grassley-alerts-dhs-fbi-to-evidence-of-human-trafficking-calls-for-immediate-action-to-locate-and-rescue-migrant-children.

Grassley indicated that he had evidence of suspicious sponsors and summarized several instances of apparent sponsor fraud, including a case of "a male subject who provided questionable documents to sponsor a young female. Although he claimed to be one of the girl's close relatives, he later posted photographs of the female on social media showing himself touching her in a suggestive manner."

In 2021, the Senate Committee on Finance published an Investigative Report titled, "Exposing the Risks of Deliberate Ignorance: Years of Mismanagement and Lack of Oversight by the Office of Refugee Resettlement, Leading to Abuses and Substandard Care of Unaccompanied Alien Children."[4] The report stated, "After examining data largely from 2014 to 2020, the congressional investigation found that HHS, via ORR, fails to provide the basic oversight needed to ensure the safety of children in its care due to extensive record-keeping deficiencies and the lack of a clear framework for taking action when serious incidents occur." The report provided a number of recommendations, many of which are reflected below.

Recent media reports have reported that UAC, including young girls, have been released to homes where they live with multiple unrelated men, yet ORR has not taken any steps to identify these individuals (i.e., household members of sponsors) or to confirm that they are not sex offenders or convicted felons.[5] In one reported case, a sponsor sponsored two UAC at two different addresses simultaneously.[6] The sponsor admitted to a reporter that there were five men living at one of the addresses. ORR took no steps to identify those men to confirm that it was safe to release a child to the residence. In another reported case, a young female UAC was living with four adult men, whose identities and backgrounds were never checked by ORR. Other young children in the same apartment complex were interviewed by the reporter. They said that the young girl was not living with her parents, but with some "men." Finally, in another reported case, a young female UAC admitted to a reporter that her sponsor—her alleged "aunt" whom the UAC had never met—was using her for "sex work."

## RECOMMENDATIONS

ORR must immediately shift from a culture of accommodation and sympathy to a firm commitment to identify and address fraud, particularly among those attempting to sponsor vulnerable UACs and adults fraudulently presenting themselves as UACs at the border. Over the past 12 months, ORR's I&A team has developed a robust analytical process to detect and validate fraud. It is imperative that I&A is positioned at the forefront of ORR's mission, with their work being prioritized to clearly communicate to all ORR staff—both federal and contracted—that fraud is tantamount to trafficking and must be treated as such. Implementation of the recommended immediate actions, discussed below and recommended by the I&A Team, may lengthen the sponsor adjudication process; however, ensuring child safety and preventing trafficking must be the priority. We do not anticipate that the length of care will dramatically increase if these recommendations are implemented. Currently, the average length of care is 25.8 days, which is exceedingly fast, suggesting that only a cursory review of sponsor applications is

---

[4] The report is available here: https://www.grassley.senate.gov/imo/media/doc/finance_committee_report_-_orr_unaccompanied_children_program.pdf.

[5] See Project Veritas undercover report, available here: https://www.youtube.com/watch?v=1B-L_wfbhXc

[6] This claim in the media was confirmed by OGC.

occurring along with very few enhanced safety measures like fingerprinting, home studies, and DNA testing.

In terms of fingerprinting, ORR has a contract with Fieldprint for sponsor fingerprints. ORR staff has said that fingerprint results are consistently returned in 24-48 hours. Fieldprint also has thousands of fingerprint sites throughout the United States, making it convenient for sponsors to be fingerprinted. For instance, based on a search of the Fieldprint website, it appears they have 18 fingerprint sites in Houston, Texas alone. Therefore, requiring fingerprints of all sponsors and household members should not have a dramatic effect on length of care, though it may slow releases by a day or two as the results are evaluated.

ORR is currently at 42% capacity and has an additional 6,000 beds on cold status. The UAC population that is likely to enter ORR custody (non-Mexican and Mexican age 13 or less) encounter average for the last 7 days is 96. Therefore, if implementation of increased fraud detection measures results in a small increase in the average time in care, there is existing capacity to absorb the increased population in licensed facilities.

Accordingly, we are recommending the following:

***Immediate Sponsor Process and UAC Encounter Enhancements to Address Trafficking Concerns***

- Initiate ICE's "Super Sponsor" enforcement operation with high visibility video and media communications demonstrating the Administration's commitment to child safety and intolerance for sponsor fraud.
- Assign ORR I&A analysts and HHS OIG agents to human trafficking task forces to address UAC-related trafficking concerns.
- Implement fingerprinting requirements for all sponsor categories to conduct comprehensive criminal background checks.
- Implement fingerprinting requirements for all household members of sponsors to ensure that children are not released to a household with an adult whose criminal history indicates they may pose a threat to the UAC.
- Introduce *mandatory* rapid DNA testing for all Category 1, 2A, and 2B sponsors.
- Formalize the sponsorship application and associated documents as an official federal document, imposing legal penalties for fraudulent statements.
- Reassess the use of secondary documents (e.g., foreign marriage certificates, foreign driver's licenses, baptismal certificates) that cannot be reliably verified as proof of identity.
- Remove sponsor processes, application packets, and internal ORR policies and procedures from public-facing platforms to reduce the risk of system exploitation by bad actors.
- Require sponsors to present original identification documents in person to to the grantee or contractor.

