UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DIEGO N., *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,

Defendants.

Civil Action No. 1:26-cv-577-JCN

**DECLARATION OF TOBY BISWAS**

I, **Toby Biswas**, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Assistant Deputy Director for Policy for the Unaccompanied Alien Children Bureau ("UACB"), and manage the Division of Policy Coordination & Intergovernmental Affairs, and the Division of Policy Administration & Legal Affairs within the Office of Refugee Resettlement ("ORR"), an entity within the Administration for Children and Families ("ACF"), U.S. Department of Health and Human Services ("HHS").

2. I have held various roles within ORR since joining the agency in November 2009, and I have held my current role since August 2025. My responsibilities encompass the development and implementation of ORR's policies and procedures concerning the care and custody unaccompanied alien children ("UAC"). In this capacity, I am responsible for ensuring ORR's implementation of and compliance with programmatic policy prerogatives and statutory responsibilities, including those arising under the Homeland Security Act of 2002 ("HSA"), 6

U.S.C. § 279; Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232; and ORR's regulations, including the Foundational Rule, 45 CFR part 410.[1]

3. This Declaration is based upon my personal knowledge, information acquired in the course of performing my official duties, information contained in the records of ACF and ORR, and information conveyed to me by current agency employees and contractors.

**Policies for an Unaccompanied Alien Child's Safe and Timely Release**

4. An unaccompanied alien child means a child who has no lawful immigration status in the United States; has not attained 18 years of age; and with respect to whom there is no parent or legal guardian in the United States or no parent or legal guardian in the United States is available to provide care and physical custody. 6 U.S.C. § 279(g)(2).

5. Pursuant to the TVPRA, absent exceptional circumstances, "any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours *after determining that such child is an unaccompanied alien child*." 8 U.S.C. § 1232(b)(3) (emphasis added).

6. As the TVPRA makes clear, the determination that a child is a UAC is made by another department or agency of the Federal Government prior to the UAC's transfer to ORR custody. *See* 8 U.S.C. § 1232(b)(3).

7. ORR "*shall* accept referrals of unaccompanied children, from any department or agency of the Federal Government at any time of day, every day of the year." 45 C.F.R. § 410.1101(a) (emphasis added).

---

[1] ORR policies with respect to UAC are also embodied in the ORR UAC Bureau Policy Guide ("UACB Policy Guide"), which is publicly available on ORR's website at https://acf.gov/orr/policy-guidance/unaccompanied-children-bureau-policy-guide.

8. ORR has no ability to refuse a referral when the referring federal agency transfers custody to it of an individual that other agency has determined to be a UAC. *See generally* 8 U.S.C. § 1232(b).

9. While "ORR may seek clarification about the information provided by the referring agency as needed", the regulation does not provide for ORR to refuse to accept a referral or demand the referring agency change the child's designation as a UAC. 45 C.F.R. §§ 410.1101(a), (b); 8 U.S.C. § 1232(b).

10. Once UACs are placed in ORR's custody, ORR's goal is to release them to suitable sponsors where consistent with its statutory mandate to ensure that placement does not result in danger to UACs, to the community, or risk of flight by any UAC. *See, e.g.*, 6 U.S.C. § 279(b)(1), (b)(2)(A)(ii); 8 U.S.C. § 1232(c)(1), (c)(3)(A).

11. ORR must balance its responsibility to make and record prompt and continuous efforts towards release of UACs, *see* 45 C.F.R. § 410.1203(a), with concurrent duties to ensure the safety of releases.

12. The TVPRA prohibits HHS from releasing a child to a proposed custodian unless HHS first "makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being," which "shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. § 1232(c)(3)(A).

13. In addition, under its regulations, which implement the prior *Flores* Settlement

Agreement ("FSA"),[2] ORR assesses all potential sponsors (even when the potential sponsor alleges that they are a child's parent or legal guardian) before making any release determination, including a review of the potential sponsor's strengths, resources, risk factors, and relationship to the UAC. *See, e.g.*, 45 C.F.R. §§ 410.1201(a); 1202(b) and (c) (implementing Paragraphs 14 and 17 of the FSA, respectively).

14. Further, as part of the sponsor suitability assessment process:

> "ORR shall evaluate the unaccompanied child's current functioning and strengths in conjunction with any risks or concerns such as: … (1) Victim of sex or labor trafficking or other crime, or is considered to be at risk for such trafficking due, for example, to be observed or expressed current needs e.g., expressed need to work or earn money; (2) History of criminal or juvenile justice system involvement (including evaluation of the nature of the involvement, for example, whether the child was adjudicated and represented by counsel, and the type of offense) or gang involvement." 45 C.F.R. § 410.1202(f).

