UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DIEGO N., *et al*.,

             Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al*.,

            Defendants.

Civil Action No. 1:26-cv-577-JCN

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
<u>MOTION FOR CLASS CERTIFICATION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ..............................................................................................................1

BACKGROUND ..............................................................................................................2

    I.      Statutory and Regulatory Background...........................................................2

          A.  The Homeland Security Act of 2002 ....................................................2

          B.  The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 .........................................................................................................3

          C.  The Unaccompanied Children Program Foundational Rule....................................4

          D.  ORR Release Policies and Practices ........................................................5

          E.  Recent Reports Concerning ORR's Sponsor Vetting Process (2022–24) ..............7

          F.  Updated ORR Guidance Regarding UAC Sponsor Vetting (2025) ........................9

    II.     This Lawsuit.......................................................................................................12

    III.   The Named Plaintiffs .......................................................................................13

    IV.   Plaintiffs' Proposed Class Definition...............................................................17

STANDARD.....................................................................................................................18

ARGUMENT....................................................................................................................19

    I.      The proposed class is impermissible because it includes, or potentially includes, individuals who have not suffered, or will not suffer, the same injury—or have not suffered or will not suffer any injury .........................................................................19

    II.     No common questions drive the resolution of the litigation as to the proposed class, and the named Plaintiffs' claims are not typical of all putative class members' claims .................................................................................................................22

          A.  Plaintiffs have not shown that their claims depend upon a common contention capable of classwide resolution .............................................................................23

i

B.  The named Plaintiffs' claims would not be typical of a class under Plaintiffs'

proposed class ...................................................................................................26

III.    Certification under Rule 23(b)(2) is inappropriate because the relief Plaintiffs seek

will not benefit all class members.................................................................................28

CONCLUSION.................................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*AmChem Prods. V. Windsor*,

    521 U.S. 591 (1997) ........................................................................................................ 18, 21

*Califano v. Yamasaki*,

    442 U.S. 682 (1979) ............................................................................................................. 17

*Damus v. Nielsen*,

    313 F. Supp. 3d 317 (D.D.C. 2018) .................................................................................... 25

*Flores v. Garland*,

    No. CV 85-4544-DMG (AGRX), 2024 WL 3467715 (C.D. Cal. June 28, 2024) ...................... 4

*Gen. Tel. Co. of Southwest v. Falcon*,

    457 U.S. 147 (1982) ................................................................................................. 17, 19, 22

*Harris v. Med. Transportation Mgmt., Inc.*,

    77 F.4th 746 (D.C. Cir. 2023) .............................................................................................. 25

*In re Lorazepam & Clorazepate Antitrust Litig.*,

    202 F.R.D. 12 (D.D.C. 2001) ............................................................................................... 25

*J.D. v. Azar*,

    925 F.3d 1291 (D.C. Cir. 2019) ........................................................................................... 22

*Kas v. Financial General Bankshares, Inc.*,

    105 F.R.D. 453 (D.D.C. 1984) ............................................................................................. 25

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,

    571 F.3d 672 (7th Cir. 2009) ............................................................................................... 19

*Lemon v. Int'l Union of Operating Engr's, Local No. 139, AFL–CIO*,

    216 F.3d 577 (7th Cir. 2000) ............................................................................................... 28

*Lewis v. Nat'l Football League*,

    146 F.R.D. 5 (D.D.C. 1992)........................................................................................ 18

*Lightfoot v. D.C.*,

    273 F.R.D. 314 (D.D.C. 2011)................................................................................... 28

*McCarthy v. Kleindienst*,

    741 F.2d 1406 (D.C. Cir. 1984)................................................................................. 17

*Pigford v. Glickman*,

    182 F.R.D. 341 (D.D.C. 1998)................................................................................... 18

*Ross v. Lockheed Martin Corp.*,

    267 F. Supp. 3d 174 (D.D.C. 2017) .......................................................................... 19

*Thorpe v. District of Columbia*,

    303 F.R.D. 120 (D.D.C. 2014)............................................................................. 18, 19

*Wal-Mart Stores, Inc. v. Dukes*,

    564 U.S. 338 (2011)........................................................................................... *passim*

## STATUTES

6 U.S.C. § 279.......................................................................................................... 1, 28

6 U.S.C. § 279(b)(1) ...................................................................................................... 3

6 U.S.C. § 279(b)(1)(A).................................................................................................. 3

6 U.S.C. § 279(b)(1)(B)                                                                                 ......3

6 U.S.C. § 279(b)(1)(C) ................................................................................................. 2

6 U.S.C. § 279(b)(1)(E)                          ...                                    ..    .3

6 U.S.C. § 279(b)(2)(A)(ii)............................................................................................ 3

6 U.S.C. § 279(a) .......................................................................................................... 2

6 U.S.C. § 279(g)(2) ....................................................................................................... 3

8 U.S.C. § 1232 ........................................................................................................... 28

8 U.S.C. § 1232(b) ............................................................................................ 5, 6, 7, 11

8 U.S.C. § 1232(b)(1) .................................................................................................... 3

8 U.S.C. § 1232(c)(1) ........................................................................................ 1, 2, 3, 21

*8 U.S.C. § 1232(c)(2)(A) ...................................................................................... *passim*

8 U.S.C. § 1232(c)(3) .............................................................................................. 23, 28

*8 U.S.C. § 1232(c)(3)(A) ...................................................................................... *passim*

8 U.S.C. § 1232(i) ......................................................................................................... 3

8 U.S.C. § 1158 ............................................................................................................. 3

31 U.S.C. § 6305 .......................................................................................................... 3

## RULES

Fed. R. Civ. P. 23(a) ................................................................................................... 18

Fed. R. Civ. P. 23(a)(1) ............................................................................................... 19

Fed. R. Civ. P. 23(a)(2) ............................................................................................... 22

Fed. R. Civ. P. 23(a)(3) ........................................................................................... 22, 23

Fed. R. Civ. P. 23(b)(2) ........................................................................................ 2, 18, 27

## REGULATIONS

45 C.F.R. Part 410 ........................................................................................................ 4

45 C.F.R. § 410.1001 ................................................................................................... 26

45 C.F.R. § 410.1003 .................................................................................................... 5

45 C.F.R. § 410.1201 .................................................................................................... 4

v

45 C.F.R. § 410.1202(b) ........................................................................................................ 4

45 C.F.R. § 410.1202(c) ......................................................................................................... 4

45 CFR § 410.1205(a) ........................................................................................................... 24

## <u>OTHER AUTHORITIES</u>

*Unaccompanied Children Program Foundational Rule*,

  89 Fed. Reg. 34384 (Apr. 30, 2024) ............................................................................ *passim*

*Protecting the American People Against Invasion*, Executive Order 14159

90 Fed. Reg. 8443 (Jan. 20, 2025) ........................................................................................ 9, 10

  The Homeland Security Act (2002**),**

    Pub. L. No. 107-296 ..................................................................................................... *passim*

*The William Wilberforce Trafficking Victims Protection Reauthorization Act (2008),

  Pub. L. No. 110-457 ....................................................................................................... *passim*

**INTRODUCTION**

In the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Congress imposes on the U.S. Department of Health and Human Services ("HHS") a paramount obligation to "establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity . . . ." 8 U.S.C. § 1232(c)(1). As the agency is entrusted with the responsibility for caring for the thousands of unaccompanied alien children ("UAC") under the Homeland Security Act of 2002, 6 U.S.C. § 279, the Office of Refugee Resettlement ("ORR") must balance its obligation to protect UAC from human trafficking and exploitation, with promptly reunifying UAC, where possible, with their parents or other suitable sponsors. 8 U.S.C. § 1232(c)(2)(A).

