**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| DIEGO N., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:26-cv-577 |
| U.S. DEPARTMENT OF HEALTH AND | ) | |
| HUMAN SERVICES, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 3

    I.    Plaintiffs Are Likely to Succeed on the Merits .................................................. 3

        A.    ORR's Blanket Reapplication Policy Violates Procedural Due Process ........................ 4

            1.    Defendants disregard Plaintiffs' compelling interests ............................... 4

            2.    ORR's refusal to consider the individual circumstances of Plaintiffs' re-referral creates a severe risk of erroneous deprivation ........................... 8

            3.    Any burden on Defendants is slight in comparison to children's profound harms ... 14

        B.    ORR's Blanket Reapplication Policy Violates the Administrative Procedure Act ...... 16

            1.    Plaintiffs lack an adequate alternative remedy ......................................... 16

            2.    ORR's reapplication policy is final agency action .................................... 18

            3.    ORR's reapplication policy is contrary to law ......................................... 19

            4.    ORR's reapplication policy is arbitrary and capricious ........................... 21

    II.    Plaintiffs Are Suffering Irreparable Harm ....................................................... 22

    III.  The Balance of Equities and Public Interest Favor Plaintiffs ........................... 23

    IV.  Plaintiffs' Requested Relief is Justified ............................................................ 24

    V.   Class Certification is Fully Briefed and there is no Basis to Delay Provisional Class Certification ......................................................................... 25

    VI.  The Court Should Require No Bond or a Nominal Bond .................................. 25

CONCLUSION .................................................................................................................. 25

**TABLE OF AUTHORITIES**

**Cases**                                                                                  **Page(s)**

*A.A.R.P. v. Trump*, 605 U.S. 91 (2025).................................................................... 25

*\*A.N.P.S. v. Salazar*, No. 25-cv-14778, 2025 WL 3707333 (N.D. Ill. Dec. 22, 2025) ................................................................................................................ *passim*

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967)........................................................... 17

*Am. First Legal Found. v. Becerra*, No. 24-cv-1092, 2024 WL 3741402 (D.D.C. Aug. 9, 2024) ........................................................................................................ 25

*Angelica S. v. HHS*, 786 F. Supp. 3d 158 (D.D.C. 2025) ....................................... 17, 22

*Application of Gault*, 387 U.S. 1 (1967)..................................................................... 11

*\*Bennett v. Spear*, 520 U.S. 154 (1997) ..................................................................... 19

*Darby v. Cisneros*, 509 U.S. 137 (1993)..................................................................... 17

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194 (3d Cir. 2024)........................................................................................ 24

*\*DHS v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020)................................................. 22

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 396 F.3d 1265 (D.C. Cir. 2005) ....................................................................................................... 17

*FBI v. Fikre*, 601 U.S. 234 (2024) .............................................................................. 10

*General Elec. Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) ......................................... 19

*\*Goss v. Lopez*, 419 U.S. 565 (1975) ....................................................................... 4, 8

*J.E.C.M. v. Lloyd*, 352 F. Supp. 3d 559 (E.D. Va. 2018) ...................................... 17, 19

*Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491 (D.D.C. 2018) ............... 22

*Jackson v. Mabus*, 808 F.3d 933 (D.C. Cir. 2015) ..................................................... 21

*Kingdom v. Trump*, No. 25-cv-691, 2025 WL 1568238 (D.D.C. June 3, 2025) .......... 24

*\*L.V.M. v. Lloyd*, 318 F. Supp. 3d 601 (S.D.N.Y. 2018)................................... 17, 19, 22

*Lucas R. v. Becerra*, No. 18-cv-5741, 2022 WL 2177454 (C.D. Cal. March 11, 2022) ...................................................................................................................... 16, 22

*LULAC v. Exec. Office of the President*, 780 F. Supp. 3d 135 (D.D.C. 2025)............ 25

*Moore v. City of E. Cleveland*, 431 U.S. 494 (1977) ...................................................................... 1

*Nicholson v. Scoppetta*, 3 N.Y.3d 357 (2004) ............................................................................. 11

*P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020) .................................................................. 25

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925) ......................................................................... 1

*Quilloin v. Walcott*, 434 U.S. 246 (1978) .................................................................................... 1

*Ramirez v. ICE*, 310 F. Supp. 3d 7 (D.D.C. 2018) ..................................................................... 19

*Reno v. Flores*, 507 U.S. 292 (1993) .............................................................................. 6, 7, 8, 23

*Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) ................................................. *passim*

*Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017) ................................................ *passim*

*Schall v. Martin*, 467 U.S. 253 (1984) ....................................................................................... 23

*Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022) ........................................................................... 24

*Skinner v. Switzer*, 562 U.S. 521 (2011) .................................................................................... 18

*Stanley v. Illinois*, 405 U.S. 645 (1972) ........................................................................... 1, 6, 11

*Texas v. Biden*, 646 F. Supp. 3d 753 (N.D. Tex. 2022) .............................................................. 24

*Troxel v. Granville*, 530 U.S. 57 (2000) ...................................................................................... 1

*Trump v. J.G.G.*, 604 U.S. 670 (2025) .................................................................................. 16, 18

*W. Virginia v. EPA*, 577 U.S. 1126 (2016) ................................................................................. 24

*Wilkinson v. Dotson*, 544 U.S. 74 (2005) ................................................................................... 18

*Winter v N.R.D.C.,* 555 U.S. 7 (2008) ........................................................................................ 24

**Statutes**

8 U.S.C. § 1232(b)(1) ............................................................................................................. 2, 12

8 U.S.C. § 1232(b)(3) ................................................................................................................. 15

8 U.S.C. § 1232(c)(2)(A) ................................................................................................ 2, 7, 14, 20

8 U.S.C. § 1232(c)(3)(A) ............................................................................................................ 20

42 U.S.C. § 672(k) ..................................................................................................................... 12

Tex. Fam. Code § 262.104 ........................................................................................ 11

Tex. Fam. Code § 262.106 ........................................................................................ 11

**Regulations**

45 C.F.R. § 410.1001 ............................................................................................... 16

45 C.F.R. § 410.1201 .......................................................................................... 14, 20

45 C.F.R. § 410.1203 ............................................................................................... 21

45 C.F.R. § 410.1901 ............................................................................................... 13

45 C.F.R. § 410.1902 .......................................................................................... 13, 16

**Other Authorities**

Complaint, *U.S. v. Southwest Key Programs, Inc.*, No. 24-cv-00798, 2024 WL
      3462582 (W.D. Tex. July 17, 2024), ECF No. 1 ................................................ 12

Office of Refugee Resettlement, Data: Released to Sponsors (last updated Sept.
      11, 2025), *archived at* https://perma.cc/2X2G-YT3X .......................................... 11

U.S. Gov't Accountability Off., GAO-26-107592, HHS Should Clarify Guidance
      on State Spending for Congregate Care (March 2026),
      https://www.gao.gov/assets/gao-26-107592.pdf .................................................... 12

**INTRODUCTION**

Plaintiff children have endured months of separation from their parents and other family members while they languish in government custody without any semblance of due process, deprived of the care and guidance of their loved ones, cut off from their communities, and unable to continue their educations. Defendants acknowledge that the Office of Refugee Resettlement ("ORR") previously approved sponsors for these children and that ORR has not made an individualized determination that any of these sponsors have since become unfit. Defendants further admit that ORR treats a child living in the United States with a previously approved sponsor exactly the same as a child referred to ORR for the first time and requires every sponsor to repeat all the same application steps, regardless of the circumstances of the child's return to ORR custody.