➢ Mandate that all sponsorship applications, whether completed or not, receive a finalized decision—either approval or denial—to ensure accurate data collection and prevent indefinite case statuses and withdrawals without explanation.

➢ Request that CBP be directed to increase investigative scrutiny of alleged UAC that appear likely to be adults.  This should include BITMAP data, extensive interviewing, and document validation.

➢ Enhance requirements to conduct additional home studies in certain circumstances.

### *Programmatic Changes to Enhance UAC Safety and Prevent Exploitation*

➢ Reallocate vacant positions to expand the ORR Integrity and Accountability (I&A) Team, including adding an intelligence component.

➢ Conduct a comprehensive review of all Memoranda of Agreement (MOAs) and internal policies that limit information-sharing with federal law enforcement agencies.

➢ Increase background clearance standards for care provider staff to enhance child safety.

➢ Strengthen interagency collaboration to develop tools that improve the verification of foreign documents.

➢ Review the federal staffing levels for Federal Field Specialists to ensure a manageable ratio of children to Specialist to ensure a workload that allows for child safety and fraud prevention.

➢ Examine the current sponsorship circumstances that require a home study be conducted prior to placement to identify current compliance with the requirements and if the circumstances that trigger the requirement should be expanded.

➢ Evaluate the potential transition of care provider programs from grant-based models to fully contracted systems, with explicit child safety requirements in Notices of Funding Opportunity.

- Mandate abuse prevention training and reporting protocols aligned with ORR policies.

- Include internal and external auditing and compliance programs.

➢ Enforce ORR's adherence to internal policies regarding care provider oversight, including audits and corrective action plans.

### *Technological Advancements for Fraud Prevention and Accountability*

➢ Review and enhance the UAC Portal with the following features:

- Facial recognition technology to cross-check submitted identification documents against prior applications, law enforcement databases, and social media.

- Smart technology for address verification, property records, and geospatial and satellite imagery.

- A dedicated module for tracking and identifying sponsor fraud and abuse.

- Mandatory data fields critical to child safety and abuse investigations to ensure compliance with child safety and abuse prevention practices.

- Compatibility with current and expected technology improvements by examining the current centralized sponsor vetting contract with The Providencia Group (TPG). TPG currently identifies 3x (3% overall vs. less than 1%) the amount of fraud detected by care providers and federal staff.

➤ Develop an interactive case management database for care providers to manage all sponsorship-related communications and documents. Currently, communications through personal devices and WhatsApp are not preservable.

➤ Examine the scope and compliance of ORR's post-release responsibilities, including:

- Legal obligations and potential expansions or transfers to other agencies.

- Accountability measures and consequences for sponsors involved in child safety violations and sponsors who do not respond to post-release contacts.

## *Interagency Efforts*

➤ Collaborate with the DOJ/Executive Office of Immigration Review to establish UAC-specific dockets with expedited court timelines to ensure timely legal proceedings.

➤ Partner with USCIS and DOJ to revise policies so that UAC status is no longer applicable for immigration benefits upon reunification with a parent or legal guardian. Additionally, link all family members' immigration cases pending with EOIR.

➤ Revamp Age Redetermination MOU with ICE mandating ORR refer every redetermination case to ICE for comprehensive investigation to combat UAC fraud.

➤ Implement with State and DHS international and domestic "It's a NEW DAY" communication campaign warning aliens not to send their children to the US and that UAC and sponsor fraud is not going to be tolerated and will be fully prosecuted.

## *Legislative Recommendations*

➤ Oppose the continuation of the Appropriations language that restricts information sharing between ICE and ORR and limits enforcement of federal law.

➤ Review the Foundational Rule IFR to identify information sharing limitations that can contribute to victimization of UACs and interferes with enforcement of federal law.

➤ Advocate for the automating the National Child Abuse and Neglect Data System (NCANDS) and integrating it into the National Crime Information Center (NCIC) to provide quick and centralized access to child welfare data.

➤ Require DHS to collect biometrics, such as fingerprints or retinal scans, for all minors encountered (minimum age to be determined), in alignment with international refugee standards.