15. The sponsor assessment process is particularly important because ORR is not a law or immigration enforcement agency and lacks the authority to hold individuals accountable by reassuming care if the sponsor abuses or neglects a child after a UAC has been released from ORR custody. Instead, ORR only takes children into its custody upon referral by another federal agency, as described in 8 U.S.C. § 1232(b). In this regard, ORR is also very different from state child welfare agencies, which typically retain such authority post-placement. Accordingly, ORR must front-load

---

[2] The FSA is a consent decree entered into by the former Immigration and Naturalization Service governing the apprehension, process, and care and custody of alien minors in its custody. The Department of Homeland Security and Department of Health and Human Services are successor agencies to the former INS with respect to various parts of the FSA. However, the FSA has been mostly terminated as to HHS. *See Flores v. Garland*, No. CV 85-4544-DMG (AGRX), 2024 WL 3467715, at *9 (C.D. Cal. June 28, 2024) (conditionally and partially terminating the FSA as to HHS based on ORR's publication of regulations implementing the Agreement). The few remaining paragraphs of the FSA that still apply to HHS do not pertain to ORR release processes (e.g., sponsor vetting processes).

child safety considerations, including whether the child may pose a safety risk to the community, in its identity verification and sponsor-vetting policies.

16. The process for the safe and timely release of UAC from ORR custody involves several steps, including: the identification of sponsors; sponsor application; interviews; the assessment (evaluation) of sponsor suitability, including verification of the sponsor's identity and relationship to the child (if any), background checks, and in some cases home studies; and post-release planning. *See generally* 45 C.F.R. part 410, subpart C. Also, under ORR sub-regulatory guidance, there are four categories of potential sponsors: (1) Category 1, consisting of parents or legal guardians, including qualifying step-parents that have legal or joint custody of the child or teen; (2) Category 2, consisting of siblings, grandparents, or other immediate relatives (such as aunts, uncles, first cousins), and includes biological relatives, relatives through marriage, and half-siblings; (3) Category 3, consisting of other sponsors, such as distant relatives, unrelated adult individuals, or an institutional/organizational sponsor; (4) Category 4: no sponsor identified. *See* ORR UACB Policy Guide ("UACB Policy Guide"), § 2.2.1, available at https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2#2.2.1 (revised March 6, 2026).

17. A potential sponsor must complete a sponsorship application package to be considered as a sponsor. 45 C.F.R. § 410.1202. The sponsor must provide unexpired government-issued identification documentation for the sponsor and any other adults living in the household or identified in a sponsor care plan; and, along with any adult living in his or her household, undergo background checks. UACB Policy Guide §§ 2.2.4, 2.5. All potential sponsors must also submit proof of address, income, sponsor-child relationship, and criminal history documents (if applicable). *Id*. § 2.2.4. ORR does not disqualify potential sponsors based solely on their

immigration status or for law enforcement purposes. *Id*. § 2.6.

18. In mid-2023, ORR established an Integrity & Accountability ("I&A") Team to detect and prevent fraud. The I&A Team identified several instances of fraudulent sponsorship applications, document falsifications, and patterns of human trafficking and exploitation. For instance, the Team has identified instances of children and sponsors using altered birth certificates or unaltered birth certificates belonging to another person. The Team found that the fraud often involved collusion with other people, such as a family member in the Country of Origin. For example, the I&A Team identified 10 UAC who were released to sponsors who committed intentional document fraud in October 2024. The Team believes, however, that this level of fraud is underreported. The volume of fraud is difficult to capture because the different categories of sponsors require varying documentation and scrutiny levels. For example, Category 1 sponsors (parents or legal guardians) and Category 2A[3] (close relatives who have previously served as primary caretakers for the UAC) and 2B (close relatives who have not previously served as primary caretakers for the UAC) may be subject to less vigorous background check requirements than the Category 3 sponsors (distant relatives and unrelated adults). ORR believed there was a significant risk that bad actors realized there were diminishing levels of scrutiny with increasing degrees of (alleged) relatedness to UAC and gamed the system under ORR's previous sponsor supporting documentation policies.

19. In one particularly egregious case, the I&A Team found that a woman and her partner attempted to sponsor a total of 15 UAC over a five-year period by using multiple aliases. The woman used various aliases to attempt to sponsor eight UAC over the same period, with four

---

[3] On March 6, 2026, ORR updated its policy and procedural guidance to phase out the terminology of referring to "Category 2A" and "2B" sponsors separately, and instead consolidated the two into "Category 2" which would encompass both the former 2A and 2B sponsors.