The named Plaintiffs are four UAC who were previously in ORR custody and were released by ORR to approved sponsors and later re-referred to ORR by the Department of Homeland Security ("DHS"). Plaintiffs challenge ORR's "blanket policy of systematically disregarding its prior sponsorship approval decisions and requiring that all previously approved sponsors begin the sponsor application process anew regardless of the circumstances of a child's return to ORR custody ('reapplication policy')." Plaintiffs' Mem. in Support of Mot. for Class Certification ("Mot".), ECF No. 4-1 at 1. Plaintiffs also allege that such a policy violates the Fifth Amendment and the Administrative Procedure Act ("APA"). Mot. at 1.

The named Plaintiffs seek to represent a class of:

> noncitizen minors who are or will be in the custody of HHS and (1) who were previously in ORR custody, (2) who were approved for release by ORR to a sponsor, (3) who have been or will be re-detained by DHS and re-referred to ORR, and (4) whom ORR has not released to their previously approved sponsor pursuant to ORR's

> policy requiring the previously approved sponsor to submit a new
> sponsor application and obtain a new approval for release.

Mot. at 23-24. The proposed class, however, is impermissibly overbroad, indefinite, and fails to satisfy commonality, typicality, and the cohesiveness required for an injunctive-relief class under Federal Rules of Civil Procedure 23(b)(2). For these reasons, the Court should not certify the proposed class.

## BACKGROUND

### I.     Statutory and Regulatory Background

The statutory and regulatory framework governing the federal care and custody of UAC reflects explicit congressional intent for ORR to "mak[e] placement determinations for all unaccompanied alien children who are in Federal custody by reason of their immigration status," and to ensure UAC "are protected from smugglers, traffickers, or others who might seek to victimize or otherwise engage them in criminal, harmful, or exploitive activity." 6 U.S.C. § 279(b)(1)(C) & (b)(2)(A)(ii); *see also* 8 U.S.C. § 1232(c)(1), (c)(3)(A). That framework balances the mandate that ORR protect UAC from harm with the requirement that ORR "promptly" place UAC "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A).

### A.     The Homeland Security Act of 2002

In 2002, Congress enacted the Homeland Security Act ("HSA"), Pub. L. No. 107-296, 116 Stat. 2135 (codified in relevant part at 6 U.S.C. § 279), abolishing the Immigration and Naturalization Service ("INS") and transferring functions under the immigration laws of the United States with respect to the care of UAC, including the responsibility for their care and placement from INS to ORR. 6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2).

The HSA defines an "unaccompanied alien child" as "a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom—(i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2). Further, it assigns ORR broad authority over the care and custody of UAC who are in federal custody due to their immigration status, including coordinating their care and placement, ensuring that the interest of the child are considered in custodial decisions, implementing policies with respect to the care and placement of UAC, and coordinating with other entities to ensure that they are protected from smugglers, traffickers, and others who might seek to victimize or otherwise engage them in criminal, harmful, or exploitive activity. 6 U.S.C. §§ 279(b)(1)(A), (B), (E), & (b)(2)(A)(ii). These responsibilities are carried out through cooperative agreements and contracts with care providers under ORR oversight. *See* 6 U.S.C. § 279(b)(1); 8 U.S.C. § 1232(i); 31 U.S.C. § 6305.

### B.      The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008

In 2008, Congress enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") to extend legal protections to UAC and to support their safe repatriation or appropriate placement. Pub. L. No. 110-457 § 235(d), 122 Stat. 5044, 5074, codified at 8 U.S.C. §§ 1158, 1232(d). Through the TVPRA, Congress makes the HHS Secretary responsible, consistent with the HSA, for the care and custody of UAC. 8 U.S.C. § 1232(b)(1). Congress also provides that HHS, and other agencies, "shall establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity." 8 U.S.C. § 1232(c)(1). It also requires the HHS Secretary to determine that

3

a proposed sponsor "is capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A). This safety and suitability determination must "at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id.* Thus, the TVPRA is explicit that ORR must prioritize the safety and well-being of UAC in its care and upon release.

### C.    The Unaccompanied Children Program Foundational Rule

In April 2024, ORR promulgated *Unaccompanied Children Program Foundational Rule*, 89 Fed. Reg. 34384 (Apr. 30, 2024) ("the Rule" or "Foundational Rule"), codified at 45 C.F.R. Part 410, to establish a foundation for the UAC program consistent with ORR's statutory responsibilities. It also implemented provisions of the *Flores Settlement Agreement* ("FSA")[1] relevant to ORR's care and placement of UAC. The final rule became effective on July 1, 2024.

Specifically, the Rule provides that ORR must release UAC from its custody "[s]ubject to an assessment of sponsor suitability," 45 C.F.R. § 410.1201, which includes "verification of the potential sponsor's identity," 45 C.F.R. § 410.1202(b), "verification of the employment, income, or other information provided by the potential sponsor as evidence of the ability to support the child," 45 C.F.R. § 410.1202(c), and "[i]n all cases, ORR shall require background and criminal records checks," *id.*, which may include a criminal history check based on fingerprints. The Rule

---

[1]    The FSA is a consent decree entered into by the former INS governing the apprehension, process, and care and custody of alien minors in its custody. DHS and HHS are successor agencies to the former INS with respect to various parts of the FSA. However, the FSA has been mostly terminated as to HHS. *See Flores v. Garland*, No. CV 85-4544-DMG (AGRX), 2024 WL 3467715, at *9 (C.D. Cal. June 28, 2024) (conditionally and partially terminating the FSA as to HHS on the basis of ORR's publication of regulations implementing the Agreement). The few remaining paragraphs of the FSA that still apply to HHS do not pertain to ORR release processes (e.g., sponsor vetting processes).

does not prohibit the collection of fingerprints in any circumstances, and it is silent regarding the types of documents acceptable and any related requirements for identity or income verification. The Rule reinforces congressional intent articulated in the HSA and TVPRA that HHS must ensure UAC protection from human traffickers and release UAC only to those sponsors capable of protecting their well-being. 45 C.F.R. § 410.1003.