Defendants insist that Plaintiffs' prolonged detention is necessary because there is a *chance* that Plaintiffs' previously vetted and approved sponsors may no longer be suitable. *See* Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction at 22-24, ECF No. 33 ("Opp."). This position is fundamentally inconsistent with the requirements of procedural due process and our nation's deep-rooted tradition of respect for family integrity. While it is *possible* that any given parent or custodian is unfit, our constitutional system does not permit the government to remove children from their homes and keep them in government custody without individualized *evidence* that this is the case. *See Troxel v. Granville*, 530 U.S. 57, 65, 68-69 (2000); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Moore v. City of E. Cleveland*, 431 U.S. 494, 504-06 (1977); *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925). Defendants' suggestion that Plaintiffs are not suffering harm because ORR provides mental health care to help cope with the distress of family separation and detention, Opp. at 38, reflects a shocking disregard for children's family relationships and their aspirations to further their educations and build meaningful lives in their communities.

1

Faced with profound harm, Plaintiffs seek only modest, narrowly tailored relief. Contrary to Defendants' characterizations, Plaintiffs do not claim an absolute entitlement to release, do not request release to new sponsors, and do not object to additional vetting in cases where the circumstances of a child's re-referral demonstrate actual safety concerns with the sponsor. Plaintiffs request only that ORR make individualized determinations as to whether the evidence in each child's particular case requires reconsideration of ORR's own prior sponsor approval decision and that it provide notice of that determination and a fair opportunity to be heard. Due process requires no less.

Defendants have offered no legitimate reason why ORR cannot consider each child's individual circumstances before requiring their parent or other prior sponsor to repeat the lengthy application process. While claiming unbounded authority to keep children in custody for however long ORR deems necessary, Defendants simultaneously present ORR as powerless to address the unique situation of previously released children. Not so. The Trafficking Victims Protection Reauthorization Act ("TVPRA") vests authority for the care and custody of unaccompanied children, including placement determinations, with the Secretary of Health and Human Services ("HHS"). 8 U.S.C. § 1232(b)(1). The TVPRA obligates HHS to promptly place a child in the least restrictive setting in the child's best interests. 8 U.S.C. § 1232(c)(2)(A).

Once ORR places a child with a sponsor pursuant to the TVPRA, the Department of Homeland Security ("DHS") has no statutory authority to change or revoke that placement. If a child re-enters DHS custody, DHS is required to refer the child to ORR and it is ORR's responsibility to evaluate whether the previous placement must be revisited. Although ORR may not control DHS's actions, it has no legal basis to treat detention by DHS as automatically nullifying ORR's prior sponsor approval decision. Unsurprisingly, courts that have considered this

question have concluded that, where a child has a previously approved sponsor, "[n]othing in the TVPRA requires the government to conduct this review a second time." *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1143 (9th Cir. 2018); *see also A.N.P.S. v. Salazar*, No. 25-cv-14778, 2025 WL 3707333, at *6 (N.D. Ill. Dec. 22, 2025). Further, Defendants do not dispute that ORR adopted its reapplication policy without an analysis of the facts specific to previously released children, without consideration of these children's strong reliance interests, and without evaluating whether the benefits of its categorical policy outweigh the harms of detention. ORR's insistence on closing its eyes to a child's prior sponsor approval is thus contrary to law and arbitrary and capricious in violation of the Administrative Procedure Act ("APA").

Provisional class certification and a preliminary injunction are necessary to address ongoing irreparable harm to Plaintiffs and putative class members and provide them an opportunity to return to their families and begin to rebuild their lives.

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits

Defendants' opposition confirms that ORR applies a blanket policy of requiring all previously approved sponsors to repeat the sponsor application process every time DHS re-refers a child to ORR, regardless of the reason for DHS's referral and regardless of whether there is any evidence the sponsor has become unfit. Opp. at 1. Because ORR's reapplication policy guarantees that Plaintiffs and putative class members will experience extended detention and family separation based on the mere possibility of safety concerns and without any procedural protections, it plainly violates the Due Process Clause. Plaintiffs are also likely to succeed on their Administrative Procedure Act ("APA") claims because they lack an adequate alternative remedy for the relief they seek, ORR's reapplication policy is a final agency action with immediate legal consequences for all re-referred children, and it is contrary to law and arbitrary and capricious.

3

**A. ORR's Blanket Reapplication Policy Violates Procedural Due Process**

**1. Defendants disregard Plaintiffs' compelling interests**

Defendants acknowledge, as they must, that unaccompanied children have constitutionally protected liberty interests at stake in this case. Opp. at 23. But Defendants partially address just one of Plaintiffs' liberty interests and fail to address Plaintiffs' evidence and legal authority showing their compelling interests in family integrity and their "legitimate claim of entitlement" to continued placement in the least restrictive setting under the TVPRA. *See* Plaintiffs' Memorandum in Support of their Motion for Preliminary Injunction at 22-27, ECF No. 10-1 ("PI Memo") (citing *Goss v. Lopez*, 419 U.S. 565, 573 (1975). Moreover, Defendants' suggestion that Plaintiffs' interests are minimal because the sponsorship process is temporary is incorrect.

a. <u>ORR's reapplication policy severely burdens family integrity</u>

Defendants entirely disregard Plaintiffs' family integrity interests—both in their briefing and in ORR's policy toward previously released children—and fail to rebut the long line of Supreme Court cases cited in Plaintiffs' memorandum confirming the constitutional importance of this interest. *See* PI Memo at 22-24.