UAC being released to her and four unsuccessful attempts to sponsor other UAC. The aliases were only discovered when the sponsor underwent fingerprinting. Of the four successful sponsorships, three were Category 1 cases, and one was a Category 2A case. Despite this evidence, ORR's data revealed that less than 1% of sponsorship applications have been denied in recent years, highlighting systemic gaps in oversight that create dire child safety concerns.

20. In December 2022, the Permanent Subcommittee on Investigations within the U.S. Senate Committee on Homeland Security and Governmental Affairs ("the Subcommittee") published a report detailing the inadequate treatment of UAC in federal care and the insufficient safeguards to ensure they are not trafficked or abused following their release. The Subcommittee found that despite the increased number of UAC entering the United States in 2021 and 2022, the completion of background checks by ORR significantly declined from FY 2019. Moreover, the Subcommittee identified the lack of adequate sponsor background checks and the waiver of certain background check requirements on household members, even when releasing a child to his or her parent, as areas where additional safeguard measures were necessary. The Subcommittee specifically recommended that ORR enhance its procedures for verifying pre-existing relationships and develop formal guidance for case managers during the verification process. The Subcommittee also recommended that ORR update the UACB Policy Guide to indicate that if a potential sponsor or household member refuses to comply with required background checks, ORR will prohibit further consideration of the release of a child into their custody.

21. In February 2024, HHS OIG published its findings in *Gaps in Sponsor Screening and Follow-up Raise Safety Concerns for Unaccompanied Children* that:

a. In 16 percent of children's case files, one or more required sponsor safety checks lacked any documentation indicating that the checks were conducted.

b. For 19 percent of children who were released to sponsors with pending FBI fingerprint or State child abuse and neglect registry checks, children's case files were never updated with the results.

c. In 35 percent of children's case files, sponsor-submitted IDs contained legibility concerns.

d. ORR failed to conduct mandatory home studies in two cases and four other cases raise concerns about whether ORR guidance on discretionary home studies should offer more specificity.

e. In 5 percent of cases, sponsor records within ORR's case management system were not updated with child welfare outcomes or sponsorship history. [Exhibit A].

As a result of these findings, HHS OIG recommended, among others, that ORR develop additional safeguards to ensure that all safety checks are conducted and documented prior to approving the release of a child to their sponsor. This recommendation is still marked as ongoing on the HHS OIG recommendation implementation tracker.

22. On January 20, 2025, President Trump signed Executive Order 14159, "*Protecting the American People Against Invasion*" which ordered the Secretary of Health and Human Services, along with the Attorney General and the Secretary of Homeland Security, to take "all appropriate action to stop the trafficking and smuggling of alien children into the United States[.]" 90 FR 8443, at 8447.

23. On February 4, 2025, former Acting Director of ORR, Mellissa Harper, issued a memorandum ("Harper Memo") outlining immediate changes to address ongoing concerns with gaps in ORR's sponsor vetting process, as well as fraud and trafficking. [Exhibit B]. The

memorandum highlighted one particularly egregious instance of sponsor fraud, where a potential sponsor had obviously photoshopped himself into a photograph to establish kinship with the child. Subsequently, that same potential sponsor presented a foreign identification card bearing the name and photograph of another individual in an attempt to establish his identity and sponsor another child. In another example regarding age fraud, a UAC killed his sponsor months after he was released from ORR care. It was later discovered during a law enforcement investigation that the UAC was actually 23 years old at the time of the murder. In the memorandum, former Acting Director Harper specifically cited the results of the aforementioned investigations as the rationale for implementing immediate policy changes, which include mandatory enhanced biometric collection and background checks, reassessment of the use of secondary documents that cannot be reliably verified as proof of identity, and sponsor presentation of original documents in-person.

24. The Harper Memo noted that the average length of care, which at the time was 25.8 days, did not permit ORR to conduct the adequate sponsor vetting measures necessary to ensure that children are not released into potentially dangerous situations like the ones detailed in the numerous investigations.