### D.    ORR Release Policies and Practices

To carry out its statutory and regulatory mandate under the HSA, TVPRA, and the Foundational Rule, ORR has developed policies and procedures for identifying and conducting suitability assessments of potential sponsors. These procedures are generally set out in ORR's publicly available UAC Bureau Policy Guide ("UACB Policy Guide"). *See* ORR Unaccompanied Alien Children Bureau Policy Guide, *available at* https://perma.cc/Q2C3-3SC5; *see also* Declaration of Toby Biswas, dated March 10, 2026, ECF No. 23-1, Ex. 1 ("Biswas Decl.") ¶¶ 2 & n.1. A full assessment of a potential sponsor's suitability is particularly appropriate because ORR is not a law enforcement agency and it lacks the authority to hold an unsuitable sponsor accountable if the sponsor abuses or neglects an unaccompanied alien child that has been released from ORR custody. Biswas Decl. ¶ 15. Rather, ORR only takes UAC into its custody upon referral by another federal agency, as described in 8 U.S.C. § 1232(b). *Id.* In this regard, ORR is also very different from state child welfare agencies, which typically retain such authority post-placement. *Id.* Accordingly, ORR must front-load child safety considerations in its identity verification and sponsor vetting policies. *Id.*

In light of ORR's obligation to protect UACs from smugglers, traffickers, and others who may seek to victimize them, "safe and timely release . . . involves several steps, including: the identification of sponsors; sponsor application; interviews; the assessment (evaluation) of sponsor

suitability, including verification of the sponsor's identity and relationship to the child (if any), background checks, and in some cases home studies; and post-release planning." UACB Policy Guide § 2.1. There are four categories of release according to types of potential sponsors: (1) Category 1, consisting of parents or legal guardians; (2) Category 2, consisting of siblings, half-siblings, grandparents, or other immediate relatives (such as aunts, uncles, and cousins); (3) Category 3, consisting of other sponsors, such as distant relatives and unrelated adult individuals; and (4) Category 4, no sponsor identified. *Id.* § 2.2.1. ORR conducts suitability assessments of any potential sponsor, including a review of the potential sponsor's strengths, resources, risk factors, and special concerns within the context of each child's needs, strengths, resources, risk factors, and relationship to the sponsor. *Id.* §§ 2.2.2, 2.4.

A potential sponsor must complete a Family Reunification Application ("FRA"), provide unexpired government-issued identification documentation for the sponsor and any other adults living in the household or identified in a sponsor care plan, and, along with any adult living in his or her household, undergo a background check. UACB Policy Guide §§ 2.2.4, 2.5. All potential sponsors must also submit proof of address, income, sponsor-child relationship, and criminal history documents (if applicable). *Id.* § 2.2.4. Additionally, in certain circumstances a home study, which consists of interviews, a home visit, and a written report containing the home-study case worker's findings, is performed. *Id.* § 2.4.2.

Once the assessment of the potential sponsor is complete, the care provider makes a release recommendation. UACB Policy Guide § 2.7. ORR makes the final release decision. *Id.* Release decisions include: (1) approve release to sponsor; (2) approve release with post-release services; (3) conduct a home study before a final release decision; (4) deny release; or (5) remand for further information. *Id.* ORR denies release requests if: (1) the potential sponsor is not willing or able to

provide for the child's physical or mental well-being; (2) the potential sponsor is not willing to complete the mandatory fingerprint check; (3) the physical environment of the home presents a risk to the child's safety or well-being; or (4) release of the UAC would present a risk to him or herself, the sponsor, household, or community. *Id.* § 2.7.4.

### E.    Recent Reports Concerning ORR's Sponsor Vetting Process (2022–24)

In December 2022, the Permanent Subcommittee on Investigations within the U.S. Senate Committee on Homeland Security and Governmental Affairs ("the subcommittee") published a report detailing the inadequate treatment of UAC in federal care and the insufficient safeguards to ensure they are not trafficked or abused following their release. Biswas Decl. ¶ 20. The subcommittee found that despite the increased number of UAC entering the United States in 2021 and 2022, ORR's completion of background checks significantly declined from FY 2019. *Id.* The subcommittee specifically recommended that ORR enhance its procedures for verifying pre-existing relationships and develop formal guidance for case managers during the verification process. *Id.* The subcommittee also recommended that ORR update the UACB Policy Guide to indicate that if a potential sponsor or household member refuses to comply with required background checks, ORR will prohibit further consideration of the release of a child into their custody. *Id.*

In mid-2023, ORR established an Integrity & Accountability ("I&A") Team to detect and prevent fraud. Biswas Decl. ¶ 18. The I&A Team identified several instances of fraudulent sponsorship applications, document falsifications, and patterns of human trafficking and exploitation. *Id*. For instance, the Team identified instances of children and sponsors using altered birth certificates or unaltered birth certificates belonging to another person. *Id.* The Team found that the fraud often involved collusion with others, such as a family member in the country of

origin. *Id.* In another example, the I&A Team identified 10 UAC who were released to sponsors who committed intentional document fraud in October 2024. *Id.*

In one particularly egregious case, the I&A Team found that a woman and her partner attempted to sponsor a total of 15 UAC over a five-year period by using multiple aliases. Biswas Decl. ¶ 19. The woman used various aliases to attempt to sponsor eight UAC over the same period, with four UAC being released to her and four unsuccessful attempts to sponsor other UAC. *Id.* The aliases were only discovered when the sponsor underwent fingerprinting. *Id.* Of the four unsuccessful sponsorships, three were Category 1 cases, and one was a Category 2 case. *Id.* Despite this evidence, ORR's data revealed that less than 1% of sponsorship applications have been denied in recent years. *Id.*

In February 2024, the HHS Office of Inspector General published its finding in *Gaps in Sponsor Screening and Follow Up Raise Safety Concerns for Unaccompanied Children* that:

a. In 16% of children's case files, one or more required sponsor safety checks lacked any documentation indicating that the checks were conducted.
b. For 19% of children who were released to sponsors with pending Federal Bureau of Investigation fingerprint or State child abuse and neglect registry checks, children's case files were never updated with the results.
c. In 35% of children's case files, sponsor-submitted identification documents contained legibility concerns.
d. ORR failed to conduct mandatory home studies in two cases and four other cases raise concerns about whether ORR guidance on discretionary home studies should offer more specificity.
e. In 5% of cases, sponsor records within ORR's case management system were not updated with child welfare outcomes or sponsorship history.

Biswas Decl. ¶ 21, Ex. A, February 2024 HHS OIG Report.

As a result of these findings, HHS OIG recommended, among other things, that ORR develop additional safeguards to ensure that all safety checks are conducted and documented prior to approving the release of a child to their sponsor. *Id.*

8

F.      **Updated ORR Guidance Regarding UAC Sponsor Vetting (2025).**

**Executive Order 14159 -** Upon his inauguration, President Trump ordered HHS, along with the U.S. Department of Justice and Department of Homeland Security, to take "all appropriate action to stop the trafficking and smuggling of alien children into the United States[.]" Executive Order 14159, "*Protecting the American People Against Invasion*," 90 Fed. Reg. 8443, at 8447 (Jan. 20, 2025). Investigations into events in which UAC were released to unsuitable sponsors, sometimes with tragic consequences, led to changes to the sponsor vetting process. Biswas Decl. ¶ 23, Ex. B, February 2025 Harper Memorandum.