To the extent Defendants argue that Plaintiffs' family separation is not attributable to ORR's reapplication policy because some Plaintiffs have experienced sponsorship changes while in ORR custody, this is plainly incorrect. Opp. at 38. There is an immense difference between asking a previously approved sponsor to accept their child back and asking that individual to submit to a new, lengthy, and complex vetting process that may require them to obtain a new proof of identification, share all their household members' personal information, agree to a home study, and attend an identification verification appointment at an ICE office where they could be detained. *See* PI Memo at 9-12. Sponsors are understandably intimidated by this prospect, and children are consequently denied the opportunity to return home to their families.

4

For instance, Defendants note that Renesme's aunt initially pursued sponsorship but recently withdrew in favor of Renesme's father, Michael R. Opp. at 38. This recitation omits significant material facts. Michael has always wanted his daughter back. Renesme's aunt pursued sponsorship only after Michael learned that he would be required to repeat the full application process and could be at significant risk of immigration enforcement as a result. Declaration of Renesme R. ¶¶ 10-12, ECF No. 4-5 ("Renesme R. Decl."). After the filing of this case, ORR reached out to Michael indicating that he could pursue an expedited sponsorship process.[1] When offered this option, Michael re-engaged in sponsorship. Had ORR simply offered to recognize Michael's prior sponsorship approval, Renesme would already be home.

Similarly, Mario's mother has consistently been eager to bring her son home but believed she could not to do so because of ORR's new sponsorship requirements. Declaration of Toby Biswas ¶ 47, ECF No. 33-1 ("Biswas Decl."); Declaration of Mario C. ¶ 14, ECF No. 4-6 ("Mario C. Decl."). When ORR reached out again in early March, after this case was filed, she willingly re-applied. Biswas Decl. ¶ 47. Benito S.'s aunt similarly declined to pursue sponsorship only after learning ORR would require her to re-apply and satisfy all its new requirements. Biswas Decl. ¶ 48; Declaration of Benito S. ¶ 10, ECF No. 4-7 ("Benito S. Decl.").

Defendants' insistence that the harm is minimal because ORR custody is temporary is belied by the fact that children are spending months in custody, missing school, and experiencing significant burdens on their family integrity. That Plaintiffs' previously approved sponsors might eventually be able to obtain a new sponsorship approval does not negate the harm Plaintiffs have

---

[1] On March 11, 2026, Plaintiffs' counsel emailed Defendants' counsel to ask whether ORR would stipulate to this fact. On the same day, Defendants' counsel responded that "ORR is willing to stipulate to the fact that Renesme's father commenced the sponsorship process following outreach from ORR indicating that he could pursue an expedited sponsorship process."

5

experienced and continue to experience. *See, e.g.*, *Stanley*, 405 U.S. at 647 (explaining that even if the petitioner were eventually able to regain custody of his children, "if there is delay between the doing and the undoing petitioner suffers from the deprivation of his children, and the children suffer from uncertainty and dislocation"). Moreover, many previously released children are unable to return to their prior sponsors because of ORR's new requirements and procedures. Benito S., for instance, chose placement in an ORR long-term foster care group home because his aunt could not sponsor him again due to these requirements and he exhausted other options for placement with family. Biswas Decl. ¶ 48; Benito S. Decl. ¶¶ 10-11. For these reasons, ORR's sponsor appeals process, which occurs only after a sponsor completes all the application steps and "a decision is made," Opp. at 27, fails to provide a meaningful remedy. *See* PI Memo at 19.

      b. <u>Children have a constitutionally significant interest in continuing to live freely in their communities without unnecessary restrictions on their liberty</u>

As to the one private interest Defendants do arguably respond to—Plaintiffs' interest in being free from unnecessary government interference in their liberty—Defendants fail to engage with the specific circumstances of previously released children. Defendants rely on *Reno v. Flores*, 507 U.S. 292 (1993), for the general proposition that a child's interest in freedom from institutional confinement is limited by the fact that children "are always in some form of custody." *Id.* at 302. But *Flores* addressed a narrow issue: "the alleged right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution." *Id.* As the *A.N.P.S.* court observed, "*Flores*, then, concerns UACs who are (1) detained for the first time and (2) do not have a readily available parent, close relative, or legal guardian to take custody of them." 2025 WL 3707333, at *7. The

6

case "says little if anything about what procedural due process" is available to a child previously released to a close relative and re-referred to ORR custody. *Id.*

Children with established ties to the community who are re-detained in government custody have especially strong liberty interests in freedom from unnecessary detention. Where children "have been taken away from their families, their schools, and their communities," "the liberty deprivation . . . is not the same as when someone is caught coming across the border and detained in the nearest facility." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1196 (N.D. Cal. 2017), *aff'd* 905 F.3d 1137 (9th Cir. 2018). Defendants do not contest that Plaintiffs have been unable to continue their high school educations or that schools in ORR congregate care programs are designed for short stays by recently arrived children and do not offer academic credit. *See* PI Memo at 15-17, 24-25. Nor do Defendants dispute that ORR's shelter programs are highly regulated and not intended for long-term care, with constant staff supervision and severe restrictions on children's ability to leave the facility, pursue extracurricular interests, maintain contact with family and friends, and interact with the community. PI Memo at 14-17, 24-26. Defendants' conclusory assertion that ORR does not classify standard programs such as shelters as restrictive placements does not change the reality of children's deprivations of liberty in these facilities. Opp. at 38.

Moreover, the *Flores* decision predates the TVPRA's codification of the standards for the care and custody of unaccompanied children. While the Supreme Court declined to recognize a substantive constitutional right to placement in the best interests of the child, *Flores*, 507 U.S. at 303-04, Congress later created a statutory right to prompt placement "in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A). Once ORR approves placement with a sponsor as the least restrictive setting in the child's best interests, the child has a liberty

interest founded in "a legitimate claim of entitlement" to continued placement in the community under the TVPRA. PI Memo at 25-26 (citing *Goss v. Lopez*, 419 U.S. 565, 573 (1975)).

Notably, far from endorsing Defendants' unbounded view of government authority to keep children from their families at will, the *Flores* Court explicitly recognized the family integrity rights of children in federal immigration custody. The Court explained that the regulation at issue in the case already provided for release to "parents, whom our society and this Court's jurisprudence have always presumed to be the preferred and primary custodians of their minor children" and "to other close blood relatives, whose protective relationship with children our society has also traditionally respected." 507 U.S. at 310.