25. In response to the Harper Memo, on February 14, 2025, ORR issued Field Guidance ("FG") 26 which requires all potential sponsors, their adult household members aged 18 and above, and all adult caregivers identified in a Sponsor Care Plan undergo national fingerprint-based FBI background checks. FG 26 also restricts the acceptable list of identification to only unexpired and legible photocopies or high-resolution digital scans/photos of identification documents for establishing identity purposes. These sponsor vetting changes directly support ORR's efforts to combat sponsor fraud and mitigate risk of human trafficking of unaccompanied alien children by: requiring the same identity document be used as part of the sponsorship application, the fingerprint

application, and at discharge; ensuring that acceptable identity documents are easily validated as expired documents or unoriginal copies are not able to be consistently authenticated by issuing agencies; and re-establishing universal FBI fingerprints for all sponsors, a policy that was in place prior to 2018 – ensuring equity in background information available for each sponsor as part of the totality of circumstances assessment conducted by ORR in making release decisions.

26. On March 7, 2025, in alignment with ORR's statutory and regulatory requirements (*see* 8 U.S.C. § 1232(c)(3)(A) and 45 C.F.R. § 410.1202) and to address identified gaps in the reporting of fraud incidents to HHS Office of the Inspector General ("HHS OIG"), ORR updated its UACB Policy Guide Sections 2.2.4, 2.7.4, and 5.8.2 to align the acceptable identity documents for identity verification purposes with the standards used for I-9 verifications as a safer framework to mitigate reliance on foreign-issued identity documents, and establish clear protocols for detecting, documenting, and responding to fraud, including preventing fraudulent actors from exploiting the UAC Bureau and UAC for trafficking or other forms of exploitation. The updated list of documents ensures that the accepted documents from potential sponsors meet similar criteria as those used for I-9 verifications. In balance, ORR continues to afford due process protections for most relative sponsors, including providing written notice of the reason for the denial and opportunity to pursue an administrative appeal available to parents or other close relatives.

27. In further justification of this revision, ORR stated, in an accompanying decision memo, that while its former policies permitted the acceptance of a wide variety of identity documents, including many foreign-issued documents, ORR has encountered difficulties authenticating foreign-issued documents, especially in a timely manner. ORR is aware of widespread fraud involving the use of such documents and has had to rely on foreign consulates and embassies, often liaising with the Department of State, to authenticate documents issued

outside the United States. This process is complicated by international relations (including whether the United States maintains diplomatic relations with certain countries) and the stability of certain foreign states. [Exhibit C]. Therefore, to address concerns regarding sponsor fraud involving identity documents, ORR's revised policy relies on documents that the federal government relies on to establish identity for both citizens and non-citizens. In consideration of family reunification, the policies contemplate an exception for Category 1 sponsors on a case-by-case basis. Regarding proof of address documentation, ORR has previously released children to addresses that did not include apartment numbers or were themselves suspected to be fraudulent; resulting in children being released to locations that may not have been actual residences or for which the specific residential unit is unknown. Regarding sponsor denial criteria, ORR clarified that sponsor or adult household member refusal to present for fingerprinting would be sufficient for denial of release as failure to present can be an indication that the individual is trying to conceal known biometrics or criminal history, which could themselves be grounds for sponsorship denial. In balance, ORR continues to afford due process protections for most relative sponsors, including providing written notice of the reason for the denial and opportunity to pursue an administrative appeal available to parents or other close relatives.

28. On March 14, 2025, in the effort to combat fraud and consistent with statutory requirements to place a UAC with an appropriate custodian (*see* 8 U.S.C. § 1232(c)(3)(A), ORR issued FG 27 which utilizes DNA testing to confirm kinship of any potential sponsor who claims a biological relationship with the child. While the FG states that submitting a DNA sample is not

mandatory, failing to do so may result in ORR's recategorizing the sponsorship as an unrelated Category 3 sponsorship and necessitating enhanced vetting procedures.[4]

29. On April 15, 2025, to support child safety and further mitigate the risk of human trafficking, ORR revised its UACB Policy Guide Sections 2.2.4 and 2.4.1 to include income verification measures. This revision aims to ensure that sponsors can financially support the children they sponsor. The accompanying decision memo elucidates that 45 C.F.R. § 410.1202(c) requires a suitability assessment to include all necessary steps to determine the potential sponsor's ability to provide for the child's physical and mental well-being, which is a statutory requirement, (*see* 8 U.S.C. § 1232(c)(3)(A)). This includes verifying the employment, income, or other information provided by the potential sponsor as evidence of their capacity to support the child. [Exhibit D]. Additionally, in the state child welfare system, parents, legal guardians, and close kin must demonstrate their financial capability to support a child's needs if the child is returned to their care. By requiring the submission of proof of income information and supporting documentation, case managers and Federal Field Specialists ("FFS") will be better equipped to identify potential indicators of labor trafficking or labor exploitation. The Office on Trafficking in Persons has identified instances where parents and other family members have been subjected to human trafficking and/or labor exploitation and had similar debts as the children they sponsored.