**Field Guidance 26 for fingerprint-based background checks -** On February 14, 2025, ORR issued Field Guidance ("FG") 26, which requires all potential sponsors, their adult household members aged 18 and over, and all adult caregivers identified in a Sponsor Care Plan to undergo national fingerprint-based FBI background checks. Biswas Decl. ¶ 25. It also requires the use of only unexpired and legible photocopies or high-resolution digital scans/photos of identification documents to establish identity. *Id.* These updates to the guidance for vetting potential sponsors directly support ORR's efforts to enhance the safety of releases to sponsors, prevent fraud, and to mitigate the risk of human trafficking of UAC by: requiring the same identity document be used as part of the sponsorship application, the fingerprint application, and at discharge; ensuring validation of acceptable identity documents; and reestablishing universal FBI fingerprints for all sponsors. *Id.* The universal fingerprint policy was previously in place prior to 2018, and it ensured equity in background information available for each sponsor as part of the totality of circumstances assessment conducted by ORR in release determinations. *Id.*

**Updates to Policy Guide Sections 2.2.4, 2.7.4, and 5.8.2 -** On March 7, 2025, and to further address identified gaps in the sponsor vetting process, ORR updated its UACB Policy

9

Guide Sections 2.2.4 (concerning required supporting documents for sponsor applications to include unexpired identity documents and proof of income), 2.7.4 (concerning lack of fingerprinting and proof of income as bases for denial of release requests), and 5.8.2 (concerning fraud reporting). Biswas Decl. ¶ 26. ORR made these updates to align the acceptable identity documents for identity verification purposes with the standards used for I-9, Employment Eligibility Verifications as a safer framework than reliance on foreign-issued identity documents. *Id*. ORR had encountered difficulties authenticating foreign-issued documents, especially in a timely manner. *Id*. ¶ 27. Because of widespread fraud involving the use of such documents, ORR had to rely on foreign consulates and embassies, often liaising with the Department of State, to authenticate documents issued outside the United States. *Id.* This process is complicated by international relations (including whether the United States maintains diplomatic relations with certain countries) and the stability of certain foreign states. *Id.*, Ex. C, March 2025 ORR Decision.

To facilitate family reunification, ORR allows exceptions for Category 1 sponsors on a "case-by-case" basis. Biswas Decl. ¶ 27; UACB Policy Guide § 2.2.4. Regarding proof of address documentation, ORR has previously released children to addresses that did not include apartment numbers or were themselves suspected to be fraudulent; resulting in children released to locations that may not have been actual residences or for which the specific residential unit is unknown. Biswas Decl. ¶ 27. Regarding sponsor denial criteria, ORR clarified that a sponsor's or adult household member's refusal to present for fingerprinting would be sufficient for denial of release as failure to present can be an indication that the individual is trying to conceal known biometrics or criminal history, which could be grounds for sponsorship denial. UACB Policy Guide § 2.7.4.

**Field Guidance 27 regarding DNA testing -** On March 14, 2025, in the effort to combat fraud and consistent with statutory requirements to place a UAC with an appropriate custodian

10

(*see* 8 U.S.C. § 1232(c)(3)(A)), ORR issued FG 27 which utilizes DNA testing to confirm kinship of any potential sponsor who claims a biological relationship with the child. Biswas Decl. ¶ 28. In FG 27, ORR established that to enhance its sponsor vetting procedures it generally requires DNA testing to support proof of relationship between a potential sponsor and a UAC where the sponsor purports to be biologically related to the child.[2] *Id*. Submission of a DNA sample by the potential sponsor is not mandatory, but refusal to submit a DNA sample may be grounds for ORR to recategorize the sponsorship as an unrelated Category 3 sponsorship and to require enhanced vetting procedures pursuant to ORR Policy. *Id*. FG 27 also provides, among other things, that DNA test results must never be the sole reason for denying release to a potential sponsor, unless the sponsor misrepresented his or her relationship with the child; however, results of DNA tests may result in ORR updating the potential sponsor's Sponsor Category under its existing policies. *Id*.

**Updates to Policy Guide Sections 2.2.4 and 2.4.1 -** On April 15, 2025, to support child safety and further mitigate the risk of human trafficking, ORR revised its UACB Policy Guide Sections 2.2.4 and 2.4.1 to include income verification measures. *Id*. ¶ 29, Ex. D, April 2025 ORR Decision. This revision aims to ensure that sponsors can financially support the children they sponsor. By requiring the submission of proof of income information and supporting documentation, ORR's case managers and Federal Field Specialists will also be better equipped to identify potential indicators of labor trafficking or labor exploitation. *Id*. The information

---

[2]    *See* FIELD GUIDANCE – Revised May 15, 2025 (First Issued March 14, 2025) RE: Field Guidance #27 – DNA Testing Expansion, available at https://acf.gov/sites/default/files/documents/orr/FG-27_-_DNA_Testing_Expansion.pdf (last visited March 6, 2026). ORR requires DNA results that confirm biological parentage, biological grand-parentage, avuncular relationship, or siblingship (full or half). *Id*. Submitting a DNA sample is not mandatory, but failing to submit a DNA sample may result in ORR recategorizing the sponsorship as an unrelated Category 3 sponsorship, thereby necessitating enhanced vetting procedures. *Id*.

11

obtained during employment and income verification can inform the safety assessment, safety planning, decision to refer a case for a home study or not, and the appropriate level of Post-Release Services to recommend. *Id*.

## II.    This Lawsuit

On February 23, 2026, Plaintiffs filed this lawsuit, Complaint, ("Compl."), ECF No. 1, and moved for class certification and appointment of class counsel, Mot., ECF No. 4. The next day, Plaintiffs moved for a preliminary injunction, ECF No. 10. Plaintiffs allege that they are UAC who "were previously in ORR custody, determined to be eligible for release, and released to a suitable sponsor who was vetted and approved by ORR pursuant to the TVPRA." Compl., ¶ 8. Plaintiffs assert that, after they were released from ORR custody, years later DHS detained them for various reasons, and re-referred them to ORR. *See id.* According to Plaintiffs, ORR has required "their previously approved sponsors to recommence the sponsorship application process as if there was no prior sponsor approval decision." *Id.* Plaintiffs contend that ORR has a "blanket policy of requiring all previously approved sponsors to reapply for sponsorship." *Id.* Plaintiffs argue that ORR also "provides no explanation or justification for why its prior decisions approving these [UAC's] sponsors are no longer valid or respected." *Id.* ¶ 35.

Plaintiffs contend that DHS has apprehended and re-referred them to ORR for "many different reasons that do not necessarily implicate sponsor suitability." *Id.* ¶ 50. Plaintiffs assert that UAC's average length of time in ORR custody has increased since ORR implemented additional sponsorship application requirements since February 2025. *Id.* ¶ 37.

Plaintiffs bring three causes of action. In Count I, Plaintiffs allege that ORR's purported "reapplication policy" deprives Plaintiffs of liberty without procedural due process in violation of the U.S. Constitution's Fifth Amendment. *Id.* ¶¶ 87–92. In Count II, Plaintiffs contend that ORR's

12

purported reapplication policy is contrary to law and exceeds ORR's statutory authority. *Id.* ¶¶ 93–101. And finally, in Count III, Plaintiffs assert that the application of ORR's reapplication policy "to each Plaintiff and punitive class member to disregard [their previous decisions of sponsor's approval]" is arbitrary and capricious in violation of the APA. *Id.* ¶¶ 102–07.

In their motion for class certification, Plaintiffs argue that the putative class has two legal issues in common: (1) whether ORR's alleged "reapplication policy" denies procedural due process because it is applied without any individualized determination and the child or previously approved sponsor does not have an opportunity to respond; and (2) whether this reapplication policy is contrary to law, beyond statutory authority, and arbitrary and capricious, in violation of the APA. Mot. at 12-13.