### 2. ORR's refusal to consider the individual circumstances of Plaintiffs' re-referral creates a severe risk of erroneous deprivation

Defendants admit that "a re-referred [child] is treated the same as a [child] who is encountered by ORR for the first time" and "ORR applies the same release requirements to all" children in its custody, whether or not the child has a previously approved sponsor. Opp. at 1; *see also id.* at 33. Although ORR considers the circumstances of a child's apprehension and re-referral to assess danger and make an initial placement decision, Opp. at 27, it refuses to evaluate whether those same circumstances demonstrate a need to revisit the prior sponsorship approval decision and, if so, what additional vetting is needed. ORR's deliberate disregard of children's individual circumstances creates an unacceptable risk of erroneous deprivation of liberty, especially when it could achieve its asserted child welfare goals consistent with the requirements of due process.

a. ORR's reapplication policy includes no safeguards against unnecessarily prolonged detention

By Defendants' own description, ORR's categorical reapplication policy has no limiting principle. ORR treats the mere fact of a DHS apprehension as a material changed circumstance

requiring an entirely new sponsorship application process. Opp. at 32. ORR applies this requirement regardless of whether the apprehension involved any safety concerns involving the prior sponsor, regardless of how thorough the prior ORR vetting process was, and regardless of the likely harm and disruption of continued ORR custody. *See, e.g.*, Declaration of C.A.C.C. ¶¶ 2-4, 6, ECF No. 4-10 (8-year-old child was previously released to mother after approximately two months in ORR custody, was re-detained by DHS less than two years later, and then spent six months in ORR custody because ORR required his mother to repeat the application process anew); *see also Saravia*, 280 F. Supp. 3d at 1196 ("If DHS could, the day after a minor was released to a parent or other sponsor, arrest the minor on the same basis and restart the process, the TVPRA's instruction to place the minor in the least restrictive appropriate setting would mean little.").

Renesme R., for example, was apprehended by ICE "during an ongoing DHS immigration enforcement operation" after a friend drove her home from the laundromat. Biswas Decl. ¶ 46; Renesme R. Decl. ¶ 8. There is no suggestion in the record that she was involved in wrongdoing or that her father was in any way neglectful, and nothing except bad luck to distinguish her from the thousands of other children previously released from ORR custody and living in the community. Had ORR considered her individual circumstances at the time of referral, Renesme could have promptly returned to her father's care and continued her junior year of high school and her progress in Junior ROTC. Renesme R. Decl. ¶¶ 5, 14. Instead she has been detained hundreds of miles away from her family for nearly four months.

Although Defendants assert "there is no evidence of 'endless re-detention and re-evaluation,'" Opp. at 32, by their own account ORR's policy includes no limit on requiring sponsors to complete a new application for a third or fourth or fifth time. Diego N., for example, was finally released to his father on March 12, 2026, after over four months in ORR custody. But

9

he lives near the U.S.-Mexico border and is concerned that he could encounter DHS officials again. Declaration of Diego N. ¶ 17, ECF No. 4-4 ("Diego N. Decl."). If he were once again detained by DHS and sent back to ORR, under ORR's policy he would be treated as if he had entered for the first time, regardless of why he was re-referred. Opp. at 33. The only way to avoid this fate appears to be for Diego's father to never let his teenage son out of his sight. *See* Biswas Decl. ¶¶ 45-46 (noting that Diego and Renesme were apprehended with no parent or legal guardian present).[2]

    b.  <u>Child welfare concerns can be addressed through individualized due process</u>

ORR's legitimate child welfare concerns regarding *some* previously approved sponsors cannot justify its prolonged detention of *all* re-referred children. Plaintiffs do not dispute that ORR may have made errors in its prior sponsorship decisions and have no objection to ORR requiring individualized additional vetting where ORR has evidence that a prior sponsor is unsuitable. But where a child's re-referral to ORR provides no evidence that a previously approved sponsor is unfit and the child wishes to return home, due process does not permit ORR to presume that all re-referred children must be separated from their families while ORR repeats the vetting process.

Notably, even under the facts presented by Defendants, sponsorship fraud represents a small percentage of the total number of children released to sponsors by ORR. Defendants, for example, note that ORR's Integrity & Accountability Team identified "10 UAC who were released to sponsors who committed intentional document fraud in October 2024." Opp. at 9; *see also id.* (noting that I&A Team "identified *several* instances of fraudulent sponsorship applications, document falsifications, and patterns of human trafficking and exploitation") (emphasis added).

---

[2] For this reason, Diego's claims are not moot despite his recent release. *See, e.g.*, *FBI v. Fikre*, 601 U.S. 234, 241, 243 (2024) ("[A] defendant's voluntary cessation of a challenged practice will moot a case only if the defendant can show that the practice cannot reasonably be expected to recur," which is a "formidable burden.") (internal citations omitted).

According to ORR's data, the agency released 5,111 children to sponsors in October 2024. *See* Office of Refugee Resettlement, Data: Released to Sponsors (last updated Sept. 11, 2025), *archived at* https://perma.cc/2X2G-YT3X. The identified unsafe releases thus represent less than one half of one percent of ORR's releases that month. Defendants also point to an Office of Inspector General report noting that ORR failed to properly document some safety checks or ensure all documents were legible documents. Opp. at 9. Although a lack of adequate documentation is undoubtedly a problem, it does not unto itself indicate that the release was unsafe.

Even if sponsorship fraud were widespread, this would not justify detaining all re-referred children away from their families and communities without due process. *See Stanley*, 405 U.S. at 654-55, 657-58 (even if "most unmarried fathers are unsuitable and neglectful parents," "some are wholly suited to have custody of their children" and mere administrative convenience "is insufficient to justify refusing a father a hearing when the issue at stake is the dismemberment of his family"); *see also Application of Gault*, 387 U.S. 1, 17-19 (1967) (noting that although "the highest motives and most enlightened impulses led to a peculiar system for juveniles" accused of delinquency, "[d]epartures from established principles of due process have frequently resulted not in enlightened procedure, but in arbitrariness").[3]

---

[3] The severe risk of erroneous deprivation is clear when compared to how similar interests are handled in the state child welfare system, where a child cannot be removed from their home without evidence of abuse or neglect and their state custody is subject to judicial oversight. *See, e.g.*, Tex. Fam. Code §§ 262.104, 262.106 (generally requiring "immediate danger" to take possession of a child without a court order and requiring return to child's prior custodian if a court hearing is not held within three business days of removal); *see also Nicholson v. Scoppetta*, 3 N.Y.3d 357, 369-70, 375-381 (2004) (discussing legal standards and procedures for removal in New York and explaining that a court must balance "the imminent risk to the child" with "the harm removal might bring, and it must determine factually which course is in the child's best interests"). Moreover, in contrast to the ORR system, children in the domestic foster care system generally attend public school and are in most cases placed in family foster homes in the community. The Family First Prevention Services Act (FFPSA) strictly restricts federal funding for domestic congregate care placements due to the well-established harm of such placements for