---

4 On May 15, 2025, FG 27 was updated to address the following process matters:

- Clarifying that the DNA Diagnostic Center ("DDC"), not Point Comfort Underwriters ("PCU") issues a reference number for DNA results;
- Directing case managers to email DDC when a child with pending DNA test results transfers to another ORR facility;
- Directing care providers to complete and send Treatment Authorization Request to PCU, then submit approved TAR to DDC according to DNA Testing Instructions;
- Clarifying that appointments may take between 5-7 days to schedule.

The information obtained during employment and income verification can inform the safety assessment, safety planning, and the appropriate level of Post-Release Services to recommend.

30. In amending the aforementioned policies concerning sponsor vetting, ORR thoroughly considered Category 1 sponsor's interests in family unity. As a result, as it relates to the updated list of acceptable documents to establish sponsor identity, ORR permits deviations, such as an exception, from the published list in § 2.2.4 for Category 1 sponsors on a case-by-case basis. UACB Policy Guide § 2.2.4. However, Category 1 sponsors who are unable to provide an acceptable proof of identification or address or have household members who are unable to do so and are seeking an exception must undergo additional vetting measures to adequately assess the safety and suitability of the sponsor's home. *Id*.

31. ORR conducts a suitability assessment of the potential sponsor, including a review of the sponsor's strengths, resources, risk factors, and special concerns within the context of each child's needs, strengths, risk factors, and relationship to the sponsor. *See* 45 C.F.R. § 410.1202. Additionally, home studies, which consist of interviews, a home visit, and a written report containing the home-study case worker's findings, are performed. *See* 45 C.F.R. § 410.1204; UACB Policy Guide § 2.4.2.

32. Once the assessment of the potential sponsor is complete, the care provider makes a release recommendation. UACB Policy Guide § 2.7. The recommendation must take into consideration all relevant information, including the report and recommendations from a home study, if conducted, laws governing the process, and other facts in the case. *Id*. ORR makes the final release decision. *Id*. Release decisions include: (1) approve release to sponsor; (2) approve release with post-release services; (3) conduct a home study before a final release decision; (4) deny release; or (5) remand for further information. *Id*. Absent complicating factors, ORR

adjudicates completed sponsor applications within 10 calendar days of receipt for Category 1 sponsors. *Id*.

33. In general, ORR denies release if: (1) the potential sponsor is not willing or able to provide for the child's physical or mental well-being; (2) the potential sponsor is not willing to complete the mandatory fingerprint check; (3) the physical environment of the home presents a risk to the child's safety or well-being; or (4) release of the UAC would present a risk to him or herself, the sponsor, household, or community. *Id*. § 2.7.4; 45 C.F.R. § 410.1205.

34. Where ORR denies release to a potential sponsor who is a parent or legal guardian or close relative (Category 1 or 2 sponsor), ORR provides the sponsor with a written Notification of Denial letter that includes an explanation of the reason(s) for the denial, the evidence and information supporting ORR's denial, and an overview of their right to examine evidence and seek an appeal. 45 C.F.R § 410.1205(c).

35. In making placement decisions, HHS "may consider danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(A). If the sole reason for the denial of release is a concern that the UAC is a danger to self or others, ORR shall send the UAC and their counsel (if represented by counsel) a copy of the Notification of Denial letter provided to the sponsor and the child may seek an appeal of the denial. 45 C.F.R § 410.1205(f).

36. Separately, 45 C.F.R. § 410.1903 provides for risk determination hearings before an independent HHS hearing officer to determine, through a written decision, whether the unaccompanied alien child would present a risk of danger to the community if released. The answer to that question may affect the type of facility ORR would place a child in, as well as whether ORR is able to release a child to a sponsor (or the level of post-release services given to the child). All UAC in restrictive placements based on a finding of dangerousness are automatically placed

in such hearings, unless the UAC indicates in writing that they refuse such hearing. 45 C.F.R. § 410.1903(a). UAC placed in restrictive settings shall receive a written notice of the procedures. *Id*. Additionally, all other UAC in ORR custody may request a hearing to determine, through written decision, whether the UAC would present a risk of danger to self or to the community if released. 45 C.F.R. § 410.1903(b). However, "[d]eterminations made under [45 C.F.R. § 410.1903] will not compel an unaccompanied child's release; nor will determinations made under [45 C.F.R. § 410.1903] compel transfer of an unaccompanied child to a different placement. Regardless of the outcome of a risk determination hearing or appeal, an unaccompanied child may not be released unless ORR identifies a safe and appropriate placement pursuant to [45 C.F.R. §§ 410.1200-1210]; and regardless of the outcome of a risk determination hearing or appeal, an unaccompanied child may only be transferred to another placement by ORR pursuant to requirements set forth at [45 C.F.R. §§ 410.1100-1109 and 45 C.F.R. §§ 410.1600-1601]." 45 C.F.R. § 410.1903(j).