### III.    The Named Plaintiffs

Plaintiffs are four UAC: Diego N., Renesme R., Mario C., and Benito S. Mot. at 4-6.

**Diego N.** As of February 18, 2026, Diego N. was 14 years old. Declaration of Diego N., ECF No. 4-4 ¶ 2. Diego N. is in ORR custody at a shelter in █████ Compl., ¶ 10; Biswas Decl. ¶ 45. ORR previously released Diego N. to his father Alexis N. in October 2024. Compl., ¶¶ 10, 60; Biswas Decl. ¶ 45. On November 6, 2025, U.S. Customs and Border Protection ("CBP") in DHS detained Diego N. and re-referred him to ORR. Compl., ¶¶ 10, 61–62. At the time of his encounter with CBP, Diego N. admitted to being a scout for alien smuggling, but he later denied making that statement to ORR staff. Biswas Decl. ¶ 45.

Alexis N. has applied to sponsor Diego N. again, and as of March 4, 2026, ORR has not issued him a denial. Compl., ¶¶ 63–64; Biswas Decl. ¶ 45. Alexis N. uploaded the sponsor application and submitted his birth certificate and fingerprints. *Id.* On December 17, 2025, ORR commenced a home study due to Diego N.'s criminal history, his history of controlled substance

13

uses and inappropriate contact with an adult while in his father's care, and history of making gang-related comments and drawings while in ORR care. *Id.* The home study focused on all aspects of Diego N.'s home, and was essential to assess whether concerning behavioral or safety concerns stemmed from Diego N.'s home life. *Id.* Additionally, in Diego N's case, the caseworker conducted family counselling sessions to ensure that his father would be better equipped to care for Diego N. *Id.* On December 30, 2025, ORR completed Diego N.'s home study, and a positive recommendation was made. *Id.* On January 18, 2026, ICE informed ORR that Diego N.'s case has been administratively closed and that ORR may proceed with standard release. *Id.* On January 29, 2026, ORR informed Alexis N. that his DNA appointment, identity verification, and additional vetting were still pending. *Id.* On February 6, 2026, Alexis N. was cleared on his internet criminal and sex abuse checks. *Id.* On February 24, 2026, ORR informed Alexis N. of the requirement to provide his taxpayer identification number/social security number and that the scheduling of his DNA appointment is still pending. *Id.*

**Renesme R.** As of February 17, 2026, Renesme R. was 16 years old. Declaration of Renesme R., ECF No. 4-5 ¶2. Renesme R. is in ORR custody at a shelter in ▮▮▮▮ Compl., ¶ 11; Biswas Decl. ¶ 46. ORR previously released her to her father Michael R. in December 2023. *Id.* ¶¶ 11, 67; Biswas Decl. ¶ 46. DHS detained Renesme R. in November 2025 as Renesme was traveling with a male friend during an ongoing DHS immigration enforcement operation and DHS re-referred her to ORR care on November 9, 2025. Biswas Decl. ¶ 46. Michael R. initially did not apply to sponsor Renesme R. again. Biswas Decl. ¶ 46; ECF No. 4-5. ¶¶ 11, 70.

On November 9, 2025, the same day Renesme was re-referred to ORR care, ORR contacted Renesme R.'s potential sponsor, her paternal aunt, and she agreed to commence the family reunification process. Biswas Decl. ¶ 46. On December 22, 2025, ORR contacted Renesme R.'s

14

aunt to request the required documents and information for the sponsorship application. *Id*. On January 13, 2026, ORR informed Renesme R. that her aunt completed the sponsorship application, but they were still waiting for her to submit proof of her address and income, her fingerprinting and home study results were still pending, and they needed in-person verification of her identity documents. *Id*. On February 3, 2026, Renesme R. was informed again that those outstanding items were still pending. *Id*. On February 26, 2026, Renesme's aunt informed ORR that she would be withdrawing her sponsorship application and that Renesme R.'s father would instead move forward as her sponsor. *Id*. On March 2, 2026, Renesme R's aunt's sponsorship withdrawal was recommended by her ORR case manager and ORR proceeded to commence the sponsorship process with her father with his agreement. *Id*. As of March 4, 2026, ORR has not issued a denial of sponsorship to Michael R. *Id*.

**Mario C.** As of February 10, 2026, Mario C. was 17 years old. Declaration of Mario C., ECF No. 4-6 ¶2. Mario C. is in ORR custody at a shelter in ███████. Compl., ¶ 12; Biswas Decl. ¶ 47. ORR previously released Mario C. to his mother Marisol C. in December 2023. *Id*. ¶¶ 12, 71. On November 17, 2025, Mario C. was cited for theft (stolen vehicle). Biswas Decl. ¶ 47. ICE then referred Mario C. to ORR on November 24, 2025, and he was admitted to ORR care for a second time on November 25, 2025. *Id.*

On November 26, 2026, ORR made initial contact with Mario C.'s potential sponsor, his mother, to discuss the reunification process. *Id.* Between November of 2025 and February of 2026, ORR had several conversations with Mario C.'s mother about sponsorship. *Id.* During each conversation, Mario C.'s mother declined to sponsor Mario C. Mario C. was informed that his mother confirmed her interest in sponsorship but had declined sponsorship due to the requirements. *Id.*; *see* Compl., ¶¶ 12-15, 73.

On February 23, 2026, Mario C.'s mother identified a new sponsor who she alleged was her third cousin, and provided his name and phone number to ORR on February 24, 2026. *Id*. It was later learned that the third cousin is not related at all, and, was instead, a family friend. *Id*. The lack of familial relationship was confirmed by both the sponsor and Mario's mother. *Id*. Mario's mother was contacted on March 5, 2026, to revisit sponsorship and the reunification process was discussed. *Id*. Mario's mother confirmed interest in proceeding and her birth certificate and identification were submitted for authentication. *Id*. No denial has been issued for any sponsor application for Mario C. as of March 6, 2026. *Id*.

**Benito S.** As of February 20, 2026, Benito S. was 17 years old. Declaration of Benito S., ECF No. 4-7 ¶ 2; Biswas Decl. ¶ 48. Benito S. is currently placed at ████████████████ ████████████████████████████. Biswas Decl. ¶ 48. ORR previously released Benito S. to his aunt in August 2023. *Id*. He was admitted to ORR care for a second time on December 18, 2025, after local law enforcement cited him for driving without a license and following too close. *Id*. ICE was contacted to verify Benito S.'s immigration status. *Id*. After Benito S. posted bond, he was transported to ICE for processing, where ORR's referral notes indicate he stated he has no legal guardian in the United States, but reported he had been residing with his aunt. *Id*. On December 19, 2025, ORR spoke with Benito S.'s aunt regarding the Sponsorship Application. *Id*. Benito S.'s aunt communicated she will not be able to sponsor Benito S. due to financial and limiting circumstances, and further stated she consulted with family friends to see if anyone is willing to sponsor Benito S., and at this time, there was no identified sponsor. *Id*.