11

Nor is there evidence that children are categorically safer in ORR custody than with their parents or other previously approved sponsors. *See*, *e.g.*, Complaint, *U.S. v. Southwest Key Programs, Inc.*, No. 24-cv-00798, 2024 WL 3462582 (W.D. Tex. July 17, 2024), ECF No. 1 (Department of Justice lawsuit alleged repeated sexual abuse and harassment of unaccompanied children in facilities operated by Southwest Key Programs, the largest operator of ORR facilities at the time, that persisted for nearly a decade despite reports to ORR).

    c.  <u>ORR faces no legal obstacle to providing Plaintiffs due process protections</u>

Neither the TVPRA nor the Foundational Rule require ORR to repeat the vetting process for previously approved sponsors. *See A.N.P.S.*, 2025 WL 3707333, at *6 & n.6; *Saravia*, 905 F.3d at 1143. Defendants' attempts to distinguish *A.N.P.S.* and *Saravia* are unavailing. Defendants acknowledge that *A.N.P.S.* is factually similar to the present case but contend the court's decision was incorrect because HHS cannot control who is re-referred to its custody. Opp. at 25-26. But it is HHS, not DHS, that is legally responsible for an unaccompanied child's placement under the TVPRA. 8 U.S.C. § 1232(b)(1). DHS has no statutory authority to revoke HHS's decision to place a child with a sponsor, and HHS thus has no obligation to treat the mere fact of DHS apprehension as a revocation of its prior sponsor approval decision.

Defendants appear to suggest that because the *Saravia* class involved only children re-referred to ORR based on allegations of gang membership and this case involves all re-referred children, ORR's reapplication requirement is somehow more acceptable. Opp. at 25. But both the district court and the Ninth Circuit in *Saravia* specifically addressed and rejected the government's general argument that "the TVPRA requires ORR to conduct a reassessment of the sponsor's

---

children. *See* 42 U.S.C. § 672(k); U.S. Gov't Accountability Off., GAO-26-107592, HHS Should Clarify Guidance on State Spending for Congregate Care, 1 & n.4, 7, 22-23, 33-34 (March 2026), https://www.gao.gov/assets/gao-26-107592.pdf.

fitness to care for the child once the child is returned to ORR custody." *Saravia*, 280 F. Supp. 3d at 1198; *see also Saravia*, 905 F.3d at 1143. And even if Defendants' interpretation of the TVPRA and Foundational Rule were correct, "neither Congress nor any administrative agency can authorize a violation of due process rights." *A.N.P.S.*, 2025 WL 3707333, at *6.

Moreover, there is no legal or logical basis to provide more due process protections to children re-referred to ORR custody based on allegations of gang affiliation than to children re-referred for other reasons, or for no articulable reason at all. The risks of erroneous deprivation absent basic due process protections are clear in Diego N.'s case. Although Mr. Biswas claims that Diego admitted to being a scout for illegal smuggling at the time of his encounter with DHS, Mr. Biswas does not indicate what foundation he has for this knowledge. Biswas Decl. ¶ 45. As Mr. Biswas acknowledges, Diego has denied this allegation. *Id.* Similarly, although Defendants allude to "gang related inquiries" while Diego was in ORR custody, he was not formally accused of gang affiliation in his re-referral. Opp. at 15, 25. Diego thus did not receive a hearing under the then-operative *Saravia* settlement agreement, which could have resulted in his immediate release to his father. *See* PI Memo at 8-9 n.2. As a result, Diego was never provided formal notice or an opportunity to contest the allegations against him or any other options for prompt release.[4]

Further, even assuming that ORR had sufficient evidence of child welfare concerns to require Diego's father Alexis to undergo additional vetting, ORR did not tailor its requirements to its stated child welfare concerns and instead required Alexis to repeat its *entire* application process, including re-proving his identity and relationship with Diego. Biswas Decl. ¶ 45. By Defendants'

---

[4] Because ORR did not consider Diego to pose a safety concern that required placement in a restrictive setting, he also never received notice of the reasons for his placement or a Placement Review Panel ("PRP") hearing to contest those allegations. 45 C.F.R. §§ 410.1901, 410.1902. Unlike a *Saravia* hearing, however, a PRP hearing would not have resulted in his release.

13

own account, ORR's individualized child welfare concerns were resolved by the end of December 2025 when Alexis received a positive home study recommendation. *Id.*; Opp. at 15, 25. Yet Diego remained detained for *two and a half additional months*, apparently solely because ORR had not yet scheduled a DNA appointment. Biswas Decl. ¶ 45; Diego N. Decl. ¶¶ 9-10.[5] Although Mr. Biswas's March 10, 2026, declaration indicated that DNA was still pending scheduling by ORR, Biswas Decl. ¶ 45, ORR released Diego to his father on March 12, 2026.

### 3. Any burden on Defendants is slight in comparison to children's profound harms

ORR's utter lack of procedural protections for the unique interests of previously released children is not in the public interest. Although Defendants allege that Plaintiffs' requested relief will burden their interest in making decisions in the best interests of the child, they systematically disregard the concrete and tangible harms of prolonged ORR custody on re-referred children as well as ORR's statutory and regulatory obligations to *promptly* place the child "in the least restrictive setting" that is in their best interests and "release a child from its custody without unnecessary delay." 8 U.S.C. § 1232(c)(2)(A); 45 C.F.R. § 410.1201(a).

Defendants' assertions regarding undue administrative burden cannot negate children's right to minimum due process protections, given that Defendants largely dispute whether a prompt hearing is needed to address the children's profound liberty interests at stake here. Plaintiffs request that ORR determine within 72 hours of a child's re-referral whether the circumstances of

---

[5] Mr. Biswas notes that Diego's father cleared internet background checks in mid-February 2026 and was informed in late February 2026 of the requirement that he provide his taxpayer identification number/social security number. Biswas Decl. ¶ 45. But Alexis already cleared a fingerprint-based background check in November 2025 and previously provided ORR his Social Security number and work permit. *Id.*; Diego N. Decl. ¶ 8. Diego's consulate also verified the authenticity of Diego's birth certificate listing Alexis as his father, but ORR insisted on a DNA test because the "birth certificate, although authentic, does not contain photographs of the parents." Biswas Decl. ¶ 45.

14

the child's re-referral constitute material changed circumstances that require reconsideration of the prior sponsor approval decision. Plaintiffs further request ORR provide children with an administrative hearing within seven days of their re-referral to determine whether additional sponsor application steps are necessary prior to release. *See* Plaintiffs' Proposed Order, ECF No. 10-2. These proposed timelines reflect the imperative to promptly reunify children with fit custodians and minimize unnecessary disruption to children's lives and schooling. All of Defendants' objections are unsupported by the facts of this case.