37. ORR does not have a re-referral policy for children who are referred again to ORR by DHS after a previous release. Instead, ORR applies the same requirements (as described in regulations and sub-regulatory guidance) as to release for all UAC in its custody, including to the named plaintiffs in this litigation. Thus, the only applicable policies for re-referrals are contained within 45 C.F.R. §§ 410.1200-410.1210.

38. However, ORR is in the process of reviewing cases of children re-referred, by another federal agency, in the interior United States who had previously been in the custody of a parent or legal guardian in the United States and where that same parent or legal guardian is again seeking to sponsor the child. ORR requires background checks of all sponsors including sponsors of children re-referred to custody. ORR will determine as part of this review of re-referred cases,

whether the results of these background checks reveal the parent or legal guardian may be unfit or a danger to the child, such that additional vetting may be required in line with ORR's process for vetting new sponsors.

39. The timeframes proposed by plaintiffs in the Proposed Order Granting Plaintiffs' Motion for a Preliminary Injunction to review these cases would be presumptively burdensome. The proposed timeline fails to consider that ORR often does not learn that there may be a parent or legal guardian in the United States if the UAC does not disclose this information immediately. Further, ORR must conduct a dangerousness assessment at the initial intake stage and prior to placement, based on the circumstances of the child's apprehension and re-referral.

40. Additionally, the hearing mechanism proposed by Plaintiffs in the Proposed Order Granting Plaintiffs' Motion for a Preliminary Injunction is problematic as ORR does not have access to a neutral and detached decision maker. Instead, ORR would need to enter into Inter Agency Agreements ("IAAs") to work with the Department Appeals Board ("DAB") to set up these hearings. While ORR has previously entered into IAAs with the DAB to provide regulatorily required hearings for ORR matters, ORR does not believe it can expand the DAB's scope without entering into a new IAA.

**ORR Care Provider Facility Types and Conditions**

41. ORR's regulation at 45 C.F.R. § 410.1102 establishes that ORR may place UAC in settings such as shelters, group homes, individual family homes, heightened supervision facilities, and secure facilities according to the needs of each child as required by 45 C.F.R. § 410.1103.

42. All standard programs and secure facilities must meet the minimum standards under 45 C.F.R. § 410.1302, meaning that all standard programs and secure facilities must provide children in their care, among other things, proper physical care and maintenance, individual needs

assessments, educational services appropriate to each child's level of development, opportunities for recreation and leisurely activities, individual counseling, and visitations and contact with family. *See also* UACB Policy Guide § 3.3.

43. ORR's regulation at 45 C.F.R. § 410.1001 defines "standard program" as

> any program, agency, or organization that is licensed by an appropriate State agency to provide residential, group, or transitional or long-term home care services for dependent children, including a program operating family or group homes, or facilities for unaccompanied children with specific individualized needs; or that meets the requirements of State licensing that would otherwise be applicable if it is in a State that does not allow state licensing of programs providing care and services to unaccompanied children.

44. As stated in UACB Policy Guide § 1.4.3, some children may stay in ORR custody for four months or more, and those children would be considered for long-term care placement in accordance with the criteria set out under UACB Policy Guide § 1.2.6.

**Plaintiffs' Case Statuses**

45. Diego N. is a fourteen-year-old national of [redacted] He is currently placed at [redacted] He was first admitted to ORR care on October 19, 2024, and discharged on October 22, 2024, to his father. He was admitted to ORR for a second time on November 6, 2025, after being referred again by CBP upon an encounter where he was traveling with a friend near the Rio Grande River with no parent or legal guardian present. At the time of his encounter with CBP, Diego N. admitted to being a scout for alien smuggling, though he later denied making that statement to CBP to ORR staff. On November 6, 2025, ORR identified Diego N.'s father as his potential sponsor and made direct contact. On November 11, 2025, Diego N.'s father submitted Diego N.'s birth certificate for authentication with the [redacted] consulate. On November 12, 2025, Diego N.'s father uploaded the sponsor application to ORR and scheduled his fingerprinting appointment. On November 19, 2025, Diego N.'s father submitted his