On December 24, 2025, Benito S. first expressed interest in speaking with his Legal Service Provider about Long-Term Foster Care. *Id*. He then expressed interest in being sponsored by a

16

friend, but after multiple discussions, Benito S. refused to contact his friend when he learned that the call would need to be screened. *Id*. On January 21, 2026, Benito S. confirmed that he wanted to proceed with Long-Term Foster Care and no longer wanted to pursue the request to speak to his friend or have his friend sponsor him. *Id*. ORR informed Benito S, on January 28, 2026, that it was approved to continue with the Long-Term Foster Care application and ORR would be compiling the necessary information. *Id*. On February 4, 2026, he was informed that ORR was compiling all required documents for the Long-Term Foster Care application. *Id*. On February 19, 2026, the Long-Term Foster Care packet was complete and sent out and Benito S. was informed. *Id*.

On March 5, 2026, ORR met with Benito S.; Benito S. informed ORR that he would like to accept the Long-Term Foster Care placement offer at ▇▇▇ *Id*. ▇▇▇ was notified of Benito S.'s acceptance of the offer for placement that same day. *Id*. Benito S. was admitted to ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ on March 10, 2026. *Id*. There is no active sponsor application pending for Benito S., so no denial has been issued for any Sponsor Application for Benito as of March 10, 2026.

### IV.    Plaintiffs' Proposed Class Definition

The named Plaintiffs seek to represent a class of:

> noncitizen minors who are or will be in the custody of HHS and (1) who were previously in ORR custody, (2) who were approved for release by ORR to a sponsor, (3) who have been or will be re-detained by DHS and re-referred to ORR, and (4) whom ORR has not released to their previously approved sponsor pursuant to ORR's policy requiring the previously approved sponsor to submit a new sponsor application and obtain a new approval for release.

Mot. at 23-24.

17

**STANDARD**

The class action "is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To fall within this narrow exception, Plaintiffs must "affirmatively demonstrate" their compliance with each element of Rule 23— "that is, [they] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores*, 564 U.S. at 350; *see also McCarthy v. Kleindienst*, 741 F.2d 1406, 1414 n. 9 (D.C. Cir. 1984) ("It is the party seeking class certification that bears the burden of establishing the class action requirements."). This is not just a "mere pleading standard." *Id.* "[A]ctual, not presumed, conformance" with Rule 23 is "indispensable," *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982), and certification is proper only if the Court is satisfied "after a rigorous analysis" that Plaintiffs have shown that each requirement of the Rules has been met. *Wal-Mart Stores*, 564 U.S. at 350–51.

Thus, Plaintiffs must demonstrate each element of Rule 23(a) is met: (1) the class is so numerous that joinder is impractical ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the Named Plaintiffs are typical of claims or defenses of the class ("typicality"); and (4) the Named Plaintiffs and counsel will fairly and adequately protect the interests of the class ("adequacy of representation"). Fed. R. Civ. P. 23(a).

To satisfy the commonality element, identifying one or more common questions is not enough. "It is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation"

18

that makes a case appropriate for class treatment. *Wal-Mart Stores*, 564 U.S. at 350 (emphasis in original).

In addition to meeting the requirements set forth in Rule 23(a), the proposed class must also qualify under Rule 23(b)(1), (2), or (3). *AmChem Prods. V. Windsor*, 521 U.S. 591, 614 (1997). Plaintiffs seek certification under Federal Rule of Civil Procedure 23(b)(2), which permits certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the individual nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores*, 564 U.S. at 360.

## ARGUMENT

I.   **The proposed class is impermissible because it includes, or potentially includes, individuals who have not suffered, or will not suffer, the same injury—or have not suffered or will not suffer any injury.**

Courts in this District interpret Rule 23 as imposing a "requirement that a class be clearly defined." *Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998). This requirement ensures that the class is "neither amorphous, nor imprecise." *Lewis v. Nat'l Football League*, 146 F.R.D. 5, 8 (D.D.C. 1992). "A class sought to be certified under Rule 23(b)(2) must "accurately articulate[] the general demarcations of the class of individuals who are being harmed." *Thorpe v. District of Columbia*, 303 F.R.D. 120, 139 (D.D.C. 2014). A class definition may be fatally overbroad if it "sweeps within it persons who could not have been injured by the defendant's conduct." *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 191 (D.D.C. 2017) (quoting *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009)). Having an inadequately defined or overbroad

19

class often implicates multiple Rule 23 requirements, including typicality, commonality, and the standards for certifying an injunctive-relief class under Rule 23(b)(2).[3]

The proposed class is overbroad for several reasons. First, the proposed class is not sufficiently definite. The class definition hinges on speculative, future conditions that cannot reliably identify who belongs in the class. *See Falcon*, 457 U.S. 11 at 161 ("[W]ithout reasonable specificity the court cannot define the class, cannot determine whether the representation is adequate, and the employer does not know how to defend . . . . '[M]ost significant' [is] the potential unfairness to the class members bound by the judgment if the framing of the class is overbroad.") (internal citations omitted). In *Falcon*, the class representative sued on behalf of a class of all present or future Mexican-American employees (applicants) of the defendant-company, claiming that the company discriminated in its hiring and promotion practices. *Id.* at 149-51. As the Supreme Court emphasized, the post-certification evolution of the case confirmed that class action was not appropriate due to the disparity between present employees and applicants. *Id.* at 159.

Similarly, here, a class member is defined as someone "who is or will be in the custody of HHS" or "who has or will be re-detained by DHS or re-referred to ORR" based on an alleged "blanket policy" that Plaintiffs fail to identify or cite. Under this imprecise class definition, nearly every UAC could be a class member, or perhaps no UAC, because we do not presently know who "will be in the custody of HHS" or who "will be re-detained by DHS or re-referred to ORR" due to the alleged policy. Furthermore, the class would include UAC who do not share in the claimed

---

[3]    For purposes of this opposition to Plaintiffs' motion for class certification, Defendants concede that Plaintiffs have established the numerosity requirement in Federal Rule of Civil Procedure 23(a)(1) and that the Individual Plaintiffs would be adequate representatives, under Rule 23(a)(4), if the Court certifies a class. Defendants, at a future date, might oppose class certification or, if the Court certifies a class, seek decertification of the class based on numerosity and adequacy of representation.

class injury as circumstances and length of each individual's time in ORR custody or the reason for their re-referral will differ greatly. *See Wal-Mart Stores*, 564 U.S. at 348 ("[A] class representative must . . . possess the same interest and suffer the same injury as the class members."). Plaintiffs' themselves concede that DHS has apprehended and re-referred them to ORR for "many different reasons that do not necessarily implicate sponsor suitability." Compl., ¶ 50. Likewise, it is not simply the case that the sponsors who ORR previously released the named Plaintiffs to are always willing or able to be sponsors again. *See* Biswas Decl. ¶¶ 46–48. For two of the four named Plaintiffs identified, *new or no sponsors* have submitted sponsorship applications. *See* Mario C. and Benito S., Biswas Decl. ¶¶ 47, 48. And for another named Plaintiff, a new sponsor commenced the application with ORR and then withdrew, and the original sponsor proceeded to apply months later. *See* Renesme R., Biswas Decl. ¶ 46. Inherently in these situations, new information will be considered. Thus, ORR is not simply looking at the *exact same* information as it did the first time it reviewed sponsor applications for the named Plaintiffs.