First, Defendants argue the proposed timelines are not compatible with the time it takes to complete ORR's sponsorship application process. Opp. at 27. But this objection simply reveals Defendants'' misunderstanding of this case. The purpose of the hearing is to determine *whether* additional sponsorship application steps are necessary in the first place. If the child's re-referral does not evidence material changed circumstances, there is no need for a new application and no need for a home study. *Saravia*, 905 F.3d at 1143. If a hearing determines that additional vetting such as a home study is necessary, those additional steps can take place after the hearing.

Second, Defendants state that Plaintiffs' timeline fails to consider that ORR may not immediately learn that there may be a parent or legal guardian in the United States. Opp. at 27. But the proposed class includes only children with previously approved sponsors. ORR already has information about these children and their sponsors in its system.

Third, Defendants state that "ORR must conduct a dangerousness assessment at the initial intake stage and *prior to placement*, based on the circumstances of the child's apprehension and re-referral." Opp. at 27 (emphasis added). Thus, by Defendants' own account, ORR assesses the circumstances of the child's re-referral prior to the child's placement in ORR custody. Under the TVPRA, this must generally occur within 72 hours. 8 U.S.C. § 1232(b)(3). Defendants have

15

offered no reason why ORR cannot simultaneously assess whether those same circumstances indicate that the prior sponsor approval decision must be reconsidered.

Finally, ORR asserts it is unable to immediately provide a neutral and detached decision maker because it would need to enter into a new agreement with the Department Appeals Board. Opp. at 27-28. This potential administrative hurdle cannot be the basis to deny children due process. Although Plaintiffs' proposed order calls for a neutral and detached decision-maker, this does not specifically require a hearing officer from outside ORR. ORR's Placement Review Panel ("PRP"), for instance, is "a three-member panel consisting of ORR's senior-level career staff with requisite experience in child welfare," not including any staff member directly involved in the child's case. 45 C.F.R. § 410.1001; *see also Lucas R. v. Becerra*, No. 18-cv-5741, 2022 WL 2177454, at *22 (C.D. Cal. March 11, 2022) (holding that ORR's PRP could satisfy procedural due process for children placed in restrictive placements with certain adjustments, such as ensuring that "none of the three PRP panelists should be the [official] involved in making the original step-up decision, to ensure neutrality"). Under ORR's regulations, consistent with Plaintiffs' proposed order, ORR must convene a PRP hearing within seven days. 45 C.F.R. § 410.1902(c).

### B. ORR's Blanket Reapplication Policy Violates the Administrative Procedure Act

#### 1. Plaintiffs lack an adequate alternative remedy

By contending that Plaintiffs have an adequate alternative remedy in habeas, Defendants again reveal their misunderstanding of the nature of Plaintiffs' claim. The issue at stake here is the legality of ORR's categorical policy of treating children previously released from ORR custody as if they had newly arrived and requiring their previously approved sponsor to reapply in every case. Plaintiffs do not seek an order of release, and a preliminary injunction would not "necessarily imply the invalidity" of their detention. *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025).

16

"The Supreme Court has long instructed that the 'generous review provisions' of the APA must be given 'a hospitable interpretation' such that 'only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review.'" *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)). Consistent with that presumption of judicial review, the APA's requirement that there be "no adequate remedy in a court" was intended "simply to avoid duplicating previously established special statutory procedures for review of agency actions." *Darby v. Cisneros*, 509 U.S. 137, 146 (1993).

Plaintiffs request the Court hold unlawful and set aside ORR's blanket reapplication policy under 5 U.S.C. § 706(2). Compl. at 24-28, ECF No. 1. This relief is not available through an individual action for habeas corpus and is valuable to Plaintiffs because it would impact not only their current release cases but also prevent them from becoming subject to the same policy in the future. *See* Diego N. Decl. ¶ 17. The possibility of a habeas action does not foreclose challenges to general ORR release procedures through the APA. Indeed, multiple district courts have adjudicated APA challenges to ORR policies that impact a child's opportunity for release. *See, e.g.*, *Angelica S. v. HHS*, 786 F. Supp. 3d 158, 172-75 (D.D.C. 2025); *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 612 (S.D.N.Y. 2018); *J.E.C.M. v. Lloyd*, 352 F. Supp. 3d 559, 580 (E.D. Va. 2018). Moreover, it is incorrect that the district court's decision in *Saravia* arose from habeas. Although one named plaintiff in *Saravia* brought an individual habeas claim, the district court did not reach that claim in its preliminary injunction order. 280 F. Supp. 3d at 1182, 1206. The court explained that the claims for declaratory and injunctive relief "go[] beyond the relief sought in A.H.'s habeas petition" and analyzed whether pendent venue was appropriate for such claims. *Id.* at 1191-92. The court ultimately granted a preliminary injunction on class-wide procedural due process claims,

17

not on habeas grounds. *Id.* at 1194. As with the class-wide claims in *Saravia*, Plaintiffs here seek relief unavailable in habeas. *See* Compl. at 24-28.

Nor are Plaintiffs bringing core habeas claims. Plaintiffs do not claim that it is inherently unlawful for ORR to maintain custody over previously released children. To the contrary, Plaintiffs readily concede that if the circumstances of a child's re-referral demonstrate the previously approved sponsor is unfit, ORR may reconsider its sponsorship approval decision. Although Plaintiffs certainly hope that ORR will find that no further sponsor reapplication process is needed in their cases, they do not ask this Court to make that determination. Plaintiffs' claim for relief therefore does not "necessarily imply the invalidity" of their detention. *J.G.G.*, 604 U.S. at 672; *see also Skinner v. Switzer*, 562 U.S. 521, 534 (2011); *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005).

### 2. ORR's reapplication policy is final agency action

By Defendants' own account, "[p]rior to February of 2025, it was extremely rare for a federal agency to re-refer" a previously released child to ORR custody. Opp. at 12. When ORR began receiving significant numbers of re-referred children last year, the agency had a choice to make. It was aware of the Ninth Circuit's holding that the TVPRA does not require ORR to repeat the application process for previously approved sponsors. *Saravia*, 905 F.3d at 1143. It nonetheless decided to require all prior sponsors to repeat the application process in full in every case of a newly re-referred child. Opp. at 1. That ORR appears to have adopted this policy reflexively, without any reasoned decision-making or consideration of alternatives, renders the policy arbitrary and capricious. But the policy, and each application of that policy to each re-detained child, is final agency action nonetheless.

The reapplication policy "mark[s] the consummation of the agency's decisionmaking process" because it was immediately applied to children's cases. *Bennett v. Spear*, 520 U.S. 154,

177-78 (1997). Both as a general policy and in each individual child's case, the reapplication mandate was presented as the agency's final decision, with no opportunity for the child or sponsor to appeal. Defendants do not present this reapplication requirement as "tentative or interlocutory," *id.*, instead insisting that it is required by law. At most they suggest that ORR may be revisiting details of its reapplication policy for parent or legal guardian sponsors. Opp. at 30. But the fact that an agency action may be revised in the future does not render it non-final. *General Elec. Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002); *J.E.C.M.*, 352 F. Supp. 3d at 582.