fingerprints and was cleared. On November 28, 2025, the [redacted] consulate confirmed the authenticity of Diego N.'s birth certificate. However, as a matter of policy, ORR still requires a DNA test and identity verification, even for Category 1 sponsors, as Diego N.'s birth certificate, although authentic, does not contain photographs of the parents. It is therefore imperative for ORR to confirm not only that the document is authentic but also that the sponsor is who is on the birth certificate and that the relationship is confirmed via DNA testing. On December 17, 2025, ORR commenced a home study for Diego N. due to Diego N.'s criminal history while in his father's care, history of controlled substance use while in his father's care, history of inappropriate contact with an adult while in his father's care, and history of making gang-related comments and drawings while in ORR care. The home study focused on all aspects of Diego N.'s home, and was essential to assess whether concerning behavioral or safety concerns stemmed from Diego's home life. Additionally, in Diego N's case, the caseworker conducted family counselling sessions to ensure that his father would be better equipped to care for Diego N. On December 30, 2025, ORR completed Diego N.'s home study and a positive recommendation was made. On January 18, 2026, ICE informed ORR that Diego N.'s case has been administratively closed and that ORR may proceed with standard release. On January 29, 2026, ORR contacted Diego N.'s father to let him know that his DNA appointment, identity verification, and additional vetting are still pending. On February 6, 2026, Diego N.'s father was cleared on his internet criminal and sex abuse checks. On February 24, 2026, ORR informed Diego N.'s father of the requirement that he provide his taxpayer identification number/social security number and that his DNA appointment is still pending scheduling by ORR. No denial has been issued to Diego N.'s father as of March 4, 2026.

46. Renesme R. is a sixteen-year-old national of [redacted] She is currently placed at [redacted] She was first admitted to ORR care on November 28, 2023, and

discharged on December 4, 2023, to her father. She was admitted to ORR for a second time on November 9, 2025, after being referred by ICE upon an encounter where she was traveling with a male friend with no parent or legal guardian present in [redacted] during an ongoing DHS immigration enforcement operation. On November 9, 2025, ORR contacted Renesme R.'s potential sponsor who purported to be her paternal aunt. The potential sponsor agreed to commence the family reunification process with Renesme R. On December 22, 2025, ORR contacted Renesme R.'s paternal aunt to request required documents and information for sponsorship application. On January 13, 2026, Renesme R. was informed that her aunt had recently completed the sponsorship application; however, several other elements are still pending, such as submittal of proof of address, proof of income, fingerprinting results, home study results, and in-person verification of identity documents. On February 3, 2026, Renesme R. was informed that those outstanding items are still pending. On February 26, 2026, Renesme R.'s aunt indicated to ORR that she will withdraw her sponsorship application and that Renesme R.'s father will instead move forward as sponsor. On March 2, 2026, Renesme R.'s aunt's sponsorship withdrawal was recommended by her ORR case manager and ORR proceeded to commence the sponsorship process with her father with his agreement. No denial has been issued to Renesme R.'s father as of March 4, 2026.

47. Mario C. is a seventeen-year-old national of [redacted] He is currently placed at [redacted] He was first admitted to ORR care on December 2, 2023, and discharged to his mother on December 14, 2023. Mario C. was cited on November 17, 2025, for theft (stolen vehicle) by local law enforcement, who referred him to ICE. ICE then referred Mario C. to ORR on November 24, 2025, and he was admitted to ORR care for a second time on November 25, 2025. On November 26, 2026, ORR made initial contact with Mario C.'s potential sponsor, his

mother, to discuss the reunification process. Mario C.'s mother initially declined to proceed with the sponsorship application after being informed of the requirements. Between November of 2025 and February of 2026, ORR had several conversations with Mario C.'s mother about sponsorship. During each conversation, Mario C.'s mother declined to sponsor Mario C. Mario C. was informed that his mother confirmed her interest in sponsorship but had declined sponsorship due to the requirements. On February 23, 2026, Mario C.'s mother identified a new sponsor who she alleged was her third cousin, and provided his name and phone number to ORR on February 24, 2026. ORR informed Mario C. on February 25, 2026, that his mother was able to identify her third cousin as a potential sponsor. On March 2, 2026, ORR contacted the potential sponsor to conduct sponsor identification and an initial screening. That same date, the intake specialist provided an orientation and reviewed the required supporting documentation for reunification with the proposed sponsor. On March 3, 2026, the potential sponsor indicated Mario C. is a distant relative and the proposed sponsor is from [redacted] However, the sponsor then confirmed during the same conversation that he is neither related to child's mother nor from [redacted] Instead, he stated that he knows Mario C. because Mario C. worked at his restaurant, and Mario C.'s mother requested sponsorship as a favor. That same date, the potential sponsor completed and signed the Authorization for Release of Information ("ARI"), and his identification, selfie, and ARI were uploaded into the portal. ORR spoke with Mario C.'s mother on March 3, 2026, who indicated ORR is asking her to complete a DNA test to confirm the relationship between her and the potential sponsor. Mario C.'s mother indicated she is unable to provide DNA because she and the proposed sponsor are unrelated; specifically, they are not related by blood but have known each other for a long time and treat each other like family. On March 5, 2026, ORR contacted the initial proposed sponsor, Mario C.'s mother, to revisit sponsorship and discussed the reunification process. Mario