This is also highlighted by the example of named Plaintiff Diego N. Even though Diego N.'s original sponsor reapplied to sponsor him again, ORR still needed to commence a home study due to Diego N.'s criminal history, his history of controlled substance uses and inappropriate contact with an adult *while in his father's care*, and history of making gang-related comments and drawings while in ORR care. Biswas Decl. ¶ 45. The home study focused on all aspects of Diego N.'s home, and was essential to assess whether concerning behavioral or safety concerns stemmed from Diego's home life. *Id*. Additionally, in Diego N's case, the caseworker conducted family counselling sessions to ensure that his father would be better equipped to care for Diego N. moving forward, a clear benefit to both sponsor and UAC. *See id*. And as a matter of policy, ORR still requires a DNA test and identity verification, even for Category 1 sponsors, as Diego N.'s birth

21

certificate, although authentic, does not contain photographs of the parents. *Id.* It is therefore imperative for ORR to confirm not only that the document is authentic but also that the sponsor is who is on the birth certificate and that the relationship is confirmed via DNA testing. *Id.*

This demonstrates the reality that ORR is never looking at the exact same information, because new circumstances can always come to light. And, even if ORR were looking at the exact same information (it is not), Defendants are nevertheless legally required to "establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity . . . ." 8 U.S.C. § 1232(c)(1); *see generally* UACB Policy Guide. In short, it is not outside the realm of possibility that a previously vetted sponsor can later endanger a child and no longer be the appropriate individual for release. Thus, ORR needs time to appropriately vet potential sponsors, even sponsors who had once been approved.

In sum, the breadth of the proposed class means the claims of the proposed class are too disparate to be measured at once. And, as explained below, this precludes a finding of commonality and typicality among the asserted class claims. *See infra* § II; *cf. AmChem Prods.*, 521 U.S. at 626 (concluding that named plaintiffs with diverse medical conditions were not adequate representatives of a single class because the "the interests of those within the single class are not aligned"). This Court should deny Plaintiffs' motion for class certification.

II.     **No common questions drive the resolution of the litigation as to the proposed class, and the named Plaintiffs' claims are not typical of all putative class members' claims.**

For the same reasons that the class is overbroad, commonality and typicality are lacking. Rule 23(a)(2) permits class certification only if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement is easy to misread, since "[a]ny competently crafted class complaint literally raises common 'questions.'" *Wal-Mart Stores, Inc.*

*v. Dukes*, 564 U.S. 338, 349 (2011). Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury" *Id*. (quoting *Falcon*, 457 U.S. at 161). This does not mean merely that they have all suffered a violation of the same provision of law. *Id*. Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. *Id*. What matters to class certification "is not the raising of common questions, but rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (internal punctuation omitted). Plaintiffs must show that their claims "depend upon a common contention" "capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

"Typicality of class differs from commonality in that typicality concerns the relationship between the representative's individual claims and the class's claims rather than the relatedness of the entire class's claims." *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019). Yet, both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical. *Id*. (citing Fed. R. Civ. P. 23(a)(2), 23(a)(3)). To destroy typicality, a distinction must differentiate the "*claims or defenses*" of the representatives from those of the class. *Id*. (emphasis added in original) (citing Fed. R. Civ. P. 23(a)(3)). As a result, typicality is ordinarily met "if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." *Id*. (quoting 7A Wright et al., Federal Practice and Procedure § 1764 (footnote omitted)).

### A.    Plaintiffs have not shown that their claims depend upon a common contention capable of classwide resolution.

Plaintiffs assert that UAC that were released to ORR approved sponsors and later have been or will be re-referred to ORR should have an "individualized determination" and essentially

be released to their previously approved sponsors. *See* generally Mot. They also assert that the imposition of the new sponsor document requirements unnecessarily extend time in ORR custody or result in ORR's denial of release to their previously approved sponsors. *Id.*

Commonality is not met here because the proposed class includes disparate groups of UAC, including UAC who are not in ORR custody, UAC who are in ORR custody before potential sponsors have an opportunity to submit the required documentation, but later are able to submit the documents, and UAC who are in ORR custody and their potential sponsors are unable or unwilling to submit the sponsor documentation requirements. *See* Mot. at 1-2. For example, Diego N.'s previously approved sponsor has submitted some of the required documents but his identity and income verification are still pending, Mario C.'s approved sponsor was initially either unable or unwilling to sponsor him again, though she has since changed her mind, and Benito S.'s previously approved sponsor declined to sponsor him due to financial and limiting circumstances. *See* Biswas Decl. ¶¶ 45, 47, 48. Moreover, the potential sponsors could change while the UAC are in custody, which would necessitate new documentation requirements and require a new safety and suitability assessment. *See* 8 U.S.C. § 1232(c)(3). For example, Renesme R.'s aunt applied to sponsor her instead of her father (who was her sponsor the first time), and then later her aunt withdrew, only for her father to resubmit his sponsorship application four months later. Biswas Decl. ¶ 46.

The proposed class also would include UAC whose potential sponsors are subject to exceptions from the general document requirements and to whom ORR denies release for reasons other than missing documents. *See* UACB Policy Guide § 2.4.4 (providing that a potential sponsorship will be denied if it is determined that the potential sponsor cannot provide for the child's physical or mental well-being or the placement would result in a danger to the child or the

24

community) (citing 45 CFR § 410.1205(a)). Additionally, the UAC-sponsor relationships within the proposed class are vastly different because a "previously approved sponsor" could include a Category 1 (parent or legal guardian), 2 (brother, sister, grandparent, or other immediate relative (e.g., aunt, uncle, first cousin), or 3 (distant relatives and unrelated adult individuals) sponsor.[4] *See* UACB Policy Guide § 2.2.1. The UAC-sponsor relationships could also result in different documentation requirements. *See* UACB Policy Guide § 2.2.4. (providing that exceptions to the required documents may be made on a case-by-case basis for Category 1 Sponsors only).

Further, the determination of whether a class member has been injured and is entitled to relief would require examination of *individualized* facts concerning the sponsorship and documentation requirements. In some cases, a previously approved sponsor may have already submitted the newly required documents or some of the documents previously submitted may still be valid and additional documents may not be required. *See* UACB Policy Guide § 2.2.4 (employer income verification is valid for 60 days), § 2.5.3 (background checks expire 90 or 270 days from the day results are received), § 2.2.4. A previously approved sponsor could also be unable to submit the newly required documents under the Policy Guide updates but may also now be an unsuitable sponsor for other reasons. *See* UACB Policy Guide § 2.4.4 (citing 45 CFR § 410.1205(a)). In such a case, whether the UAC in this situation was injured at all would require an individualized case-by-case inquiry. Accordingly, resolving the legal questions that Plaintiffs assert will not resolve the claims of each class member in one stroke.

---

[4]    For example, Benito S.'s previously approved sponsor was a Category 2 sponsor, while the other named class members' sponsors were Category 1. *See* Biswas Decl. ¶ 45-48.

**B.    The named Plaintiffs' claims would not be typical of a class under Plaintiffs' proposed class definition.**

To prove typicality, the named Plaintiffs must establish that they "possess the same interest and suffer the same injury" as the other class members. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 331 (D.D.C. 2018). The typicality requirement asks whether distinctions differentiate the claims and defenses of the representatives from the class. *Harris v. Med. Transportation Mgmt., Inc.*, 77 F.4th 746, 759 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 818 (2024).