It is undeniable that ORR's reapplication policy had immediate legal consequences for Plaintiffs. *Bennett*, 520 U.S. at 178. Because of ORR's requirement, every re-referred child is required to remain in ORR detention for the duration of a new sponsorship process. And in each Plaintiff's case, ORR informed their previously approved sponsor they would be required to reapply. Diego N. Decl. ¶ 7; Renesme R. Decl. ¶¶ 10-11; Mario C. Decl. ¶¶ 13-14; Benito S. Decl. ¶ 10. As discussed above, it is only *after* this final decision by ORR that some Plaintiffs experienced changes or shifts in sponsorship. *See, e.g.*, *Ramirez v. ICE*, 310 F. Supp. 3d 7, 21-23 (D.D.C. 2018) (concluding that ICE custody determinations "had immediate and significant legal consequences for Plaintiffs, who must bear detention in more restrictive settings than Defendants might otherwise deem appropriate"); *L.V.M.*, 318 F. Supp. 3d at 612 (holding that ORR director review policy that had the effect of delaying release was reviewable final agency action). Defendants' argument that their policy does not create legal consequences merely repeats their merits argument that it is required by law. Opp. at 30.

### 3. ORR's reapplication policy is contrary to law

Defendants insist at length that subjecting previously approved sponsors to a new monthslong application process is required by statute and regulation, while ignoring ORR's

statutory obligation to ensure children are "promptly placed in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A), and its regulatory obligation to "release a child from its custody without unnecessary delay," 45 C.F.R. § 410.1201(a).

ORR has already conducted a suitability assessment of Plaintiffs' sponsors under the TVPRA and nothing in either the TVPRA or Foundational Rule requires that ORR repeat this process simply because *DHS* chose to detain a child. *See A.N.P.S.*, 2025 WL 3707333, at 6 ("[T]he Court has good news: Respondents *already identified* N.C.S.E. as a suitable sponsor."); *Saravia*, 905 F.3d at 1143. DHS simply has no statutory authority to change ORR's placement determinations. If the individual circumstances of a child's arrest by DHS do not demonstrate material changed circumstances that require a reassessment of the sponsor, then re-referred children are no differently situated than the thousands of other previously released children living in the community. Despite its concerns about its prior vetting processes, ORR is not reevaluating every past sponsorship decision and in fact has disclaimed the authority to do so. Opp. at 6-7; *see also A.N.P.S.*, 2025 WL 3707333, at 6 n.6 ("An application of the Rule that would permit the Government to re-arrest the thousands of UACs placed with a sponsor prior to April 2024, taking them away from their family and community, would be the definition of absurd.").

Even if ORR were required to conduct some reassessment of sponsor suitability when a child re-enters its custody, Plaintiffs' proposed relief is consistent with the TVPRA's requirement that ORR verify "the custodian's identity and relationship to the child" and make a finding "that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. § 1232(c)(3)(A). Because ORR has already verified all this information, it need only verify that the prior sponsor is the same person and that the circumstances of the re-referral do not indicate that the relationship has changed in material ways or that the sponsor poses a risk to the child. If

the re-referral indicates the sponsor poses a risk to the child, ORR can conduct further vetting.[6]

Indeed, Defendants themselves appear to recognize that ORR has discretion to create expedited

sponsorship application procedures consistent with its legal obligations. Opp. at 30; *supra* note 1.

ORR's onerous reapplication policy is simply not required by the TVPRA or the

Foundational Rule; rather, it is fundamentally inconsistent with ORR's statutory and regulatory

obligations to release children to their sponsors promptly and without unnecessary delay.

### 4. ORR's reapplication policy is arbitrary and capricious

Defendants' repeated insistence that ORR treats re-referred children the same as newly

arrived children vividly illustrates the arbitrary and capricious nature of its policy. Defendants

acknowledge that the TVPRA and the Foundational Rule are silent on the issue of re-referred

children, Opp. at 32, but continue to insist ORR has no choice but to close its eyes to its prior

approval decision. As discussed, this is incorrect as a matter of law and ignores ORR's

considerable discretion under these legal authorities to tailor its sponsorship process to children's

individual circumstances. This policy is thus neither "reasonable [nor] reasonably explained."

*Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015).

Defendants fail to address the specific arguments raised in Plaintiffs' memorandum and do

not contest that they adopted this reapplication requirement without a factual basis specific to re-

referred children, without consideration of children's significant reliance interests in the prior

release approval, and without consideration of whether the benefits of repeating the application

---

[6] Similarly, Plaintiffs are not asking that ORR release children to sponsors who it "*has reason to believe* may harm or neglect the unaccompanied child or fail to present the unaccompanied child" for immigration proceedings. 45 C.F.R. § 410.1203(e) (emphasis added). Where such reasons do not yet exist, ORR is neither required nor permitted to detain children based on the mere possibility that it may at some point develop reasons to believe the sponsor is unsuitable.

process in every case outweigh the well-established harms to children's mental health, family integrity, personal liberty, educational progress, and disruption of their lives. PI Memo at 38-39.

Although Defendants contend that ORR is in the process of exploring potential alternatives to its blanket reapplication policy for children previously living with parents or legal guardians in the United States, Biswas Decl. ¶ 38, that does nothing to render its *current* policy any less arbitrary and capricious. To the contrary, it shows that even under ORR's view of its legal obligations, the agency has alternatives to treating all re-referred children as if they had newly arrived. ORR's failure to consider alternative approaches to accommodate Plaintiffs' significant reliance interests in continued placement with their previously approved sponsors is thus arbitrary and capricious. *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 32-33 (2020). Even now, ORR has offered no clarity regarding what policy it is contemplating for children previously living with their parents or legal guardians and appears to be giving no consideration to children previously released to sponsors who were not their parents or legal guardians.

## II.    Plaintiffs Are Suffering Irreparable Harm

Every day Plaintiffs remain unnecessarily detained in ORR custody, they suffer concrete irreparable harm in the form of family separation, lost educational progress, and loss of liberty. *See* PI Memo at 22-25, 39-40. Defendants, shockingly, respond by disputing that ORR custody causes any harm. Opp. at 38. They cite no authority for this position, and every court to have considered this issue has concluded that unnecessarily prolonged ORR custody causes irreparable harm. *See, e.g.*, *Angelica S.*, 786 F. Supp. 3d at 170; *Lucas R.*, 2022 WL 2177454, at *27, 33; *Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 503 (D.D.C. 2018); *L.V.M.*, 318 F. Supp. 3d at 618; *Saravia*, 280 F. Supp. 3d at 1200.