C.'s mother confirmed interest in proceeding and her birth certificate and identification were submitted for authentication. No denial has been issued for any Sponsor Application for Mario C. as of March 6, 2026

48. Benito S. is a seventeen-year-old national of [redacted] He is currently placed at [redacted] He was first admitted to ORR care on July 17, 2023, and discharged to his aunt on August 13, 2023. He was admitted to ORR care for a second time on December 18, 2025, after local law enforcement cited him for driving without a license and following too close. ICE was contacted to verify Benito S.'s immigration status. After Benito S. posted bond, he was transported to ICE for processing, where ORR's referral notes indicate he stated he has no legal guardian in the United States, but reported he had been residing with his aunt. On December 19, 2025, ORR spoke with Benito S.'s aunt regarding the Sponsorship Application. Benito S.'s aunt communicated she will not be able to sponsor Benito S. due to financial and limiting circumstances, and further stated she consulted with family friends to see if anyone is willing to sponsor Benito S., and at this time, there was no identified sponsor. ORR again spoke with Benito S.'s aunt on December 20, 2025, regarding identifying possible sponsors. Benito's aunt expressed understanding of the requirements and indicated that she has not been able to identify any family members or family friends that may have the acceptable documents. On December 24, 2025, Benito S. expressed interest in speaking with his Legal Service Provider about Long Term Foster Care. On January 7, 2026, Benito S. expressed interest in speaking with a friend and his client manager indicated he would elevate this request and report back. On January 14, 2026, Benito S. was told he could not speak with his friend, as the friend is not an approved contact. Benito S. asked if his friend could sponsor him and ORR informed Benito S. that this issue would need to

be staffed as the contact information is in Benito S.'s possession, not his mother's. On January 19, 2026, ORR met with Benito S. and let him know that Long Term Foster Care preferred placements were going to be discussed with his Legal Service Provider. Additionally, Benito S. was informed that he and a staff member could go into his property to retrieve the phone number for his friend and then the call would need to be screened. Benito S. then refused the call after learning it would need to be screened. On January 21, 2026, Benito S. confirmed that he wanted to proceed with Long Term Foster Care and no longer wanted to pursue the request to speak to his friend or have his friend sponsor him. ORR informed Benito S, on January 28, 2026, that it was approved to continue with the Long Term Foster Care application and ORR would be compiling the necessary information. On February 4, 2026, Benito S. was again informed that ORR was compiling all required documents for the Long Term Foster Care application. Benito S. was informed of the updates regarding compiling documents for Long Term Foster Care on February 11, 2026. On February 19, 2026, the Long Term Foster Care packet was sent and Benito S. was informed. Benito S. was informed that the Long Term Foster Care packet is submitted and is pending approval and response on February 26, 2026. On March 3, 2026, Benito S. received two preplacement offers for Long Term Foster Care, and the preplacement interviews were scheduled for March 3, 2026, and March 4, 2026. Benito S. participated in both preplacement interviews. On March 5, 2026, ORR met with Benito S.; Benito S. informed ORR that he would like to accept the Long-Term Foster Care placement offer at [redacted] was notified of Benito S.'s acceptance of the offer for placement that same day. Benito S. was admitted to [redacted] on March 10, 2026. There is no active sponsor application pending for Benito, so no denial has been issued for any Sponsor Application for Benito as of March 10, 2026.

I declare under penalty of perjury that the foregoing is true and correct.

**Dated: March 10, 2026** **Washington, D.C.**

TOBY R. BISWAS -S
Digitally signed by TOBY R. BISWAS -S
Date: 2026.03.10 17:30:50 -04'00'

**Toby Biswas**
Assistant Deputy Director for Policy
Unaccompanied Alien Children Bureau
Office of Refugee Resettlement