The typicality requirement of Rule 23(a)(3) ensures that the interests of the named class representatives align with the interests of the class. As long as the claims "resemble or exhibit the essential characteristics of those of the representatives," Rule 23(a)(3) will be satisfied. *Kas v. Financial General Bankshares, Inc.*, 105 F.R.D. 453, 461 (D.D.C. 1984). The typicality requirement is not met, however, if the proposed class representatives are subject to unique defenses. *Id*. The typicality requirement is used to ascertain "whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of the absent class members so as to assure that the absentees' interests will be fairly represented." *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 27 (D.D.C. 2001) (citations omitted).

The named Plaintiffs have not established that they have typical claims for the same reasons that they have not shown commonality. As noted above, Plaintiffs assert that UAC that were released to an ORR approved sponsor and re-detained and re-referred to ORR should have an "individualized determination" and be released again to that same ORR approved sponsor. *See generally* Mot. They also allege new sponsor document requirements unnecessarily delay detention or cause previously approved sponsors to no longer qualify as potential sponsors. *Id*. As argued *supra*, the named Plaintiffs cannot represent the proposed class because it includes

26

disparate groups of UAC, including UAC not in custody, UAC who are in ORR custody before potential sponsors have an opportunity to submit the required documentation, but later are able to submit the documents, and UAC who are in ORR custody and their potential sponsors are unable or unwilling to submit the required documentation. *See* Mot. at 1-2. The proposed class also includes UAC whose potential sponsors are excepted from the document requirements and to whom ORR does not release for reasons other than missing documents. *See* UACB Policy Guide § 2.4.4. Such disparity is not appropriate for class action.

Significantly, the UAC-sponsor relationships within the proposed class are vastly different because a "previously approved sponsor" could include a parent or legal guardian, other immediate relatives, and distant relatives or unrelated adult sponsor. *See* UACB Policy Guide § 2.2.1 (providing sponsor categories). The named Plaintiffs were previously released to either a parent or an aunt, and thus their claims would be distinct from any class member who previously released to a distant relative or unrelated adult sponsor. Biswas Decl. ¶¶ 45-48. While Plaintiffs argue that 8 U.S.C. § 1232(c)(2)(A) mandates immediate return to a prior sponsor, *see* Pls' Preliminary Inj. Mot. at 31, they also request an "individualized determination," *id*. at 37; *e.g.*, Mot., ECF No. 4-1 at 1-2. To this end, class members may have an interest in being released to a parent or immediate relative rather than the same previously approved sponsor who is only distantly related or not related at all; the inverse could also be true where a class member may have an interest in not being released to the same immediate relative or legal guardian. In other words, the named Plaintiffs have not shown that they are typical of the proposed class because it is prohibitively disparate. To the extent the proposed class encompasses individuals whose previous sponsor is no longer considered suitable based on ORR's rigorous, multi-factored assessment of a child's safety and

27

well-being, 45 C.F.R. § 410.1001, whether the UAC in this situation was injured at all would have to be determined on a case-by-case basis.

And considering Plaintiffs are in ORR custody and seek to represent a class of UAC "who are or will be in the custody of HHS" or "who are or will be re-detained by DHS or re-referred to ORR," their claims would be distinct from any class member who is *not* in ORR custody but will be in ORR custody in the future based on pure speculation and the purported "reapplication policy." It is also problematic that Plaintiffs seek to represent a class defined by actions taken by DHS, an entity that is not even a party to this lawsuit. *See generally* Compl.

Put another way, while Plaintiffs may be frustrated with their return to ORR custody by DHS, that does not establish the alleged ORR policy, and HHS does not control DHS. Even the re-referral circumstances among the named Plaintiffs differ and are not typical. For example, Benito S. was re-referred to ORR by DHS after local police arrested him for a driving without a license and following too close, wherein ICE was contacted and took custody. Biswas Decl., ¶ 48; *see* Benito S. Decl., ECF No. 4-7 ¶ 7. While, Mario C., on the other hand, was re-referred to ORR by DHS after local police cited him for theft (stolen vehicle). Biswas Decl. ¶ 47. This new information which relates to the case-by-case circumstances of the named Plaintiffs may be considered by ORR when making their placement decisions pursuant to 8 U.S.C. § 1232(c)(2)(A).

For these reasons, the named Plaintiffs' claims would not be typical of a class under Plaintiffs' proposed class definition.

### III.    Certification under Rule 23(b)(2) is inappropriate because the relief Plaintiffs seek will not benefit all class members.

A court may certify a class under Rule 23(b)(2) only when a single injunction or declaratory judgment "is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The "key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the

notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores*, 564 U.S. at 360 (citation omitted). Class certification under Rule 23(b)(2) therefore "applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.*; *see also Lemon v. Int'l Union of Operating Engr's, Local No. 139, AFL–CIO,* 216 F.3d 577, 580 (7th Cir. 2000) ("By virtue of its requirement that the plaintiffs seek to redress a common injury . . . Rule 23(b)(2) operates under the presumption that the interests of the class members are cohesive."); *Lightfoot v. D.C.*, 273 F.R.D. 314, 329 (D.D.C. 2011).

Plaintiffs assert that Defendants' application of its "reapplication policy" is a final agency action generally applicable to the class. *See* Mot. at 19-20. [5] However, there is no "policy" regarding what happens when UAC are re-referred to the custody of HHS's ORR and neither the TVPRA, HSA, Foundational Rule, or UACB Policy Guide specifically address how UAC with previously approved sponsors should be assessed when they return to ORR custody. *See generally* 8 U.S.C. § 1232; 6 U.S.C. § 279. Moreover, ORR retains its authority to conduct case-by-case safety and suitability assessments after re-referral because it is required to verify that a sponsor is "capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A). It also is reasonable that ORR may need to assess the case anew when such determinations were made a year or even three years prior (as is the case for the named Plaintiffs here), it is presented with new information, or it becomes aware of a change in the circumstances of the previously approved sponsor and/or the child. *See generally* 8 U.S.C. § 1232(c)(3); *see* Biswas Decl. ¶¶ 45-

---

[5]    Defendants assert that there is no final agency action here. *See* Defs' Opp. to Mot. for Prelim. Inj., ECF No. 23 at 29-31. To the extent sponsors have applied or re-applied, ORR also has not made a final action on any of the Plaintiffs' individual sponsorship applications. *See generally* Biswas Decl. ¶¶ 45-48.

48. While reunification may not be as "prompt" as Plaintiffs desire, ORR is obligated to ensure that UAC are safe and that such a release is still in the "best interests of the child," and that is precisely what ORR is doing on a case-by-case basis for all UAC in its custody. *See* 8 U.S.C. § 1232(c)(2)(A); 8 U.S.C. § 1232(c)(3)(A).

Accordingly, this Court should decline to certify the class under Rule 23(b)(2).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Class Certification.

Dated: March 10, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANTHONY P. NICASTRO
Acting Director

GLENN M. GIRDHARRY
Acting Deputy Director

JOSHUA M. MCCROSKEY
JESSE A. MONTES
Trial Attorneys

/s/ *Cara E. Alsterberg*
CARA E. ALSTERBERG
Acting Assistant Director
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 532-4667
Email: Cara.E.Alsterberg@usdoj.gov

*Attorneys for Defendants*