Defendants' suggestion that Plaintiffs' harms are somehow mitigated by ORR's provision of mental health care, Opp. at 38, reflects astonishing indifference to the value of family and

22

liberty. The best therapist in the world cannot provide Renesme the comfort of her father's presence and support or make her feel any less imprisoned by the severe limitations of life in an ORR shelter. Renesme R. Decl. ¶ 14-15. No amount of therapy will allow Mario to taste his mother's food or watch his baby brother grow up. Mario C. Decl. ¶ 21. Nor are ORR's programs equipped to handle the severe mental health challenges that accompany prolonged detention. In 2019—when average lengths of stay were approximately *half* of what they are currently—the HHS Inspector General reported that ORR facilities and clinicians were struggling to cope with increased mental health concerns related to longer time in custody. PI Memo at 13. As lengths of stay have soared, staff at ORR programs are again struggling to manage children's deteriorating mental health. *See* Declaration of Alexa L. Sendukas ¶ 6, ECF No. 4-8.

### III.    The Balance of Equities and Public Interest Favor Plaintiffs

Defendants' arguments on the balance of equities merely reiterate their merits arguments that the public interest favors keeping children in custody for whatever amount of time ORR deems necessary. Defendants cite no authority to support this view of boundless government power and make no effort to distinguish Plaintiffs' contrary caselaw. *See* PI Memo at 41-42. Even the cases on which Defendants principally rely contradict their position. *See, e.g.*, *Flores*, 507 U.S. at 304 ("Even if it were shown, for example, that a particular couple desirous of adopting a child would *best* provide for the child's welfare, the child would nonetheless not be removed from the custody of its parents so long as they were providing for the child *adequately.*"); *Schall v. Martin*, 467 U.S. 253, 269-70, 277 (1984) (finding preventative detention of minors permissible where detention was "strictly limited in time" and the minor received notice of the charges against him and a "formal, adversarial probable-cause hearing within three days of his initial appearance").

Nor is there any general presumption against enjoining executive action. The Third Circuit opinion that Defendants rely on involved a challenge to state gun laws and has no relationship to

23

child welfare investigations. *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 197 (3d Cir. 2024). That court's reluctance to block "two democratically enacted state laws," *id.* at 205, is in no way comparable to the instant situation, where Plaintiffs allege ORR's unilateral actions are contrary to the Constitution and federal statute.

## IV.   Plaintiffs' Requested Relief is Justified

Defendants argue that Plaintiffs should meet a higher standard to obtain a mandatory injunction. Opp. at 19. The D.C. Circuit has declined to adopt such a heightened standard for preliminary injunctions "that alter the status quo or grant irreversible relief," as the traditional test "is sufficiently flexible to take account of all the concerns implicated by the nature of the relief sought here." *Singh v. Berger*, 56 F.4th 88, 96-97 (D.C. Cir. 2022). The district court cases cited by Defendants pre-date the D.C. Circuit's clarification of this issue. Opp. at 19. Plaintiffs satisfy the factors in *Winter v N.R.D.C.,* 555 U.S. 7, 20 (2008). But even under a heightened standard, Plaintiffs have shown a clear likelihood of success on the merits and serious irreparable harm.

Defendants also object that Plaintiffs' requested relief is beyond the scope of the APA. Opp. at 36. But "[c]ourts—including the Supreme Court—routinely stay already-effective agency action." *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022) (citing, *e.g.*, *W. Virginia v. EPA*, 577 U.S. 1126 (2016)); *accord Kingdom v. Trump*, No. 25-cv-691, 2025 WL 1568238, at *5 (D.D.C. June 3, 2025) (observing that "various courts have interpreted § 705 to permit a 'stay'— which may be more aptly described as a temporary rollback—even of already-consummated agency action"). And, as discussed above, Plaintiffs request vacatur of ORR's reapplication policy on their APA claim, and a preliminary injunction enjoining this policy. Plaintiffs' additional requested relief flows from their procedural due process claim. Although Defendants object to particular aspects of the requested relief, they do not contest that such relief is within the Court's authority to address a constitutional due process violation.

24

## V.    Class Certification is Fully Briefed and there is no Basis to Delay Provisional Class Certification

Defendants offer no persuasive reason to delay provisional class certification. They have already had a full opportunity to respond to Plaintiffs' arguments in favor of class certification. Opp. at 41. Putative class members are currently suffering irreparable harm and will continue to suffer irreparable harm absent a preliminary injunction that includes provisional class certification. *See, e.g.*, Declaration of J.M.P.V. ¶¶ 2, 7, ECF No. 4-11. To the extent the Court deems it necessary to decide the preliminary injunction motion prior to class certification, it is empowered to "issue temporary relief to a putative class" in the meantime. *A.A.R.P. v. Trump*, 605 U.S. 91, 98 (2025).

## VI.    The Court Should Require No Bond or a Nominal Bond

Defendants argue that Plaintiffs must be required to post security pursuant to Federal Rule of Civil Procedure 65(c). Opp. at 41. District courts have broad discretion under Rule 65(c) to set the amount of an injunction bond, or to set no bond at all. *See Am. First Legal Found. v. Becerra*, No. 24-cv-1092, 2024 WL 3741402, at \*16 n.11 (D.D.C. Aug. 9, 2024) (collecting cases). Bond should be waived here (or, alternatively, set at a nominal amount), as Defendants do not allege that ORR will suffer monetary harm, *see, e.g.*, *LULAC v. Exec. Office of the President*, 780 F. Supp. 3d 135, 225 (D.D.C. 2025), and Plaintiffs are unaccompanied children with limited financial means who seek to vindicate important rights, *see P.J.E.S. v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020); *see also* PI Memo at 32 (requested relief is likely to save government resources).

### CONCLUSION

The Court should provisionally certify the putative class and issue a preliminary injunction.

Date: March 17, 2026                                    Respectfully submitted,

                                                         */s/ Diane de Gramont*

25

Diane de Gramont*
Mishan Wroe*
National Center for Youth Law
428 13th Street FL 5
Oakland, California 94612
(510) 835-8098
ddegramont@youthlaw.org
mwroe@youthlaw.org

Anna Deffebach (D.C. Bar No. 241346)
Joel McElvain (D.C. Bar No. 448431)
Robin F. Thurston (D.C. Bar No. 1531399)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
adeffebach@democracyforward.org
jmcelvain@democracyforward.org
rthurston@democracyforward.org

*Counsel for Plaintiffs*

\* Admitted *pro hac vice*

26